# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

IN RE SHANDA GAMES LIMITED
SECURITIES LITIGATION

Case No. 18-CV-02463 (ALC)

<u>CLASS ACTION</u>

LEAD PLAINTIFF'S CLASS ACTION
COMPLAINT FOR VIOLATIONS
OF THE FEDERAL SECURITIES LAWS

Jury Trial Demanded

**TABLE OF CONTENTS**

I.  NATURE OF THE ACTION ................................................................................................ 1

II.  JURISDICTION AND VENUE ......................................................................................... 9

III.  PARTIES AND OTHER KEY ACTORS ...................................................................... 10

    A.  Lead Plaintiff ....................................................................................................... 10

    B.  Defendants ............................................................................................................ 10

    C.  Shanda Interactive ............................................................................................... 13

    D.  Special Committee ............................................................................................... 13

    E.  Buyer Group......................................................................................................... 13

IV.  SUBSTANTIVE ALLEGATIONS ................................................................................ 15

    A.  Overview of Shanda's Business........................................................................... 15

    B.  Shanda's IPO and Listing on the NASDAQ....................................................... 18

    C.  Shanda's Focus Shifts to the Lucrative Mobile Game Market ........................... 20

    D.  Shanda Develops Mir II Mobile .......................................................................... 22

    E.  Shanda Explores a Going Private Transaction.................................................... 29

    F.  Shanda Accepts the Going Private Offer ............................................................ 33

    G.  Shanda Publishes the Initial Proxy ..................................................................... 35

        1.  Financial Projections................................................................................ 36

            (a)  The Purpose of the Projections ................................................... 36

            (b)  Representations Regarding the Scope of the Projections ............ 37

            (c)  Representations Regarding the Preparation of the
Projections................................................................................... 40

        2.  Fairness of the Transaction ...................................................................... 43

    H.  The Composition of the Buyer Group Changes Again........................................ 44

    I.  Shanda Publishes the Final Proxy....................................................................... 47

J.    Defendants Had Access to and Reviewed Information Concerning MIR II Mobile's Success at the Time of the Final Proxy ................................................. 49

K.    The Transaction Closes .......................................................................... 52

L.    The Appraisal Suit ................................................................................. 53

      1.    Admissions and Findings that the Merger Consideration Was Unfair and that the Projections Were Erroneous ...................................... 54

      2.    Unreasonable Revenue Intensity Estimates ............................................ 56

      3.    Unreasonable Amortization and Depreciation .......................................... 58

      4.    Mir II Mobile's Revenue ......................................................................... 59

V.    DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS DURING THE CLASS PERIOD .................................... 61

A.    The Deal Announcement ........................................................................ 65

B.    Initial Proxy ........................................................................................... 66

      1.    Promotion of the Transaction Price ...................................................... 67

      2.    The False Projections ........................................................................... 67

      3.    False Representations About the Preparation of the Projections ............. 67

      4.    False Representations About the Scope of the Projections...................... 68

      5.    False Representations that the Transaction Was Fair .............................. 69

C.    The Final Proxy ...................................................................................... 73

      1.    Promotion of the Transaction Price ...................................................... 73

      2.    The False Projections ........................................................................... 73

      3.    False Representations About the Preparation of the Projections ............. 74

      4.    False Representations About the Scope of the Projections...................... 74

      5.    False Representations that the Transaction Was Fair .............................. 74

D.    The October 19, 2015, Press Release..................................................... 77

VI.   CONTROL PERSON ALLEGATIONS.................................................... 78

VII.   ADDITIONAL ALLEGATIONS SUPPORTING DEFENDANTS' SCIENTER........... 80

    A.   Motive and Opportunity....................................................................... 80

        1.   Defendant Zhang Had the Motive and Opportunity to Defraud the Class Members......................................................................... 80

        2.   Defendant Liang Had the Motive and Opportunity to Defraud the Class Members......................................................................... 81

    B.   The Content of the Projections was Known to the Individual Defendants........... 82

    C.   MIR II Mobile Was a Core Component of Shanda's Success and It Was Closely Watched by Defendants.................................................................. 83

    D.   Shanda's Own Admissions and the Appraisal Action Support Scienter ............. 85

    E.   The Individual Defendants Knew or Were Reckless in Not Knowing that the Proxies Omitted the Projections of Shanda's 2020 Performance .................. 88

    F.   Additional Allegation Regarding Shanda's Knowledge....................................... 88

VIII.   LOSS CAUSATION........................................................................................... 89

IX.   APPLICATION OF THE PRESUMPTION OF RELIANCE......................................... 90

X.   NO SAFE HARBOR ............................................................................................. 92

XI.   ALLEGATIONS OF INSIDER TRADING................................................................ 93

XII.   CLASS ACTION ALLEGATIONS ........................................................................ 94

COUNT I Violation of § 10(b) of the Exchange Act and Rule 10b-5  Promulgated Thereunder Against All Defendants ..............................................................97

COUNT II Violation of § 20A of the Exchange Act Against Defendant Shanda ........................99

COUNT III Violation of § 20(a) of the Exchange Act Against the Individual Defendants .......100

XIII.   PRAYER FOR RELIEF ....................................................................................... 102

XIV.   JURY DEMAND .................................................................................................. 102

By and through its undersigned counsel, David Monk ("Lead Plaintiff") brings this complaint individually and on behalf of a class of former stockholders and former owners of American Depository Shares ("ADS") of Shanda Games Limited ("Shanda" or the "Company"). Lead Plaintiff alleges the following upon personal knowledge as to those allegations concerning Lead Plaintiff and, to all other matters, upon the investigation of counsel, which included, without limitation: (a) review and analysis of public filings made by Shanda with the U.S. Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and other publications disseminated by certain of the Defendants and other related non-parties; (c) review of news articles, including news articles translated from Chinese into English through a certified translation service; (d) interviews with former employees of Shanda, its affiliates, and other third parties; (e) review of the publicly available documents from prior litigation involving Shanda; and (f) consultation with individuals with expertise in accounting, damages, and Cayman Islands law.  Lead Plaintiff believes that substantial additional evidentiary support exists for the allegations herein and will be revealed after Lead Plaintiff has a reasonable opportunity to conduct discovery.

Lead Plaintiff alleges the following against Defendants Yingfeng Zhang, Li Yao, Lijun Lin, Heng Wing Chan, Yong Gui, Shaolin Liang, and Danian Chen (collectively the "Individual Defendants") and against Shanda (together with the Individual Defendants, the "Defendants").

## I.  NATURE OF THE ACTION

1.      This case concerns a scheme by Defendants to depress the value of Shanda's stock and ADS in order to avoid paying a fair price to Shanda's shareholders during a transaction to take the Company private (the "Transaction").  Defendants executed this scheme by publishing faulty and misleading financial projections, making affirmative misrepresentations

1

about those projections, omitting key information from their disclosures, and making false assurances about the fair value of Shanda's stock and ADS.

2.      This scheme caused losses to those who sold Shanda's stock or ADS (together "Shanda Securities") during the Class Period.  Those acquiring the Company, a group that included Shanda's Chief Executive Officer and Board of Directors' Chairman, profited enormously by acquiring Shanda for far less than its fair value.

3.      Shanda develops and operates video games that are either played on computers or mobile devices, such as mobile phones.  As of the going private Transaction, Shanda operated 34 massively multiplier games and 32 mobile phone games.  Despite this catalogue of games, throughout its history, the Company was heavily dependent on just a few titles for the vast majority of its revenue.

4.      The Company' history dates back to 2001, when Shanda Interactive Entertainment Limited ("Shanda Interactive"), licensed the rights to market a hit Korean game called Mir II (hereinafter "Mir II PC") within China. Mir II PC is a computer game that simultaneously connects thousands of users, who play as fantasy character-types (e.g., wizard or warrior) and go on quests, battle each other, or socialize.

5.      In 2009, Shanda Interactive spun off its video game business under the name Shanda Games Limited, a Cayman Islands company, through an initial public offering ("IPO"). Rather than directly registering Shanda's stock as part of this spin-off, the Company accessed U.S. capital markets by sponsoring a listing of ADS on the NASDAQ and registering those ADS with the SEC.  Following this IPO, Shanda Interactive remained heavily invested in Shanda.

6.      In the year of this IPO, Mir II PC accounted for 56.4% of the new company's net revenue (i.e., $397 million).  By 2014, the game's prominence was declining, but it still

accounted for 30.9% of Shanda's net revenue (i.e., $185 million), and Shanda still disclosed in its annual report that it "depend[ed] substantially" on the game, as it had in each previous report.

7.      By this time, the Company had made significant progress in executing a strategic pivot toward embracing the broader trend of marketing games for mobile phones, rather than for computers.  Mobile games went from accounting for a negligible 0.2% of Shanda's revenue in 2012 to contributing 10.7% of revenue in 2014.  Against this backdrop, in mid-2013, Shanda began developing a mobile version of their amazingly successful Mir II PC game, called Mir II Mobile.  The Company touted Mir II Mobile's development and the expectation was that Mir II Mobile would be a blockbuster success just like its predecessor.

8.      Beginning in December 2013, Shanda began exploring possible strategic transactions to take the Company private.  Over the next year, the Company's management and a newly formed three-person committee at Shanda (the "Special Committee") explored the possibility of selling the Company to various interested parties.  While exploring these possible transactions, Shanda's management prepared financial forecasts regarding the Company's prospects (the "March 2014 Projections") to shop the Company around.

9.      During this time, several companies that comprised a group bought significant stakes in the Company from Shanda's former parent Shanda Interactive.  In March 2015, the potential buyers proposed purchasing the outstanding shares at a price of $6.90 per ADS. Shortly after this offer was made, and in an effort to justify the price, certain projections that had been prepared by Shanda's management (the "March 2015 Projections") were provided to the Special Committee.  The March 2015 Projections forecasted an inexplicable and dramatic decline in the Company's business prospects relative to the March 2014 Projections.

10.     Ultimately, the Special Committee for Shanda negotiated the purchase price up to $7.10 per ADS and recommended the deal.  On April 3, 2015, the day the Class Period begins, Shanda announced a proposed Transaction wherein the Company would buy all the Shanda Securities held by those outside the group of buyers ("Unaffiliated Holders") and Shanda would become the surviving entity of a merger with an entity that was owned by the group of buyers.

11.     On May 5, 2015, the Company published a proxy (the "Initial Proxy") with certain information about the deal.  The Initial Proxy included a summary of the March 2014 Projections and March 2015 Projections, made various false affirmative representations about these projections and falsely represented that the deal was "fair," and in the "best interest" of Unaffiliated Holders, while failing to disclose material information that would suggest otherwise.

12.     Indeed, unknown to the market, the March 2015 Projections upon which the summary was based (a) were riddled with errors;  (b) relied on revenue estimates for games Shanda was preparing to release that were grossly flawed and inconsistent with the Company's estimates regarding the expenses of those games; (c) calculated depreciation using a method that was at odds with Shanda's previous practices, in conflict with accounting practices, and which produced glaringly unreasonable results; and (d) applied an unreasonable assumption (in contrast to its own public statements about the anticipated success of Mir II Mobile) that Mir II Mobile would produce average revenues for a game of its type.  These false calculations resulted in summary projections which dramatically understated the true prospects of the Company and which misled investors into believing that the deal price was fair.

13.     With this Transaction queued up, between March 2015 and August 2015 Shanda continued taking steps to prepare for the highly anticipated release of Mir II Mobile.  The game had been under development for well over a year by this time and the Company had made a

multitude of public statements about its expectations for the game.  For example, in December 2014, Defendant Zhang presented the keynote speech during China's Game Industry Annual Conference and described the "explosive growth" that mobile games like Mir II Mobile can offer the industry.  At that conference Shanda made a presentation promoting Mir II Mobile, and in an article about that presentation Shanda noted that Mir II Mobile must surely be the most anticipated [action role playing] mobile game of the year."  Later that month Shanda released a statement promoting Mir II Mobile's fan club, explaining that "gamers have expressed overwhelming interest in [Mir II Mobile] that is beyond [Shanda's] expectations."

14.     Similarly, in February of 2015, Mir II Mobile's lead developer, Tang Yanwen, stated that testing was going "extremely well" and that data showed that overall interest in the game was "very high."  Later that month Defendant Zhang described Mir II Mobile's role in Shanda's "accelerating . . . mobile phone strategy" and the Company's Vice President, Zhu Xiaojing, explained that "all levels of [Shanda] are very optimistic about it" and that, based on testing data, Mir II Mobile is "by far the most excellent mobile game product of Shanda."

15.     Then, on August 3, 2015, the Company launched Mir II Mobile and distributed the game through a partnership with video game behemoth Shenzhen Tencent Computer System Co., Ltd. ("Tencent").  In an article published on the day of its launch, Shanda boasted that it was the "most anticipated RPG mobile game of the year."  Indeed, it was.  Shortly after its release it charted at the top of lists tracking mobile game downloads.  This success was recognized by Defendant Zhang himself, who sent an email to Shanda employees on August 14, 2015, with the subject line: "Mir fever reignites to take a legendary win on the charts."  The body of the email stated that the game had made it to the "top spot on the iOS best-selling chart" as of "6AM on August 14, 2015."  The letter continued to explain that "team morale is surging" and advised

employees that "the company will be disbursing a special bonus . . . today" and advised that the Shanghai office would be hosting "celebratory wine and firecrackers."

16.     As anticipated by Defendants, Mir II Mobile was a huge a success.  As would be disclosed after the Class period, the game produced between $92 and $107 million in revenue every month starting at launch.  While this revenue was shared with Tencent, Shanda retained roughly $136 million from the game in its first quarter of operation.  This meant that Mir II Mobile produced more **revenue** than Shanda earned in any of the first three quarters of 2015 and more **profit** than Shanda earned from the rest of the entire business during the whole of the first three quarters of 2015.

17.     With this evidence of Mir II Mobile's blockbuster success in hand, Defendants nonetheless decided to proceed with the proposed Transaction at the same price.  On October 13, 2015, Shanda published another proxy (the "Final Proxy" and, together with the Initial Proxy, the "Proxies") soliciting shareholders to vote in favor of the Transaction at the Extraordinary Shareholders Meeting.

18.     The Final Proxy falsely stated that the deal was "fair" and in the "best interest" of Unaffiliated Holders.  The Final Proxy included the same misleading summary of the March 2015 Projections that were included in the Initial Proxy, without any update to account for the known success of Mir II Mobile.

19.     Defendants continued to rely on the assumption that the mobile version of its golden goose would produce no better than average revenue for a game of its type.  This treatment meant that Shanda was projecting $15 million of total revenue for Mir II Mobile across its entire lifespan, when it had already generated approximately $91 million in revenue (i.e.,

more than five times the forecasted lifetime earnings) for Shanda by the time the Final Proxy was published.

20.    Despite this massive disparity between projected and actual revenue, the Final Proxy once again misleadingly indicated that the March 2015 Projections had been based on the "***best currently available estimates***" including "projected revenues for ***each new game***," that Shanda's management "believed" the March 2015 Projections were based on assumptions that were "reasonable at the time the projections were prepared," and that Shanda's management was "not aware of any facts or circumstances that would make such information or data inaccurate or misleading." The Final Proxy made all of these statements and stated that the Transaction was "fair" and "in the best interests" of investors without any mention of Mir II Mobile or any disclosure of the unreasonable treatment of its revenues.

21.    Both Proxies also represented that the summary of the March 2015 Projections were provided to "give shareholders access to certain information that was made available to the financial advisor." In fact, the summarized projections omitted an entire year of data, which had been provided to the financial advisor. This omitted data showed that Shanda continued to project growth into the year 2020, which was yet another material and positive piece of information that Defendants hid from the Unaffiliated Holders and that would have alerted investors that the deal price was false and misleading.

22.    On November 18, 2015, Shanda held the Extraordinary Shareholders Meeting to vote on the Transaction. At this time, as it had since the Transaction was first announced, the potential buyers controlled sufficient votes to approve the Transaction regardless of how Unaffiliated Holders voted. Thus, many members of the Class were forced to sell their Shanda Securities to Shanda for either $3.55 per share or $7.10 per ADS, unless they had taken steps to

exercise their appraisal rights.  A small group of shareholders (the "Dissenting Shareholders")

did exercise those rights and brought the appraisal suit ("Appraisal Suit").

23.    Through the Appraisal Suit, both Shanda and the Dissenting Shareholders put

forward expert testimony regarding the fair value of the Shanda Securities.  The Dissenting

Shareholders had the benefit of discovery from Shanda where they received numerous internal

documents and obtained testimony and interviews from Defendants.  During these proceedings,

***Shanda's own expert stated that the fair value of Shanda's equity was $9.56 per ADS*** and this

calculation did not even include any adjustments to the forecasts to account for Mir II Mobile's

huge success.  Even without factoring in the true or reasonably expected value of Mir II Mobile,

Shanda admitted, through this expert, that the $7.10 per ADS price provided by the Transaction

that it had called "fair and in the best interest" of its minority investors was 34% lower than the

true "fair value" of those shares.

24.    Shanda was also forced to recognize over a dozen errors in the March 2015

Projections, including three errors that prompted it to issue corrected March 2015 Projections to

the Dissenting Shareholders.  On April 25, 2017, Judge Segal published his opinion,[1] finding that

Shanda's projections relied on approaches that were "unreasonable," "unrealistic," and

"unreliable," such that even Shanda's expert "recognized" the problems.  As previously

mentioned, these errors included an inconsistent method of tracking game revenue, which had

the effect of under-projecting revenue and over-projecting expenses.  They also utilized a method

of estimating amortization and depreciation that conflicted with Shanda's prior approach to those

same calculations, conflicted with accepted accounting practices, and produced nearly

---

[1] This opinion is attached as Exhibit A and incorporated herein.

impossible results—by projecting, without any connection to the reality of Shanda's financial condition, that Shanda's capital assets would have negative value at certain times.

25.     As a result of these findings, Judge Segal concluded that the fair value of Shanda's shares was $16.68 per ADS.  This finding meant that Shanda had actually paid its investors a mere 42.5% of the fair value of their Shanda Securities.  Shanda appealed and the Court of Appeal of the Cayman Islands reversed a single issue—a reversal that did not disturb the lower court's findings regarding the errors in Shanda's projections—and found that the fair value was $12.84 per ADS, by this measure ***Shanda had paid investors a mere 55.2% of the fair value of their Shanda Securities***.[2]

26.     Thus, the buyers reaped an incredible windfall by only paying $468 million of Shanda's money to acquire the Shanda Securities held by those outside of their group, when the real price should have been at least $847 million—this meant that they effectively stole at least $379 million in value out of the pockets of Shanda's shareholders.[3]  So while Shanda's shareholders lost millions of dollars, Defendant Zhang received a windfall of approximately $57 million and Ningxia Yilida Capital Investment Limited Partnership ("Ningxia"), one of the other buyers, who was represented on Shanda's Board by Defendant Liang, received a windfall of approximately $159 million.

## II.     JURISDICTION AND VENUE

27.     The claims asserted herein arise under Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5; Section

---

[2] This opinion is attached as Exhibit B and incorporated herein.

[3] These numbers are approximate and assume roughly 132 million shares (including shares backing ADS) were held outside the Buyers Group at the time of the transaction.  The numbers were calculated by multiplying 132 million by the $3.55 per share deal price and the $6.42 per share price determined in the Appraisal Suit.

20(a) of the Exchange Act, 15 U.S.C. § 78t(a); Section 20A of the Exchange Act, 15 U.S.C. §
78t–1.

28.     This Court has subject matter jurisdiction over this action pursuant to Section 27
of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1331.  The Defendants engaged in a
scheme that violated United States securities law.  In doing so, the Defendants engaged in
conduct that was directed toward the United States.  Shanda registered its ADS with the SEC
pursuant to Section 12(b) of the Exchange Act and these securities traded on the NASDAQ stock
exchange.

29.     Venue is proper in this judicial district pursuant to Section 27 of the Exchange
Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1391(b).

30.     In connection with the acts alleged in this Complaint, Defendants, directly or
indirectly, used the means and instrumentalities of interstate commerce, including, but not
limited to, the mails, interstate telephone communications, and the facilities of the NASDAQ
stock exchange.

## III.   PARTIES AND OTHER KEY ACTORS

### A.   Lead Plaintiff

31.     On June 1, 2018 this Court appointed David Monk to serve as the Lead Plaintiff
in this action pursuant to the Private Securities Litigation Reform Act of 1995 (the "PSLRA")
(ECF No. 11).  As set forth in his PSLRA certification (*see* ECF No. 5-1), Lead Plaintiff held
6,500 ADS of Shanda as of November 18, 2015, when they were sold through the Transaction
for $46,150.  These shares were purchased on or before January 27, 2012.

### B.   Defendants

32.     Defendant Shanda is a Cayman Islands corporation with its principal executive
offices located at No. 1 Office Building, No. 690 Bibo Road, Pudong New Area, Shanghai,

10

201203, People's Republic of China.  Shanda is a developer, operator and publisher of online video games for computers and mobile phones.  Shanda's common stock is not registered with the SEC.  Rather, Shanda registered ADS which traded on the NASDAQ under the ticker symbol "GAME."  The ADS securities were redeemable for two shares of Shanda's Class A common stock.

33.     Defendant Yingfeng Zhang ("Zhang") was Shanda's CEO from October 2014 through the end of the Class Period.  He was Chairman of Shanda's Board from November 2014 through the end of the Class Period.  Prior to running Shanda, he worked for Shanda Interactive since 2001 and throughout much of his tenure Shanda's business was a division of Shanda Interactive.  According to Shanda's 2014 annual report,[4] Defendant Zhang was "in charge of screening, negotiations and licensing of online games, including 'Mir II.'"  Defendant Zhang was one of the buyers who acquired Shanda through the Transaction.  He owned a block of shares that provided him with the second most votes in the Extraordinary Shareholders Meeting.  Defendant Zhang signed the Form 6-K SEC filing announcing the proposed Transaction on April 3, 2015, the Initial Proxy, and the Final Proxy.

34.     Defendant Li Yao ("Yao") was Shanda's Chief Financial Officer ("CFO") from April 2015 through the end of the Class Period.  He was a director of Shanda from March 2013 through the end of the Class Period.  Mr. Yao was employed by Shanda, Shanda Interactive, or its affiliates from 2007 through the end of the Class Period.  Among other roles, Mr. Yao served as the head of finance for Shanda Interactive and as CFO of Shanda's partially owned subsidiary Actoz Soft Co., Ltd. ("Actoz"), which licensed Mir II PC to Shanda.  Defendant Yao signed the Initial Proxy and the Final Proxy's on behalf of Shanda.

---

[4] Shanda's 2014 Annual Report refers to the report for the year ending December 31, 2014, and other references herein to annual reports follow this naming convention.

35.     Defendant Lijun Lin ("Lin") was a director on Shanda's Board from May 2009 through the end of the Class Period.  He served on the Special Committee from the formation of that committee on January 28, 2014, until he resigned from the committee in September 2014, because companies he was affiliated with joined the group of potential buyers.  After resigning from the Special Committee, he remained a director.

36.     Defendant Heng Wing Chan ("Chan") was a director on Shanda's Board from June 2009 through the end of the Class Period.  Defendant Chan appears to also go by the name Chan Heng Wing in certain public documents.  He served on the Special Committee from the formation of that committee on January 28, 2014, until the committee's work was complete.[5]

37.     Defendant Yong Gui ("Gui") was a director on Shanda's Board from June 2013 through the end of the Class Period.  He served on the Special Committee from the formation of that committee on January 28, 2014, until the committee's work was complete.

38.     Defendant Shaolin Liang ("Liang") was a director on Shanda's Board from February 2015 through the end of the Class Period.  Since February 2015, he has served as a vice general manager of Ningxia, one of the buyers who acquired Shanda through the Transaction. He has been associated with Ningxia since at least December 2007.  Defendant Liang signed the Final Proxy.

39.     Defendant Danian Chen ("Chen") was a director of the Company from June 2008 through the close of the Class Period.  Along with his brother Tianqiao Chen, he co-founded Shanda Interactive and has served as both a director and officer of that Company.

---

[5] Shanda's public filings do not disclose whether the Special Committee was ever formally disbanded, and the last meeting of that committee described in public filings was on September 21, 2015.  Each member of the Special Committee served as directors on Shanda's Board through the end of the Class Period.

C. **Shanda Interactive**

40.     Shanda originated as a department within Shanda Interactive.  Immediately following Shanda's IPO on September 30, 2009, Shanda Interactive remained the controlling shareholder of Shanda.  As described herein, Shanda Interactive sold portions of its position in Shanda to various parties interested in acquiring Shanda and on November 25, 2014, sold its remaining interest in Shanda to Defendant Zhang.  Shanda Interactive held shares in Shanda through its wholly owned subsidiary Shanda SDG Investment Limited and the term "Shanda Interactive" includes both entities.

D. **Special Committee**

41.     The Special Committee was formed on January 28, 2014.  Upon formation, the Special Committee had three members: Defendant Chan, Defendant Gui, and Defendant Lin serving as Chairman of the Special Committee.

42.     In September 2015, Defendant Lin resigned from the Special Committee because a company he was affiliated with joined the group of potential buyers.  Upon his resignation from the Special Committee, Shanda's Board voted to elect Defendant Chan as the Chairman of the Special Committee.  At this time, Defendant Chan and Defendant Gui were the only members of the Special Committee.

E. **Buyer Group**

43.     There were various groups of prospective buyers throughout the period of time during which Shanda explored a going private transaction.  The group of potential buyers at any given time is referred to as follows:[6]

---

[6] These titled are provided for easy reference.  They do not necessarily track SEC filings regarding the group compositions because, for example, the entities proposing to acquire Shanda did not change between Buyer Group 4 and Buyer Group 5, but the ultimate owner of those entities did change.

44.     "Buyer Group 1" refers to the group of potential buyers as of January 27, 2014, which was composed of Primavera Capital Limited ("Primavera") and Shanda Interactive.

45.     "Buyer Group 2" refers to the group of potential buyers as of April 18, 2014, which was composed of Primavera, Shanda Interactive, and Perfect World Co., Ltd ("Perfect World")

46.     "Buyer Group 3" refers to the group of potential buyers as of September 1, 2014, which was composed of Shanda Interactive, Orient Securities Company Limited (referred to herein, along with its affiliates, as "Orient Securities"), Haitong Securities Co., Ltd. (referred to herein, along with its affiliates, as "Haitong"), and Ningxia.

47.     "Buyer Group 4" refers to the group of potential buyers as of November 25, 2014, which was composed of Orient Securities, Haitong, Ningxia and Defendant Zhang.[7]

48.     "Buyer Group 5" refers to the group of potential buyers as of June 2015, which was composed of Ningxia, Defendant Zhang and Century Huatong Group Company Limited ("Century Huatong").[8]

49.     The following table shows the composition of the Buyer Group at various times:

[chart on following page]

---

[7] Defendant Zhang held his shares through two entities Yili Shengda and Ningxia Yilida, which he established for purpose of acquiring his interest in Shanda.  Yili Shengda is directly and wholly owned by Ningxia Yilida, and the general partner of Ningxia Yilida is Shanghai Yingfeng, a company directly and wholly owned by Mr. Zhang.  References to Transactions by Defendant Zhang includes transactions by these entities that he was affiliated with.

[8] The term "Century Hontang" includes its affiliates, which for the avoidance of doubt, includes the entities it acquired from Orient Securities and Haitong, at any point in time when those entities were owned by Century Hontang.

| Group | Month Established | Members | | | |
|---|---|---|---|---|---|
| 1 | January 2014 | Shanda Interactive | | Primavera | |
| 2 | May 2014 | Shanda Interactive | Primavera | Perfect World | |
| 3 | September 2014 | Shanda Interactive | Orient Securities | Haitong | Ningxia |
| 4 | November 2014 | Orient Securities | Haitong | Ningxia | Defendant Zhang |
| 5 | June 2015 | Ningxia | Defendant Zhang | Century Huatong | |

## IV.    SUBSTANTIVE ALLEGATIONS

### A.    Overview of Shanda's Business

50.    In November 2001, Shanda Interactive licensed Mir II PC, one of the first

massively multiplayer online computer games, and launched it in China.  The game had

originally been developed by WeMade Entertainment Co., Ltd. ("WeMade") and was marketed

in South Korea.  Mir II PC was widely successful and has often been cited as the "most popular"

game of its kind in China.  For example, an April 1, 2004, South China Morning Post article

described the game as "China's most popular online game," while discussing Shanda

Interactive's IPO.

51.    Massively multiplayer games like Mir II PC simultaneously connect players—

sometimes hundreds of thousands of players—to play the game together.  As Shanda

Interactive's website still explains, the lack of internet infrastructure in China around the time of

this game's launch posed a major obstacle to its success.  Therefore, Shanda built a business

network of over 200,000 internet cafés where users could play the game.  According to the

previously referenced South China Morning Post article, by the time of its IPO, Shanda

Interactive's games were played at 350,000 internet cafés through China.

52.     Shanda Interactive's website also explains that, because internet-based payment systems did not yet exist in China, it developed a payment system using prepaid cards sold at 400,000 locations.  However, Mir II PC was so popular that it became necessary to replace this system and Shanda Interactive developed an innovative online payment system.  One result of this payment processing innovation was that Shanda Interactive developed an unprecedented ability to track data on its users and their game purchases throughout China.

53.     There are two common business models for massively multiplayer online games.  Some games operate on a "time-based" model, where users pay depending on how much time they spend playing the game.  Prior to 2005, Mir II PC was based on this model.  In 2005, it shifted to a "freemium" or "item-based model," where users play for free but are encouraged to buy virtual items, such as weapons, clothing, accessories and pets.  The popularity of these items is tracked to allow more successful pricing and new items can be released to generate new demand.  As such, Shanda boasted in its 2014 annual report, that when it used this model, it would "track the number and price of each virtual item sold as well as user behavior in response to the launch of a virtual item" and "adjust the pricing of certain virtual items based on their consumption pattern and other factors."

54.     Mir II PC continued to provide a majority of Shanda Interactive's gaming revenue as it began developing its own massively multiplayer game internally.  It launched this game in October 2003 under the name Woool (sometimes also referred to as "World of Legend").  After the launch of Woool, WeMade sued Shanda Interactive alleging that the game had copied certain elements of Mir II PC.  While the suit ultimately settled, it underscored that Woool was itself heavily influenced by Shanda's earlier success with Mir II PC, which it sought to recreate with

its internally developed game.  As the Financial Times reported on February 21, 2005, Woool was seen as a "successor" to Mir II PC and was criticized as "highly derivative" of Mir II PC.

55.     Over subsequent years, Shanda launched various other massively multiplayer roleplaying games as well as other games it described as more "casual."  As of the publication of Shanda's 2014 Annual Report, eight of the major games Shanda Interactive launched between 2001 and 2008 continued to operate.  Some of these games were developed internally and others were licensed from outside developers.

56.     While Shanda Interactive had licensed the rights to market Mir II PC, it doubled down on this investment by purchasing a significant stake in Actoz, the counter-party to the Mir II PC licensing agreement.  By the end of 2007 Shanda Interactive owned a majority stake in Actoz.

57.     In 2008, Shanda Interactive underwent a reorganization and through this process it housed its video game business in Shanda, a wholly owned subsidiary of Shanda Interactive. A primary purpose of the reorganization was to enable Shanda Interactive to market shares of Shanda through an IPO.  Shanda Games Limited was incorporated in the Cayman Islands on June 12, 2008.

58.     The newly formed Shanda Games Limited had two classes of stock: Class A shares and Class B shares.  As relevant here, the difference between the two classes was that Class B shares were entitled to 10 votes per share and Class A were entitled to only 1 vote per share.  Further, Class B shares could be converted into Class A shares at the shareholder's request, a maneuver that would be useful to a shareholder that was selling Class B shares but seeking to retain voting control over the Company.

B.      **Shanda's IPO and Listing on the NASDAQ**

59.     On September 30, 2009, Shanda conducted its IPO of ADS shares on the

NASDAQ under the ticker GAME.  The registration of ADS is a common tool used by foreign

companies to access America's capital markets.  While they can have complex mechanics, at a

simple level an ADS is a security that is redeemable for some underlying stock—in this case two

shares of Shanda's Class A shares.  These ADS were created by depositing two shares of

Shanda's Class A shares with JPMorgan Chase Bank, N.A. (the "Depositary"), and selling the

"receipts" to these deposited shares.  As explained in the Registration Statement for the ADS, the

Depositary's office was located at 4 New York Plaza, New York, NY 10004.  The Depositary

held the shares underlying the ADS and the investor who owned a given ADS was the ultimate

owner of any dividends issued by the Company.  The ADS holder could pay a nominal fee and

turn in their ADS to redeem the two underlying shares.

60.     The three types of Shanda Securities are as follows:

| Name of Security | Key Feature | Public Exchange Listing |
|---|---|---|
| Class A Shares | • Shanda's basic stock<br>• Entitled to **one** vote per share | Unlisted |
| Class B Shares | • Economic rights of **one** Class A share<br>• Voting rights of **ten** Class A shares | Unlisted |
| ADS | • Redeemable for **two** Class A shares<br>• Economic rights of **two** Class A share<br>• Voting rights of **two** Class A shares[9] | Listed on NASDAQ |

61.     As stated in the IPO prospectus, Shanda sold 13,043,500 ADS (representing

26,087,000 Class A shares) through the IPO and Shanda Interactive, which at the time of the IPO

was Shanda's sole shareholder, sold an additional 70,456,500 ADS (representing 140,913,000

Class A shares).  These shares sold for approximately $1.04 billion, which according to news

---

[9] Holders of ADS vote by submitting "voting instructions" to the Depositary and, as such, their
voting rights are not identical to the voting rights of two Class A shares.

articles, made Shanda's IPO the biggest U.S. offering by a Chinese internet company. Following

the IPO, Shanda Interactive continued to own roughly 409,087,000 million Class B shares,

meaning that it controlled 71.01% of the combined share value in the Company and 96.08% of

the outstanding voting rights.

62.     As it explained in the IPO prospectus, the Company remained heavily dependent

on the Mir II PC and Woool games, which together accounted for 75.9% of the Company's net

revenue in 2008. More specifically, Mir II PC accounted for 55.3% of the Company's net

revenue in 2008 (i.e., $273 million) and 56.4% of net revenue in 2009 (i.e., $397 million).

63.     In the Company's first reporting quarter following the IPO, its then-CEO Diana

Li explained the Company's strategy: "Looking forward, as a pure-play online gaming company

we will continue to deliver new versions of our hit franchises including Mir II and Woool while

developing new games both in-house and through partnerships with developers in China and

abroad."

64.     Following the strategy its CEO had proposed, throughout 2009, the Company

continued to release a steady stream of new games, several of which remained in operation as

late as its 2014 annual report. Shanda also continued to release updates to its existing games.

65.     On January 8, 2010, an industry publication called Gigaon, reported that Shanda

had obtained an exclusive license to market Mir III in China from Actoz and WeMade, the

company that originally developed Mir II PC. The article also indicated that Shanda had

acquired the rights to produce a Mir II film, but provided no details on whether the movie was

under development. Mir III was launched by Shanda in October 2011. It was a traditional

personal computer (PC) game rather than a game for mobile phones.

66.     Shanda has not publicly reported the revenue of Mir III.  Its annual reports, both before and after Mir III was released, refer to the revenue of Mir II "including [its] sequels," but given that Mir II PC did not have a proper "sequel" prior to the release of Mir III, this reference appears to refer to the expansions and other developments to Mir II that have followed its initial release.[10]  Shanda's 2012 annual report lists net revenue from "new games" in 2011 as 196.8 million RMB (i.e., about $31 million and 3.7% of net revenues).  Thus, the game was not successful on the same scale as its predecessor.

**C.     Shanda's Focus Shifts to the Lucrative Mobile Game Market**

67.     Since its IPO, Shanda had developed some of its games to be played on mobile phones, tablets, or similar devices.  However, its focus on mobile games accelerated in 2013. Shanda first began publicly reporting mobile games as a stand-alone category of revenue data in its 2013 annual report.  That annual report showed that Shanda earned a mere 0.2% of its net revenue from mobile games in 2012 and by the time the Company published its 2014 annual report, mobile game's accounted for 10.7% of net revenue.

68.     This dramatic increase in mobile game revenue reflected the Company's successful execution of a dramatic shift toward mobile games.  As Shanda explained in an August 23, 2011, press release it had adopted a strategy of "fundamentally expanding the focus of [its] business to include the introduction of social and mobile games through a broad range of mobile devices and social networking sites."  By March 31, 2014, the Company operated 38 non-mobile games and 25 mobile games.  The trend toward mobile games continued and by the date of the Final Proxy, the Company operated 34 non-mobile games and 32 mobile games.

---

[10] For example, according to a March 1, 2010, press release Shanda launched an expansion to Mir II PC titled, "Mir II Return" in 2009, and that press release attributed this Mir II PC expansion as a significant contributor to a 44% increase in Shanda's fourth quarter massively multiplayer role playing game revenue in 2009.

69.     The trend toward the development of games for mobile devices made sense, as a business matter, when compared to the general trend in China toward using mobile devices to access internet content.  According to the 39th Statistical Report on Internet Usage in China, mobile devices accounted for 60.8% of total internet usage in 2009 and 81.8% in 2014—and it is now known that total internet usage by mobile phone would increase to 95.1% by 2016.

70.     While revenues for Shanda's mobile games were growing dramatically, the revenue from Mir II PC was beginning to slowly decline.  The following chart shows the amount and portion of Shanda's overall net revenue attributable to Mir II PC, as stated in Shanda's annual reports for each respective year:

| Shanda's Net Revenue Attributable to MIR PC | | | | | | | |
|---|---|---|---|---|---|---|---|
| Year | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 |
| Net Revenue in Millions of USD[11] | $273 | $397 | $312 | $333 | $248 | $214 | $185 |
| % of Net Revenue | 55.3% | 56.4% | 45.7% | 39.7% | 33.0% | 29.8% | 30.9% |
| | | | | | | (Net Revenues are in millions of USD) | |

71.     Despite decreases in revenue, the Company continued to report that it "depend[ed] substantially" on Mir II PC.  In its 2014 annual report, Shanda explained that a "decrease . . . in net revenues generated from Mir II [PC], Mir III and Woool" was the primary driver of an overall decrease in massively multiplayer game revenues.

72.     Unsurprisingly, the Company understood and warned investors that the future of Mir II PC was a significant concern for investors.  As explained in the 2014 annual report, the game had a "finite commercial lifespan," even though the Company was taking steps to extend that lifespan, such as scaling back monetization activities by selling fewer in-game items and making more in-game content available for free.

---

[11] This numbers in this row are estimated by multiplying the net revenue disclosed in Shanda's annual reports by the percent of net revenue attributed to Mir II PC in Shanda's Registration Statement for 2008 and in Shanda's annual reports for the remaining years.

**D.     Shanda Develops Mir II Mobile**

73.     As Shanda looked for ways to breathe new life into its key franchise, Mir II

Mobile was the logical next step, especially given the growing trend toward mobile games.  MIR

II Mobile was first broadcast to investors during a conference call on July 29, 2013.  When an

analyst from Barclays Bank asked Shanda's then-CEO Mr. Xiangdong Zhang about the pipeline

for mobile games, Mr. Xiangdong Zhang responded that the Company was developing a mobile

version of Mir II PC.  In response to the next question, he explained that mobile games had

become "very important" to Shanda's business strategy.

74.     This was an obvious development for Shanda and necessary to remain

competitive.  As reported in a February 5, 2015, article in the industry publication GameLook,

many of Shanda's competitors were also converting established franchises into mobile games.

75.     The Company was under enormous pressure to meet the incredibly high

expectations of the Mir franchise's fans.  As the head of development for Mir II Mobile Tang

Yanwen explained in the previously cited GameLook article, the Company "spared no efforts in

terms of . . . reinvestments into this game."

76.     Shanda began promoting the game in Chinese-language websites and in China-

based events.  These promotional efforts show that Mir II Mobile was both a major focus of

Shanda and that Shanda had strong reason to know that the game would be a major success:

(a)     On November 20, 2014, the Company launched a social media account for

Mir II Mobile and posted an article on the website WeChat claiming that the game would

leverage "the memories of gamers' youth" and the "friendships between gamers over the years,"

while letting "more gamers experience" the Mir franchise "anytime and anywhere."  The

following day the Company announced, on a leading Chinese news website ("Sina") that it had

launched Mir II Mobile's promotional preview website.  That announcement explained that the

game "shouldered . . . massive expectations from countless . . . fans" and these expectations served "as a driving force" for the game's development team.

(b)      On November 28, 2014, the Company began internal testing of Mir II Mobile with Company personnel.  According to a post on Sina that day, the roll out of the mobile version of a game with such "sentimental value" prompted staff to download the test product. The testers were so enthralled by it, that in interviews they would "only look at you blankly before shifting their gazes back onto their mobile phones."  Furthermore, the game received so much internal interest that it put stress on the servers and the phones at the studio developing the game within Shanda were "ringing off the hook."

(c)      On December 11, 2014, another Sina article reported that the Company had launched the game's official website, allowing users to test that their mobile phones would be capable of running the game.  Further, the post stated that the game was an "an authentic remake of the legendary game series of the same name based on its original desktop version."

(d)      On December 17, 2014, Defendant Zhang attended China's Game Industry Annual Conference and gave the event's keynote speech.  The transcript of that speech was reproduced in an article on the Chinese publication "People's Network."  In that Speech Defendant Zhang spoke "on behalf of Shanda Games."  His speech made two key points.  First, he predicted that the video game industry was approaching its "best times" due to the rise of mobile gaming and the "capital . . . flowing into mobile games."  In particular, he noted mobile games tend to have lower research and development costs and a larger audience making them particularly lucrative.  He also explained that Shanda would be launching Mir II Mobile in 2015 and described the "explosive growth" of mobile games, which can bring new players to existing PC games.

(e)     On December 19, 2014, Shanda published an article on Mir II's website about the "concept showcase" presentation that the Company made during China's Game Industry Annual Conference.  This article explained that "Shanda has concluded that the promotion strategy of . . . throw[ing] in big money, on big labels, with big-scale productions . . . works."  The article also explained that the premier of Mir II Mobile "not only managed to attract widespread attention from its peers but also piqued great public interest."  It noted that Mir II PC had "amassed a huge crowd following of loyal gaming fans" over the fourteen years that had passed since its creation and that the game had seen over five hundred million fans. And then explained that the franchise already was an "internet legend," that Mir II Mobile "must surely be the most anticipated [action role playing] mobile game of the year."

(f)     Also on December 17, 2014, an industry publication titled "Game Grape" visited with staff at the studio responsible for Mir II Mobile at Shanda and published an interview with a representative of Shanda.  In that interview, Shanda explained the internal testing for Mir II Mobile was already completed and that the "results have been fabulous."  The representative explained that Shanda had "faith that this game will not disappoint anyone."

(g)     The next day, the Company released a statement through Sina, indicating that "gamers have expressed overwhelming interest in [Mir II Mobile] that is beyond [Shanda's] expectations."  Therefore, "[i]n response to gamers' widespread soaring interest" the Company was beginning a fan club to keep their audience informed.  This community would also allow Shanda to receive feedback from the game's prospective users.

(h)     On February 5, 2015, Tang Yanwen, the head of development for Mir Ii Mobile franchise, was interviewed by industry publication GameLook, regarding the game.  The article began by noting the trend toward converting computer game intellectual properties into

mobile games and noted that Shanda was following this trend with one if its "star" products. Later in the article Mr. Yanwen explained that Shanda's decision to make a mobile version of Mir II was driven by seeing "the scale of the mobile gaming market, especially when there were more and more heavyweight[12] mobile game apps" and feeling that Shanda "had to produce our own mobile game app for The Legend of Mir." Mr. Yanwen explained that "data from the past few game experiencing trials" reflected that "overall gamers' interest in [Mir II Mobile] is very high." He also explained that development had begun in 2013 and involved a team of over 80 personnel. Turning to discuss the expectations for the game, he explained that Shanda "hope[d] that it can be popularly played for at least 2 to 3 years" and later he continued to note that "[w]e also do not wish to produce merely a short-term product." He reported that internal testing statistics were doing "extremely well." After noting that the Company would "look at the overall revenue of the product" he explained that the target for the game was that it would "not be any lower than many of the mobile gaming products partially adapted from [PC games]."

(i)     On February 11, 2015, Sina published an article about Defendant Zhang's remarks during Shanda's annual meeting. That article explained that Shanda had reorganized its development into a series of studios and that one such studio, headed by Tan Yanwen, was dedicated to the Mir franchise. The article quotes Defendant Zhang as saying that, "Shanda will accelerate the advancing pace in mobile phone strategy" and describing Mir II Mobile's leading role as part of this strategy. This article also quoted Shanda's Vice President, Zhu Xiaojing, as stating that he was "personally very optimistic," that "all levels of [Shanda] are very optimistic about it" and that based on "official pre-orders, Official Weibo and Wechat data and the recent technical experience data, this is by far the most excellent mobile game product of Shanda

---

[12] This phrase appears to be a reference to the concept of making bigger mobile games than those that had traditionally been made, such as games based on PC games.

Game"  He concluded by noting that he is "very confident about the future" of Mir II Mobile, due to its early "excellent performance."

(j)  Through Sina, on February 13, 2015, Shanda published a letter on the status of Mir II Mobile, directly addressed to game players.  This letter apologized for delays but explained that the slow schedule was because Mir II Mobile is "unlike any other mobile game" due to the "expectations involved," which give the development team a "huge responsibility to perfect the game."

(k)  On February 18, 2015, a report was published on the news page of Mir II Mobile's official website addressed to game players.  The report described that the Company has met with over a thousand players interested in the game and hosted over fifty online promotional events.  It explained that the game's development team is under "massive pressure" and that after launching the official website for the game the "explosive reactions . . . of this news went far beyond our expectations," as "hundreds of thousands of passionate gamers" congregated on the website "within an extremely short time."

(l)  On May 13, 2015, the official site for Mir II Mobile posted a press release announcing the upcoming public release of the game and discussed the cooperation between Tencent and Shanda in the release of the game.  The release described this as the first in-depth collaboration between the two companies.  It also quoted Shanda's Vice President Zhu Xiaojing as explaining that through this partnership "the number 1 online gaming IP and number 1 mobile platform" would be "working hand in hand."  Similarly, Tang Yangwen is quoted delivering a speech about the development of the game and the strategic cooperation between Shanda and Tencent.  The article also described the prestigious role of the Mir franchise within China and stated that the partnership would be a significant development for the Chinese gaming industry.

(m)     On August 3, 2015, Shanda published an article on Weibo announcing that the game had been launched.  This article thanked the "massive group of gamers for waiting in anticipation" and referred to Mir II Mobile as the "most anticipated RPG mobile game of the year."  It also noted that the game was the product of more than two years of intensive research and development and more than a year of testing.  That same day the Company posted on Mir II Mobile's official website, that the game's server was "overloaded upon activation" and that two new zones were being added as an "emergency measure."

(n)     On August 14, 2015, Shanda posted to one of its social media sites about the success of the game.  This post included an internal email from Shanda's CEO Defendant Zhang, with the subject line "Mir fever reignites to take a legendary win on the charts."  The body of the email stated that the game had made it to the "top spot o[n] the iOS best-selling chart" as of "6AM on August 14, 2015."  The iOS App store is the primary way that iPhone users download games.  The internal email continued to explain that "team morale is surging" and advised employees that "the company will be disbursing a special bonus" and advised that the Shanghai office would be hosting "celebratory wine and firecrackers."

(o)     Also on August 14, 2015, an article was posted on the official website for Mir II Mobile, explaining that the game had made it to the top of the iOS App store and that current players were being awarded with in-game vouchers to thank them for their support of the game.

77.     As noted above, these accounts show that Shanda anticipated Mir II Mobile's tremendous success, invested significantly in the game, and saw positive results throughout testing.  MIR II Mobile was indeed a huge success, producing revenues between $92 million and

$107 million each month after its release on August 3, 2015.[13]  This revenue was split between Shanda and Tencent.  MIR II Mobile generated roughly $136 million in *revenue* for Shanda during its first quarter of operation, which meant that it contributed more revenue than Shanda generated from the rest of the business in any of the first three quarters of 2015.  Similarly, during its first quarter of operations, Mir II Mobile generated more profit than Shanda reported earning from the combined total of the rest of the business during the whole of the first three quarters of 2015.[14]

78.     This revenue was not only directly significant to the Company, it was also indicative of the Company's future prospects.  It suggested that just like Mir II PC, Mir II Mobile would itself be a golden goose with years of productive earnings.  As Shanda's Vice President Zhu Xiaojing put it in the March 9, 2016, speech, the success of Mir II Mobile "was proof that a classic will never become outdated."  It also provided valuable data for evaluating the Company's ability to execute on its overall mobile strategy.

79.     The importance of Mir II Mobile's success was further emphasized by Defendant Zhang's speech to the China Game Industry Annual Conference on December 15, 2015.  In that speech, which was reproduced in a Sina article on the day it was delivered, he explained that Mir II Mobile had "achieved very impressive results."  Drawing a comparison to Hollywood superhero movies, he explained that Shanda's plans for the Mir franchise involve rolling out

---

[13] The financial data regarding the success of Mir II Mobile remained secret until March 9, 2016, when Shanda Games vice-chair Zhu Xiaojing revealed that the game was making between $92 and $107 million dollars each month, according to an article in the publication Tech in Asia published March 10, 2016.  The Appraisal Suit explained that MIR II Mobile generated roughly 844 million RMB in revenue its first quarter (or $136 million using the exchange ratio listed in the final proxy).

[14] Section IV(L)(4), gives the exact context of these figures.  During an Appraisal Suit brought following the consummation of the Transaction an expert witness for the Dissenting Shareholders provided these figures based on Shanda's own internal documents.

other fictional stories based on the Mir II franchise.  It was clear that Shanda viewed Mir II

Mobile as significant both in its direct success but also in the opportunities it unlocked to

continue leveraging the brand.

       **E.**    **Shanda Explores a Going Private Transaction**

      80.     Beginning in December 2013, Shanda's co-founder and then-CEO Mr. Tianqiao

Chen and Mr. Richard Wei, Shanda's Chief Financial Officer at the time, met with

representatives of Kilometre Capital Management Cayman ("Kilometre") regarding potential

strategic transactions that could reshape the Company's future.  Over the next year, Kilometre

contacted prospective investors who were potentially interested in taking Shanda private.

      81.     On January 26, 2014, Shanda began sharing diligence materials with one such

investor, Primavera.  The next day, Shanda Interactive entered into an agreement with Primavera

to form a group and make a proposal to take the Company private.  In accordance with this

agreement, Shanda Interactive converted 28,959,276 Class B shares into Class A shares and sold

them to Primavera.  The new group (Buyer Group 1 – which consisted of Shanda Interactive and

Primavera) proceeded to submit a preliminary proposal to the Board to acquire all the

outstanding shares of the Company.

      82.     Two days later, the Board met telephonically to consider the proposal and formed

the Special Committee to negotiate and evaluate the proposed going private transaction.  The

Special Committee was initially composed of Defendant Lin (serving as the committee's

chairman), Defendant Chan, and Defendant Gui.  On January 29, 2014, Shanda issued a press

release noting that it had received a preliminary non-binding going private offer.

      83.     The Special Committee retained Sullivan & Cromwell LLP to provide it with

legal advice and Merrill Lynch (Asia Pacific) Limited ("Merrill Lynch") to provide it with

financial advice.  On February 25, 2014, the Special Committee began meeting with these advisors and considering the proposed transaction.

84.     On March 17, 2014, the Company presented the March 2014 Projections to Merrill Lynch and Buyer Group 1.  On the same day, Buyer Group 1 presented a draft merger agreement to the Company.  On March 25, 2014, the Special Committee discussed the March 2014 Projections and the draft merger agreement with Merrill Lynch and Sullivan & Cromwell.

85.     Buyer Group 1 and the Special Committee continued negotiating the terms of the proposed going private transaction and Buyer Group 1 indicated a willingness to pay $6.90 per ADS.  The Special Committee pushed for a higher price, and on April 1, 2014, Buyer Group 1 informed Merrill Lynch that it was not prepared to increase the proposed $6.90 per ADS merger consideration.

86.     At this point Buyer Group 1 began looking for additional parties to join them in taking the Company private.  On April 18, 2014, another interested party was found and Shanda Interactive converted 30,326,005 Class B shares into Class A shares and sold them to Perfect World.  At this point, the new three-party group (Buyer Group 2 – consisting of Shanda Interactive, Primavera and Perfect World) continued negotiating possible transactions with other interested parties, which led to the following transactions:

(a)     On August 31, 2014, Shanda Interactive converted 123,552,669 Class B shares into Class A shares and then sold them to Orient Securities.

(b)      On September 1, 2014, Shanda Interactive converted 48,152,848 Class B shares into Class A shares and then sold them to Haitong.

(c)     On September 1, 2014, Primavera and Perfect World each sold their shares in Shanda to Haitong.

(d)     On September 1, 2014, Shanda Interactive converted 80,577,828 Class B shares into Class A shares and then sold them to Ningxia.

87.     Following this series of sales, Primavera and Perfect World left the Buyer Group and Orient Securities, Haitong and Ningxia joined, which resulted in Buyer Group 3 – consisting of Shanda Interactive, Orient Securities, Haitong and Ningxia.

88.     Defendant Lin, the Chairman of Shanda's Special Committee, was CEO of an affiliate of Orient Securities.  Therefore, when Orient Securities joined Buyer Group 3, he had a conflict of interest and resigned from the Special Committee.  This left behind a Special Committee of two: Defendant Chan and Defendant Gui.  Shanda's Board then voted to elect Defendant Chan as Chairman of the Special Committee.

89.     Throughout September 2014, Buyer Group 3 continued negotiating with the Special Committee and on September 22, 2014, the group indicated it would increase its offer to $7.10 per ADS.  The Special Committee determined that they would entertain this offer.

90.     Amidst these negotiations, on October 28, 2014, Shanda's CEO Xiangdong Zhang abruptly resigned from his role as CEO and stepped down from the Shanda's Board.  He was simultaneously replaced by Defendant Zhang who had been acting Co-General Counsel and Vice President at Shanda Interactive.  The Company provided no meaningful explanation as to why Xiangdong Zhang resigned.

91.     Shanda's new CEO, Defendant Zhang, promptly began negotiating the purchase of a block of Shanda's stock for himself.  Those negotiations resulted in a transaction, on November 25, 2014, wherein Shanda Interactive sold 48,759,187 Class B shares to Mr. Zhang and sold 48,759,187 Class B shares to Ningxia.  Because Class B shares carry 10 voting rights,

this transaction also made Ningxia and Defendant Zhang the two most dominant decision makers among Shanda's shareholders.

92.     This sale of Class B shares resulted in Shanda Interactive, Shanda's former controlling shareholder, no longer owning any interest in Shanda.  Shanda's co-founder and significant stakeholder in Shanda Interactive, Tianqiao Chen, abruptly resigned from his position as director and Chairman of the Board.  Having sold its position in Shanda, Shanda Interactive was no longer a member of the group of interested buyers—thus Buyer Group 4 was composed of Defendant Zhang, Ningxia, Orient Securities and Haitong.

93.     Upon Tianqiao Chen's resignation from Shanda's Board, Defendant Zhang was appointed to fill the position as Chairman.  At the same time, Shengming Ma, the Chairman of Ningxia's Board of Directors was nominated to Shanda's Board.  However, on February 6, 2015, Mr. Ma resigned from Ningxia's Board of Directors for "personal reasons" and therefore he would no longer function as an effective representative of Ningxia on Shanda's Board. Therefore, concurrent with his resignation from Ninxia's Board of Directors, Mr. Ma resigned from Shanda's Board and was replaced on Shanda's Board by Defendant Liang, a vice general manager of Ningxia.  Therefore, due to his position and affiliation with Ningxia and Ningxia's position on Buyer Group 4, Defendant Liang was conflicted with respect to the proposed transaction.

94.     Together, Buyer Group 4 controlled approximately 70% of Shanda's outstanding shares and, due to the special voting privileges of Class B shares it controlled approximately 90% of all shareholder votes.

F.      **Shanda Accepts the Going Private Offer**

95.     On March 19, 2015, Buyer Group 4, proposed a purchase price of $6.90 per ADS. This price was considered unacceptable by the Special Committee as it was even lower than the $7.10 it had previously expressed a willingness to entertain.

96.     However, the two directors comprising the Special Committee decided to postpone their rejection to review financial information regarding the fiscal year ending on December 31, 2014, that apparently had just been made available to the Special Committee. Then, on March 27, 2015, the Company provided the March 2015 Projections to the Special Committee and Merrill Lynch proceeded to discuss those projections with the Special Committee.  The March 2015 Projections were attributed to Shanda's management—and, as Shanda's CEO, Defendant Zhang was certainly a member of Shanda's management.

97.     The March 2015 Projections suggested a serious decline in the Company's prospects as compared to the March 2014 Projections.  Shanda never provided an explanation for this decline.  According to the numbers provided in the Proxies, the projections for Net Revenues and Net Income for the fiscal years ending on December 31, of the years 2015, 2016, 2017, and 2018 were revised as follows:

| Change in Net Revenue | | | | |
|---|---|---|---|---|
| | **2015** | **2016** | **2017** | **2018** |
| 2014 Projection's Net Revenue Projection | 5,222 | 6,228 | 6,976 | 7,589 |
| 2015 Projection's Net Revenue Projection | 3,591 | 4,700 | 5,662 | 6,465 |
| Projected Decline | -1,631 | -1,528 | -1,314 | -1,124 |
| | | | | |
| **Change in Net Income** | | | | |
| | **2015** | **2016** | **2017** | **2018** |
| 2014 Projection's Net Income Projection | 1,648 | 1,972 | 2,206 | 2,385 |
| 2015 Projection's Net Income Projection | 1,234 | 1,462 | 1,602 | 1,848 |
| Projected Decline | -414 | -510 | -604 | -537 |
| | | | | (RMB in millions) |

98.     Upon receiving the March 2015 Projections, the Special Committee convened to discuss the proposal with Merrill Lynch.  Merrill Lynch noted that these projections were lower than those previously issued by the Company.  The Special Committee discussed these lower projections with Merrill Lynch, but despite these lowered projections, determined to request that Buyer Group 4 offer $7.10 per ADS.

99.     On April 3, 2015 Buyer Group 4 stated that it would be prepared to pay the requested amount.  On that same day, Merrill Lynch presented its "fairness opinion" to the Special Committee.  In reaching this opinion Merrill Lynch represented that it had reviewed certain public and non-public information including "certain financial forecasts relating to the Company prepared by the management of the Company"—a clear reference to the March 2014 Projections and March 2015 Projections.  Merrill Lynch explained, as part of its formal opinion, that it had simply "assumed" that the projections provided to it by Shanda's management had been "reasonably prepared on bases reflecting the best currently available estimates and good faith judgments of the management of the Company as to the future financial performance of the Company."  Based upon this assumption, and its analysis, Merrill Lynch concluded that the merger consideration of $7.10 per ADS was fair, from a financial point of view.

100.    Following Merrill Lynch's presentation of its opinion, the Special Committee purportedly determined that the merger was fair and "in the best interests of, the Company and the Unaffiliated Holders."  Next, Shanda's Board met and purportedly determined that the proposed transaction "was fair to, advisable and in the best interests of the Company and the Unaffiliated Holders."  Shanda's Board then authorized the execution of the merger agreement.

101.    That evening, the Company published a press release announcing the merger and publishing the merger agreement.  By the close of the next business day, Shanda's ADS had

increased in value by 4.78% to a price of $6.80.  The public announcement of this deal was in furtherance of Defendants' fraudulent scheme to deceive investors into selling their Shanda shares for less than they were worth.  To accomplish this goal, Defendants would need to avoid tipping off investors that their shares were worth far more than the $7.10 per ADS being offered through the Transaction.

102.    The April 3, 2015, announcement promoted the deal by pointing to a premium ($7.10 per ADS) as compared to the Company's recent trading price.  It further stated that the deal had been approved by the Board and was recommended by the Special Committee.  But, as unknown to the market, this deal did not, in fact, reflect the true fair value of the Shanda Securities.  This announcement also omitted to disclose that these recommendations were predicated on the March 2015 Projections—which as will be discussed herein, were false and misleading.  In making this announcement, the Company misled its investors into believing that a robust review process had been conducted and that the deal price was fair and accurate – when it was not.

### G.    Shanda Publishes the Initial Proxy

103.    The proposed Transaction required approval by a two-thirds vote.  Therefore, the Buyer Group held enough voting power to ensure the Transaction would be approved regardless of how any minority shareholders voted.  However, to close the Transaction, the Company needed to hold a meeting to allow all shareholders to vote.  This Extraordinary Shareholders Meeting was scheduled for November 18, 2015.

104.    On May 5, 2015, the Company filed the Initial Proxy on Form 13E-3 explaining the proposed Transaction to the holders of Shanda Securities and making certain disclosures regarding the proposed Transaction.  The Initial Proxy was directed to all "Shareholders of Shanda Games Limited" and was signed by Defendant Zhang, Defendant Yao (on behalf of

Shanda) and each member of Buyer Group 4.  Several of the relevant provisions in the Initial Proxy are discussed below.

### 1.  Financial Projections

105.     The Initial Proxy included a section, titled "Certain Financial Projections," which was a summary of the March 2014 Projections and March 2015 Projections which were prepared by management[15] and purportedly used by the Defendants and others when considering the deal. These projections were a core element of the fraudulent scheme orchestrated by the Defendants and by putting this summary of the projections in the Initial Proxy and making false representations and omissions regarding these projections, the Defendants were able to mislead holders of Shanda Securities about the true value of their investment.  As a result, Buyers Group 5, which included Defendant Zhang and Defendant Liang's principal Ningxia, were able to acquire Shanda for far less than its true value.

### (a)  The Purpose of the Projections

106.     In this section of the Initial Proxy, the Company explained that it did not typically make financial projections available to the public but had decided to make the March 2015 Projections available in summary form.  That Shanda did not generally publish projections heightened the significance that investors would apply to the summaries of the projections published in the Initial Proxy.  While the Initial Proxy implied that more limited projections were made available through "guidance on the coming quarter in earnings releases and on earnings conference calls," this guidance and these calls had completely stopped by the start of 2014.

---

[15] The Initial Proxy did not define who "management" was, but arguably each of the Individual Defendants were "management" of Shanda due to their role on Shanda's Board and clearly Defendant Zhang and Defendant Yao were "management" due to their respective roles as CEO and CFO.

107.    Investors would view the summarized projections and any representations about the projections as highly significant when making investment decisions—including in deciding whether the deal price was fair.  Furthermore, the Initial Proxy emphasized the usefulness of the summarized projections for that purpose, by disclosing that Shanda's directors and Merrill Lynch had relied on the projections when evaluating the fairness of the proposed transaction.

108.    As stated in the cover letter to the Initial Proxy, the document "provide[s] information regarding the matters to be acted on at the extraordinary general meeting." Furthermore, because the Buyer Group 4 controlled sufficient voting power to approve the proposed transaction regardless of how Unaffiliated Holders voted, the practical purpose of the Initial Proxy was to inform such holders of what consideration they were to receive through the Transaction – specifically, to give them information relevant to whether or not that consideration was fair and justified, and as to whether or not to exercise appraisal rights.

**(b)    Representations Regarding the Scope of the Projections**

109.    The Proxies did not reproduce the entirety of the financial analysis used by management when preparing the March 2014 Projections and March 2015 Projections, nor did they publish the actual March 2014 and March 2015 Projections.  Instead, the Proxies purported to provide faithful summaries of these projections.

110.    The Initial Proxy summarized the March 2014 Projection as follows:

[chart on following page]

| | Management Projections | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | Fiscal Year Ending December 31, | | | | | |
| | 2013E[1] | 2014E | 2015E | 2016E | 2017E | 2018E |
| | (RMB in millions)[2] | | | | | |
| Total Net Revenues | 4,346 | 4,210 | 5,222 | 6,228 | 6,976 | 7,589 |
| Growth | -7.9% | -3.1% | 24.0% | 19.3% | 12.0% | 8.8% |
| Gross Profit | 3,210 | 3,146 | 3,852 | 4,555 | 5,098 | 5,461 |
| Gross Margin | 73.9% | 74.7% | 73.8% | 73.1% | 73.1% | 72.0% |
| Total Operating Expenses | 1,481 | 1,561 | 1,895 | 2,213 | 2,427 | 2,615 |
| Income from Operations | 1,729 | 1,585 | 1,957 | 2,342 | 2,671 | 2,847 |
| Operating Margin | 39.8% | 37.6% | 37.5% | 37.6% | 38.3% | 37.5% |
| Net Income attributable to Shanda Games Limited | 1,589 | 1,326 | 1,648 | 1,972 | 2,206 | 2,385 |

(1) These projections were prepared by the Company's management during the first quarter of 2014.  At the time these projections were prepared, the audit for the fiscal year ended December 31, 2013 had not been completed.  Accordingly, management estimates for fiscal year 2013 may vary materially from the Company's audited financial statements.

(2) Financial projections were prepared and provided in RMB.

111.   The Initial Proxy summarized the March 2015 Projections as follows:

| | Management Projections | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | Fiscal Year Ending December 31, | | | | | |
| | 2014E[1] | 2015E | 2016E | 2017E | 2018E | 2019E |
| | (RMB in millions)[2] | | | | | |
| Total Net Revenues | 3,717 | 3,591 | 4,700 | 5,662 | 6,465 | 7,661 |
| Growth | -14.5% | -3.4% | 30.9% | 20.5% | 14.2% | 18.5% |
| Gross Profit | 2,777 | 2,723 | 3,463 | 4,066 | 4,548 | 5,491 |
| Gross Margin | 74.7% | 75.8% | 73.7% | 71.8% | 70.3% | 71.7% |
| Total Operating Expenses | 1,594 | 1,386 | 1,799 | 2,105 | 2,323 | 2,826 |
| Income from Operations | 1,183 | 1,337 | 1,663 | 1,961 | 2,225 | 2,665 |
| Operating Margin | 31.8% | 37.2% | 35.4% | 34.6% | 34.4% | 34.8% |
| Net Income attributable to Shanda Games Limited | 1,040 | 1,234 | 1,462 | 1,602 | 1,848 | 1,902 |

(1) These projections were prepared by the Company's management during the first quarter of 2015.  At the time these projections were prepared, the audit for the fiscal year ended December 31, 2014 had not been completed.  Accordingly, management estimates for fiscal year 2014 may vary materially from the Company's audited financial statements.

(2) Financial projections were prepared and provided in RMB.

112.    The first set of numbers was presented as a summary of "the financial projections provided by management to the [potential buyers] and Merrill Lynch in March 2014."  In other words, the Initial Proxy represented that these numbers were a faithful summary of the March 2014 Projections.

113.    The second set of numbers was presented as a summary of "the financial projections provided by management to the [potential buyers] and the Merrill Lynch in March 2015."  In other words, the Initial Proxy represented that these numbers were a faithful summary of the March 2015 Projections.

114.    The Initial Proxy reinforced the representation that the Company was providing faithful summaries of the actual March 2015 Projections by explaining that the summaries were included in the Initial Proxy to "give shareholders access to certain information that was made available to the financial advisor."

115.    However, the summary of the March 2015 Projections that was included in the Initial Proxy only forecasted out until the fiscal year ending in 2019.  The summary showed shrinking revenues through 2015, followed by a 30.9% year over year increase in revenue in 2016, a 20.5% increase in 2017, a 14.2% increase in 2018 and an 18.5% increase in 2019.  In reality, however, the March 2015 Projections that Buyer Group 4 (and 5), the Special Committee, and Merrill Lynch had access to contained detailed forecasts up to and including the year 2020.

116.    The failure to include the forecasts for the year 2020 in the Initial Proxy was a material omission.  The representation that the Initial Proxy actually summarized the projections shared with Buyer Group 4 (and 5) and Merrill Lynch in March 2015 was a false and misleading statement.

117.    Shanda's true March 2015 Projections which included figures for the year 2020 forecasted revenue growth in that year of 5.4%.  While this constitutes less growth than the Company projected for 2019, it still shows positive growth in that year.  Therefore, by failing to include the 2020 numbers, Shanda's management deprived investors of significant and positive information about the Company and its value.

118.    Furthermore, the representation that the summarized information was in fact the information provided to Merrill Lynch, deprived shareholders of an opportunity to draw their own conclusions about reliability of Merrill Lynch's opinion that the merger consideration was fair.  More specifically, it deprived them of significant information that would have tended to suggest that Merrill Lynch was wrong in assessing that the merger consideration was fair.

**(c)    Representations Regarding the Preparation of the Projections**

119.    The summarized projections did not provide any game-by-game analysis attributing specific revenue amounts to specific games.[16]  However, the Initial Proxy contained numerous assurances that the March 2014 Projections and March 2015 Projections were prepared with adequate care.

(a)    The Initial Proxy stated that "[in] compiling the projections, the Company's management took into account historical performance of legacy games, projected launch dates of new games in the Company's pipeline, and projected revenues for **each new game**, combined with estimates regarding gross margin, operating expenses, tax rates, capital expenditure, EBITDA and net income."

---

[16] In fact, across the hundreds of pages in the Initial Proxy and its annexed documents, there is only a single mention of the Mir franchise and the franchise is only then mentioned to note that Defendant Zhang had been in charge of licensing for Mir II.  Mir II Mobile is not mentioned anywhere in the Proxies despite its significance to Shanda.

(b)     The Initial Proxy states that the projections were "based on numerous assumptions and estimates as to future events made by management that management believed were reasonable at the time the projections were prepared."

(c)     The Initial Proxy included a statement by Merrill Lynch that it was "advised by the Company and assumed" that the "Management Forecasts" have been "reasonably prepared on bases reflecting the best currently available estimates and good faith judgments of the management of the Company as to the future financial performance of the Company."[17]

(d)     The Initial Proxy included a statement by Merrill Lynch that it "assumed and relied upon . . . the accuracy and completeness of the financial information and other information . . . provided to or otherwise reviewed by or discussed with [it]" and that it "relied upon assurances by management of the Company" that they were "not aware of any facts or circumstances that would make such information or data inaccurate or misleading in any material respect."

120.    Altogether these statements conveyed that the March 2014 Projections and March 2015 Projections were reasonably prepared, based on historical data, an understanding of Shanda's game pipeline – including an analysis of revenue projections for each new game, assumptions and estimates which management believed were reasonable and, in fact, the "the best currently available estimates."  Further, the statements affirmatively represented to investors

---

[17] The Proxies also stated that the Special Committee "expressly adopted" the "analysis and opinions" of Merrill Lynch.  Furthermore, the Proxies stated that the Board "adopted such recommendations and analysis" as given by the Special Committee.  As such, each Defendant not only signed the Final Proxy with full knowledge of Merrill Lynch's recitation of these assurances about the preparation of the projections, but affirmatively "adopted" those statements as their own analysis.

that Shanda's management was not aware of any circumstances that would make the information relied upon misleading in any material respect.

121.    Such assurances were important in the orchestration of the fraudulent scheme.  If shareholders trusted the integrity of the projections, they would place far more weight on the value of the published summaries of those projections, as accurate predictions of the Company's future financial prospects.  Furthermore, they would more generally trust the Company's representations regarding the fairness of the deal and, more specifically, trust the "fairness opinions" of Merrill Lynch and the Special Committee, which were predicated upon the reliability of the projections.

122.    These assertions were plainly false; the March 2015 Projections (and the summaries derived therefrom) were not reasonably prepared, did not rely upon the best available estimates regarding the Company's future, did not take into account the realistic projected revenues for each new game, and management was aware of information that would render the information relied upon materially misleading.  These errors are explained in greater depth at Section IV(L) and three of them are summarized below:

(a)    In preparing the March 2015 Projections, Shanda grouped to-be-released mobile games into one of three categories: B1, B2 or B3.  For example, B1 games were supposedly modeled as earning 500,000 RMB per day (roughly $80,585[18]) in their first quarter of operation and all games were expected to earn revenue according to their category and age. However, beginning in 2016 and without explanation, Shanda began modeling some B1 games with far less revenue than B1 games were supposed to produce.  This was erroneous and would have understated Shanda's future revenue.  Games subject to this erroneous treatment were also

---

[18] Dollar value calculated using the exchange rate of $1.00 USD to 6.2046 RMB, as set forth in the Final Proxy.

subject to an additional error; Shanda continued to model revenue-depended licensing and royalty costs from these games as though they were producing B1 revenues, despite erroneously modeling them as producing far lower revenue—thus, Shanda's error was amplified and further understated the Company's future revenue.

(b)     Shanda also modeled depreciation and amortization using a method that was unreliable and which conflicted with the approach it had historically used.  Whereas Shanda has previously calculated these accounting entries by writing down fixed assets in accordance with their expected useful lives, in in preparing the March 2015 Projections, Shanda simply calculated depreciation and amortization as a percentage of revenue.  As revenue was expected to grow, this resulted in offsetting growth with depreciation and amortization, which dramatically understated Shanda's value.

(c)     Incredibly, Shanda also assumed that Mir II Mobile would produce lifetime revenues of a mere $15 million, an unrealistic assumption given the popularity of the Mir II PC game (that Mir II Mobile was based on) which had been generating revenues of roughly $333 million in 2011, $248 million in 2012, $214 million in 2013 and $185 million in 2014 (and this at a time that 10+ year old game's popularity was waning).  Shanda's assumption that Mir II Mobile would produce lifetime revenues of a mere $15 million was therefore unreasonable and absurd.  It was also in direct contrast to Shanda's public statements touting the anticipated (and later realized) blockbuster success of the game.

### 2.     Fairness of the Transaction

123.    The Initial Proxy made numerous assertions that the merger consideration being offered to the Unaffiliated Holders was fair.  The Initial Proxy presented Merrill Lynch's statement that, the consideration offered through the Transaction was "fair, from a financial point of view" to the Unaffiliated Holders.  The Board and Special Committee adopted that opinion

and went further to note that the Transaction was "in the best interests of" the Unaffiliated

Holders.

124.    However, the $7.10 per ADS merger consideration was not fair.  Rather, this price

reflected an effort by the Defendants to suppress the value of the Shanda Securities to decrease

the price that would need to be paid[19] to acquire the Company through the Transaction.

### H.    The Composition of the Buyer Group Changes Again

125.    After the Initial Proxy was published, Century Huatong began maneuvering to

acquire a position in Shanda.  Existing business with Shanda accounted for 57% of Century

Huatong's net revenue in 2014 and it sought to expand its mobile and web gaming businesses

through a greater relationship with Shanda.  By mid-June 2015, Century Huatong negotiated an

agreement with Orient Securities and Haitong to buy their positions in Shanda.  Through this

purchase Century Huatong became the owner of 230,990,798 Class A shares and Buyer Group 5

was formed.

126.    Buyer Group 5 owned 75.6% of Shanda's outstanding shares and 90.7% of the

outstanding votes.  The individual entities comprising Buyer Group 5 can be grouped together by

affiliation and the composition of the group, as it relates to the proposed Transaction, was as

follows:

[chart on following page]

---

[19] While the Transaction called for Shanda to actually buy the Unaffiliated Holders shares, as an
economic matter, any money flowing out from Shanda through the Transaction was money that
the ultimate Buyers Group would be "spending," since it was money that they otherwise would
come to indirectly own through their acquisition of Shanda.

| Affiliate Group & Projected Ownership Percentage | Specific Entities that would own Shanda through Capitalhold Limited & Projected Ownership Percentage | Shares Owned by Affiliate Group | Votes Controlled by Affiliate Group as of Final Proxy | Representation within Shanda's Management |
|---|---|---|---|---|
| Defendant Zhang (15.1%) | Ningxia Yilida Capital Investment Limited Partnership (9.0%)<br><br>Ningxia Zhengjun Equity Investment Partnership Enterprise (Limited Partnership) (6.1%) | 48,759,187 Class B shares | 487,591,870 | Defendant Zhang was Chairman of Shanda Board and its CEO |
| Ningxia (42.1%) | Ningxia Zhongyincashmere International Group Co., Ltd. (23.9%)<br><br>Ningxia Silkroad Equity Investment Partnership Enterprise (Limited Partnership) (12.2%)<br><br>Ningxia Zhongrong Legend Equity Investment Partnership Enterprise (Limited Partnership) (6.0%) | 80,577,828 Class A shares<br><br>48,759,187 Class B shares | 568,759,187 | Ningxia's vice general manager was Defendant Liang, a member of Shanda's Board |
| Century Huatong (42.7%) | Orient Hongtai (Hong Kong) Limited (11.4%)<br><br>Orient Hongzhi (Hong Kong) Limited (11.4%)<br><br>Hao Ding International Limited (19.9%) | 230,990,798 Class A shares | 230,990,798 | None, but business partners with Shanda |

127.     Century Huatong purchased its stake in Shanda for $4.44 per share, which was far more than the $3.55 per share merger consideration offered through the proposed Transaction.[20] Despite this, the Special Committee met on August 25, 2015, and purportedly determined that

---

[20] In fact, while Ningxia's original position of Class A shares was purchased for $3.45 per share, the remaining Buyer Group shares were purchased for far more than the $3.55 per share ($7.10 per ADS) offered through the Transaction—with Ningxia and Defendant Zhang each paying $5.13 per Class B share and Century Huatong paying $4.44 per Class A share.

this consideration remained "fair to, and in the best interests of, the Company and the shareholders and ADS holders of the Company who are unaffiliated with the Company."

128.    On August 17, 2015, Individual Defendants Chan, Gui, Zhang, and other unnamed members of Shanda's Board, advisors and a representative of Century Huatong, had a conference call, which discussed the strategic relationship between Century Huatong and Shanda.  This strategic relationship had previously been described in diligence calls by representatives of Century Huatong, where they had noted that Shanda's "portfolio of well-known [PC] games" was "highly complementary" to their "plans for developing a games business focused on web- and mobile-based games."  Thus, in discussing Century Huatong's strategic goals for Shanda, Defendants would have discussed Mir II Mobile—which was the stand-out example of Shanda's efforts to convert well-known PC games into successful mobile games.

129.    On August 25, 2015, the Special Committee purportedly determined that the merger was "fair to, and in the best interests of" the Unaffiliated Holders.  In making this determination the Special Committee was purportedly acting with the "advice and assistance of the Company's management and its independent financial and outside legal advisors."  However, the Special Committee did not seek an updated fairness opinion from Merrill Lynch and instead continued to rely upon its April 3, 2015, advise.  On August 26, 2015, the Board purportedly unanimously "affirmed its April 3, 2015 resolutions . . . determining it was fair to, advisable and in the best interests of the Company and the Unaffiliated Holders to consummate the Merger."

130.    Finally, on September 18, 2015, the merger agreement was amended and restated to alter the termination rights held by the merger parties.  The substance of this amendment is not important to the instant suit.  However, the amendment once again prompted a reevaluation of

the transaction by the Special Committee.  Therefore, on September 21, 2015, after "due

consideration" the committee determined the transaction was "fair to, and in the best interests of,

the Company and the shareholders and ADS holders of the Company who are unaffiliated with

the Company."  Once again, the Special Committee did not seek updated advice from Merrill

Lynch.  The Board also restated its purported opinion that the transaction was "fair to, and in the

best interests of, the Company and the Shareholders and ADS holders of the Company who are

unaffiliated with the Company."

  **I.**  **Shanda Publishes the Final Proxy**

  131.  In anticipation of the Extraordinary Shareholder Meeting, Shanda published the

Final Proxy on October 13, 2015.  The Company published the Final Proxy as an amendment to

its earlier filed Form 13E3.[21]  Much of the content of the Final Proxy was identical to the content

of the Initial Proxy.  The Company continued its fraudulent scheme to depress the value of

Shanda's stock by failing to modify many of the representations in the Initial Proxy.

  132.  In particular, the Initial Proxy and Final Proxy contained substantively identical

sections titled "Certain Financial Projections," which included the summarized March 2014

Projections and March 2015 Projections.  The Final Proxy also reproduced the sections regarding

Merrill Lynch's fairness opinion, which were not updated or reconfirmed despite the

developments and passage of time since the Initial Proxy.  The Final Proxy also failed to account

for now known (instead of projected) revenues - despite having the opportunity to do so in the

Final Proxy.

---

[21] The Final Proxy was filed as an amendment to the Initial Proxy.  The Company also published
several other amendments in the time between the filing of the Initial Proxy and the filing of the
Final Proxy.  Finally, upon the approval of the Transaction at the Extraordinary Shareholders
Meeting, the Company filed one further amendment recognizing the results of that meeting.

133.    However, the Final Proxy contained some new descriptions of the developments related to Century Huatong's acquisition of its position in Shanda and described how the Special Committee and Board had purportedly reconfirmed their opinions regarding the Transaction – evidencing Shanda's ability to provide new information it was privy to that affected the Transaction.  The Final Proxy explained that on August 25 and August 26, 2015, respectively, the Special Committee and the Board both claimed to have unanimously determined the Transaction was "fair to, and in the best interests of" the Unaffiliated Holders.

134.    Furthermore, the Final Proxy stated in present tense (i.e., as of its October 13, 2015 publication) that the "Company believes" that the Transaction is "fair to, and in the best interests of" the Unaffiliated Holders.  The Board unequivocally recommended that the shareholders vote in favor of the Transaction.

135.    The inclusion of the sections of the Proxy regarding the March 2014 Projections and March 2015 Projections, the republication of the prior assertions regarding the deals fairness, and the present tense reaffirmation of these assertions was a continuation of Defendants' fraudulent scheme to depress the price of the Shanda Securities to reduce the price Buyer Group 5 would need to pay to acquire Shanda and to mislead the market as to the true value of Shanda Securities.

136.    One key difference between the Initial Proxy (published on May 5, 2015) and the Final Proxy (published on October 13), was that by the time the Final Proxy was Published, Mir II Mobile had already undergone its very successful launch on August 3, 2015.  At this point (over two months later), it was actually known to each of the Defendants that Mir II Mobile was producing revenues far beyond those provided for by the March 2015 Projections.  Specifically, while the March 2015 Projections accounted for $15 million in revenues ***over the course of Mir***

*II Mobile's life*, by the time Final Proxy was published, Mir II Mobile had already generated more than $184 million in revenue (approximately $91 million of that revenue went to Shanda during that 2 month period).[22]  While the forecasts regarding Mir II Mobile were false and misleading when they were originally presented in the Initial Proxy on March 2015 – because they were based on the unreasonable assumption that the anticipated blockbuster Mir II Mobile would only generate $15 million in revenue over the life of the game – by October 13, 2015 when the Final Proxy was published, Defendants had *actual* information concerning MIR II Mobile's success which contradicted the $15 million revenue figure by a massive amount, but failed to provide this known information to investors.

> **J.   Defendants Had Access to and Reviewed Information Concerning MIR II Mobile's Success at the Time of the Final Proxy**

137.    Indeed, by the release of the Final Proxy, Mir II Mobile had been on the market for over two months.  Shanda, its directors, and CEO certainly knew of the game's success.  Shanda had long been an industry pioneer when it came to using data to better understand its games.  In addition, certain aspects of the business model made this knowledge inescapable.  Unlike some physical retail products, the success of digital games, such as Mir II Mobile, which are distributed through platforms such as the iPhone's "App Store" or one of several China-focused marketplaces for Android phone apps are instantly tracked by the game's producer.  As the Wall Street Journal reported, in a November 15, 2011, article, "Real-time data analytics has

---

[22] This $91 million figure is based on the conclusion, during the Appraisal Suit, that Mir II Mobile produced revenue for Shanda of approximately $136 million in its first quarter of operation.  Thus, two-thirds of $136 million would be about $91 million.  It is possible that revenue was not evenly distributed all three months, but given the March 9, 2016, disclosure that Mir II Mobile earned between $92 and $107 million in total revenue each month, the month-to-month variation was small enough to make this approximation reasonable.

enabled game companies to collect and analyze every action their players make, and change their games according to what users want and don't want."

138.    As a free-to-play mobile game, Mir II Mobile produces revenue through the sale of in-game items.  Shanda's 2014 annual report, boasted of the Company's ability to carefully track various metrics about game performance.  For example, Shanda explained: (1) "[w]e track the number and price of each virtual item sold as well as user behavior in response to the launch of a virtual item.  We adjust the pricing of certain virtual items based on their consumption pattern and other factors;" (2) "[w]e track various information, including player accounts and in-game purchases, to verify the transactions and proceeds;" (3) "[t]he sale of virtual items requires us to track closely game players' tastes and preferences, especially as to in-game consumption patterns."

139.    Former employees of the Company also support that Defendants would have access to this data.  Former Employee 1 ("FE1") was a senior operations planner for a different massively multiplayer role playing game at Shanda.  He worked at the Company from July 2015 until October 2016.  According to FE1, because Shanda was the developer of Mir II Mobile, it would have had access to data such as the number of active users and revenue in real time from the game's servers.  Due to their access to this information FE1 believed that Shanda's management team, which included the Individual Defendants, would know of the game's success in real time, even based on its performance on just the first day of operations.

140.    Former Employee 2 ("FE2") was a network operations specialist for a different massively multiplayer role playing game based on the same free-to-play business model as Mir II Mobile.  In this role he conducted operations planning and execution, recorded data about the game he worked on and analyzed the income from that game.  He would gather data directly

from the Company's internal data pool.  He worked at the Company from December 2014 to June 2015.  According to FE2, prior to the official launch of a game, Shanda would collect data from the public beta testing to estimate the game's success.  After the launch, once the first player entered the game, the Company's back-end system would begin recording data, including things like the time each player spent playing and the payments that player has made.  This data was summarized and reviewed every week, but in some cases management would view the data within a day.  Members of the particular game's team would report the relevant data to Shanda's management.

141.    Former Employee 3 ("FE3") was an internet architecture manager at Shanda.  His role involved planning and operating certain complex tasks on Shanda's infrastructure data center.  He worked at Shanda from March 2011 until May 2016.  According to FE3, Shanda would normally have information about the success of its games in real time, including data regarding the number of active players, cash flow, and other metrics.  He explained that the management team should have known very quickly how Mir II Mobile was performing as lower-level employees would report to them beginning on the first day the game was published.  Management also would have received updates about the game at weekly internal meetings.

142.    The many previously described Chinese-language public statements reveal that Defendant Zhang and the members of the Company's management were paying close attention to the game.  More specifically, corroborative of what the FE's stated, Defendant Zhang admitted in an August 14, 2015, email to Shanda's employees that he was aware of the game's tremendous success.  *See* ¶ 76(n).  The Company even hosted a celebration at their Shanghai office complete with champagne and firecrackers on August 14, 2015.  And on October 19, 2015

– just six days after the Final Proxy was issued – Defendant Zhang publicly referred to the game in a press release as a "blockbuster success."

143.    Notwithstanding its knowledge that Mir II Mobile was a massive success, as Shanda had anticipated it would be, Shanda continued to rely on its March 2015 Projections, when assessing the "fairness" of the merger.  The projections had treated Mir II Mobile as an average B1 game, when by the time the Final Proxy was published in October 2015, the Company had two months of data showing that MIR II had already outperformed B1 game projections by an incredible amount and would continue doing so.  Shanda omitted any discussion of Mir II Mobile from its Final Proxy, choosing instead to use its absurdly low and baseless projections for the game to undervalue the Company to the benefit of Buyer Group 5, which included Defendant Zhang and Defendant Liang's employer and principal, Ningxia.

### K.    The Transaction Closes

144.    On November 18, 2015, Shanda held its Extraordinary Shareholders Meeting to vote on the proposed Transaction.  As was expected, Buyer Group 5 voted in favor of the Transaction and it was approved and consummated.  According to a press release issued the day of the meeting, 84.5% of the Company's total outstanding ordinary shares, representing 94.1% of its outstanding voting rights voted in person or by proxy.  Of those voting, Shanda reported that 99.3% voted in favor of the proposal.

145.    Because the Transaction was approved, each share of Shanda's common stock, except those shares held by Buyer Group 5 was effectively sold, for $3.55 and each ADS was effectively sold for $7.10.  Shanda explained this in the Final Proxy by noting that "the holders of the Class A ordinary shares of the Company and ADS (other than Excluded Shares, ADS representing Excluded Shares and Dissenting Shares) will be cashed out in exchange for the Per Share Merger Consideration or the Per ADS Merger Consideration."

146.     Any holder of Shanda Securities who did not tender a written notice of objection to Shanda prior to the shareholder meeting relinquished their appraisal rights.  Shanda has not disclosed the number of shareholders who issued these written notices.

147.     As a result of the Transaction, Shanda merged into Capitalcorp Limited, a Cayman Islands corporation created for the purpose of the Transaction.  Shanda was the surviving entity of that merger and became a wholly owned subsidiary of Capitalhold Limited, a Cayman Islands corporation.  Capitalhold Limited was owned by Buyer Group 5, meaning that through the merger Shanda became indirectly owned by Buyer Group 5.

**L.     The Appraisal Suit**

148.     The Proxies informed holders of Shanda Securities that they would have certain dissenting rights under Cayman Islands law.  These rights provided investors with the ability to obtain an "appraisal" of the "fair value" of their shares.  As a matter of Cayman Law, such "fair value" could be greater, the same as, or less than the consideration offered through the merger.  The risk of losing money through an appraisal meant that holders of Shanda Securities had an incentive not to seek these rights unless they had some reason to doubt that they were in fact receiving fair value for their shares.  Inversely, any investor who held Shanda Securities at the time the Transaction closed would have either sought appraisal had they known or had reason to believe that the merger consideration was not the fair value of their shares.  By convincing investors through their false statements and omissions that the proposed merger consideration provided them with fair value for their Shanda Securities, the Defendants were able to buy the Company for far less than it was worth.

149.     Anyone holding Shanda's ADS who wanted to dissent would have needed to act prior to the Extraordinary Shareholders Meeting in order to exercise their rights.  According to the Proxies, ADS holders needed to redeem their ADS for the underlying common shares, a step

requiring them to pay a nominal fee to the Depository.  Once holding Shanda's stock, the

dissenter would be required to give a written "notice of objection" to the Company prior to the

Extraordinary Shareholders Meeting.

150.    Prior to the Extraordinary Shareholders Meeting, three shareholders issued notice

of their objection to the Transaction.  The Dissenting Shareholders were (1) Blackwell Partners

LLC-Series A, (2) Crown Managed Accounts SPC, and (3) Maso Capital Investments Limited.

Together the Dissenting Shareholders had held 8,822,062 of Shanda's Class A common stock,

which would have been worth roughly $31.3 million at the deal price.

151.    Following the Extraordinary Shareholders Meeting, the Dissenting Shareholders

followed the necessary procedure to seek an appraisal of the fair value of their shares as of the

date of the Transaction.  The Appraisal Suit was filed on February 4, 2016, and the proceedings

were held before Judge Segal in the Grand Court of the Cayman Islands.

152.    Various procedures for the exchange of evidentiary discovery and expert reports

were arranged with the Grand Court's supervision.  Both sides of the dispute selected expert

witnesses to assist in the valuation and both sides' witnesses issued initial and supplementary

expert reports.  A hearing was held from November 7, 2016 through November 17, 2016.  The

hearing included expert witness testimony, cross examination of both expert witnesses, and

closing submissions.

> **1.    Admissions and Findings that the Merger Consideration Was Unfair
> and that the Projections Were Erroneous**

153.    During the Appraisal Suit, the expert for the Dissenting Shareholders, Mr. Inglis

obtained non-public information from Shanda beyond what was included in the Proxies.  In

addition to document discovery, Mr. Inglis participated in conference calls, in which he obtained

further information directly from Defendant Zhang and other members of Shanda's management.

154.    With access to this additional information, Mr. Inglis was able to identify many errors in Shanda's calculations.  Shanda admitted that the issues identified by Mr. Inglis were errors.  Through its attorneys, Shanda provided Mr. Inglis with a corrected version of the March 2015 Projections.  By providing these corrected projections, Shanda not only recognized that the errors identified by Mr. Inglis were indeed errors, but also implicitly recognized that they were significant enough to require revised projections.  Even Shanda's expert, Mr. Jarrell, went on to use the corrected projections in his discounted cash flow analysis in reaching his assessment of the fair value of Shanda's shares – *which even Shanda's own expert determined was higher than the $7.10 per ADS share price.*

155.    During the Appraisal Suit, Shanda's own expert found that as of November 18, 2015, when the Transaction closed, the fair value of Shanda's equity was $9.56 per ADS, which is 34% higher than the $7.10 price that Shanda called "fair and in the best interest" of the holders of Shanda Securities outside of Buyer Group 5.  This $9.56 projection did not reflect any adjustment based on the true Mir II Mobile revenue data.  In offering this expert opinion Shanda was effectively admitting that the deal it offered was in fact not fair, as of the merger date and that the statements made in the Proxies were false and misleading.

156.    The Dissenting Shareholders argued in the Appraisal Suit that the fair value of each ADS was $27.16.  On April 25, 2017, the Grand Court of the Cayman Islands issued its decision in the Appraisal Suit, awarding the dissenters *$16.68 per ADS*, finding that the Transaction had actually provided a mere 42.5% of the fair value of their Shanda Securities.

157.    Then on March 6, 2018, the Court of Appeal of the Cayman Islands partially reversed that ruling, holding that a "minority discount" should have been applied and adjusting the "fair price" down to *$12.84 per ADS*—by this measure investors had been paid a mere 55.2%

of the fair value of their Shanda Securities.  The decision on appeal affirmed much of Judge

Segal's decision.  In particular, it left the criticisms of the March 2015 Projections intact,

including the conclusions that they were unrealistic, unreasonable, and unreliable.

158.    Shanda also admitted to additional errors in the March 2015 Projections but did

not issue corrections to account for these errors.  In introducing the unresolved issues, requiring

his analysis, Judge Segal wrote that "Shanda no longer disputed" the need to make **ten additional

corrections** in the March 2015 Projections, beyond those it had already corrected.

159.    Outside of these admitted errors, the Appraisal Suit decision dealt with nine

points of dispute between Shanda and the Dissenting Shareholders regarding the appropriate

methods for determining fair value.  Of these nine areas of dispute, three disputes directly related

to significant errors in the analysis underpinning the March 2015 Projections.  These errors

rendered the summary of those projections materially false and misleading.

### 2.    Unreasonable Revenue Intensity Estimates

160.    Shanda's management forecasted the expected revenue of each game slated for

release.  To calculate this revenue Shanda used a crude process that grouped mobile games into

one of three categories, referred to as B1, B2 or B3.  This simplistic method of generating

projections, which was not disclosed until the Appraisal Suit, meant that the affirmative

statements that these projections were based upon "the best currently available estimates" and

took into account the revenue of each new game, was false and misleading.  Using this system,

the games were predicted to generate a certain amount of revenue based on their categorization.

For example, in their first quarter, B1, B2 and B3 games were predicted to earn 500,000 RMB ($80,585), 250,000 RMB ($40,292) or 125,000 RMB ($20,146) per day, respectively.[23]

161.     The model followed this exact approach through 2014 and 2015, but in 2016 without explanation, the model predicted some B1 Games as producing far less revenue than their type would suggest.  Shanda initially maintained that this was not an error and hid behind the fact that a game could actually perform better or worse than predicted.  However, the modeling mismatch was not a matter of expectations clashing with results.  The issue was that the predictions conflicted with the purported process used to generate those predictions—which should have been forecasting revenue from games based on their categorization as B1, B2 or B3.

162.     As troubling as the mismatch was, far more troubling still was that Shanda continued to model the expenses for these games as though they were earning at the full rate for B1 games.  For example, a game that was supposedly categorized as a B1 game, would be forecasted as producing far lower revenues in 2016, but would also be forecasted with licensing and royalty costs (which are a function of revenue) as though the game was producing far higher revenues.  For example, a B1 game was incorrectly forecasted to have four times lower revenue than called for by the model, but despite this was still assumed to have licensing/royalty costs of a game producing four times more revenue!

163.     Judge Segal noted that Shanda's expert eventually "recognized . . . the extent of the problem" during cross examination.  Ultimately, Judge Segal found that "the forecasts in this respect [were] unreliable" and that the March 2015 Projections "needed to be corrected."  As calculated by the Dissenting Shareholder's expert and as accepted by Judge Segal, these errors— i.e., just those regarding the mismatch between game-type and projected revenue and expenses—

---

[23] Dollar values calculated using the exchange rate of $1.00 USD to 6.2046 RMB, as set forth in the Final Proxy.

understated Shanda's value by about $0.37 per ADS.  This meant that faulty revenue intensity calculations contributed to the ADS being undervalued by about 5%.

164.    These errors not only significantly understated Shanda's value, but they also meant that the summarized March 2015 Projections, published in the Proxies, showed figures in each line item that understated the Company's prospects.  However, because the Proxies only provided the March 2015 Projections to investors in summary form, investors could not see the otherwise obvious flaws in the method used by Shanda to prepare these projections.

### 3.    Unreasonable Amortization and Depreciation

165.    In preparing the March 2015 Projections, Shanda calculated depreciation and amortization as a percentage of revenue, which, according to Judge Segal, produced results that were "unreasonable and unrealistic."  The use of this flawed approach resulted in a dramatic shift from Shanda's historical practices toward one that obviously deflated the Company's value.

166.    Throughout its historical financial data, such as the data published in its annual reports, Shanda amortized and depreciated expenses based on the estimated useful life of those assets.  In contrast, the model Shanda used in preparing the March 2015 Projections simply assumed that depreciation and amortization would grow at a rate that was a function of revenue growth.  This had the effect of substantially over-estimating depreciation and amortization over the period following the Transaction.  This approach was wrong as a matter of basic accounting principles and certainly did not make use of the best currently available estimates.

167.    One result of Shanda's decision to model amortization and depreciation as products of revenue, as pointed out by Mr. Inglis in the Appraisal Suit, was that the March 2015 Projections showed that the book value of Shanda's capital assets fell rapidly over the forecasted period and then *became negative from 2018*.  It was this observation that prompted Judge Segal to note that the Company's approach was "unreasonable and unrealistic."  It was simply not

possible that the book value of Shanda's capital assets would have become negative and this obvious anomaly would have directly exposed the flaws in the approach to those relying on the depreciation model.

168.    The court then accepted Mr. Inglis' correction to this calculation, which increased the value of Shanda's equity by roughly $0.22 per ADS.  This meant that faulty revenue intensity calculations contributed to the ADS being undervalued by about 3%.

169.    This error not only meant that the approach used by Shanda was itself deeply flawed but it also would have reduced the line items for "Total Operating Expenses" and "Net Income" in the summary of the March 2015 Projections.  However, because the Proxies only provided the March 2015 Projections to investors in summary form, they could not see the otherwise obvious flaws in the method used by Shanda to prepare these projections.

### 4.    Mir II Mobile's Revenue

170.    As was revealed during the Appraisal Suit, when Shanda's management prepared the March 2015 Projections they modeled Mir II Mobile, using the method described above, as an ordinary B1 game with total lifetime revenues of $15 million.  Given the resources Shanda had invested in the game,[24] its tremendous expectations for the product, and the historical success of Mir II PC (which grossed $185 million, $214 million, and $248 million in the three years prior to the Transaction alone) a prediction of $15 million in lifetime revenue was

---

[24] According to an August 3, 2015, Sina article the MIR II Mobile development team included about 80 people.  According to a February 5, 2015, Gamelook article the development process lasted more than two years.  As Mir II Mobile's lead developer said in the Gamelook article, Shanda "spared no efforts in terms of . . . reinvestments into this game."  In the December 19, 2014, article on Mir II Mobile's website about Shanda's presentation promoting the game, the Company described their development strategy as: "throw[ing] in big money, on big labels, with big-scale productions."

obviously outrageous and failed to take into account "projected revenues for each new game," as stated in the Proxies.

171.    Shanda had based its March 2015 Projections on an assumption that the mobile version that it had been touting as its golden goose would merely produce average revenues for a game of its type.  But Mir II Mobile was not an average game that produced average revenues.  Instead, it produced between $92 million and $107 million every month (with a large portion of that revenue flowing to Shanda)—including in August, September and October of 2015.

172.    As such, the March 2015 Projections were not reasonably prepared and hid a significant source of anticipated revenue from holders of Shanda Securities.  Choosing to project Mir II Mobile as an average B1 game, dramatically understated the Company's prospects.

173.    Had Shanda announced that Mir II Mobile was being categorized this way, investors could have adjusted their assessment of the summarized March 2015 Projections to account for the dramatic undervaluation of the game and could have sought appraisal.  However, Shanda did not publish game-level data, or any other means to test its analysis.  Investors were left to rely upon Shanda's assurances that the March 2015 Projections were reasonably prepared, based upon historical data, took into account the realistic "projected revenues for each new game," and were based on reasonable assumptions and the best currently available estimates.

174.    Moreover, the projections were published without any indication that they potentially understated the true value of Mir II Mobile by a massive amount, a point that is particularly jarring in the face of the representation that Shanda's "management" was not aware of "any" circumstances that would make the information relied upon in preparing the projections misleading.

175.     In the Appraisal Suit decision, Judge Segal noted that "Shanda has not provided or uploaded into the data room any information concerning the revenue generated from the Mir II [Mobile] game."  In light of this, Mr. Inglis, the expert witness for the shareholders in the Appraisal Suit, developed estimates regarding the game's financial contribution to Shanda using the March 2016 public statement by Shanda's vice chairman,[25] a review of Shanda's agreement with Tencent, and answers given by Mr. Zhang during a conference call with Shanda's management as part of the Appraisal Suit.  Judge Segal found that the approach used by Mr. Inglis was "reasonable and reliable" and therefore "accepted" his approach.

176.     More specifically, Judge Segal quoted Mr. Inglis' expert report as estimating that in its first quarter of operation, the game contributed 844 million RMB (i.e., roughly $136 million) in revenue to Shanda, which was "more revenue than it reported earnings from the rest of the business in any of the first three quarters of 2015."  Furthermore, the court also quoted Mr. Inglis' expert report as estimating that, in Mir II Mobile's first quarter of operation, it would produce "**more profit than Shanda reported earnings from the rest of the business during the whole of the first three quarters of 2015, in total**."  Ultimately, Judge Segal concluded that Shanda's projections for Mir II Mobile were "substantially below a reasonable forecast."

## V.  DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS DURING THE CLASS PERIOD

177.     During the Class Period, Defendants made numerous materially false and misleading statements and omissions.[26]  The specific false and misleading statements are detailed

---

[25] Specifically, the March 9, 2016, revelation that Mir II Mobile was producing revenues between $92 and $107 million each month.

[26] The statements that are ***bolded and italicized*** in this section are statements alleged to be false and misleading.

below and reference is made therein to the following subparagraphs, which explain reasons those statements are false and misleading:

(a)      **Statements That Presented the Transaction in a Positive Light, or As "Fair."**  These statements were false and misleading because they conveyed that the consideration of $3.55 per common stock and $7.10 per ADS was a fair price for the Shanda Securities when in fact, the Shanda Securities were undervalued, causing the price to be unfair. Shanda's own expert in the Appraisal Suit found the fair value of each ADS to be $9.56, which is 34% higher than the deal price and the Court of Appeals in the Appraisal Suit found the fair value of each ADS to be $12.84, meaning Shanda only paid 55.2% of the fair value of the Shanda Securities.  *See* § IV(L).  The $7.10 per ADS share price was based on the March 2015 Projections which omitted certain information (like the 2020 projections) and included numerous errors and unreasonable assumptions - including over a dozen errors that Shanda admitted to in the Appraisal Suit (*see* § IV(L)(1)); errors regarding forecasted game revenue and expenses associated with those games (*see* § IV(L)(2)), errors in depreciation and amortization (*see* § IV(L)(3)), and unreasonable assumptions about the anticipated success of Mir II Mobile, which inexplicably contradicted Defendants' public statements about the anticipated results for the game (*see* §§ IV(L)(4), IV(D)).

(b)      **Statements Concerning the Process in Preparing For and Approving the Transaction.**  These statements were false and misleading because they misled investors into believing that a robust process had been conducted in reaching a Transaction that was fair to the holders of Shanda Securities, when in fact the process had not been fair.  Despite describing a process that took into account new game revenues and games in the pipeline to forecast revenues, Defendants instead employed a crude process of grouping games - including the

blockbuster Mir II Mobile- into simple categories that did not account at all for the game's anticipated success.  The process was further tainted by the unreliable March 2015 Projections which omitted certain information (like the 2020 projections) and included numerous errors  - including over a dozen errors that Shanda admitted to in the Appraisal Suit (*see* § IV(L)(1)); errors regarding forecasted game revenue and expenses associated with those games (*see* § IV(L)(2)), errors in depreciation and amortization (*see* § IV(L)(3)), and unreasonable assumptions about the anticipated success of Mir II Mobile, which inexplicably contradicted Defendants' public statements about the anticipated results for the game (*see* §§ IV(L)(4), (IV)(D)).

(c)      **Statements Concerning the Projections Themselves.**  These statements were false and misleading because the projections omitted certain information (like the 2020 projections) and were based on the March 2015 Projections which included numerous errors and unreasonable assumptions  -  including over a dozen errors that Shanda admitted to in the Appraisal Suit (*see* § IV(L)(1)); errors regarding forecasted game revenue and expenses associated with those games (*see* § IV(L)(2)), errors in depreciation and amortization (*see* § IV(L)(3)), and unreasonable assumptions about the anticipated success of Mir II Mobile, which inexplicably contradicted Defendants' public statements about the anticipated results for the game (*see* §§ IV(L)(4), (IV)(D)).

(d)      **Statements Concerning the Information Actually Reviewed by the Buyers Group and Merrill Lynch.**  These statements were false and misleading because the Company actually provided the Buyer Group and Merrill Lynch detailed forecasts up to and including the year 2020.  The year 2020 information was omitted from the Proxies.  The true March 2015 Projections included the year 2020 information forecasted growth of 5.4% in 2020.

This meant that the Company omitted additional material information that would have given investors positive information about the value of the Company.  *See* § IV(G)(1)(b).

(e)     **Statements Made in the Final Proxy After Mir II Mobile's Blockbuster Launch.**  These statements misled holders of Shanda Securities into believing that the March 2015 Projections had incorporated reasonable assumptions about Mir II Mobile and that the March 2015 Projections also reasonably accounted for the actual and known success of Mir II Mobile which was known by the time the Final Proxy was published.  *See* §§ IV(L)(4), (IV)(D).  Thus, these statements omitted material information about the amazing success of Mir II Mobile and its positive effect on the value of the Company and were misleading due to these omissions.  It was also materially misleading to continue to rely upon the analysis of Merrill Lynch, which analysis was prepared before the tremendous success of Mir II Mobile was known and was based on an earlier assumption that was at the time wrong and was later proven wrong by actual Mir II Mobile results.

178.     To the extent that it is determined that any of the statements detailed below are statements of opinions, these opinion statements were false and misleading.  Statements of opinion conveying that the Transaction was fair or advisable were false and misleading because they were not actually held by the Defendants.  Rather, they were part of a fraudulent scheme to deprive shareholders of the fair value of their Shanda Securities.  This is supported by the fact that Shanda's own expert witness, in the Appraisal Suit, agreed that the Transaction did not provide holders of Shanda Securities with the fair value of these shares, and in fact undervalued their shares.  These opinion statements were misleading because they were rendered in reliance on the projections, which Defendants knew were seriously flawed and not capable of producing reliable analysis that a shareholder could reasonably use in assessing the fairness of the

Transaction.  Similarly, these opinions were misleading because they falsely conveyed that a commercially acceptable procedure had been used to evaluate the Transaction, when in reality it was known (or recklessly disregarded) by Defendants that such process was illusory because it was tainted by the flawed projections.  Any such opinion statements omitted material information that would need to have been disclosed to make these opinions not misleading, such as material information about the March 2015 Projections that would have allowed holders of Shanda Securities to understand the true meaning of these opinions.

### A.    The Deal Announcement

179.    Shanda issued a press release on April 3, 2015, announcing that the Company had agreed to the Transaction.  This press release was issued by Shanda, and the Form 6-K filing this press release with the SEC was signed by Defendant Zhang.

180.    The April 3, 2015, announcement promoted the Transaction by disclosing the deal price and pointing to a premium as compared to the Company's recent trading price, without also disclosing that the Shanda Securities were worth far more than that deal price.  Specifically, the press release explained that:

> Pursuant to the Agreement**, *Parent will acquire the Company for cash consideration equal to US$3.55 per ordinary share of the Company (each, an "Ordinary Share") and US$7.10 per American Depositary Share of the Company, each representing two Class A Ordinary Shares (each, an "ADS"), in a transaction valuing the Company at approximately US$1.9 billion.  This price represents a premium of 46.5% and 53.8%, respectively, over the Company's 30- and 60-trading day volume-weighted average price as quoted by NASDAQ Global Select Market ("NASDAQ") on January 24, 2014*, the last trading date immediately prior to the Company's announcement on January 27, 2014 that it had received a "going private" proposal.

181.    These statements were false and misleading for the reasons stated in ¶ 177(a).

182.    The deal announcement further stated that the Transaction had been approved by the Board upon recommendation by the Special Committee and that the Board recommended shareholders approve the Transaction.  Specifically, the press release explained that:

> *The Company's Board of Directors, acting upon the unanimous recommendation of the . . . Special Committee . . . unanimously approved the Agreement, the plan of merger required to be filed with the Registrar of Companies of the Cayman Islands in connection with the Merger and the transactions contemplated thereby (the "Transactions"), including the Merger, and resolved to recommend that the Company's shareholders vote to approve the Agreement and the Transactions, including the Merger.*

183.    These statements were false and misleading for the reasons stated in ¶¶ 177(a)-(b).

184.    Finally, the press release intentionally conveyed to investors that there had been a robust negotiation by the Special Committee with the assistance of an independent financial advisor.  Specifically, the press release stated that:

> The Special Committee, which is composed solely of independent directors who are unaffiliated with Parent, Merger Sub, any member of the Buyer Group or management of the Company, *exclusively negotiated the terms of the Agreement with the Buyer Group with the assistance of its independent financial and legal advisors.*

185.     These statements were false and misleading for the reasons stated in ¶ 177(a)-(b).

**B.    Initial Proxy**

186.    On May 5, 2015, the Company filed the Initial Proxy on Form 13E-3 explaining the proposed Transaction to holders of Shanda Securities.  The Initial Proxy was directed to all "Shareholders of Shanda Games Limited" and was signed by Defendant Zhang, Defendant Yao (on behalf of Shanda) and each member of Buyer Group 4.  The Initial Proxy included the following misleading statements or omissions.

1.      **Promotion of the Transaction Price**

187.    The Initial Proxy promoted the Transaction by describing the merger

consideration of $3.55 per common share and $7.10 per ADS.

188.    These statements were false and misleading for the reasons stated in ¶ 177(a).

2.      **The False Projections**

189.    The Initial Proxy included a summary of the March 2015 Projections as follows:

| | Management Projections | | | | | |
|---|---|---|---|---|---|---|
| | Fiscal Year Ending December 31, | | | | | |
| | 2014E[(1)] | 2015E | 2016E | 2017E | 2018E | 2019E |
| | (RMB in millions)[(2)] | | | | | |
| Total Net Revenues | 3,717 | 3,591 | 4,700 | 5,662 | 6,465 | 7,661 |
| Growth | -14.5% | -3.4% | 30.9% | 20.5% | 14.2% | 18.5% |
| Gross Profit | 2,777 | 2,723 | 3,463 | 4,066 | 4,548 | 5,491 |
| Gross Margin | 74.7% | 75.8% | 73.7% | 71.8% | 70.3% | 71.7% |
| Total Operating Expenses | 1,594 | 1,386 | 1,799 | 2,105 | 2,323 | 2,826 |
| Income from Operations | 1,183 | 1,337 | 1,663 | 1,961 | 2,225 | 2,665 |
| Operating Margin | 31.8% | 37.2% | 35.4% | 34.6% | 34.4% | 34.8% |
| Net Income attributable to Shanda Games Limited | 1,040 | 1,234 | 1,462 | 1,602 | 1,848 | 1,902 |

(1) These projections were prepared by the Company's management during the first quarter of 2015.  At the time these projections were prepared, the audit for the fiscal year ended December 31, 2014 had not been completed.  Accordingly, management estimates for fiscal year 2014 may vary materially from the Company's audited financial statements.
(2) Financial projections were prepared and provided in RMB.

190.    The presentation of this summary of the March 2015 Projections was false and

misleading for the reasons stated in ¶¶ 177(c)-(d).

3.      **False Representations About the Preparation of the Projections**

191.    The Initial Proxy also included representations that the projections were

reasonable.  These statements were as follows:

> In compiling the projections, ***the Company's management took into account historical performance of legacy games, projected launch dates of new games in the Company's pipeline, and projected revenues for each new game, combined with estimates regarding gross margin, operating expenses, tax rates, capital expenditure, EBITDA and net income***. Although the projections are presented with numerical specificity, ***they were based on numerous assumptions and estimates as to future events made by management that management believed were reasonable at the time the projections were prepared***.

192.   These statements were materially misleading for the reasons stated in ¶¶ 177(b)-(c).

### 4.   False Representations About the Scope of the Projections

193.   The Initial Proxy reproduced the projections in summary form as quoted above. The published version of the March 2015 Projections extends until 2019.  However, as was uncovered in the Appraisal Suit, the real March 2015 Projections that were provided to the Buyer Group and Merrill Lynch extended until 2020 and showed continued growth through that year; Judge Segal wrote that, the "March 2015 Projections contained detailed forecasts up to and including the year 2020."  The March 2015 Projections forecasted growth of 5.4% in 2020 but this was not included in the summarized projections.  This meant that the Company omitted additional material information and deprived investors of significant and positive information about the Company and its value.

194.   The Initial Proxy also falsely represented that the March 2015 Projections that were provided to the Buyer Group and Merrill Lynch actually extended only until 2019 by stating:

> However, in connection with the Buyer Group's due diligence review of the Company, ***the Company's management provided financial projections . . . for the fiscal year ended December 31, 2014 through the fiscal year ending December 31, 2019 to the Buyer Group in . . . March 2015 . . . and in connection with Merrill Lynch's financial analysis of the consideration to be paid***

68

> *in the Merger, the Company's management provided financial*
> *projections for the . . . fiscal year ended December 31, 2014*
> *through the fiscal year ending December 31, 2019 to Merrill*
> *Lynch, as the financial advisor to the Special Committee . . .*
> *March 27, 2015.*

195.    These statements were false and misleading for the reasons stated in ¶ 177(d).

196.    The Initial Proxy also falsely asserted that the published summary of the March

2015 Projections was faithful to the actual projections that the Company had provided to the

Buyer Group and Merrill Lynch.  Specifically, just before including the table summarizing the

March 2015 Projections, the Initial Proxy stated: "***The following table summarizes the financial***

***projections provided by management to the Buyer Group and the Merrill Lynch in March***

***2015. . . .***"  The Initial Proxy further emphasized the fact that the relevant table was a faithful

reproduction of the March 2015 Projections by stating that the projections were included "***to give***

***shareholders access to certain information that was made available to the financial***

***advisor***. . ."

197.    These statements were false and misleading for the reasons stated in ¶ 177(d).

**5.    False Representations that the Transaction Was Fair**

198.    The Initial Proxy included many false and misleading assertions that the

Transaction was fair or in the best interests of the holders of Shanda Securities outside the Buyer

Group.

199.    The Special Committee purportedly found that the deal was fair, and the Initial

Proxy stated that:

> At a meeting on April 3, 2015, the Special Committee, after due
> consideration, unanimously (a) ***determined that the Merger***
> ***Agreement, the Plan of Merger and the Transactions, including***
> ***the Merger, were fair to, and in the best interests of, the***
> ***Company and its shareholders and ADS holders***, other than the
> members of the Buyer Group and their respective affiliates (such
> shareholders and ADS holders, the "Unaffiliated Holders"); (b)

declared advisable the Merger Agreement, the Plan of Merger and
the Transactions, including the Merger; and (c) recommended that
the Board authorize and approve the Merger Agreement, the Plan
of Merger and the Transactions, including the Merger.

200.    This statement was false and misleading because the Transaction was not fair or

in the best interests of shareholders and ADS holders as explained in ¶¶ 177(a)-(b).

201.    The Board purportedly found that the deal was fair, and the Initial Proxy stated

that:

At a meeting on April 3, 2015, the Board, acting upon the
unanimous recommendation of the Special Committee,
unanimously (a) *determined that it was fair to, advisable and in
the best interests of the Company and the Unaffiliated Holders to
consummate the Transactions, including the Merger* . . . and (c)
resolved to recommend in favor of the authorization and approval
of the Merger Agreement, the Plan of Merger and the
consummation of the Transactions, including the Merger, to the
shareholders of the Company and directed that the Merger
Agreement, the Plan of Merger and the consummation of the
Transactions, including the Merger, be submitted to a vote of the
shareholders of the Company for authorization and approval.

202.    This statement was false and misleading because the Transaction was not fair or

in the best interests of shareholders and ADS holders as explained in ¶¶ 177(a)-(b).

203.    Both the Board and the Special Committee purportedly found that the deal was

fair "after careful consideration," and the Initial Proxy stated as follows:

*After careful consideration and acting upon the unanimous
recommendation of a special committee (the "Special
Committee") of the board of directors of the Company (the
"Board"), composed solely of directors who are unaffiliated with
any member of the Buyer Group or any member of the
management of the Company, the Board unanimously (a)
determined that it is fair to, advisable and in the best interests of
the Company, its shareholders and ADS holders, other than the
members of the Buyer Group and their respective affiliates (such
shareholders and ADS holders the "Unaffiliated Holders"), to
consummate the Transactions, including the Merger.*

204.    This statement was false and misleading because the Transaction was not fair or in the best interests of shareholders and ADS holders as explained in ¶¶ 177(a)-(b).

205.    The Initial Proxy also included representations made in the context of presenting Merrill Lynch's opinion that the Transaction was fair.  While these statements were in some sense originally made by Merrill Lynch, they are attributable to the Individual Defendants for two reasons: first, they are part of the Initial Proxy, which was signed by Defendant Zhang, Defendant Yao (on behalf of Shanda), and second, each of the Individual Defendants "expressly adopted" the analysis of Merrill Lynch.[27]   The relevant statements are as follows:

> In arriving at its opinion, Merrill Lynch assumed and relied upon, without independent verification, the accuracy and completeness of the financial and other information and data publicly available or provided to or otherwise reviewed by or discussed with Merrill Lynch and relied upon ***the assurances of the management of the Company that they are not aware of any facts or circumstances that would make such information or data inaccurate or misleading in any material respect***.   With respect to the Management Forecasts, Merrill Lynch was advised by the Company, and assumed, that ***such forecasts were reasonably prepared on bases reflecting the best available estimates and good faith judgments of the management of the Company*** as to the future financial performance of the Company.

206.    These statements were false and misleading because the forecasts were not reasonable and numerous facts existed to undermine these projections as explained in ¶¶ 177(a)-(c).

207.    Merrill Lynch's written fairness opinion was also appended to the Final Proxy and contained the following statement:

---

[27] The Initial Proxy states that the Special Committee "expressly adopted" the "analyses and the opinion" of Merrill Lynch and that Shanda's Board "adopted such recommendations and analysis" as given by the Special Committee.  Each Individual Defendant is a member of Shanda's Board.

> In arriving at this Opinion, we have . . . relied upon the ***assurances of the management of the Company that they are not aware of any facts or circumstances that would make such information or data inaccurate or misleading in any material respect. With respect to the Management Forecasts, we have been advised by [the] Company, and have assumed, that they have been reasonably prepared on bases reflecting the best currently available estimates and good faith judgments of the management of the Company as to the future financial performance of the Company.***

208. These statements were false and misleading because the forecasts were not reasonable and numerous facts existed to undermine these projections as explained in ¶¶ 177(a)-(c).

209. Merrill Lynch, as financial advisor to the Special Committee, purportedly found that the Transaction was fair from a financial point of view, and the Initial Proxy stated as follows:

> The Special Committee retained Merrill Lynch (Asia Pacific) Limited ("Merrill Lynch") to act as its independent financial advisor in connection with the Merger. At the meeting of the Special Committee on April 3, 2015, Merrill Lynch rendered its oral opinion, which was subsequently confirmed in writing, that, as of such date, ***based upon and subject to the assumptions made, procedures followed, matters considered and qualifications and limitations on the review undertaken by Merrill Lynch set forth in its opinion, the Per Share Merger Consideration or Per ADS Merger Consideration, as applicable, to be received in the Merger by holders of Class A ordinary shares of the Company or ADSs (other than holders of Excluded Shares) is fair, from a financial point of view, to such holders.***

210. This statement was false and misleading because the Transaction was not fair to shareholders and ADS holders from a financial point of view as explained in ¶¶ 177(a)-(c).

211. In signing the Initial Proxy, Defendant Zhang and Defendant Yao each stated that "***[a]fter due inquiry and to the best of each of the undersigned's knowledge and belief, each of***

*the undersigned certifies that the information set forth in this Transaction Statement is true, complete and correct.*"

212.     These statements were false and misleading for the reasons stated in ¶¶ 177(a)-(d).

### C.     The Final Proxy

213.     Shanda published the Final Proxy on October 13, 2015 as an amendment to its earlier filed Form 13E3.  The Final Proxy was directed to all "Shareholders of Shanda Games Limited" and was signed by Defendant Zhang, Defendant Liang, Defendant Yao (on behalf of Shanda), each of the Individual Defendants, and each member of Buyer Group 5.

214.     The Final Proxy continued the fraudulent scheme by reproducing the false and misleading statements that were originally included in the Initial Proxy regarding March 2015 Projections and the preparation of the March 2015 Projections.

#### 1.     Promotion of the Transaction Price

215.     The Final Proxy continued the fraudulent scheme by continuing to promote the Transaction by describing the merger consideration of $3.55 per common share and $7.10 per ADS.

216.     These statements were false and misleading for the reasons stated in ¶ 177(a).

#### 2.     The False Projections

217.     The Final Proxy continued the fraudulent scheme by reproducing the false and misleading summarized projections in ¶ 189.

218.     These statements were false and misleading for the reasons stated in ¶¶ 177(c)-(d), 177(e).

### 3.      False Representations About the Preparation of the Projections

219.    The Final Proxy continued the fraudulent scheme by reproducing the

representations in ¶ 191 that the projections were reasonable.[28]

220.    These statements were false and misleading for the reasons stated in ¶¶ 177(b)-

(c), 177(e).

### 4.      False Representations About the Scope of the Projections

221.    The Final Proxy continued the fraudulent scheme by reproducing the

representations in ¶¶ 194, 196 that the summarized projections were faithful to the March 2015

Projections, when in fact they omitted an entire year of data.

222.    These statements were false and misleading for the reasons stated in ¶ 177(d).

### 5.      False Representations that the Transaction Was Fair

223.    The Final Proxy continued the fraudulent scheme by reproducing the false and

misleading statements in ¶¶ 199, 201, 203, 205, 207, 209 that the Transaction was fair or in the

best interest of holders of Shanda Securities outside the Buyer Group.

224.    These statements were false and misleading for the reasons stated in ¶¶ 177(a)-(c),

177(e).

225.    In addition to the repeated representations concerning fairness in the Initial Proxy,

the Final Proxy also included several additional representations that the Transaction was fair.

226.    The Final Proxy stated that the Special Committee found the Transaction to be

fair at an August 25, 2015, meeting:

> At a meeting on August 25, 2015, the Special Committee, after due
> consideration, unanimously . . . ***determined that the Transactions,
> including the Merger, are fair to, and in the best interests of, the***

---

[28] The Final Proxy states that the Special Committee "expressly adopted" the "analysis and the opinion" of Merrill Lynch and that Shanda's Board "adopted such recommendations and analysis" as given by the Special Committee.

>***Company and the shareholders and ADS holders of the Company who are unaffiliated with the Company*** and whose securities are to be purchased pursuant to the terms of the Merger Agreement . . . [and] affirmed its April 3, 2015 resolutions . . . determining that the Merger Agreement, the Plan of Merger and the Transactions, including the Merger, would be fair to, and in the best interests of, the Company and the Unaffiliated Holders.

227.   These statements were false and misleading for the reasons stated in ¶¶ 177(a)-(b), 177(e).

228.   The Final Proxy stated that Shanda's Board made the same determination at an August 26, 2015, meeting:

>Following the meeting of the Special Committee, the Board met via video conference on August 26, 2015, with representatives of Davis Polk, Sullivan & Cromwell and Conyers.   Sullivan & Cromwell, on behalf of the Special Committee, briefed the Board on the work undertaken by the Special Committee and its advisors to date in connection with the Merger. . . .   Members of the Board then discussed the fairness of the Merger . . . [and] . . . acting upon the unanimous affirmation of the Special Committee, unanimously . . . ***determined that the Merger and other transactions contemplated by the Merger Agreement are fair to, and in the best interests of, the Company and the Unaffiliated Holders*** and . . . affirmed its April 3, 2015 resolutions . . . determining it was fair to, advisable and in the best interests of Company and the Unaffiliated Holders to consummate the Merger.

229.   These statements were false and misleading for the reasons stated in ¶¶ 177(a)-(b), 177(e).

230.   After an amendment to the merger agreement (which is not relevant to the instant dispute) the Special Committee and the Board met again to consider the fairness of the Transaction on September 21, 2015.   The Final Proxy stated that:

>At a meeting held via conference call on September 21, 2015, the Special Committee, after due consideration, unanimously . . . determined that ***the Transactions, including the Merger, are fair to, and in the best interests of, the Company and the shareholders and ADS holders of the Company who are unaffiliated with the Company*** and whose securities are to be purchased pursuant to the

terms of the Merger Agreement, as amended and restated by the proposed amendment and restatement. . . .  Following the meeting of the Special Committee, the Board, acting upon the unanimous recommendation of the Special Committee, through unanimous written consent . . . ***determined that the Transactions, including the Merger, are fair to, and in the best interests of, the Company and the Shareholders and ADS holders of the Company who are unaffiliated with the Company and whose securities are to be purchased pursuant to the terms of the proposed amended and restated Merger Agreement***.

231.    These statements were false and misleading for the reasons stated in ¶¶ 177(a)-(b), 177(e).

232.    The Final Proxy also made the following statement in the present tense, i.e., as of its October 13, 2015, publication, regarding the fairness of the Transaction:

> For the foregoing reasons, ***the Company believes that the Merger Agreement, the Plan of Merger and the Transactions, including the Merger, are fair to, and in the best interests of, the Company and its unaffiliated security holders***.

233.    These statements were false and misleading for the reasons stated in ¶¶ 177(a)-(b), 177(e).

234.    Similarly, as of the October 13, 2015, publication of the Final Proxy, the Board "unanimously" recommended that shareholders approve the Transaction and directed shareholders to a section of the Final Proxy which described the:

> material factors considered by the Special Committee and the Board in determining to recommend the approval . . . of the Transactio[n], including the Merger, and in determining that ***the Merger is fair to, advisable and in the best interests of the Company and the Unaffiliated Holders***.

235.    These statements were false and misleading for the reasons stated in ¶¶ 177(a)-(b), 177(e).

236.     Finally, the Final Proxy also stated in the present tense as of its October 13, 2015, publication that "***Each member of the Buyer Group believes that the Merger is fair to the Company's unaffiliated security holders***."[29]

237.     These statements were false and misleading for the reasons stated in ¶¶ 177(a)-(b), 177(e).

238.     In signing the Final Proxy Defendant Zhang, Defendant Liang, Defendant Yao stated that "***[a]fter due inquiry and to the best of each of the undersigned's knowledge and belief, each of the undersigned certifies that the information set forth in this Transaction Statement is true, complete and correct.***"

239.     These statements were false and misleading for the reasons stated in ¶¶ 177(a)-(e).

**D.     The October 19, 2015, Press Release**

240.     Shanda issued a press release on October 19, 2015, regarding the Company's "First Half 2015 Unaudited Results."  This press release was issued by Shanda and signed by Defendant Zhang.  Due to clerical errors, unrelated to the allegations herein, the press release was amended and refiled on October 19, 2015.  This reissued release was also issued by Shanda and signed by Defendant Zhang.

241.     This press release described the launch of Mir II Mobile.  In the press release, Defendant Zhang is quoted as follows:

> "The Company continues its focus on strengthening its development culture and capabilities.  Titles originally scheduled for the first half of 2015 were slated for delayed releases, as we made the decision to give our producers and their teams more time – to create the best games possible for our fans," commented Mr.

---

[29] The Buyer Group included Defendant Zhang, who signed the proxy both on his own behalf and on behalf of each of the specific entities on the Buyer Group that he controlled.  Defendant Liang was a representative of a member of the Buyer Group and signed the Final Proxy on his own behalf.

Yingfeng Zhang, Chairman of the Board and acting Chief Executive Officer of Shanda Games. "Our core strategies are to nurture key franchises and to grow our mobile audience. ***The blockbuster success of 'Mir 2 Mobile' is the result of our focus and improved execution in mobile game development.*** To serve our PC gaming fans, we have planned for release, 'Chuan Qi Yong Heng' a 3D-MMORPG masterpiece made using the Unreal 3 engine, in the near future."

242.    Despite touting the incredible success of Mir II Mobile, the press release omitted

to the tell the market that this incredible success - both anticipated and actual - had not been

factored into the projections (and in fact, Mir II Mobile was woefully undervalued in the March

2015 Projections) which formed the basis for the deal price – rendering the deal price unfair.

These statements were false and misleading for the reasons stated in ¶¶ 177(a)-(b), 177(e).

## VI.    CONTROL PERSON ALLEGATIONS

243.    The Individual Defendants, by virtue of their senior positions at Shanda, directly

participated in the management of the Company, were directly involved in the day-to-day

operations of the Company at the highest levels, and were privy to confidential, proprietary

information concerning the Company and its business, operations, growth, financial statements,

and financial condition, as alleged herein.  As set forth below, the distribution of misleading

information and the failure to convey material information to the public was the result of their

collective actions and knowing inactions.

244.    As Shanda's Chairman and CEO, Defendant Zhang was closely involved in all

aspects of the Company's business operations.  Defendant Zhang had control over Shanda during

the Class Period, through these positions and by holding 48,759,187 Class B shares of Shanda

stock.  This shareholding meant that Zhang held approximately 9% of Shanda's outstanding

stock and, because each Class B share is entitled to ten votes, he controlled approximately 34%

of all voting rights in Shanda.

245.    As directors and members of the Special Committee, Defendant Lin, Defendant Gui and Defendant Chan each had considerable ability to control the Company during the Class Period.  Defendants Lin and Gui had additional control within the Company as members of Shanda's audit committee.

246.    As Shanda's CFO, Defendant Yao had considerable control over the Company during the Class Period and would have had a heightened control of the Company's statements regarding its financial condition and projections.

247.    As a director and as the representative of Ningxia, Shanda's most dominant shareholder at the time the Transaction was completed, holding 80,577,828 Class A Shares and 48,759,187 Class B shares of Shanda stock, Defendant Liang had control over Shanda during the Class Period.  Ningxia's position in Shanda meant that it owned approximately 24% of Shanda's outstanding shares and approximately 40% of all voting rights in Shanda.

248.    As a Co-Founder of Shanda's former parent company, as an officer of that company and a director of Shanda, Defendant Chen had control over Shanda during the Class Period.

249.    The Individual Defendants, because of their positions of control and authority as senior executive officers and directors of Shanda, were able to, and did, control the content of the SEC filings, press releases, and other public statements issued by Shanda during the Class Period.  Defendant Zhang, Defendant Liang, Defendant Yao signed SEC filings that contained the material misstatements or omissions at issue here.  Accordingly, they are responsible for the accuracy of the public statements detailed herein.

250.    The Individual Defendants are liable as participants in a fraudulent scheme and course of conduct that operated as a fraud or deceit on the Class members by disseminating

materially false and misleading statements and/or concealing material information.  Each of the

Individual Defendants were culpable for this deceit insofar as they acted with the requisite

scienter, as explained throughout, and especially in the following Section.

## VII.   ADDITIONAL ALLEGATIONS SUPPORTING DEFENDANTS' SCIENTER

251.    At all relevant times, the Individual Defendants acted with scienter in making the

materially false and misleading statements and omissions alleged herein.  The Individual

Defendants had actual knowledge that the statements and omissions made by them were false

and misleading, or acted with reckless disregard for the truth or falsity of those statements and

omissions.  The Individual Defendants' intent to deceive, or reckless disregard for the truth, is

demonstrated by substantial direct and circumstantial evidence supporting a strong inference of

scienter.  Furthermore, Defendant Zhang and Defendant Liang both had the motive and

opportunity to commit the fraud.

### A.    Motive and Opportunity

#### 1.    Defendant Zhang Had the Motive and Opportunity to Defraud the Class Members

252.    As Shanda's CEO and the Chairman of its Board, it is clear that Defendant Zhang

had the opportunity to commit the fraudulent acts described herein.  He had the ability to

influence the March 2015 Projections and the information contained in the Proxies and he made

public statements about the Company's prospects.  Defendant Zhang signed the Proxies and had

the ability to influence their preparation.  He also had the opportunity to vote as he saw fit as to

the acceptance of the Transaction and as to whether or not to recommend that the shareholders

vote in favor of the Transaction.

253.    As a member of Buyer Group 4 and Buyer Group 5 Defendant Zhang had an

immense motivation to close the deal as cheaply as possible.  By deflating the value of the

Shanda Securities through the fraudulent scheme described herein, Defendant Zhang was able to reduce the amount of money he needed to spend to acquire Shanda.  In fact, by defrauding the holders of Shanda Securities, he received a windfall of approximately **$57 million**.[30]  Defendant Zhang also stood personally to gain through the completion of the Transaction, whereby he obtained private control of the Corporation.  Ultimately, Zhang was motivated to vote that the Transaction was fair so that he could capitalize on the deflated share price and reap millions.

> **2.**      **Defendant Liang Had the Motive and Opportunity to Defraud the Class Members**

254.      As a director on Shanda's Board, it is clear that Defendant Liang had the opportunity to commit the fraudulent acts described herein.  He had the ability to influence the March 2015 Projections and the information contained in the Proxies.  Defendant Liang signed the Final Proxy and had the ability to influence its preparation.  He also had the opportunity to vote as he saw fit as to the acceptance of the Transaction and as to whether or not to recommend that the shareholders vote in favor of the Transaction.

255.       Defendant Liang also had motivation to commit the fraudulent acts contained herein.  Liang was put on the Board as a representative of Ningxia.  He has been associated with Ningxia as a Vice President of Ningxia or its affiliates since 1999.  Liang would have the same motives as Defendant Zhang—he wanted to complete the Transaction as cheaply as possible to enrich his company (Ningxia)—and like Defendant Zhang, Ningxia received a windfall of

---

[30] This number assumes roughly 132 million shares outstanding at the time of the transaction, uses the $6.42 per share value determined in the Appraisal Suit appeal and calculates Defendant Zhang's portion of the Buyer Group's windfall at 15.1%, since this is effectively the portion of Shanda he acquired through the Transaction.

approximately $159 million.[31]  Liang was motivated to vote that the Transaction was fair so that Ningxia could capitalize on the deflated share price and reap millions.

B.    **The Content of the Projections was Known to the Individual Defendants**

256.    As directors of the Company, there can be no reasonable doubt that the Individual Defendants knew the contents of the projections and knew (or recklessly disregarded) that they were false and misleading.

257.    According to the Proxies, the March 2015 Projections were prepared by the Company's management.  Among the Individual Defendants are many of the senior members of the Company's management—in particular Defendant Zhang was Shanda's CEO and Defendant Yao was Shanda CFO.  They certainly were members of the "management," who prepared the Proxies.

258.    The Proxies disclosed that the Special Committee (of which Defendants Chan and Gui were members) discussed the March 2015 Projections with Merrill Lynch as part of reaching their purported opinion that the merger was fair.  Further, the Proxies also disclosed that the Board (of which all the Individual Defendants were members) considered the "analysis" of the Special Committee, as well as the "factors examined by the Special Committee."  The Proxies also list specific factors (including new game revenues) that the Board and Special Committee supposedly considered when determining whether the Transaction was fair.  If the Board members and the Special Committee had actually considered new game revenues (both projections and actuals) as they assured the market they did, then they knew (or were extremely

---

[31] Using the same approach as in the prior footnote, except assuming Ningxia's portion of the windfall at 42.1%, since this is effectively the portion of Shanda it acquired through the Transaction.

reckless in not knowing) that the Projections based on Mir II Mobile were false and misleading when made.

259.    Further, as disclosed in the Proxies and as known by the Individual Defendants, the March 2015 Projections were not reviewed by independent accountants.  In making any affirmative representations about the March 2015 Projections and in relying on those projections, the Individual Defendants knew that they were the only meaningful check on the content of those projections.

260.    Finally, as disclosed in the Company's 2014 Annual Report, Defendants Chan, Defendants Lin and Defendants Gui each were members of Shanda's audit committee.  As a general matter the members of the audit committee were responsible for, among other things, "reviewing reports prepared by management or the independent auditors relating to significant financial reporting issues and judgments."  Specifically, the Proxies also disclosed that because the Transaction qualified as a "related party transaction" the audit committee had an obligation to "review and approve" the Transaction.  Given the context of the disclosure of this obligation, within the Proxies, and their role on the audit committee Defendants Chan, Defendants Lin and Defendants Gui are charged with knowledge that the statements in the Proxies were false and misleading and were at the very least acted recklessly.

C.    **MIR II Mobile Was a Core Component of Shanda's Success and It Was Closely Watched by Defendants**

261.    It was known to each of the Individual Defendants that Mir II PC was the Company's most important franchise.  In fact, Defendant Zhang personally negotiated the licensing agreement for Mir II PC and the Company's annual reports stated that Shanda "depend[s] substantially" on the game.  As a continuation of the Mir II line of business, Mir II Mobile was a core operation of Shanda's business even prior to its release.

262.     It was also known to each Individual Defendant that Mir II Mobile was going to be extremely successful based on the success of Mir II PC, early testing data and early interest by user.  In particular, Defendant Zhang and others in the Company had spoken publicly about the extremely positive expectations the Company had for the game.  *See* ¶ 76.  And, on August 14, 2015, Defendant Zhang sent an email to Shanda's employees touting the game's tremendous success.

263.     Former employees of Shanda have also confirmed that Mir II Mobile was important to the Company and its management.

(a)     According to FE1, Shanda's management team cared a lot about the Mir II Mobile project and Shanda hosted many internal promotions for the game within the Company.

(b)     According to FE2, he heard second-hand that senior management paid a lot of attention to Mir II Mobile and invested significant resources into the game.  He also heard that Defendant Zhang and other top executives had personally downloaded the game and played it together.

(c)     According to FE3, Shanda management team paid a lot of attention to Mir II Mobile and Defendant Zhang and other executives spoke highly about the game at internal meeting that FE3 attended.  He also remembered receiving an email from Defendant Zhang regarding the game's success (ranking number one in the iOS store) on August 14, 2015.

(d)     Former Employee 4 ("FE4") worked in Shanda's finance department where he was responsible for, among other things, tracking game revenue and expenses.  He left Shanda prior to the release of Mir II Mobile.  However, he recalled that the game was a frequent topic of conversation among Shanda's employees and that employees working on the game's development received awards.

264.     The previously described statements, as well as the Chinese-language news articles cited through this complaint, demonstrate that Shanda's management, including Defendant Zhang, paid close attention to Mir II Mobile both before and after its release.

265.     After Mir II Mobile was released, it immediately began making between $92 million and $107 every month.  This resulted in the game producing more revenue than Shanda generated from the rest of the business in any of the first three quarters of 2015.  Similarly, Mir II Mobile generated more profit than Shanda reported earning from the combined total of the rest of the business during the whole of the first three quarters of 2015.  *See* ¶¶ 77, 176.

266.     Former employees of Shanda confirm that the Company had immediate access to data about the success of Mir II Mobile.  For example, according to FE1 Shanda management would know of Mir II Mobile's success even based on its performance on just the first day of operation.  FE1's account is corroborated by Defendant Zhang August 14, 2015 email to Shanda's employees touting the game's tremendous success.  According to FE2, Shanda would collect data from the public beta testing to estimate the game's success—then after the launch the Company's back-end system would begin recording data and this data would be summarized and reviewed by management every week.

267.     Despite this knowledge, the Individual Directors did not revise the March 2015 Projections or provide any commentary that would have informed investors that the projections included, what by then had been proven to be, materially false assumptions regarding the Mir II Mobile's revenue.

**D.    Shanda's Own Admissions and the Appraisal Action Support Scienter**

268.     Shanda's own expert admitted in the Appraisal Action that the shares were undervalued.  Shanda's expert determined that the fair value of Shanda's equity was $9.56 per ADS and this calculation did not even include any adjustments to the forecasts to account for Mir

II Mobile's huge success.  Even without factoring in the true or reasonably expected value of Mir

II Mobile, Shanda admitted that the $7.10 per ADS price provided by the Transaction that it had

called "fair and in the best interest" of its minority investors was 34% lower than the true "fair

value" of those shares.

269.    Shanda has admitted to over a dozen errors in the March 2015 Projections, some

of which caused it to voluntarily issue corrected March 2015 Projections to the Dissenting

Shareholders in the Appraisal Suit.  The sheer number and significance of these errors is enough

to raise a strong inference that the Individual Defendants, knew or were reckless in not knowing

that the March 2015 Projections and the summaries in the Proxies based on these projections

were deficient.  At the very least, these errors show that the Individual Defendants were reckless

in their assertions regarding the quality of the March 2015 Projections and the summaries in the

Proxies based on these projections.

270.    The errors that were revealed during the Appraisal Suit, further demonstrate that

the errors would have been plainly seen by each of the Individual Defendants as they reviewed

the March 2015 Projections—though they remained invisible to those members of the investing

public who merely had access to the published summaries of the March 2015 Projections.

271.    With respect to the inconsistency of general game revenue treatment this would

have been apparent upon review of the March 2015 Projections.  Each game was given a type

and an associated revenue stream.  Any of the Individual Defendants reviewing the projections

would have seen the mismatch.  During the Appraisal Suit, Shanda took the astounding position

that the mismatch was "intentional" (a direct admission) and Judge Segal ultimately agreed with

this position.  As such, there can be no doubt that the mismatch was known.  Furthermore, as

Judge Segal found, the mismatch problem concerning the revenue (e.g., B1 games listed as

having lower than B1 revenue) produced an additional mismatch between each game and its corresponding projected revenue-dependent costs (royalty and licensing fees), so that anyone looking at the March 2015 Projection would have seen a given game fall out of sync with its "game type" (e.g., a B1 game showing four times less revenue than B1 inexplicably still showed full B1 game royalty and licensing fees).

272.    With respect to the errors in Shanda's depreciation projections, the Individual Defendants would have known that these projections were out of line with how Shanda had traditionally projected its depreciation.  Whereas Shanda had previously calculated amortization and depreciation based on the useful life of its assets, in preparing the March 2015 Projections Shanda used a new method, which relied upon the unreasonable assumption that depreciation and amortization were a function of revenue.  As Judge Segal found, this new approach produced results which both "appear to be unreasonable and unrealistic" and actually were "unrealistic and unreliable."  The flawed approach also had the result of projecting Shanda as having negative capital assets by mid-2018, a near impossibility that would have readily exposed the unreasonableness of this approach.

273.    With respect to the Mir II Mobile revenues, by the time the Final Proxy was filed, it was actually known to each of the Defendants that the game had been wildly successful. Shanda had the ability to (and did) track data on the game's success as shown by Defendant Zhang's email to Shanda's employees about the game's success on August 14.  As members of Shanda's Board and management, the Defendants would have known or would have been reckless in not knowing about this major development in Shanda's business.

274.    Despite this knowledge, the Individual Directors did not revise the March 2015 Projections or provide any commentary that would have informed investors that the projections

included, what by then had been proven to be, materially false assumptions regarding Mir II Mobile's revenue.

275.    Due to their knowledge of errors the Individual Defendants would have known or were reckless in not knowing that the March 2015 Projections were false and misleading.  The Individual Defendants would have known that the affirmative representations about the projections were false and misleading.  Furthermore, in presenting the summarized March 2015 Projections and the affirmative statements about those projections, while omitting to disclose any information about both the many errors in their assumptions and the projected and actual performance of Mir II Mobile, the Individual Defendants knew that they were defrauding the Class members.

### E.    The Individual Defendants Knew or Were Reckless in Not Knowing that the Proxies Omitted the Projections of Shanda's 2020 Performance

276.    The Defendants reviewed the Proxies and the March 2015 Projections.  They knew that the March 2015 Projections that they had reviewed included projections of the Company's performance in the year 2020.  They also knew that the publicly disclosed summary of those projections did not disclose the projected performance of the company in the year 2020 (because the Proxy was explicit that the projections only included information through 2019), despite the fact that the Proxies provided assurances that they summaries therein faithfully summarized the March 2015 Projections.  They did not.

### F.    Additional Allegation Regarding Shanda's Knowledge

277.    Shanda has the knowledge of its employees.  It therefore knew of the fraud insofar as any of the Individual Defendants knew of the fraud.  Furthermore, several of Shanda's other employees would have known that the revenue of Mir II Mobile was far higher than projected and not incorporated into the Proxies during the Class Period.  For example, Mr.

Yanwen, the head of development for Mir II Mobile, would have been closely tracking the game's success.  He would have seen the real time information about the state of the game because Shanda used this information to make strategic decisions about the pricing and marketing of in-game items.  Similarly, Shanda's Vice President, Zhu Xiaojing made public statements, regarding the anticipation surrounding Mir II Mobile, which make clear that Shanda believed that the game would be far more successful than the March 2015 Projections assumed.

## VIII.   LOSS CAUSATION

278.    During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially deflated the price of Shanda Securities and operated a fraud or deceit on Class members by failing to disclose and misrepresenting the facts detailed herein.  This course of conduct misled the Class members and caused them, in reliance on the misrepresentations and on the market price of Shanda Securities during the Class Period, to sell their shares at a depressed price.  Through the Appraisal Suit, and the subsequent appeal, it was determined that the fair value of the shares was $12.84.[32]  Class members who sold their Shanda Securities during the Class Period, were damaged thereby because they sold their shares at prices that were lower than the true value of the Company (i.e., Class members suffered damages under the federal securities laws).

279.    Those Class members who sold their Shanda Securities (prior to the Transaction) on November 18, 2015, suffered economic loss because their securities were sold at a depressed value.  Defendants' fraud caused Shanda's ADS to trade at artificially deflated levels throughout the Class Period and caused the holders of Shanda Securities to be deprived of the true value of their shares.  According to data on Bloomberg, during the Class Period the closing price of

---

[32] Lead Plaintiff reserves all rights to argue that the fair value of the shares was higher than this amount.

Shanda's ADS on each date ranged from $6.07 per share and $6.98 per share.  On the day before

the start of the Class Period, Shanda's ADS closed at $6.49.  The Class members who sold their

Shanda Securities prior to November 18, 2015, were deprived of the fair value of their shares

through this fraudulent depression of their shares by Defendants' false and misleading statements

and omissions.

280.   With respect to those Class members who sold their Shanda Securities prior to

November 18, 2015, the availability of appraisal is relevant in the following sense.  But for the

fraud, the market price for Shanda's ADS would have reflected its true value (notwithstanding

the fact that Buyer Group 5 had enough votes to force the Transaction to be completed at the

$7.10 per ADS price), because the availability of appraisal as a remedy would have prevented

the deal price from serving as a ceiling limiting the upper-price of the Shanda Securities.

281.   Class members who held their Shanda Securities through the close of the Class

period sold their Shanda Securities for either $7.10 per ADS or $3.55 per common share.  Each

of these holders of Shanda Securities was deprived of the fair value of their shares through this

fraudulent depression of the value of their shares by Defendants' false and misleading statements

and omissions.  Had these holders of Shanda Securities not been induced to sell their shares at a

depressed price, they could have sought appraisal rights where they would have received no less

than $12.84 per share through the exercise of these appraisal rights.

## IX.    APPLICATION OF THE PRESUMPTION OF RELIANCE

282.   Lead Plaintiff is entitled to a presumption of reliance under *Affiliated Ute Citizens

of Utah* v. *United States*, 406 U.S. 128 (1972), because the claims asserted herein against

Defendants are predicated upon omissions of material fact which there was a duty to disclose.

283.     In the alternative, Lead Plaintiff is entitled to a presumption of reliance on Defendants' material misrepresentations and omissions pursuant to the fraud-on-the-market theory:

(a)     Shanda's ADS was actively traded on the NASDAQ, an informationally efficient market, throughout the Class Period;

(b)     Shanda's ADS traded at high volumes during the Class Period;

(c)     As the sponsor of its ADS securities, which are registered with the SEC, Shanda filed annual reports and routinely filed quarterly unaudited financial reports;

(d)     Shanda communicated with public investors by means of established market communication mechanisms, including through regular dissemination of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts and other similar reporting services;

(e)     The market reacted promptly to public information disseminated by Shanda;

(f)     The Shanda Securities were covered by numerous securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective firms, though many of these firms discontinued coverage after the announcement of the proposed Transaction.  Each of these reports was publicly available and entered the public marketplace;

(g)     The material misrepresentations and omissions alleged herein would tend to induce a reasonable investor to misjudge the value of the Shanda Securities; and

(h)     Without knowledge of the misrepresented or omitted material facts alleged herein, Lead Plaintiff and other members of the Class sold Shanda Securities between the time

Defendants misrepresented or failed to disclose material facts and the end of the Class Period, at which time the truth had not yet been revealed.

## X.    NO SAFE HARBOR

284.    The statutory safe harbor provided by the PSLRA for forward-looking statements under certain circumstances does not apply to any of the materially false and misleading statements and omissions alleged in this Complaint.  As the Company acknowledged within the Proxies, the Transaction was a "going private" transaction under the SEC rules governing such transactions and, therefore, the statements made in connection with the Transaction are not subject to the PSLRA's safe harbor.  *See* 15 U.S.C.A. § 78u-5(b)(E).  Furthermore, even if the statements were not covered by this exemption, the statements at issue would not be protected by the PSLRA's safe harbor or the common law bespeaks caution doctrine for a variety of reasons, including the following.

285.    First, Defendants' statements and omissions alleged to be false and misleading relate to historical facts or existing conditions and, therefore, are not protected by the Safe Harbor.  Second, to the extent any of the false and misleading statements alleged may be characterized as forward-looking, they were not adequately identified as "forward-looking" statements when made.  Third, any purported forward-looking statements were not accompanied by meaningful cautionary language because risks that Defendants warned of had already come to pass, and any cautionary language did not mention important factors of similar significance to those actually realized.  Fourth, to the extent that there were any forward-looking statements that were identified as such, Defendants are liable because, at the time each of those forward-looking statements was made, the speaker knew the statement was false when made.

## XI.    ALLEGATIONS OF INSIDER TRADING

286.    Defendant Shanda engaged in insider trading to the detriment of the Class members who were forced to tender their shares in the Transaction or who voluntarily sold their shares contemporaneous with Shanda.  Through this insider trading, Defendant Shanda is liable under Section 20A of the Exchange Act, 15 U.S.C. § 78t–1, as explained in Count 2. Furthermore, to the extent that Shanda is liable for insider trading, the Individual Defendants are liable as control person under Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), and as expressly permitted by Section 20A(b)(3) of the Exchange Act, 15 U.S.C. § 78t–1(b)(3), as explained in Count 3.

287.    According to a Form 13E-3 filed by Shanda with the SEC on November 19, 2015, the Company held the Extraordinary Shareholders Meeting and approved the Transaction. Pursuant to this approval the merger "became effective" on November 18, 2015.  This is referred to by Shanda as the "Effective Time."  Shanda explained that as of the Effective Time each share of its common stock was "cancelled and converted into and exchanged for the right to receive US$3.55" and each ADS was converted into the "right to surrender one ADS in exchange for US$7.10."  Therefore, through the Transaction and at the Effective Time each Class member holding Shanda Securities sold their shares for the merger consideration.

288.    Through the Transaction, Defendant Shanda purchased the shares that were forcibly sold by Class members through the Transaction.  As laid out in Section 2.04(a) of the merger agreement, which was approved at the Extraordinary Shareholders Meeting and which was signed by Shanda, Shanda was responsible for depositing the money with a "paying agent" who would distribute the funds to the Class members for their Shanda Securities that were purchased by Shanda through the Transaction.  Furthermore, the Final Proxy describes the Transaction as one in which the shares of the holders of Shanda Securities outside of Buyer

Group 5 would be "purchased pursuant to the terms of the Merger Agreement." Thus, there can be no doubt that Shanda purchased contemporaneously with the Class members who sold their Shanda Securities through the Transaction (along with those who sold in the days preceding the Transaction).

289.    At the Effective Time, Shanda was in possession of material non-public information about its operations. Shanda was aware of Mir II Mobile's extraordinary revenue figures. Furthermore, Shanda was aware of the truth regarding each of the misstatements described herein and was aware of the material omissions detailed herein.

290.    By virtue of possessing material non-public information, Shanda has a duty to either disclose that information before trading on the basis of that information or abstain from trading. By trading while in possession of such information, it violated this duty and infringed upon the relationship of trust and confidence that it had with its investors. Moreover, Cayman Islands corporations, like Shanda, have a duty to provide investors with sufficient information to adequately understand the Transaction that they are called upon to consider.

291.    By failing to disclose the material non-public information prior to trading, Shanda caused selling investors in Shanda Securities to suffer economic losses. By trading with shareholders who were acting in reliance on the material misrepresentations made by Shanda described throughout, Shanda caused selling investors in Shanda Securities to suffer economic loss.

## XII.    CLASS ACTION ALLEGATIONS

292.    Lead Plaintiff brings this federal securities class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of itself and all persons and entities who held Shanda Securities on April 3, 2015, and who sold those Shanda Securities during the period from April 3, 2015 through November 18, 2015, inclusive (the "Class Period"), and were damaged thereby,

except as excluded below (the "Class").  For the avoidance of doubt, the Class includes those who held Shanda ADS on April 3, 2015, redeemed those ADS for Shanda's Class A common stock during the Class Period and then sold those common shares during the Class Period.  For the further avoidance of doubt, included within the Class Period is the Effective Time of the Transaction, wherein, the Shanda Securities that were still held by Class members were sold as part of that Transaction.

293.    Excluded from the Class are: (i) Defendants and members of Buyer Group 5; (ii) members of the immediate family of any Individual Defendant; (iii) any person who was an officer or director of Shanda during the Class Period; (iv) any firm, trust, corporation, or other entity in which any Defendant has or had a controlling interest; (v) the legal representatives, affiliates, heirs, successors-in-interest, or assigns of any such excluded person.

294.    The members of the Class are so numerous that joinder of all members is impracticable.  During the Class Period, Shanda had approximately 540 million common shares outstanding.  The number of outstanding ADS during the Class Period is not publicly available but the most recent number reported on Bloomberg, shows 61.83 million ADS outstanding as of November 21, 2014.  Shanda's ADS actively traded on the NASDAQ.

295.    While the exact number of Class members is unknown to Lead Plaintiff at this time, and can only be ascertained through appropriate discovery, it is likely that the proposed Class numbers in the thousands and is geographically widely dispersed.  Record owners and other members of the Class may be identified from records maintained either by Shanda or by the Depository of Shanda's ADS and may be notified of the pendency of this action by mail, using a form of notice similar to that customarily used in securities class actions.

296.     Lead Plaintiff's claims are typical of the claims of the members of the Class.  All members of the Class were similarly affected by Defendants' allegedly wrongful conduct in violation of the Exchange Act as complained of herein.

297.     Lead Plaintiff will fairly and adequately protect the interests of the members of the Class.  Lead Plaintiff has retained counsel competent and experienced in class and securities litigation.

298.     There is a well-defined community of interest in the questions of law and fact involved in this case.  Common questions of law and fact exist as to all members of the Class, and predominate over any questions solely affecting individual members of the Class.  The questions of law and fact common to the Class include, without limit:

(a)     whether the federal securities laws were violated by Defendants' acts and omissions as alleged herein;

(b)     whether the statements made to the investing public during the Class Period contained material misrepresentations;

(c)     whether Defendants' statements omitted material facts that Defendants had a duty to disclose;

(d)     whether Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

(e)     whether Defendants knew or recklessly disregarded that their statements were false and misleading;

(f)     whether defendants acted with the intent to defraud class members regarding the true value of the Shanda Securities;

(g)     whether Defendants' fraudulent conduct depressed the price of Shanda stock during the Class Period;

(h)     Whether Shanda was in possession of material non-public information at the time of the Transaction;

(i)     whether Class members sold their securities contemporaneously with Defendant Shanda's purchase of those shares;

(j)     whether the Individual Defendants were controlling persons of Shanda;

(k)     whether reliance may be presumed pursuant to the fraud-on-the-market doctrine and/or the presumption of reliance afforded by *Affiliated Ute Citizens of Utah* v. *United States*, 406 U.S. 128 (1972); and

(l)     whether and to what extent the shareholders of Shanda Securities suffered losses due to Defendants' fraudulent conduct.

299.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy because, among other things, joinder of all members of the Class is impracticable.  Furthermore, because the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

### COUNT I

### Violation of § 10(b) of the Exchange Act and Rule 10b-5
### Promulgated Thereunder Against All Defendants

300.    Lead Plaintiff repeats, incorporates, and realleges each and every allegation set forth above as if fully set forth herein.

301.    This Count is asserted pursuant to Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder by the SEC against all Defendants.

302.    Defendants, individually and in concert, directly and indirectly, by the use of the means or instrumentalities of interstate commerce, the mails, and/or the facilities of national securities exchanges, violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder by the SEC.

303.    Defendants made false and misleading statements of material facts, omitted to state material facts which they had a duty to disclose and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

304.    Defendants made their false and misleading statements and omissions and engaged in the fraudulent activity described herein knowingly and intentionally or in such a reckless manner as to constitute willful deceit and fraud upon Lead Plaintiff and the other members of the Class who sold Shanda Securities.

305.    Defendants intended to and did, as alleged herein, (i) deceive the investing public, including Lead Plaintiff and members of the Class; (ii) artificially deflate and maintain the prices of Shanda Securities; and (iii) cause Lead Plaintiff and members of the Class to sell Shanda Securities at artificially deflated prices.

306.    The Defendants were individually and collectively responsible for making the false and misleading statements and omissions alleged herein and having engaged in a plan, scheme and course of conduct designed to deceive Lead Plaintiff and members of the Class, by virtue of having made public statements and prepared, approved, signed and/or disseminated

documents that contained untrue statements of material fact and/or omitted facts necessary to make the statements therein not misleading.

307.   In ignorance of the false and misleading nature of Defendants' statements and omissions, and relying directly or indirectly on those statements or upon the integrity of the market price for Shanda common stock, Lead Plaintiff and other members of the Class sold Shanda Securities at artificially deflated prices during the Class Period.  But for the fraud, Lead Plaintiff and members of the Class would not have sold Shanda Securities at such artificially deflated prices.  By selling the Shanda Securities at these artificially deflated prices the Class members suffered economic losses, which losses were a direct and proximate result of Defendants' fraudulent conduct.

308.   By virtue of the foregoing, Defendants are liable to Lead Plaintiff and members of the proposed Class for violations of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

## COUNT II

### Violation of § 20A of the Exchange Act
### Against Defendant Shanda

309.   Lead Plaintiff repeats and realleges each of the allegations set forth above as if fully set forth herein.

310.   This Count is asserted pursuant to Section 20A of the Exchange Act against Defendant Shanda, on behalf of Lead Plaintiff and all members of the Class who sold Shanda Securities through the Transaction and contemporaneously with Shanda's purchase of those securities on November 18, 2015.

311.   As alleged herein, Shanda bought the Shanda Securities while knowingly in possession of material positive and non-public information concerning the Company.  Among

this information was the knowledge that the projections in the Proxies understated the Company's value and the knowledge of Mir II Mobile's revenue.

312.    As set forth in the PSLRA certification (*see* ECF No. 5-1), Lead Plaintiff held his shares until the close of the Class Period.  By doing so he sold his 6,500 ADS to Shanda through the Transaction.  Shanda's purchase and Lead Plaintiff's sale were contemporaneous within the meaning of Section 20A of the Exchange Act.  Numerous members of the Class also sold Shanda Securities contemporaneous with Shanda's purchase on the Transaction date.  Accordingly, under Section 20A of the Exchange Act, Shanda's purchase of the Shanda Securities while knowingly in possession of material, positive, and non-public information during the Class Period makes it liable to Lead Plaintiff and the Class for all profits gained and losses avoided as a result of such stock sales.  Shanda is required to account for all such stock sales and disgorge its profits or ill-gotten gains.

### COUNT III

### Violation of § 20(a) of the Exchange Act
### Against the Individual Defendants

313.    Lead Plaintiff repeats, incorporates, and realleges each of the allegations set forth above as if fully set forth herein.

314.    This Count is asserted pursuant to Section 20(a) of the Exchange Act against the Individual Defendants.

315.    As alleged above, Shanda violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder by making false and misleading statements and omitting material information in connection with the purchase and sale of the Shanda Securities and by participating in a fraudulent scheme and course of business or conduct throughout the Class Period.  As alleged above Shanda violated Section 20A of the Exchange Act by purchasing the

Class members' Shanda Securities through the Transaction and while in possession of material non-public information.

316.    This fraudulent conduct was undertaken with scienter and the Company is charged with the knowledge and scienter of each of the Individual Defendants who knew of or acted with reckless disregard of the falsity of their statements and the fraudulent nature of its scheme during the Class Period.  Thus, Shanda is primarily liable under Section 10(b) and Section 20(A) of the Exchange Act.

317.    As set forth above, the Individual Defendants were controlling persons of Shanda during the Class Period, due to their senior executive positions with the Company, positions on the Board and significant control over the Company's stock.  Such positions meant that the Individual Defendants had direct involvement and influence over the Company's day-to-day operations.

318.    By virtue of the foregoing, the Individual Defendants had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of Shanda, including the content of its public statements with respect to, among other things, the Transaction and the March 2015 Projections.

319.    The Individual Defendants acted knowingly and intentionally, or in such a reckless manner as to constitute willful fraud and deceit upon Lead Plaintiff and the other members of the Class who sold Shanda Securities during the Class Period.

320.    In ignorance of the false and misleading nature of Defendants' statements and omissions, and relying directly or indirectly on those statements or upon the integrity of the market price for Shanda common stock, Lead Plaintiff and other members of the Class sold Shanda Securities at artificially deflated prices during the Class Period.  But for the fraud, Lead

Plaintiff and members of the Class would not have sold Shanda Securities at such artificially deflated prices.  By selling the Shanda Securities at these artificially deflated prices the Class members suffered economic losses, which losses were a direct and proximate result of Defendants' fraudulent conduct.

321.    By reason of the foregoing, the Individual Defendants are liable to Lead Plaintiff and the members of the Class as controlling persons of Shanda in violation of Section 20(a) of the Exchange Act.

## XIII.  PRAYER FOR RELIEF

322.    WHEREFORE, Lead Plaintiff respectfully prays for judgment against the Defendants as follows:

(a)      Determining that this action is a proper class action maintained under Rule 23 of the Federal Rules of Civil Procedure, certifying Lead Plaintiff as class representative, and appointing Labaton Sucharow LLP as class counsel pursuant to Rule 23(g);

(b)      Determining and declaring that Defendants violated the Exchange Act by reason of the acts and omissions alleged herein;

(c)      Awarding Lead Plaintiff and the Class compensatory damages against all Defendants, jointly and severally, in an amount to be proven at trial together with interest thereon;

(d)      Awarding Lead Plaintiff and the Class their reasonable costs and expenses incurred in this action, including but not limited to attorneys' fees and costs incurred by consulting and testifying expert witnesses; and

(e)      Granting such other and further relief as the Court deems just and proper.

## XIV.  JURY DEMAND

323.    Lead Plaintiff demands a trial by jury of all issues so triable.

DATED:  August 13, 2018                    By:   ___/s/ Carol C. Villegas_____

**LABATON SUCHAROW LLP**
Carol C. Villegas
David J. Schwartz
Alec Coquin
Jake Bissell-Linsk
140 Broadway
New York, NY 10005
Telephone: (212) 907-0700
Facsimile: (212) 818-0477
Email:  cvillegas@labaton.com
          dschwartz@labaton.com
          acoquin@labaton.com
          jbissell-linsk@labaton.com

*Attorneys for Lead Plaintiff David Monk*
*and Lead Counsel for the Proposed Class*