**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

IN RE SHANDA GAMES LIMITED
SECURITIES LITIGATION

Case No. 18-CV-02463 (ALC)

**LEAD PLAINTIFF'S OPPOSITION TO**
**DEFENDANT'S MOTION TO DISMISS**

**TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ............................................................................................... iii

I.      SUMMARY OF THE FRAUD ............................................................. 1

II.     LEGAL STANDARDS FOR MOTION TO DISMISS ......................................... 3

III.    PLAINTIFF HAS ADEQUATELY STATED A § 10(b) CLAIM ................................. 3

        A.      Plaintiff Has Pled Material Falsity................................................ 4

                1.      Shanda Made Actionable Misstatements about the Projections ................ 4

                        a.      False Revenue Intensity Figures ................................. 5

                        b.      False Amortization and Depreciation Figures ............................ 6

                        c.      False Mir II Mobile's Revenue Figures ............................ 6

                2.      Shanda Made Actionable Misstatements About Fairness........................ 7

                3.      The Omission of the 2020 Data is Actionable ............................. 9

                4.      Falsity Regarding Mir II Mobile's Success is Actionable ...................... 10

        B.      Plaintiff has Pled Scienter .......................................................... 11

                1.      Motive and Opportunity.......................................................... 12

                2.      Knowledge or Recklessness...................................................... 13

        C.      Plaintiff has Pled Reliance ......................................................... 14

                1.      The Fraud on the Market Doctrine Applies ............................. 14

                2.      The *Affiliated Ute* Presumption Applies ......................... 16

IV.     PLAINTIFF HAS ADEQUATELY STATED A SECTION 20A CLAIM ................... 18

        A.      Shanda Purchased the Securities............................................... 18

        B.      Shanda Possessed Material Non-Public Information............................. 20

V.      *MORRISON* DOES NOT BAR PLAINTIFF'S CLAIMS ............................... 21

A.      Plaintiff Alleges a Transaction in Securities Listed on a Domestic Exchange ............................................................................................ 21

B.      Plaintiff Alleges a Domestic Transaction ........................................... 23

        1.      Plaintiff Incurred Irrevocable Liability Domestically............................ 24

        2.      Title Passed Domestically ....................................................... 25

VI.     CONCLUSION ......................................................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Absolute Activist Value Master Fund Ltd. v. Ficeto*,
  677 F.3d 60 (2d Cir. 2012)...................................................................................23, 24

*Acticon AG v. China N. E. Petroleum Holdings Ltd.*,
  615 F. App'x 44 (2d Cir. 2015) ...................................................................12

*In re Adelphia Commc'ns Corp. Sec. & Derivative Litig.*,
  398 F. Supp. 2d 244 (S.D.N.Y. 2005)...........................................................19

*Affiliated Ute Citizens of Utah v. United States*,
  406 U.S. 128 (1972)...........................................................................16, 17, 18

*Alki Partners, L.P. v. Vatas Holding GmbH*,
  769 F. Supp. 2d 478 (S.D.N.Y. 2011),
  *aff'd sub nom. Alki Partners, L.P. v. Windhorst*, 472 F. App'x 7 (2d Cir. 2012)...................16

*Allied Irish Banks, P.L.C. v. Citibank, N.A.*,
  No. 03-cv-3748, 2015 WL 4104703 (S.D.N.Y. June 30, 2015) ...........................................12

*Anwar v. Fairfield Greenwich Ltd.*,
  728 F. Supp. 2d 372 (S.D.N.Y. 2010)...........................................................21

*Ark. Teachers Ret. Sys. v. Goldman Sachs Grp., Inc.*,
  879 F.3d 474 (2d Cir. 2018)..........................................................................15

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009).................................................................................3, 20

*Barrett v. PJT Partners Inc.*,
  No. 16-cv-2841, 2017 WL 3995606 (S.D.N.Y. Sept. 8, 2017) ...............................................12

*Basic Inc. v. Levinson*,
  485 U.S. 224 (1988)..................................................................................15

*Bayerische Landesbank, N.Y. Branch v. Barclays Capital, Inc.*,
  902 F. Supp. 2d 471 (S.D.N.Y. 2012)...........................................................21

*In re Bioscrip, Inc. Sec. Litig.*,
  95 F. Supp. 3d 711 (S.D.N.Y. 2015).................................................................9

*Black v. Finantra Capital, Inc.*,
  418 F.3d 203 (2d Cir. 2005)..........................................................................15

*Blank v. TriPoint Glob. Equities, LLC,*
  338 F. Supp. 3d 194 (S.D.N.Y. 2018).................................................................12

*In re BP p.l.c. Sec. Litig.*,
  No. 10-md-2185, 2016 WL 3090779 (S.D. Tex. May 31, 2016) .........................8, 9

*Caiola v. Citibank, N.A., N.Y,*
  295 F.3d 312 (2d Cir. 2002)....................................................................7, 11, 17

*Chavin v. McKelvey,*
  25 F. Supp. 2d 231 (S.D.N.Y 1998),
  *aff'd,* 182 F.3d 898 (2d Cir. 1999) ....................................................................16

*In re CheckFree Corp. S'holders Litig.*,
  2007 WL 3262188 (Del. Ch. Nov. 1, 2007) ......................................................9, 10

*Chiarella v. United States,*
  445 U.S. 222 (1980)..............................................................................................20

*City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG,*
  752 F.3d 173 (2d Cir. 2014) ................................................................................22

*Das v. Rio Tinto PLC,*
  332 F. Supp. 3d 786 (S.D.N.Y. 2018)......................................................................7

*Davis v. Scottish Re Grp. Ltd.,*
  74 N.Y.S.3d 10 (N.Y. App. Div. 2018) ................................................................17

*Deutschman v. Beneficial Corp.*,
  132 F.R.D. 359 (D. Del. 1990) ............................................................................16

*Erica P. John Fund, Inc. v. Halliburton Co.*,
  563 U.S. 804 (2011)..............................................................................................15

*Fireman's Fund Ins. Co. v. Great Am. Ins. Co. of N.Y.*,
  10 F. Supp. 3d 460 (S.D.N.Y. 2014),
  *aff'd*, 822 F.3d 620 (2d Cir. 2016) ..................................................................20, 24

*Fogarazzo v. Lehman Bros.*,
  232 F.R.D. 176 (S.D.N.Y. 2005) ..........................................................................18

*Giunta v. Dingman*,
  893 F.3d 73 (2d. Cir. 2018)................................................................................3, 21

*Gottlieb v. Willis,*
  No. 12-cv-2637, 2012 WL 5439274 (D. Minn. Nov. 7, 2012)................................9

*Gross v. GFI Grp., Inc.*,
   310 F. Supp. 3d 384 (S.D.N.Y. 2018) .................................................................................. 8

*Herring v. Rite Aid Corp.*,
   No. 15-cv-2440, 2016 WL 401026 (M.D. Pa. Jan. 28, 2016) ................................................ 9

*Heyman v. Heyman*,
   356 F. Supp. 958 (S.D.N.Y. 1973) ..................................................................................... 25

*Hyatt Corp. v. Stanton*,
   945 F. Supp. 675 (S.D.N.Y. 1996) ..................................................................................... 19

*In re Ivan F. Boesky Sec. Litig.*,
   36 F.3d 255 (2d Cir. 1994) ................................................................................................ 20

*Kirschner v. KPMG LLP*,
   938 N.E.2d 941 (N.Y. 2010) .............................................................................................. 12

*Koppel v. 4987 Corp.*,
   167 F.3d 125 (2d Cir. 1999) ................................................................................................ 8

*Kreppel v. Guttman Breast Diagnostic Inst. Inc*,
   No. 95-cv-10830, 1999 WL 1243891 (S.D.N.Y. Dec. 21, 1999) .......................................... 8

*In re Lehman Bros. Sec. & ERISA Litig.*,
   131 F. Supp. 3d 241 (S.D.N.Y. 2015) .............................................................................. 8, 11

*In re Lyondell Chem. Co.*,
   554 B.R. 635 (S.D.N.Y. 2016) ............................................................................................ 7

*Madison Consultants v. Fed. Deposit Ins. Corp.*,
   710 F.2d 57 (2d Cir. 1983) ................................................................................................ 19

*Matrixx Initiatives, Inc. v. Siracusano*,
   563 U.S. 27 (2011) ............................................................................................................ 4

*McIntire v. China MediaExpress Holdings, Inc.*,
   38 F. Supp. 3d 415 (S.D.N.Y. 2014) .............................................................................. 15, 16

*Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit*,
   547 U.S. 71 (2006) ........................................................................................................... 22

*In re Morgan Stanley Info. Fund Sec. Litig.*,
   592 F.3d 347 (2d Cir. 2010) ................................................................................................ 4

*Mori v. Saito*,
   No. 10–cv-6465 KBF, 2013 WL 1736527 (S.D.N.Y. Apr. 19, 2013) .................................... 21

*Morrison v. Nat'l Australia Bank Ltd.*,
  561 U.S. 247 (2010)..............................................................................................21, 22, 23

*Newton v. Merrill, Lynch, Pierce, Fenner & Smith, Inc.*,
  135 F.3d 266 (3d Cir. 1998)...............................................................................................23

*Novak v. Kasaks*,
  216 F.3d 300 (2d Cir. 2000)......................................................................................11, 13

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
  135 S. Ct. 1318 (2015).............................................................................................................8

*Pasternack v. Shrader*,
  863 F.3d 162 (2d Cir. 2017)...............................................................................................21

*Phelps v. Stomber*,
  883 F. Supp. 2d 188 (D.D.C. 2012)...................................................................................21

*Pope Invs. II, LLC v. Deheng Law Firm*,
  No. 10-cv-6608, 2013 WL 3946126 (S.D.N.Y. July 31, 2013)...............................21

*In re Petrobras Sec. Litig.*,
  116 F. Supp. 3d 368 (S.D.N.Y. 2015)...............................................................................12

*In re Petrobras Sec.*,
  862 F.3d 250 (2d Cir. 2017)...............................................................................................24

*In re Poseidon Concepts Sec. Litig.*,
  No. 13-cv-1213, 2016 WL 3017395 (S.D.N.Y. May 24, 2016) ............................25

*In re Refco Sec. Litig.*,
  779 F. Supp. 2d 372 (S.D.N.Y. 2011),
  *aff'd sub nom. Krys v. Butt*, 486 F. App'x 153 (2d Cir. 2012) ..............................22

*Rolf v. Blyth, Eastman Dillon & Co.*,
  570 F.2d 38 (2d Cir. 1978)...................................................................................................8

*Sable v. Southmark/Envicon Capital Corp.*,
  819 F. Supp. 324 (S.D.N.Y. 1993) ...................................................................................16

*In re Satyam Comput. Servs. Ltd. Sec. Litig.*,
  915 F. Supp. 2d 450 (S.D.N.Y. 2013)...............................................................................22

*Schwab v. E*TRADE Fin. Corp.*,
  No. 18-cv-461, 2018 WL 5309889 (2d Cir. Oct. 26, 2018) ...................................18

*SEC v. Ahmed*,
  308 F. Supp. 3d 628, 669 (D. Conn. 2018)...................................................................24

*SEC v. Compania Internacional Financiera S.A.*,
    No. 11-cv- 4904 DLC, 2011 WL 3251813 (S.D.N.Y. July 29, 2011)...................................21

*SEC v. Credit Bancorp, Ltd.*,
    No. 99-cv-11395, 2000 WL 1752979 (S.D.N.Y. Nov. 29, 2000),
    *aff'd,* 290 F.3d 80 (2d Cir. 2002) ...........................................................25

*SEC v. Gabelli*,
    653 F.3d 49 (2d Cir. 2011),
    *rev'd on other grounds,* 568 U.S. 442 (2013)..........................................................7

*SEC v. Geranio*,
    No. 12-cv-04257 DMG, 2013 WL 12146516 (C.D. Cal. Jan. 29, 2013) ..............................21

*SEC v. Mallard*,
    No. 13-cv-5299, 2014 WL 1660024 (S.D.N.Y. Apr. 23, 2014) ..............................................23

*Simon DeBartolo Grp. v. Richard E. Jacobs Grp.*,
    186 F.3d 157 (2d Cir. 1999)..............................................................18

*In re Smith Barney Transfer Agent Litig.*,
    290 F.R.D. 42 (S.D.N.Y. 2013) ......................................................18

*Speakes v. Taro Pharm. Indus., Ltd.*,
    No. 16-cv-08318, ECF No. 36 (S.D.N.Y. June 19, 2017) ......................................22

*Stratte-McClure v. Morgan Stanley*
    776 F.3d 94 (2d Cir. 2015)..............................................................18

*Strougo v. Barclays PLC*,
    312 F.R.D. 307 (S.D.N.Y. 2016),
    *aff'd sub nom. Waggoner v. Barclays PLC*, 875 F.3d 79 (2d Cir. 2017)...............................18

*In re Symbol Techs., Inc. Sec. Litig.*,
    No. 05-cv-3923, 2013 WL 6330665 (E.D.N.Y. Dec. 5, 2013)..............................................4, 5

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007)..............................................................3, 4, 12, 16

*In re Tezos Sec. Litig.*,
    No. 17-cv-06779, 2018 WL 4293341 (N.D. Cal. Aug. 7, 2018) ............................................21

*TCS Capital Mgmt., LLC v. Apax Partners, L.P.*,
    No. 06-cv-13447, 2008 WL 650385 (S.D.N.Y. Mar. 7, 2008)..........................................4, 19

*TSC Indus., Inc. v. Northway, Inc.*,
    426 U.S. 438, 449 (1976)..............................................................4

*In re United Brands Co. Sec. Litig.*,
  No. 85-cv-5445, 1988 WL 67413 (S.D.N.Y. June 20, 1988) ..................................10

*U.S. v. Elie*,
  No. 10-cr-0336, 2012 WL 383403 (S.D.N.Y. Feb. 7, 2012) ..................................21

*U.S. v. O'Hagan*,
  521 U.S. 642 (1997) ..................................20

*Vine v. Beneficial Fin. Co.*
  374 F.2d 627 (2d Cir. 1967) ..................................19

*In re Virtus Inv. Partners, Inc. Sec. Litig.*,
  No. 15-cv-1249, 2017 WL 2062985 (S.D.N.Y. May 15, 2017) ..................................20

*In re Vivendi, S.A. Sec. Litig.*,
  838 F.3d 223 (2d Cir. 2016) ..................................18

*Waggoner v. Barclays PLC*,
  875 F.3d 79 (2d Cir. 2017) ..................................18

*Wilson v. Comtech Telecomms. Corp.*,
  648 F.2d 88 (2d Cir. 1981) ..................................17

*Wilson v. Great Am. Indus., Inc.*,
  979 F.2d 924 (2d Cir. 1992) ..................................4

**Statutes**

Del. Code Ann. tit. 8 § 141(g) (2016) ..................................23

15 U.S.C. § 78t–1 ..................................18

UCC § 1-201 ..................................25

UCC § 2-401 ..................................25

UCC. § 8-102 ..................................25

UCC § 8-102(a)(17) ..................................25

UCC § 8-501(b)(1) ..................................25

**Other Authorities**

*Title*, BLACK'S LAW DICTIONARY (10th ed. 2014) ..................................25

*Summary*, MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY (11th ed. 2004)................................9

*Summary*, POCKET OXFORD ENGLISH DICTIONARY (2d ed. 2008)..................................................9

Lead Plaintiff David Monk ("Plaintiff") files this opposition to Defendant Shanda Games Limited's ("Shanda") Motion to Dismiss.  ECF Nos. 40-42 ("Motion" or "MtD __.").[1]

## I.  SUMMARY OF THE FRAUD

Shanda defrauded its investors out of hundreds of millions of dollars when it delisted its ADS from NASDAQ and induced its minority investors to sell their holdings in a going-private transaction (the "Transaction").  The fraud deceived investors into undervaluing the Company and selling their ADS rather than seeking appraisal.  ¶¶278-81.  The fraud enriched a small group that took Shanda private (the "Buyer Group"), including Defendant Zhang (its Board Chairman and CEO), who reaped about $57 million from the fraud as well as Ningxia, which reaped about $159 million and was represented on the Board by Defendant Liang.  ¶26.

In 2009, Shanda, a global video game company, accessed U.S. capital markets through the IPO of its ADS, which it listed on NASDAQ and registered with the SEC.  ¶¶32, 59.  To create the ADS, Shanda deposited two shares of its Class A stock per ADS, at a New York office of JPMorgan Chase Bank, N.A. ("JPM").  *Id.*  Plaintiff bought his ADS on NASDAQ before the Class Period and sold them to Shanda at a deflated price through the Transaction.  ¶¶ 31, 288.

On April 3, 2015, Shanda announced the Transaction at a price of $7.10 per ADS.  ¶101.  The Buyer Group controlled enough votes to close the deal, but Shanda still needed to file Proxies so that investors could accurately value Shanda and decide whether to seek appraisal.  ¶108.  An appraisal gives investors the right to reject the deal and instead seek a judicial determination of the fair value of their shares.  ¶148.  Thus, Shanda and the Buyer Group had an

---

[1] Citations to "¶__" refer to paragraphs in the Amended Complaint ("AC"), ECF No. 25.  Public filings cited herein are subject to judicial notice.  *See* MtD 2. n1.  Citations to the "Final Proxy at __" refer to Shanda's SEC Form 13E3/A filed Oct. 13, 2015, which is attached as "Ex. A," and all citations to "Ex. __" refer to exhibits of Carol C. Villegas' Mar. 12, 2019 declaration.  Unless otherwise noted, terms are defined as in the AC and internal quotations and citations are omitted.

incentive to deceive investors into accepting the deal price, which undervalued Shanda, since they would then keep the difference between the deal price and Shanda's fair value. *Id.* Acting on this incentive, Shanda (1) told investors the deal was fair, (2) sought to convince investors that the price of $7.10 per ADS reflected the true value of the Company, and (3) omitted critical information from its Proxies. *E.g.*, ¶¶198-213, 232-39. But, when some investors did seek appraisal (the "Appraisal") (¶¶148-52), ***Shanda's own expert*** admitted the ADS' fair value was ***$9.56, 34% higher than the deal price***. ¶¶154-55. After an appeal, the courts found the fair value of the ADS to be even higher: ***$12.84, a whopping 80% higher than the deal price***. ¶157.

A set of projections (the "Projections") published in summary form in Shanda's Initial Proxy and Final Proxy were central to Shanda's deception. ¶¶189, 217. The Appraisal revealed that this so-called "summary" omitted an entire year of data (¶¶193-97, 221-22) and that the Projections undervalued Shanda by: (a) using an unreasonable game revenue model and manipulating that model to further understate revenue and overstate costs; (b) jettisoning Shanda's past practice and violating accounting rules to overstate depreciation and amortization; and (c) using unjustifiable forecasts for the mobile version of its core game, Mir II. ¶¶160-76.

Shanda was founded on the success of the PC version of Mir II ("Mir II PC"), which was "China's most popular online game" in 2001 (¶50), accounted for 56.4% of Shanda's revenue in 2009 (¶70), and still accounted for 30.9% of revenue in 2014, (*id.*). By 2015, Shanda shifted its focus to mobile games (¶¶67-72), joining an industry trend of releasing franchise PC games on mobile platforms (¶73). Unsurprisingly then, Shanda "spared no efforts" in developing Mir II Mobile, which took years to produce and employed a team of over 80 people. ¶170. Defendant Zhang publicly forecast "explosive growth" from mobile games like Mir II Mobile (¶76), while Shanda referred to it as the "most anticipated RPG mobile game of the year," boasted that it had

seen "overwhelming interest" in the game, and called it "by far [Shanda's] most excellent mobile game." *Id.* Yet, inexplicably and unbeknownst to the public, the Projections treated Mir II Mobile as an ordinary game with $15 million in lifetime revenues, ¶122(c), which was ***far less than 1%*** of the $1.96 billion Mir II PC earned in the seven years for which data is public. ¶70.

On August 3, 2015, Shanda released Mir II Mobile and, as expected, it was an instant hit. ¶77. Eleven days later, Defendant Zhang emailed employees announcing bonuses due to the game's "top spot" on the "best-selling chart." ¶76. It earned $92-$107 million each month after its release and, in its first quarter, it was more profitable than Shanda's entire business in Q1-Q3 of 2015. ¶77. Despite knowing of this success (¶¶137-42), despite knowing of the Projections' flaws (¶¶251-77), and despite disclosure duties arising from its status as a Cayman corporation and from its decision to buy investors' ADS as part of the Transaction (*see* ¶290), Shanda did not reveal this success and released the Final Proxy on Oct. 13, 2015, touting the false Projections and lying about deal's fairness (¶¶131-136). Thus, Shanda deceived investors into selling at a deflated price of $7.10 per ADS, causing them to lose hundreds of millions of dollars.

## II.    LEGAL STANDARDS FOR MOTION TO DISMISS

The Court must "accept all factual allegations in the complaint as true," *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007), and draw "all reasonable inferences in the [Plaintiff's] favor," *Giunta v. Dingman*, 893 F.3d 73, 79 (2d Cir. 2018). Generally, the AC must merely be "plausible." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Allegations of falsity and scienter must be "at least as compelling" as opposing inferences (*Tellabs*, 551 U.S. at 324), meaning if two inferences are equally compelling, Plaintiff is entitled to the requested inference.

## III.    PLAINTIFF HAS ADEQUATELY STATED A § 10(b) CLAIM

Plaintiff's § 10(b) claim requires a material misrepresentation or omission ("falsity"), scienter, a connection between the falsity and the ADS' sale, reliance, economic loss, and loss

causation. *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 37-38 (2011). Shanda only challenges Plaintiff's § 10(b) claim on the basis of material falsity, reliance, and scienter.

### A.     Plaintiff Has Pled Material Falsity

Shanda states that "at the pleadings stage," Plaintiff must show materiality by pleading fraud that would be viewed by reasonable investors as "significantly alter[ing] the 'total mix' of information." MtD 15 (quoting *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976)). However, materiality is a "mixed question of law and fact" that will "rarely be dispositive" at this stage," and dismissal is only appropriate if the fraud was "so obviously unimportant . . . that reasonable minds could not differ" on its insignificance. *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 360 (2d Cir. 2010). As discussed below, the fraud identified in the AC easily satisfies this test and was of immense importance to investors. *See* Section III(A)(1)-(4).

Shanda argues generally that any fraud was immaterial because investors could not stop the merger. MtD 11 (citing *TCS Capital Mgmt., LLC v. Apax Partners, L.P.,* 2008 WL 650385 (S.D.N.Y. Mar. 7, 2008)). In other words, it was fine to lie because there was nothing Plaintiff could do about it. But Plaintiff has a claim if he was "lulled . . . into failing to avail [himself] of some self-protective remedy." MtD 11, n.4 (quoting *TCS,* 2008 WL 650385, at *18). It has long been settled law that he can pursue securities claims if he was defrauded into selling, rather than seeking appraisal. *Wilson v. Great Am. Indus., Inc.*, 979 F.2d 924, 930-32 (2d Cir. 1992) (collecting cases). That is exactly what the AC alleges. ¶281. Shanda's speculation that Plaintiff did not "rea[d] the information" (MtD 11 n.4), is irrelevant given the theories of reliance in Section III(C) and, if relevant, is a fact issue not ripe for dismissal. *Tellabs*, 551 U.S. at 322.

### 1.     Shanda Made Actionable Misstatements about the Projections

The AC alleges misstatements relating to inputs that Shanda used in the false Projections which tricked investors into believing the deal was fair. *See In re Symbol Techs., Inc. Sec. Litig.*,

2013 WL 6330665, at *6, *13 (E.D.N.Y. Dec. 5, 2013) (finding materiality where defendant omitted to disclose that "projections were based [on] inflated . . . calculations" and a "defective sales forecasting").  Shanda tries to duck responsibility by arguing the Proxies "accurately stated" that they summarized the Projections.  MtD 13-14; *contra* Section III(A)(2).  This ignores that the Projections were misleading and ignores the other alleged misstatements of current fact in the Proxies ***about*** the Projections.[2]  For example, the Proxies claimed that the Projections took into account "***historical performance of legacy games . . . and projected revenues for each new game***, combined with estimates regarding gross margin, operating expenses, tax rates, capital expenditure, EBITDA and net income."  ¶¶191-92, 219-20.  Shanda also stated that its management assured its financial advisor, Merrill Lynch, that they were "not aware of any facts or circumstances that would make" the Projections "inaccurate or misleading" and that they "were reasonably prepared on bases reflecting [their] best available estimates and good faith judgments."[3]  ¶¶205-06, 223-24.  As discussed below, these statements were materially false.

a.    **False Revenue Intensity Figures**

It was discovered in the Appraisal that instead taking into account "***historical performance of legacy games . . . and projected revenues for each new game***" Shanda based the Projections on crude groupings that categorized to-be-released games into one of three categories (B1 for best; B3 for worst) with corresponding levels of revenue.  ¶¶160-164.  However, Shanda manipulated the numbers to model some B1 games (which were supposedly modeled at about $80,000 per day), to instead earn only the B3 rate (of about $20,000 per day).  *Id.*  Audaciously, Shanda continued modeling revenue-dependent costs as if the games were

---

[2] Shanda invokes the bespeaks caution doctrine for "the projections themselves" (MtD 14-15), but not for the statements about the Projections, which are not forward-looking.
[3] Plaintiff argues, and Shanda does not deny, that these statements were also made by the Board because it "adopted" Merrill Lynch's analysis.  *See* ¶¶119(c) n.17, 205 n.27, 219 n.28.

5

producing revenue at the higher B1 rate.  *Id.*  It was false to state that the Projections were based on "projected revenues for each new game" (¶¶191-92, 219-20), or "the best available estimates," (¶¶205-06, 223-24), when Shanda relied on a simplistic three-bucket model, and then manipulated that model to deflate revenues and inflate costs.  This was no small error; the Appraisal found that this manipulation alone understated Shanda's value by about 5%.  ¶163.

### b.    False Amortization and Depreciation Figures

In violation of basic accounting principles, the Projections modeled depreciation and amortization as a percentage of revenue.  ¶¶165-69.  Until that point, Shanda had modeled these concepts the correct way: based on the useful life of its assets.  ¶166.  In the Appraisal, Judge Segal called the results of the new approach "unreasonable and unrealistic," because it **overstated** depreciation so egregiously that Shanda's assets were shown as having **negative value** beginning in 2018.  ¶167.  Given this obviously unreasonable approach, it was false for Shanda to state that the Projections "took into account" estimates of "operating expenses" and "capital expenditure" (¶¶191-92, 219-20), and were "reasonably prepared" reflecting "the best available estimates," (¶¶205-06, 223-24).  The Appraisal found that this error alone undervalued Shanda by 3%.  ¶168.

### c.    False Mir II Mobile's Revenue Figures

Shanda told investors that it had "projected revenues for **each** new game" (¶¶191-92, 219-20) (emphasis added), when Shanda really employed (and manipulated) a crude three-bucket model that did not even try to actually forecast the revenues of Mir II Mobile.  ¶¶160-76.  Treating the game as average among its B1 category (with $15 million lifetime revenues) was not "the best available estimat[e]."  ¶¶205-06, 223-24.  It ignored Shanda's expectations for and investment in the game.  It was far less than 1% of the $1.96 billion in revenue Mir II PC earned in just the seven years that data is public (an average of $280 million a year).  ¶70.  And treating it as an ordinary B1 game contradicted Shanda's expectation (based on pre-orders and other

data), that it would be "by far" the Company's "most excellent mobile game."  ¶¶70, 76.

### 2.      Shanda Made Actionable Misstatements About Fairness

Beginning with its April 3, 2015 press release, boasting that $7.10 was a premium to the
ADS market price and that the Board recommended the deal (¶¶179-185), Shanda sought to
persuade investors that the deal was fair.  The Proxies stated that the Special Committee, Board,
and Merrill Lynch, respectively determined that the deal was "fair to, and in the best interest of,"
"fair to, advisable and in the best interests," and "fair" to minority investors.  ¶¶198-212, 223-
239.  But $7.10 was not fair.  As proven in the Appraisal the fair value was 80% higher.  ¶157.

Shanda's argument that it was "not required to opine on the quality of the Transaction"
(MtD 11-13), is false (*see* Section III(C)(2)), and misses the point that because it "cho[se] to
speak" by calling the deal fair, it was obliged to "speak truthfully" and be "both accurate and
complete."  *Caiola v. Citibank, N.A., N.Y*, 295 F.3d 312, 331 (2d Cir. 2002).  Shanda slyly tries
to reframe the AC's claims by implying that the statements in the Proxy merely described the
Transaction "process" (MtD 12-13), but Shanda stated that that the Transaction was fair on
numerous occasions.  ¶¶198-212, 223-239; *see In re Lyondell Chem. Co.*, 554 B.R. 635, 648
(S.D.N.Y. 2016) (company responsible for management's statements); *e.g.*, *Das v. Rio Tinto
PLC*, 332 F. Supp. 3d 786, 808 (S.D.N.Y. 2018) (J. Carter).  Furthermore, even if the Court
agrees that some[4] of these statements were describing "process," they left investors with the
impression that the price was "fair," and it is "well settled" that "literally true statements that
create a materially misleading impression . . . will support claims for securities fraud."  *SEC v.
Gabelli*, 653 F.3d 49, 57 (2d Cir. 2011), *rev'd on other grounds,* 568 U.S. 442 (2013).

Shanda also argues that its assertions of fairness were "non-actionable opinion," in a

---

[4] Shanda's statement in ¶232 cannot be construed as describing "process."  *See* Section III(A)(4).

single sentence that cites *Omnicare* to vaguely argue that opinions are inactionable.  MtD 13

(citing *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 135 S. Ct. 1318

(2015)).  This ignores that ¶178 clearly explained why Shanda's opinion statements were

actionable, as opinion statements often are.  *See Gross v. GFI Grp., Inc.*, 310 F. Supp. 3d 384,

396 (S.D.N.Y. 2018) (recognizing materiality of opinion about merger and noting that the

Supreme Court recognizes the "importance attached" to "statement[s] of belief" by insiders).

     First, under *Omnicare,* opinions are actionable if the speaker does not "actually hol[d] the

stated belief."  135 S. Ct. at 1326.  Shanda did not believe $7.10 per ADS was fair, as shown by

its use of the false Projections and by its own expert who claimed the fair price was $9.56.

¶¶154-55.  *See Kreppel v. Guttman Breast Diagnostic Inst. Inc*, 1999 WL 1243891, at *1

(S.D.N.Y. Dec. 21, 1999) (when a party proffers an expert report it may be treated as the parties'

opinion).  While opinions can change, given the circumstances and magnitude of the gap from

$9.56 to $7.10 (34%), the strongest inference is that Shanda never thought $7.10 was fair.

     Second, statements of opinion are actionable where they do not "fairly align with the

information in the issuer's possession at the time" in the context of "customs and practices of the

relevant industry."  *Omnicare*, 135 S. Ct. at 1329-30.  Thus, when someone says a merger is

"fair" they also are stating that this opinion is "based upon one or more accepted valuation

metric."  *In re Lehman Bros. Sec. & ERISA Litig.*, 131 F. Supp. 3d 241, 253 (S.D.N.Y. 2015);

*see Rolf v. Blyth, Eastman Dillon & Co.*, 570 F.2d 38, 48 (2d Cir. 1978) (stating that opinions are

actionable when based on "flimsy" grounds or made "without basis").  Because the Projections

were grossly unreasonable, it was misleading for Shanda to make assertions of fairness and to

adopt Merrill Lynch's opinion.  *See Koppel v. 4987 Corp.*, 167 F.3d 125, 133 (2d Cir. 1999)

(recommendation actionable when based on analysis that failed to account for financial situation

known to company); *In re BP p.l.c. Sec. Litig.*, 2016 WL 3090779, at *15 (S.D. Tex. May 31, 2016) (because "no amount of "caveats" gives a "speaker license to cherry-pick favorable data," speaker was liable for using "highly unreliable" inputs in estimates*); see also In re Bioscrip, Inc. Sec. Litig.*, 95 F. Supp. 3d 711, 731 (S.D.N.Y. 2015) (opinion actionable where speaker's basis for the opinion conflicted "with facts a reasonable investor would draw from the opinion").

### 3.     The Omission of the 2020 Data is Actionable

A full year of data (the "2020 Data"), which was part of the Projections that were available internally, was omitted from the summary of the Projections included in the publicly released Proxies.  ¶¶109-118; MtD 15-16.  Shanda argues that by presenting a "summary" it "did not suggest" it was "repeating the entire data set."  MtD 15.  While a summary "dispenses with unnecessary details or formalities," *Summary*, POCKET OXFORD ENGLISH DICTIONARY (2d ed. 2008), it still must cover "the main points succinctly," *Summary*, MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY (11th ed. 2004).  It was false to say that the Proxies summarized the Projections, because what they omitted was not detail or formality but an entire year of data.

Shanda incorrectly asserts that the 2020 Data was immaterial because Plaintiff did not allege that the "Buyer Group or Merrill Lynch" relied on it.  MtD 15.  Not so.  The 2020 Data was part of the Projections that were prepared by management, provided to the Special Committee, discussed by that committee in evaluating the Transaction, and relied upon by Merrill Lynch in preparing its fairness opinion.  ¶¶20, 96-99, 105, 111, 257; Final Proxy, at 44. In any event, Shanda's three out-of-circuit cases place no burden on Plaintiff to plead reliance by management.  Only *Herring v. Rite Aid Corp.* even dealt with materiality, and there the court simply declined to enter a preliminary injunction where (unlike here) projections were "expressly disavowed by management."  2016 WL 401026, at *3 (M.D. Pa. Jan. 28, 2016).  The other cases merely analyze when the existence of projections creates an affirmative disclosure duty under

inapplicable state law. *Gottlieb v. Willis*, 2012 WL 5439274 (D. Minn. Nov. 7, 2012); *In re CheckFree Corp. S'holders Litig.*, 2007 WL 3262188 (Del. Ch. Nov. 1, 2007). If anything, Shanda's cases affirm its disclosure duty, since, as stated above, it did rely on the Projections.

Shanda claims that because the AC alleges the Projections were depressed, it cannot also allege the 2020 Data was material. MtD 16. Two wrongs do not make a right. Shanda's value was understated by (1) depressing its Projections, and (2) omitting the 2020 data, which was material because it pointed to a higher valuation by forecasting growth. ¶117. That it would have been even more positive, had Shanda not depressed the Projections, does not excuse its omission. Shanda's argument conflates depressed bullish data with bearish data.

Finally, Shanda argues that because the 2020 Data showed less growth than the prior year, investors would have interpreted it negatively. MtD 16. The opposite conclusion is stronger: it was positive information that, after several years of growth, Shanda would continue growing in 2020. ¶117. And this opposite conclusion supports Plaintiffs premise—that Defendants hid positive information about the Company to induce investors to sell their ADS on the cheap. Furthermore, this is a textbook example of a factual argument regarding materiality that is inappropriate for a motion to dismiss. *See In re United Brands Co. Sec. Litig.*, 1988 WL 67413, at *6 (S.D.N.Y. June 20, 1988) ("The weight a reasonable investor would give to . . . particular hard numbers . . . is the type of delicate assessment that is best left for a jury.").

### 4. Falsity Regarding Mir II Mobile's Success is Actionable

By no later than August 14, 2015—11 days after Mir II Mobile launched—Shanda ***knew*** the game had massively exceeded the revenue estimates used in the Projections. ¶76(n) (Aug. 14, 2015, email about success); ¶¶137-143 (Shanda had real-time data); MtD 19 (admitting knowing of success); ¶77 (Mir II Mobile made $92-$107 dollars every month). Shockingly, about two months later (on Oct. 13, 2015) Shanda filed the Final Proxy without disclosing this

fact.  Thus, the Projections, which were always misleading, were again touted as reliable, despite using inputs that were, by then, known to be objectively false.  ¶76.

Shanda argues that "a simple comparison of the two proxy statements" showed the Projections were not updated (MtD 18), essentially admitting that they failed to provide accurate information.  This argument misses the point on three levels.  First, Shanda had duties to disclose this material information.  *See* Section III(C)(2).  Second, by publishing the Final Proxy without revising the Projections, Shanda communicated to investors that no revision was necessary.  For this same reason, its attempt to disclaim a duty to update the Projections (MtD 18), is irrelevant — having chosen to speak, it had a duty to be "accurate and complete."  *Caiola*, 295 F.3d at 331; *see* Section III(C)(2).  Third, Shanda's attempt to frame this issue in terms of "updating" is especially flawed as to the assertions of fairness in the Final Proxy, since Shanda told investors that these opinions had been refreshed since the Initial Proxy.  *E.g.*, ¶232 (Final Proxy stating in present tense, as of Oct. 13, 2015, that "the Company believes that" the merger is "fair to, and in the best interests of" minority investors); ¶228 (asserting fairness on Aug. 26, 2015); ¶230 (same on Sept. 21, 2015).  By the time of these statements, Shanda knew of Mir II Mobile's success (MtD 19-20)—*i.e.*, that it was earning $92-107 million each month (¶77)—and knew that the Projections falsely forecast it at $15 million in lifetime revenue (MtD 19-20; ¶70).  Under *Omnicare*, one can be liable for assertions of fairness made without relying on an "accepted valuation metri[c]."  *Lehman,* 131 F. Supp. 3d at 253.  Shanda stated that the deal was fair without using such a metric, as no "accepted valuation metric" uses false projections.  *Id.*

### B.    Plaintiff has Pled Scienter

Scienter can be shown with (1) "strong circumstantial evidence of conscious misbehavior or recklessness," or (2) by alleging that the defendant had the "motive and opportunity to commit fraud."  *Novak v. Kasaks*, 216 F.3d 300, 307 (2d Cir. 2000).  The AC prevails under both prongs.

### 1.      Motive and Opportunity

Shanda does not dispute that, due to their roles on the Buyer Group, Defendants Zhang and Liang had the motive and opportunity to defraud (¶¶252-255) or that, due to their roles at Shanda, their scienter would typically be imputed to Shanda (¶277).  MtD 21-22.  Shanda's response misapplies the adverse interest exception ("AIE"), which it says bars the imputation of scienter when fraud is "committed for personal benefit."  *Id.* (quoting *Barrett v. PJT Partners Inc.*, 2017 WL 3995606, at *8 (S.D.N.Y. Sept. 8, 2017)).  Shanda obviously misstates the rule, as courts routinely impute scienter based on an insider's "personal" benefit.  *Acticon AG v. China N. E. Petroleum Holdings Ltd.*, 615 F. App'x 44, 45 (2d Cir. 2015) (summary order); *Blank v. TriPoint Glob. Equities, LLC*, 338 F. Supp. 3d 194, 214-15 (S.D.N.Y. 2018) (J. Carter) (same).

As Shanda's cases state, the AIE is a "most narrow" exception, applied to "outright theft or looting or embezzlement."  *Allied Irish Banks, P.L.C. v. Citibank, N.A.*, 2015 WL 4104703, at *8 (S.D.N.Y. June 30, 2015).  It only applies when the agent "defraud[s] his principal."  *Id.*; *Barrett*, 2017 WL 3995606, at *8 (agent must "defrau[d] the corporation").  Deception ***of the company*** is key to the AIE, since the AIE is an "exception" to the "presumption that agents communicate . . . to their principals."  *Kirschner v. KPMG LLP*, 938 N.E.2d 941, 951 (N.Y. 2010).  Far from alleging Shanda was misled, the AC alleges Shanda's insiders knew the truth. ¶256-77.  At most, this leaves a fact issue, not a basis for dismissal.  *Tellabs,* 551 U.S. at 322.

The AIE also fails unless the fraud "harmed the corporation," *Kirschner,* 938 N.E.2d at 948, but the AC does not allege that Shanda was harmed (*e.g.*, by losing assets).  Inversely, the AIE applies only if the insider "totally abandoned" the company and did not "benefi[t] to *any* extent" from the fraud.  *In re Petrobras Sec. Litig.*, 116 F. Supp. 3d 368, 382 (S.D.N.Y. 2015) (emphasis in original).  While terrible for minority investors, the scheme to close the deal at a low price (and with few appraisals) saved Shanda money, by reducing the amount it needed to

12

spend on the Transaction (*see* Section IV(A)), and also preserved capital available to the Buyer

Group for future reinvestment in the Company.  Shanda appears to posit, without any support,

that the "interests" analyzed when considering the AIE, are the shareholders' rather than the

Company's.  Even if this were correct, the fraud benefited the Buyer Group (MtD 22), which

controlled 75.6% of Shanda's shares and 90.7% of its votes (¶126), meaning that Defendants

Zhang and Liang did not "totally abandon" the interests of Shanda's (majority) shareholders.

### 2.   Knowledge or Recklessness

Shanda admits knowledge of the Projections and Mir II Mobile's success (MtD 19) and

does not dispute that the Mir II franchise was Shanda's core operation (¶¶261-67, 277), but

nevertheless denies knowledge of the fraud (MtD 19-20).  Shanda attempt to describe several of

the allegations about what it knew as "opinion" (*id.*), but ignores that scienter can be pled based

on its "access to information," or when it "should have known" facts revealing likely falsity.

*Novak*, 216 F.3d at 308.  Due to its access to the Projections—as opposed to the incomplete

summary provided to investors—Shanda knew it was omitting information and misleading

investors.  It knew that the Proxies omitted the 2020 Data.  *See* Section III(A)(3).  Shanda also

knew the revenue intensity estimates crudely grouped games into three categories, rather than, as

it had represented, taking into account "projected revenues for each new game" based on the

"best available estimates."  *See* Section III(A)(1)(a).  Relatedly, Shanda knew the estimates in

the Projection were not the "best available" because, they were manipulated to undervalue

certain B1 games.  *See id.*[5] Furthermore, Shanda knew that the amortization and depreciation

---

[5] The AC also alleges that Shanda admitted that this mismatch was intentional in the Appraisal. (¶271).  The Motion denies this.  MtD 21.  The Appraisal opinion states that Shanda's counsel argued that there was "possibly an intentional disconnect" between a game's type (*i.e.*, B1-B3) and the revenue attributed to it.  *See* Exhibit A to AC at 49.  Judge Segel noted that "even if [this] was right," Shanda's model was still flawed, because *costs* continued to track game type,

figures in the Projections employed a method at odds with Shanda's prior approach.  *See* Section III(A)(1)(b).  The new approach violated accounting standards and produced a glaring anomaly, showing Shanda's assets as having negative value.  *See id.*  Because it knew of the flaws in the Projections it had created, Shanda also knew that its assertions about the Projections and fairness were misleading.  *See* Section III(A)(2).

Shanda's remaining scienter arguments focus on Mir II Mobile.  Shanda argues that the allegations that it knew the Projections' inputs for Mir II Mobile were false, are "generic and conclusory" (MtD 2), but they are neither, and are supported by, *inter alia*, Shanda's incredible success with Mir II PC, Shanda's stated expectations for Mir II Mobile, the reasonable inferences from its investment in the game, and its core role at the Company.  *See* Section III(A)(1)(c).

Finally, Shanda asserts that if knowledge of Mir II Mobile's success were enough to put it on notice that the Projections were inaccurate, this would render Plaintiff's claims related to the game untimely, because, according to Shanda, this success was revealed when Shanda referred to the game as a "blockbuster."  MtD 19-20.  As discussed in Section IV(B), this fleeting puffery did not meaningfully reveal the game's success (*i.e.*, that it had earned $92-$107 million each month, well over the $15 million used in the Projections).  ¶77.  Furthermore, even if the game's success was revealed, this would not have revealed the fraud because, unlike Shanda, investors did not know what forecasts for the game were used in the Projections.  ¶119.

### C.   Plaintiff has Pled Reliance

#### 1.   The Fraud on the Market Doctrine Applies

Plaintiff invokes fraud on the market ("FotM") to establish reliance on Shanda's fraud.  ¶283.  Shanda does not dispute that the requirements to invoke FotM are alleged, namely: (1)

---

not these "possibly . . . intentional" ad hoc revenue downgrades, and he ultimately accepted the corrections to Shanda's model presented by the shareholders seeking appraisal.  *See id.* at 49-51.

public misrepresentations; (2) the sale occurred prior to the truth emerging; (3) the ADS traded in an efficient market. *See Erica P. John Fund, Inc. v. Halliburton Co.,* 563 U.S. 804, 811 (2011) (stating FotM's requirements).  Instead, by selectively quoting *Basic*, Shanda invents a rule that, despite relying on the market price, Plaintiff cannot invoke FotM, unless he traded "at the price set by the market."  MtD 10 (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 247 (1988)).

    *Basic* goes much farther than Shanda implies.  It states that "it is hard to imagine that there ever is a . . . seller who does not rely on market integrity" and that "reliance . . . on the integrity of the market price may be presumed."  *Basic*, 485 U.S. at 246-47.  The "at the price" quote follows these broad holdings, as a conclusion, explaining that the claims in *Basic* were sufficient, but ***not*** holding that it is required to have traded "at" the market price to invoke FotM. *Id.*  Under *Basic*, market price matters because it transmits the fraudulent information and based on "common sense and probability" courts presume investors rely on prices when purchasing or selling securities.  *Id.* at 246.  Nothing about this logic requires a sale "at" the market price.

    The Second Circuit has endorsed FotM in privately negotiated transactions, including those not made at the market price, and has rejected its rebuttal even where price was only "one of several factors" considered by the trader.  *Black v. Finantra Capital, Inc.*, 418 F.3d 203, 210 (2d Cir. 2005).  This is unsurprising, as the Second Circuit's articulation of FotM does not require trading "at" the market price, and describes *Basic's* two constituent presumptions as: "[1] the price of stock traded in an efficient market reflects all public, material information . . . and [2] that investors rely on the integrity of the market price when they choose to buy or sell stock." *Ark. Teachers Ret. Sys. v. Goldman Sachs Grp., Inc.*, 879 F.3d 474, 478 (2d Cir. 2018).

    Notably, options traders regularly invoke FotM based on their reliance on the price of the underlying stock, even though they are not trading at that price or in that market. *E.g.*, *McIntire*

*v. China MediaExpress Holdings, Inc.*, 38 F. Supp. 3d 415, 433 (S.D.N.Y. 2014); *Deutschman v. Beneficial Corp.*, 132 F.R.D. 359, 371 (D. Del. 1990) (options traders can invoke FotM because the related stock price affects the options price and "the desirability of exercising the option").

      Shanda's cases do not support its proposed rule.  *Alki Partners, L.P. v. Vatas Holding GmbH*, had nothing to do with trading "at" the market price and merely denied FotM to traders who admittedly did not rely on price, as they had resale contracts ensuring them a net fee.  769 F. Supp. 2d 478, 493 (S.D.N.Y. 2011), *aff'd sub nom. Alki Partners, L.P. v. Windhorst*, 472 F. App'x 7 (2d Cir. 2012).  Shanda also cites *Sable v. Southmark/Envicon Capital Corp.*, which rejected FotM, finding the securities "were not traded actively in a large public market."  819 F. Supp. 324, 339 (S.D.N.Y. 1993).  Finally, *Chavin v. McKelvey* could not be further afield—the company was pre-IPO, there was no market.  25 F. Supp. 2d 231 (S.D.N.Y 1998), *aff'd*, 182 F.3d 898 (2d Cir. 1999) (insider tried to use FotM because written contract blocked direct reliance on oral promises made to him during face-to-face employment negotiation; court rejected FotM).

      Finally, even if Plaintiff were not presumed to have relied on the market price (which he is), it is still presumed that the market price reflected all material public information, *see Goldman,* 879 F.3d at 478 (recognizing two presumptions within FotM)*,* and that is all he needs because he pled reliance on the market price when deciding to sell.  ¶278-80.  Thus, Plaintiff's reliance on market price is not at issue because his allegations are to be taken as true, *Tellabs,* 551 U.S. at 534, and Shanda has not and cannot challenge Plaintiff's personal knowledge.  Shanda even endorses this sort of reliance in the Final Proxy, which describes the ADS' market price and uses the supposed "premium" to support the deal.  *E.g.,* Final Proxy at 38-39.

### 2.    The *Affiliated Ute* Presumption Applies

      Plaintiffs are not required to prove reliance in claims alleging omissions in violation of an affirmative duty to disclose.  *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128

(1972) ("*Ute*").  The Motion inexplicably argues that Plaintiff "alleges no duty to speak" (MtD

8), when in fact, he expressly alleges two such affirmative disclosure duties:

> [**1**] Shanda has a duty to either disclose [material non-public] information before trading on the basis of that information or abstain from trading.  By trading while in possession of such information, it violated this duty and infringed upon the relationship of trust and confidence that it had with its investors. [**2**] Moreover, Cayman Islands corporations, like Shanda, have a duty to provide investors with sufficient information to adequately understand the Transaction that they are called upon to consider.

¶290; *see also* Section IV(B) (describing insider trading duties); *Davis v. Scottish Re Grp. Ltd.*,

74 N.Y.S.3d 10 (N.Y. App. Div. 2018) (describing Cayman law duty to disclose "sufficient

information" before major transactions).  Plaintiff also highlighted these duties in his Pre-Motion

Letter, ECF No. 35, at 2 (Oct. 25, 2018), yet Shanda continues to ignore them, just as it did back

in 2015, by omitting critical information about its Projections, value, and Mir II Mobile.  ¶177.

Before introducing Shanda's main argument about *Ute*, it is helpful to clarify that there

are two concepts of omissions within the securities laws: (1) omissions violating affirmative

disclosure duties; and (2) half-truths, where one violates a duty to not mislead that arises by

beginning to speak.  Half-truths are actionable as misstatements (*Caiola*, 295 F.3d at 331), but

*Waggoner v. Barclays PLC* held that they do not give rise to *Ute* reliance.  875 F.3d 79, 96 (2d

Cir. 2017).  Shanda argues that *Ute* cannot apply where there are false statements, but supports

this argument with cases analyzing a more narrow point: whether certain duties fit into the half-

truth category.  *See* MtD 8; *e.g.*, *Wilson v. Comtech Telecomms. Corp.*, 648 F.2d 88, 93 (2d Cir.

1981) (noting duty to correct does not support *Ute* because it arises from "positive statements").

The "sufficient information" and abstain-or-disclose duties identified in ¶290 are unquestionably

affirmative duties, as they do not arise due to beginning to speak—meaning the omissions cannot

be called mere half-truths and ***can absolutely*** support the use of *Ute*.[6]  None of Shanda's cases

deal with affirmative duties,[7] and it is well established that *Ute*, which itself involved

misstatements (*Ute* 406 U.S. at 131)), can apply where plaintiffs allege both misstatements and

omissions.  *See, e.g., Fogarazzo v. Lehman Bros.*, 232 F.R.D. 176, 186 (S.D.N.Y. 2005) ("courts

in this Circuit" acknowledge that *Ute* applies when plaintiff alleges a "combination of omissions

and misstatements"); *In re Smith Barney Transfer Agent Litig.*, 290 F.R.D. 42, 48 (S.D.N.Y.

2013) (recognizing false statements and applying *Ute* because related ***omissions breached***

***disclosure duty set by regulation***).  Finally, a rule that *Ute* fails if there are also false statements

would make no sense; it would allow defendants to reduce their risk of liability by lying, where

they might face less risk by silence, and would reward artful pleading that ignores these lies.

Ἡ In any event, Shanda cannot avoid *Ute* reliance for its failure to disclose the success of

Mir II Mobile—which is not a "half-truth" or anything other than a pure omission.

## IV.   PLAINTIFF HAS ADEQUATELY STATED A SECTION 20A CLAIM

Plaintiff pleads a violation of 15 U.S.C. § 78t–1 ("20A") by alleging that Shanda

purchased his shares while possessing material non-public information.  ¶¶286-291, 309-312.

### A.   Shanda Purchased the Securities

Shanda advances a deeply confused idea of which transaction the AC is based on.  While

---

[6] Shanda also claims *Ute* only applies when duties arise from "statutes or regulations."  MtD 8
(quoting *Stratte-McClure v. Morgan Stanley* 776 F.3d 94, 102 (2d Cir. 2015)).  *Stratte-McClure*
did not discuss *Ute* and simply inexhaustively lists several duties, including the duty to disclose
before trading.  776 F.3d at 102.  *Ute* itself dealt with fiduciary duties (406 U.S. at 152-53), and
applies whenever an affirmative disclosure duty is breached.  *See, e.g., Simon DeBartolo Grp. v.
Richard E. Jacobs Grp.*, 186 F.3d 157, 173 (2d Cir. 1999) (*Ute* applied to insider trading).

[7] *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 240 (2d Cir. 2016) ("Vivendi had no legal duty to
disclose"); *Strougo v. Barclays PLC*, 312 F.R.D. 307, 319 (S.D.N.Y. 2016) ("defendants did not
have a duty to disclose"), *aff'd sub nom. Waggoner v. Barclays PLC*, 875 F.3d 79 (2d Cir. 2017);
*Schwab v. E*TRADE Fin. Corp.*, 2018 WL 5309889, at *3 (2d Cir. Oct. 26, 2018) (no duty
alleged; alleged omission was failure to disclose that a statement was false).

Shanda and Capitalcorp Ltd. merged, Plaintiff was not a party to that merger, and it was only one aspect of the Transaction.  Plaintiff's claims arise from Shanda's purchase of his ADS.  ¶288.  Those selling shares as part of a merger have standing as sellers.  *See Vine v. Beneficial Fin. Co.* 374 F.2d 627, 634 (2d Cir. 1967); *TCS,* 2008 WL 650385, at *18; *Cf. Madison Consultants v. Fed. Deposit Ins. Corp.*, 710 F.2d 57, 61 (2d Cir. 1983) ("This Circuit has repeatedly held" that those who are "forced to sell" have "standing as 'seller.'").  The assertion that "the Buyer Group, not Shanda, purchased public shares" (MtD 22), is simply false.  ¶288.  That the Buyer Group gained from the fraud has no bearing on who bought the ADS; that entities act in their own name is a basic rule of corporate law.  *Hyatt Corp. v. Stanton*, 945 F. Supp. 675, 681 (S.D.N.Y. 1996).

Shanda also argues that Plaintiff cannot show "where or when" its purchase occurred.  MtD 22.  This too is wrong.  Plaintiff can locate the time and place of sale, though the logistics of this part of the Transaction are complex and would be clarified by discovery.  On Nov. 18, 2015, Shanda became the surviving entity of its merger with Capitalcorp Ltd., and the holders of its ADS were "cashed out in exchange for the . . . Per ADS Merger Consideration."  ¶¶144-48.  The ADS were delisted from NASDAQ[8] and converted into the right to surrender each ADS for $7.10.  ¶287.  However, at this point the sale did not yet occur—Plaintiff had not yet accepted Shanda's offer nor did any other shareholder.[9]  Shanda gave the purchase money to a "paying agent" who transferred the funds to JPM's New York office.  ¶288; Final Proxy at A-10.

---

[8] *See* Ex. B (Form 25 filed with SEC by Shanda on Nov. 18, 2015, providing notice of delisting).

[9] If shares are converted by merger into the right to be surrendered in exchange for cash, then as "practical matter," the Second Circuit notes that investors will "eventually become party to a 'sale' as that term has always been used."  *Vine*, 374 F.2d at 634.  In other words, the merger does not effectuate a "sale" of the ADS, but a sale will occur "eventually" upon the surrender.  *See id. Vine* sustained claims regardless of surrender, taking a flexible view of who has standing as sellers.  *See In re Adelphia Commc'ns Corp. Sec. & Derivative Litig.*, 398 F. Supp. 2d 244, 260 n.12 (S.D.N.Y. 2005) (*Vine* is an "exception to the classic purchase and sale definitions.").

Plaintiff could then accept Shanda's offer by performing the act of surrendering his ADS at JPM's office, which required him to pay a fee.  *See id.*  Thus, the sale occurred when he surrendered the ADS at JPM's office.  *See Fireman's Fund Ins. Co. v. Great Am. Ins. Co. of N.Y.*, 10 F. Supp. 3d 460, 496 n.22 (S.D.N.Y. 2014), *aff'd*, 822 F.3d 620 (2d Cir. 2016) (the "place of contracting" is "where the last act necessary to form the contract was performed").  Even if Plaintiff could not locate the purchase, he has met his burden by plausibly alleging that Shanda bought the shares.  *Iqbal*, 556 U.S. at 678; ¶288 (Proxies explain that Shanda purchased).

### B.    Shanda Possessed Material Non-Public Information

Those violating § 10(b) by buying securities with knowledge of material non-public information are liable under 20A.  *See* MtD 22; *Chiarella v. United States*, 445 U.S. 222, 227 (1980) (insider trading violates § 10(b)); *U.S. v. O'Hagan*, 521 U.S. 642, 643 (1997) (same).  Shanda had a duty to "disclose fully all information relevant" to investors' "evaluation of the deal."  *In re Ivan F. Boesky Sec. Litig.*, 36 F.3d 255, 261 (2d Cir. 1994).  By trading without disclosing that the Projections undervalued the Company, that the Proxies withheld an entire year of data, that its statements about the Projections were misleading, and that the price was unfair, Shanda violated this duty.  *See* ¶289; Section III(A).  The Motion argues that this information was not "known" (MtD 22-23), but Section III(B)(2) establishes Shanda's knowledge.

Most egregiously, Shanda knew of Mir II Mobile's tremendous success—that it had produced $92-$107 million monthly revenue, compared to forecasted *lifetime* revenue of $15 million (¶77)—and did not disclose this information.  Shanda argues that it "disclosed the success" in October 2015 (MtD 22-23), but the only disclosure was a reference to Mir II Mobile as a "blockbuster," which, did not come close to revealing the game's actual success.  Further, assessing if truth "credibly entered the market . . . is a matter for trial [or] summary judgment."  *In re Virtus Inv. Partners, Inc. Sec. Litig.,* 2017 WL 2062985, at *5 (S.D.N.Y. May 15, 2017).

## V.    *MORRISON* DOES NOT BAR PLAINTIFF'S CLAIMS

Under *Morrison v. National Australia Bank Ltd.*, the securities laws apply to both (A)

"transactions in securities listed on domestic exchanges" and (B) "domestic transactions in other

securities."  561 U.S. 247, 267 (2010).

The AC clearly satisfies either of these prongs under the applicable *Iqbal* plausibility

standard.  *Giunta,* 893 F.3d at 79.  However, because courts utilize a flexible approach when

finding transactions to be domestic, [10] the issue is often reserved for a more developed factual

record.  *See Anwar v. Fairfield Greenwich Ltd.*, 728 F. Supp. 2d 372, 405 (S.D.N.Y. 2010)

("more developed factual record is necessary to inform a proper [*Morrison*] determination");

*U.S. v. Elie*, 2012 WL 383403, at *3 (S.D.N.Y. Feb. 7, 2012) ("*Morrison* argument is premature"

without complete factual record); *Bayerische Landesbank, N.Y. Branch v. Barclays Capital, Inc.*,

902 F. Supp. 2d 471, 473 (S.D.N.Y. 2012) (denying *Morrison* dismissal until "proof to the

contrary is submitted."); *Pope Invs. II, LLC v. Deheng Law Firm*, 2013 WL 3946126, at *5

(S.D.N.Y. July 31, 2013) (similar).

If the Court finds *Morrison* to be dispositive at this stage, but needing additional facts,

Plaintiff respectfully requests leave to amend to add the facts proffered in Ex. C.  *See Pasternack*

*v. Shrader*, 863 F.3d 162, 174 (2d Cir. 2017) (leave to amend "freely given").

### A.    Plaintiff Alleges a Transaction in Securities Listed on a Domestic Exchange

The ADS were bought on NASDAQ, a domestic exchange (Ex. D), and so, Plaintiff may

---

[10] *See, e.g.*, *Mori v. Saito*, 2013 WL 1736527, at *5 (S.D.N.Y. Apr. 19, 2013) (*Morrison* satisfied since "money changed hands" in the U.S.); *SEC v. Compania Internacional Financiera S.A.*, 2011 WL 3251813, at *6 (S.D.N.Y. July 29, 2011) (*Morrison* analyzed flexibly in insider-trading case; *Phelps v. Stomber*, 883 F. Supp. 2d 188, 207-08 (D.D.C. 2012) (*Morrison* satisfied by SEC registration, involvement of U.S. banks, brokers, and investors); *SEC v. Geranio*, 2013 WL 12146516, at *5 (C.D. Cal. Jan. 29, 2013) (*Morrison* satisfied by U.S. escrow agent and sending agreement to person in U.S.); *In re Tezos Sec. Litig.*, 2018 WL 4293341, at *8 (N.D. Cal. Aug. 7, 2018) (*Morrison* satisfied by use of crypto-currency nodes in U.S.).

invoke *Morrison's* first prong.[11]  Shanda's responds that the sale did not occur on NASDAQ.
MtD 4-5.  Shanda is proposing an unwarranted expansion of *City of Pontiac Policemen's &
Firemen's Retirement System v. UBS AG*, which rejected the "mere listing theory" and held that
purchases on a foreign exchange are not domestic, merely because the type of security is listed
domestically.  752 F.3d 173, 179-80 (2d Cir. 2014).  Shanda also cites a case where an exercise
of options in India was not domestic, merely because the shares were listed domestically.  *In re
Satyam Comput. Servs. Ltd. Sec. Litig.*, 915 F. Supp. 2d 450, 474 (S.D.N.Y. 2013).  Unlike these
cases, the very ADS at issue were bought by Plaintiff on a domestic exchange – the ***only***
exchange they traded on – and no court has denied *Morrison's* first prong in such a situation.

Shanda notes that the AC alleges Plaintiff was defrauded into *selling* (MtD 5), but this
does not affect the applicability of *Morrison's* first prong.  The very shares Plaintiff sold, were
shares he bought on a domestic exchange – unlike the "mere listing" cases, Plaintiff does not rely
on the fact that other shares traded domestically.  Plaintiff bought his ADS with every reason to
believe that, because they were purchased on NASDAQ, they would be protected from fraud by
the federal securities laws.  *See Morrison,* 561 U.S. at 267 (Section 10(b) regulates domestic
exchanges); *Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit*, 547 U.S. 71, 78 (2006) ("the
federal interest in protecting the integrity . . . of the market for nationally traded securities cannot
be overstated").  Plaintiff took no action abroad that would have changed his expectation.
Shanda's proposed expansion of *Pontiac* would repudiate *Morrison's* first prong, upend investor

---

[11] Shanda notes that Plaintiff does not expressly plead where he bought his ADS.  MtD 5.  But he
states that the ADS traded on NASDAQ (¶¶5, 28, 59, 283); the only exchange it traded on (Final
Proxy, at 84).  The clear inference is that Plaintiff bought on NASDAQ and a "motion to dismiss
is not . . . a game of 'gotcha.'"  *In re Refco Sec. Litig.*, 779 F. Supp. 2d 372, 377 (S.D.N.Y.
2011), *aff'd sub nom. Krys v. Butt*, 486 F. App'x. 153 (2d Cir. 2012).  Complaints often do not
expressly state that plaintiffs bought on the exchange.  *E.g.*, Am. Compl. *Speakes v. Taro Pharm.
Indus., Ltd.*, No. 16-cv-08318, ECF No. 36, at 8 (June 19, 2017) (J. Carter).

confidence in domestic exchanges, and force all traders to conduct a prong-two (domestic transaction) analysis before every trade, instead of relying on *Morrison's* clear rule that securities purchased on U.S. exchanges are covered by the U.S. securities laws.

Even entirely domestic firms can privatize through foreign-merger entities or locate their meetings abroad. *E.g.*, Del. Code Ann. tit. 8 § 141(g) (2016) (permitting meetings abroad). If this Court accepts Shanda's argument, deals for U.S. companies will take place abroad to evade the securities laws. As a matter of public policy, it cannot be the rule that domestically listed companies, subject to U.S. securities laws, can defraud with impunity by holding a meeting abroad. Courts have previously rejected interpretations of *Morrison* that would "create a huge hole in the enforcement regime governing companies listed [domestically]" by allowing wrongdoers to utilize "simple means" to avoid liability, since this would "seriously undermin[e]" U.S. markets. *SEC. v. Mallard*, 2014 WL 1660024, at *2 (S.D.N.Y. Apr. 23, 2014).

Furthermore, a significant step in Shanda's purchase of Plaintiff's ADS was Shanda delisting the ADS from NASDAQ. *See* Section IV(A). Thus, the sale was "on NASDAQ," even if certain elements did not occur on the exchange. In fact, because NASDAQ is not a trading floor and acts only as an "electronic inter-dealer quotation system." *Newton v. Merrill, Lynch, Pierce, Fenner & Smith, Inc.*, 135 F.3d 266, 268 (3d Cir. 1998), key aspects of all NASDAQ transactions—including placement of the order with a broker, payment, and title transfer—do not occur on the exchange. Wisely, the Court bypassed any need to analyze whether sufficient conduct occurred "on exchange" by providing its bright-line rule, in terms of "transactions in securities listed on domestic exchanges." *Morrison*, 561 U.S. at 267.

### B.    Plaintiff Alleges a Domestic Transaction

*Morrison's* second prong requires that (1) either party incurs "irrevocable liability to carry out the transaction within the [U.S.]" ***or*** (2) "title is passed within the [U.S.]." *Absolute*

23

*Activist Value Master Fund Ltd. v. Ficeto*, 677 F.3d 60, 69 (2d Cir. 2012); *see SEC v. Ahmed*, 308 F. Supp. 3d 628, 669 (D. Conn. 2018) (prong 2 satisfied where either party acts from U.S.). If analyzed through *Morrison's* second prong, the AC satisfies both disjunctive tests.

### 1.    Plaintiff Incurred Irrevocable Liability Domestically

As discussed in Section IV(A), the transaction at issue here is Plaintiff's sale of ADS to Shanda, and it is clear that his irrevocable liability to sell the ADS was incurred domestically, when he assented to the sale by surrendering his ADS at JPM's New York office.  Prior to that moment, Shanda may have been obligated to make an offer—but the offer was only accepted when Plaintiff surrendered his ADS in the U.S.  *See Fireman's Fund*, 10 F. Supp. 3d at 496 n.22 (the "place of contracting" is "where the act last necessary to form the contract was performed"). Until Plaintiff surrendered his ADS, he was free to deny or delay acceptance for any number of reasons, *e.g.*, legal concerns, JPM's fee, or to time the sale for tax or other purposes.

Shanda argues that the domestic acts were "ministerial" and analogizes to rulings that say settlement through the Depository Trust Corporation ("DTC") does not satisfy *Morrison*.  MtD 6-7 (citing *In re Petrobras Sec.*, 862 F.3d 250 (2d Cir. 2017)).  There is little similarity between DTC's role in nearly every security transaction and JPM's role in this specific sale.  First, DTC is distinguishable from JPM because DTC tracks ownership of certificates for nearly all securities and a major basis of *Petrobras* was that using DTC as a domestic hook would render *Morrison* "nugatory," since nearly all trades would be domestic.  862 F.3d at 263.  Second, DTC has nothing to do with contract formation, whereas Plaintiff's surrender of the ADS at JPM's office was the key act in the Plaintiff forming a contract and incurring irrevocable liability.

Shanda notes that the AC alleges that Plaintiff sold "at the Effective Time."  MtD 6 (citing ¶287).  That language was alluding to *Vine's* loose conception of standing based on a "forced sale," which was discussed *supra* note 9 at 19, rather than the intricacies of when a sale

occurred under *Morrison*.  If the Court is inclined to consider *Morrison* through *Vine*, it should recognize that *Vine*'s standing rule is a plaintiff friendly "legal fiction," *Heyman v. Heyman*, 356 F. Supp. 958, 963 (S.D.N.Y. 1973), resting upon an offer and a forthcoming acceptance—such that Plaintiff would have accepted the offer to sell domestically, where he and JPM were located.

### 2.    Title Passed Domestically

*Absolute Activist* cited the UCC. to explain that the location of title transfer satisfies *Morrison* because sales occur wherever title transfers.  677 F.3d at 68 (citing UCC § 2-106(1)). Under the UCC, title generally passes where "the seller completes his performance." § 2-401. Here, that would be the U.S., where Plaintiff surrendered his ADS.  *See* Section IV(A).

More specifically, under UCC § 8-501(b)(1) investors receive or transfer a "security entitlement" when a "security intermediary . . . indicates by book entry that a financial asset has been credited to [or debited from] the person."  *SEC v. Credit Bancorp, Ltd.*, 2000 WL 1752979, at *21 (S.D.N.Y. Nov. 29, 2000), *aff'd,* 290 F.3d 80 (2d Cir. 2002).  A "security entitlement" refers to "the rights and property interest" in a financial asset.  UCC § 8-102(a)(17).  In other words, it refers to the property rights that comprise legal title.  *Compare* UCC § 2-401 (describing "title" in terms of "property") *with* UCC § 1-201 (describing the idea of a "document of title"); *see also Title*, BLACK'S LAW DICTIONARY (10th ed. 2014) ("title" is "the legal link between a person who owns property and the property").  Finally, UCC § 8-102 defines "securities intermediary" to include "brokers" that "maintai[n] securities accounts for others." Thus, title transferred wherever Plaintiff's broker made a book entry recording that ownership had changed.  *Cf. In re Poseidon Concepts Sec. Litig.*, 2016 WL 3017395 (S.D.N.Y. May 24, 2016) (*Morrison* satisfied based on placing trade with broker in Florida).

## VI.    CONCLUSION

For the foregoing reasons, the Court should deny the Motion in its entirety.

DATED:  March 12, 2019                    LABATON SUCHAROW LLP

                                          By:  */s/ Carol C. Villegas*
                                          _____

                                          Carol C. Villegas
                                          David J. Schwartz
                                          Jake Bissell-Linsk
                                          140 Broadway, 34th Floor
                                          New York, NY  10005
                                          Telephone: (212) 907-0700
                                          Fax: (212) 818-0477
                                          cvillegas@labaton.com
                                          dschwartz@labaton.com
                                          jbissell-linsk@labaton.com

                                          ***Lead Counsel for the Class***