UNITED STATES DISTRICT COURT DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE SHANDA GAMES LIMITED SECURITIES LITIGATION | Civil Action No. 1:18-cv-02463-ALC |

**REPLY MEMORANDUM OF LAW IN FURTHER
SUPPORT OF SHANDA GAMES LIMITED'S MOTION TO DISMISS**

Dated: April 26, 2019

O'MELVENY & MYERS LLP
7 Times Square
New York, New York 10036
Telephone: (212) 326-2000
Facsimile: (212) 326-2061

400 South Hope Street
Los Angeles, California 90071
Telephone: (213) 430-6000
Facsimile: (213) 430-6407

*Attorneys for Defendant Shanda Games Limited*

## TABLE OF CONTENTS

**Page(s)**

PRELIMINARY STATEMENT ................................................................................................... 1

ARGUMENT .................................................................................................................................. 2

    I.    *Morrison* requires dismissal of the Complaint. ....................................................... 2

    II.   The Section 10(b) claim should be dismissed. ........................................................ 5

        A.    Monk has not pleaded that he reasonably relied to his detriment on any allegedly fraudulent statements. ............................................................ 5

            1.    Monk has not pleaded facts to invoke *Basic*. ................................. 5

            2.    Monk has not pleaded facts to invoke *Affiliated Ute*. ..................... 6

        B.    The Complaint pleads no actionable misstatements or omissions. ........... 10

        C.    The Complaint fails to adequately plead scienter. .................................... 12

CONCLUSION ............................................................................................................................. 13

## TABLE OF AUTHORITIES

Page(s)

**Cases**

*Absolute Activist Value Master Fund Ltd. v. Ficeto*,
   677 F.3d 60 (2d Cir. 2012) ............................................................................................... 3, 5

*Acticon AG v. China E. Petroleum Holdings Ltd.*,
   615 F. App'x 44 (2d Cir. 2015) ............................................................................................ 13

*Arco Capital Corps. Ltd. v. Deutsche Bank AG*,
   949 F. Supp. 2d 532 (S.D.N.Y. 2013) ................................................................................... 3

*Basic Inc. v. Levinson*,
   485 U.S. 224 (1988) ............................................................................................................... 5

*Bellefonte Re Ins. Co. v. Argonaut Ins. Co.*,
   757 F.2d 523 (2d Cir. 1985) .................................................................................................. 4

*Black v. Finantra Capital, Inc.*,
   418 F.3d 203 (2d Cir. 2005) .................................................................................................. 6

*Blank v. TriPoint Glob. Equities, LLC*,
   338 F. Supp. 3d 194 (S.D.N.Y. 2018) ................................................................................ 13

*Chiarella v. United States*,
   445 U.S. 222 (1980) ............................................................................................................... 7

*City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*,
   752 F.3d 173 (2d Cir. 2014) .................................................................................................. 2

*Davis v. Scottish Re Grp. Ltd.*,
   74 N.Y.S.3d 10 (N.Y. App. Div. 2018) ................................................................................ 9

*Euromepa, S.A. v. R. Esmerian, Inc.*,
   154 F.3d 24 (2d Cir. 1998) .................................................................................................... 9

*Int'l Fund Mgmt. S.A. v. Citigroup Inc.*,
   822 F. Supp. 2d 368 (S.D.N.Y. 2011) ................................................................................. 9

*In re Ivan F. Boesky Sec. Litig.*,
   36 F.3d 255 (2d Cir. 1994) .................................................................................................... 7

*Kirschner v. KPMG LLP*,
   938 N.E.2d 941 (N.Y. 2010) ............................................................................................... 13

*Litton Indus., Inc. v. Lehman Bros. Kuhn Loeb Inc.*,
   967 F.2d 742 (2d Cir. 1992) ................................................................................................ 11

## TABLE OF AUTHORITIES
(continued)

Page(s)

*McIntire v. China Media MediaExpress Holdings, Inc.*,
    38 F. Supp. 3d 415 (S.D.N.Y. 2014) ................................................................................. 5

*Morrison v. Nat'l Australia Bank Ltd.*,
    561 U.S. 247 (2010) ........................................................................................................ 2

*Novak v. Kasaks*,
    216 F.3d 300 (2d Cir. 2000) ......................................................................................... 12

*OFI Asset Mgmt. v. Cooper Tire & Rubber*,
    834 F.3d 500 (3d Cir. 2016) ......................................................................................... 11

*Okla. Firefighters Pension & Ret. Sys. v. Student Loan Corp.*,
    951 F. Supp. 2d 479 (S.D.N.Y. 2013) ........................................................................... 11

*Omnicare, Inc. v. Laborers*,
    135 S. Ct. 1318 (2015) ................................................................................................. 10

*In re Platinum & Palladium Antitrust Litig.*,
    2017 WL 1169626 (S.D.N.Y. Mar. 28, 2017) ................................................................ 3

*Pope Invs. II, LLC v. Deheng Law Firm*,
    2013 WL 3946126 (S.D.N.Y. July 31, 2013) ................................................................. 2

*In re Société Générale Sec. Litig.*,
    2010 WL 3910286 (S.D.N.Y. Sept. 29, 2010) ................................................................ 2

*Suez Equity Inv'rs, L.P. v. Toronto-Dominion Bank*,
    250 F.3d 87 (2d Cir. 2001) ............................................................................................. 9

*Takiguchi v. MRI Int'l, Inc.*,
    2017 WL 752283 (D. Nev. Feb. 27, 2017) ..................................................................... 3

*United States v. Georgiou*,
    777 F.3d 125 (3d Cir. 2015) ........................................................................................... 3

*United States v. O'Hagan*,
    521 U.S. 642 (1997) ........................................................................................................ 7

*Vine v. Beneficial Fin. Co.*,
    374 F.2d 627 (2d Cir. 1967) ....................................................................................... 4, 8

*In re Vivendi Universal, S.A., Sec. Litig.*,
    842 F. Supp. 2d 522 (S.D.N.Y. 2012) ............................................................................ 2

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

**Statutes**

15 U.S.C. § 78c(10) ...........................................................................................................................9

15 U.S.C. § 78j(b) .............................................................................................................................1

15 U.S.C. § 78t-1(a) ..................................................................................................................7, 8, 9

**PRELIMINARY STATEMENT**

On November 18, 2015, at a shareholder meeting in Hong Kong, Shanda shareholders approved a going-private sale to the Buyer Group.[1] The Transaction closed that day. Immediately, Monk's shares were canceled, leaving him with no equity interest in Shanda—only a contractual right to payment for his (canceled) shares. It was therefore on November 18 that he sold his shares to the Buyer Group under the "forced seller" doctrine he relies on for standing, as Monk pleads in his Complaint and admits in the Opposition. This means both that Monk's claim is barred by *Morrison v. National Australia Bank*—because the November 18 Transaction was a foreign transaction—and that Shanda had no affirmative obligation to disclose additional material information under insider trading rules, precluding Monk from stating a fraud claim.

Unable to dispute these conclusions, Monk introduces a new theory: that a separate "transaction" occurred when he surrendered his Shanda paper for cash. But he is bound to his repeated admission that he sold his shares on November 18. And he pleads no other potential transaction date, nor any other interaction he had with the Buyer Group or Shanda (or their agent). These omissions are no accident, because he has no Section 10(b) claim for his newly hypothesized transaction. While there might have been a transaction when he exchanged his paper for money—the equivalent of cashing a check—that so-called transaction was not "the purchase or sale of any security," 15 U.S.C. § 78j(b), and therefore cannot give rise to his securities fraud claims. Monk cannot claim that he sold a security on November 18 to invoke U.S. securities laws, then point to a different, subsequent transaction in an effort to avoid the legal bars to his claims. The Complaint should be dismissed.

---

[1] We use the same abbreviations and citing conventions as in Shanda's opening brief in support of its motion to dismiss (ECF No. 41), cited as "Mem." We cite Monk's Opposition (ECF No. 44) as "Opp." References to exhibits are to the January 11, 2019 declaration of Abby F. Rudzin. (ECF No. 42.)

# ARGUMENT

**I.     *Morrison* requires dismissal of the Complaint.**

In its opening brief, Shanda showed that Monk's claims fail under *Morrison v. National Australia Bank Ltd.*, 561 U.S. 247 (2010), because Monk did not sell his shares on a U.S. exchange or in an off-exchange transaction in the U.S.  (*See* Mem. at 4–8.)  Although the applicability of the statute under which he sues is a threshold issue, Monk waits until the final pages of his Opposition to even acknowledge *Morrison*.  (*See* Opp. at 21–25.)  The reason is plain: He has no good response.

First, Monk notes that factual disputes can preclude a *Morrison* dismissal on the pleadings, but he points to no disputed facts here.  (*See* Opp. at 21.)[2]  This renders inapposite the cases where the court found relevant factual questions.  *See, e.g.*, *Pope Invs. II, LLC v. Deheng Law Firm*, 2013 WL 3946126, at *4–5 (S.D.N.Y. July 31, 2013) (noting inability to determine location of execution of securities purchase agreement).  And the Second Circuit has blessed Rule 12(b)(6) as an appropriate means of dismissing cases precluded by *Morrison*.  *See City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 179–82 (2d Cir. 2014) (affirming 12(b)(6) dismissal of Exchange Act claims under *Morrison*).  *See also In re Vivendi Universal, S.A., Sec. Litig.*, 842 F. Supp. 2d 522, 528–29 (S.D.N.Y. 2012) (dismissing under Rule 12(b)(6) all Exchange Act claims as precluded by *Morrison*); *In re Société Générale Sec. Litig.*, 2010 WL 3910286, at *6–9 (S.D.N.Y. Sept. 29, 2010) (same).

Second, Monk notes that he bought his shares on a U.S. exchange (Opp. at 21), but that is not the relevant transaction.  "[T]he Court must determine whether the transactions *at issue here*

---

[2] Monk cites his proffered declaration, which refers to his U.S. residence and use of a U.S. broker, with no explanation of why those facts matter. (*See* Opp. at 21.) Shanda certainly does not dispute them for purposes of this motion.

are 'domestic' within the meaning of *Morrison* and *Absolute Activist*." *In re Platinum & Palladium Antitrust Litig.*, 2017 WL 1169626, at *26 (S.D.N.Y. Mar. 28, 2017). *Accord United States v. Georgiou*, 777 F.3d 125, 135 (3d Cir. 2015) (analyzing whether "the transactions *at issue* were domestic" under *Morrison*); *Takiguchi v. MRI Int'l, Inc.*, 2017 WL 752283, at *3 n.1 (D. Nev. Feb. 27, 2017) (same). The transaction at issue here is Monk's forced *sale* of his shares. (*See, e.g.*, AC ¶ 101 (complaining that fraud "deceive[d] investors into selling their Shanda shares").) Indeed, Monk's contention (Opp. at 21–23) that the Exchange Act should apply because there are U.S. connections—the shares traded on an SEC-regulated exchange here, and Monk purchased his shares on that exchange, which then de-listed the shares when the Transaction closed—is nothing but a nod to the Second Circuit's "conduct-and-effect" test that *Morrison* expressly rejected. *See Absolute Activist Value Master Fund Ltd. v. Ficeto*, 677 F.3d 60, 66 (2d Cir. 2012) ("[T]he Supreme Court eschewed the Second Circuit's conduct and effects test in favor of a 'transactional test.'"); *Arco Capital Corps. Ltd. v. Deutsche Bank AG*, 949 F. Supp. 2d 532, 541 (S.D.N.Y. 2013) (explaining that U.S. connections, "[w]hile potentially relevant under conduct and effects test," are not relevant after *Morrison*, which mandates the "transactional test"). For the same reason, Monk's public policy arguments (Opp. at 23) are misplaced. The Supreme Court has already considered public policy in light of the statutory text and held that the transactional test should govern.

Third, Monk claims that he incurred irrevocable liability in the U.S. because that is where he "assented to the sale" of this Shanda shares "by surrendering [them] at JPM's New York office." (Opp. at 24.) Monk cites no facts supporting this theory—neither his 103-page Complaint nor his proffered supplemental declaration mentions any interaction between him and

3

JPM—and it is belied by the facts of the Transaction.[3]  Once the Transaction was approved on November 18, 2015, "without any action on the part of" any shareholder, each share (including Monk's) was "cancelled in exchange for the right to receive" cash.  (Ex. 2 at A-7.)  Monk might have had to collect his cash from JPM (though, again, he does not plead this), but any paper he was holding after November 18 no longer represented an equity stake in Shanda.  As the Opposition concedes: "*On Nov. 18, 2015*, Shanda became the surviving entity of its merger with Capitalcorp Ltd., and *the holders of its ADS were cashed out* in exchange for the Per ADS Merger Consideration."  (Opp. at 19 (original ellipses omitted).)  So while Monk was "free to deny or delay" tendering his canceled shares (*id.* at 24), that would only prevent or delay his payment; it would not hold up the Transaction or give him any shareholder rights.

Moreover, as Monk concedes, unless he can invoke the "forced seller" doctrine of *Vine v. Beneficial Financial Co.*, 374 F.2d 627 (2d Cir. 1967), he does not have standing to bring a Section 10(b) claim.  (*See* Opp. at 24.)  But *Vine* proves Shanda's argument, because the decision makes clear that the ministerial task of exchanging "certificates of ownership in a non-existent corporation" for cash is not the event that constitutes the "sale" under Section 10(b).  *See* 374 F.2d at 634.  The "sale" occurred when the defendants caused the company in which plaintiff held stock to "disappear[]" such that his stock was, "in effect, . . . involuntarily converted into a claim for cash."  *Id.*  Here that involuntary conversion undisputedly occurred *on* November 18, 2015, and *in* Hong Kong, and that is when and where Monk "sold" his stock.

---

[3] Not only does Monk not plead anything about going to JPM to collect his cash *after* November 18, but he pleads twice that he sold his shares *on* November 18.  (*See* AC ¶¶ 31, 287.)  He is of course bound to that allegation.  *See Bellefonte Re Ins. Co. v. Argonaut Ins. Co.*, 757 F.2d 523, 528 (2d Cir. 1985) ("A party's assertion of fact in a pleading is a judicial admission by which it normally is bound . . . .").

4

Fourth, Monk notes that "*Absolute Activist* cited the UCC to explain that the location of title transfer satisfies *Morrison*." (Opp. at 25.) But *Absolute Activist* involved actual purchases and sales, not a forced sale via share cancellation. *See* 677 F.3d at 68–69. Here, as Shanda explained, there was no "transfer" of Monk's shares, only a cancellation (*see* Mem. at 6), which Monk himself acknowledges (*see* AC ¶ 287; Opp. at 19).

## II.     The Section 10(b) claim should be dismissed.[4]

### A.     Monk has not pleaded that he reasonably relied to his detriment on any allegedly fraudulent statements.

#### 1.     Monk has not pleaded facts to invoke *Basic*.

As Shanda showed, Monk cannot invoke a fraud-on-the-market presumption under *Basic Inc. v. Levinson*, 485 U.S. 224 (1988), because he did not sell his shares at a price dictated by the stock market—he sold instead at the privately negotiated Transaction price. (*See* Mem. at 10.) Monk responds by citing cases about options (Opp. at 15–16), but those cases are unhelpful because it is well settled that "[t]he market price for options is directly responsive . . . to changes in the market price of the underlying stock, and to information affecting that price." *McIntire v. China Media MediaExpress Holdings, Inc.*, 38 F. Supp. 3d 415, 433 (S.D.N.Y. 2014). Monk pleads no similar connection between the Transaction price and the market price here.

Moreover, even Monk acknowledges that one of *Basic*'s "constituent presumptions" is "that investors rely on the integrity of the market price when they *choose to buy or sell stock*." (Opp. at 15.) By his own admission, Monk did not "choose to buy or sell stock"; he was a "forced seller" when his shares were canceled in the Transaction. (*See id.* at 19, 24–25.) His

---

[4] There is no dispute that if Monk fails to plead a Section 10(b) claim, his Section 20(A) claim must also be dismissed. (*See* Opp. at 20.) As explained in Shanda's motion, Monk's Section 20(A) claim also fails for two additional reasons. (See Mot. at 22–23.)

5

citation to *Black v. Finantra Capital, Inc.*, 418 F.3d 203 (2d Cir. 2005), is therefore unavailing. There the Second Circuit affirmed a jury's conclusion that the reliance element had been met when the plaintiff Black had bought "stock at a discount to the market price," allegedly inflated by the defendants' fraud. *See id.* at 205. The Court found sufficient his testimony that he had considered the market price in agreeing to his deal, even though it was only "one of several factors taken into account in Black's investment decision." *See id.* at 206, 210. Here Monk does not, and cannot, plead that he took the market price into account as even one factor in making his investment decision, because he made no such decision.[5]

Nor has Monk pleaded facts suggesting that the Buyer Group negotiated the Transaction price based even in part on Shanda's market price. Unlike Black, the Buyer Group is not alleged to have considered the market price at all in agreeing to the Transaction price. (*See* AC ¶¶ 95–99 (describing negotiations as based on projections rather than trading price).) More important, Monk cannot show that the Transaction price was based on a *fraudulent* market price. As Monk alleges, the Transaction price was set on April 3, 2015 (AC ¶ 99), and Shanda's first alleged misstatement came in a press release announcing the deal later that evening (*see id.* ¶ 101). Lacking a time machine, Monk cannot show that the price he received for his shares—i.e., the Transaction price—was in any way based on the "fraud on the market" that he alleges.

### 2. Monk has not pleaded facts to invoke *Affiliated Ute*.

As Shanda showed in its opening brief, Monk cannot rely on the *Affiliated Ute* presumption because he alleges no affirmative disclosure obligation and instead complains that

---

[5] Monk makes the odd argument that he has pleaded actual "reliance on the market price when deciding to sell." (Opp. at 16 (citing AC ¶¶ 278–80).) But he did not (and could not under Rule 11) plead that he "decid[ed] to sell" his stock; he claims to be a *forced* seller. Nor did he plead his own reliance on the market price. The Complaint paragraphs he cites refer only to class members generally, not to himself, and he has no basis to allege actual reliance by other shareholders.

6

omissions rendered Shanda's affirmative statements misleading—i.e., "half-truths." (Mot. at 8–9.) Monk concedes that the presumption does not apply to these alleged half-truths, but argues for two affirmative disclosure duties: (i) under Section 20A, to "disclose material non-public information before trading on the basis of that information or abstain from trading" and (ii) under Cayman Islands law, to "provide investors with sufficient information to adequately understand the Transaction." (Opp. at 17.) Monk has not pleaded facts suggesting that either applies.

**Section 20A.** Monk chastises Shanda for not recognizing that he had attempted to plead an affirmative disclosure obligation under 20A because in paragraph 290 of his Complaint, under the heading "Allegations of Insider Trading," he pleaded that Shanda had "a duty to *either* disclose [material nonpublic] information before trading on the basis of that information *or* abstain from trading." (*See* Opp. at 16–17.) But contrary to Monk's new contention, Section 20A imposes no affirmative duty on issuers like Shanda to speak, and the Opposition cites no cases holding otherwise.[6] In any event, his argument fails for at least three reasons.

First, Section 20A refers to "material, *nonpublic* information," 15 U.S.C. § 78t-1(a), and Monk argues only that Shanda's alleged "failure to disclose the success of Mir II Mobile" was the "pure omission" for which he seeks *Affiliated Ute* reliance (*see* Opp. at 18). By Monk's own admission, Mir II Mobile's success was public long before Shanda allegedly bought his shares on some unidentified date after November 18, 2015. (*See* AC ¶ 76(n)–(o) (explaining Shanda's August 2015 public bragging about Mir II Mobile's success); AC ¶ 142 (noting that Shanda's October 19, 2015 press release "referred to the game . . . as a 'blockbuster success'").) So

---

[6] *Chiarella v. United States*, 445 U.S. 222 (1980), and *In re Ivan F. Boesky Securities Litigation*, 36 F.3d 255 (2d Cir. 1994), do not even mention Section 20A, and *United States v. O'Hagan*, 521 U.S. 642 (1997), explicitly declines to address it, *id.* at 665 n.11 ("[W]e do not address [Section 20A]'s significance for cases of this genre . . . .").

7

Section 20A imposed no duty on Shanda at the time of the alleged trade to disclose the by-then-very-public success of Mir II Mobile, and the Opposition points to no other allegedly material, nonpublic information in Shanda's possession on the date of its hypothesized trade.

Second, Section 20A imposes a duty only on a buyer (or seller), *see* 15 U.S.C. § 78t-1(a), and Shanda was neither. (*See* Mot. at 22.) Monk proffers an unpleaded and demonstrably incorrect theory that he sold his shares to Shanda *after* he was cashed out by the Buyer Group on November 18. (*See* Opp. at 19–20.)[7] But once again, Monk relies on *Vine* to invoke 20A (Opp. at 19), and once again *Vine* disproves his argument. *Vine* addressed Beneficial's acquisition of Crown through a tender offer and subsequent short-form merger. *See* 374 F.2d at 630–31. Vine was a Crown shareholder who did not tender his shares in response to the tender offer but was squeezed out—i.e., rendered a "forced seller." *Id.* at 634–35. The Second Circuit held that he had a 10b-5 claim *against Beneficial* because *it* was effectively the purchaser of his stock. *Id.* at 635 ("[W]e hold that [Vine] is a seller under the Act. Moreover the converse is, therefore, true; Beneficial, if the allegations of the complaint are accepted, is a purchaser of plaintiff's stock . . . ."). Thus *Vine* might give Monk standing because he was a forced seller *to the Buyer Group* (or its corporate form, Capitalcorp Ltd.), but not because he sold his shares *to Shanda*. *Shanda* therefore did not engage in insider trading and had no disclosure obligation under 20A.

Third, 20A imposes a duty only on a person trading in "a security." 15 U.S.C. § 78t-1(a). As Monk concedes, his shares were canceled on November 18 and converted into a chit for $7.10. So while Monk's collection of his cash might have involved some "transaction"—just as cashing a check does—it was not a *securities* transaction. Monk has not pleaded, argued, or

---

[7] Monk oddly claims that "the time and place of sale" would need "to be clarified by discovery." (Opp. at 19.) But his theory is that the sale occurred "when he assented to the sale by surrendering his ADS at JPM's New York office" (*id.* at 24), and he surely knows if and when he did that.

8

offered legal authority for the proposition that his contractual right to a cash payment was a "security" within the meaning of Section 20A.  See 15 U.S.C. 78c(10).

*Cayman Islands Law.*  Monk notes that he has pleaded that Cayman Islands corporations "have a duty to provide investors with sufficient information." (Opp. at 17 (quoting AC ¶ 290).) But the Court cannot merely accept as true Monk's allegation about Cayman law.  See *Euromepa, S.A. v. R. Esmerian, Inc.*, 154 F.3d 24, 28 n.2 (2d Cir. 1998) ("[W]e are not required to take all allegations of [foreign] law proffered by Petitioners to be true . . . .").  And Monk's only legal citation on this point is a First Department case that barely mentions Cayman Islands law, much less provides authority on the scope of any disclosure obligation it imposes.  (*See* Opp. at 17 (citing *Davis v. Scottish Re Grp. Ltd.*, 74 N.Y.S.3d 10 (N.Y. App. Div. 2018).) Again, the omission on which Monk rests his *Affiliated Ute* argument is the success of Mir II Mobile, and that was public immediately after it was launched.  Monk cannot invoke a presumption without showing why it should apply—i.e., demonstrating that Cayman Islands law actually required disclosure of the allegedly omitted material.  *See, e.g.*, *Int'l Fund Mgmt. S.A. v. Citigroup Inc.*, 822 F. Supp. 2d 368, 378–79 (S.D.N.Y. 2011) (dismissing failure-to-disclose claims where plaintiffs had not adequately established that alleged disclosure obligation actually encompassed omitted information).  Indeed, Monk points to nothing in either the Cayman trial or appeal courts' opinions supporting his allegation that Cayman Islands law required greater disclosure for the Transaction.  Nor can Monk turn his alleged fiduciary-duty breach into a 10b-5 violation.  *See, e.g.*, *Suez Equity Inv'rs, L.P. v. Toronto-Dominion Bank*, 250 F.3d 87, 99 (2d Cir. 2001) ("[T]he federal security laws were not intended to 'bootstrap' garden-variety state law claims of breach of fiduciary duty into federal securities claims for failure to disclose.").

9

### B.      The Complaint pleads no actionable misstatements or omissions.

The Opposition also does not rebut Shanda's showing that Monk fails to plead with the PSLRA's requisite particularity that Shanda made any material misstatements or omissions.

First, Monk concedes that the alleged misstatements or omissions are immaterial as a matter of law unless "he was defrauded into selling, rather than seeking appraisal." (Opp. at 4 (citing AC ¶ 281).) But Monk does not allege that he forewent his appraisal rights because of the supposed misinformation. Paragraph 281 says only that "[h]ad [class members] not been induced to sell their shares at a depressed price, they *could have* sought appraisal rights." An allegation that shareholders generally *could have* sought appraisal (and some did) is not an allegation that Monk *would have* done so absent the alleged fraud.

Second, Shanda showed that neither the April 3, 2015 press release nor the October 19, 2015 press releases contained any false statements. (*See* Mot. at 11, 18.) Monk has no response on the October release, and his only response on the April release is that Shanda issued it "to persuade investors that the deal was fair." (Opp. at 7.) But the purpose of a document does not make its contents false, and Monk does not—and cannot—plead that the release even says that the transaction is "fair."[8]

Third, Monk's complaint that the proxy statements were fraudulent because they characterized the Transaction as "fair" fails under *Omnicare, Inc. v. Laborers*, 135 S. Ct. 1318 (2015). (*See* Mot. at 12–13.) Monk responds by noting his allegation that "Shanda did not believe" that the deal price was fair, citing the report of Shanda's expert in the subsequent appraisal proceeding. (Opp. at 8.) But Monk is comparing apples to oranges. In evaluating the

---

[8] Shanda Games Limited, *Shanda Games Limited Enters into Definitive Merger Agreement for Going Private Transaction*, PR Newswire (April 3, 2015), https://www.prnewswire.com/news-releases/shanda-games-limited-enters-into-definitive-merger-agreement-for-going-private-transaction-300060834.html.

10

fairness of the Transaction, the Special Committee was considering "the inherent value of their corporation *as well as what the potential acquirer can be induced to pay*." *Litton Indus., Inc. v. Lehman Bros. Kuhn Loeb Inc.*, 967 F.2d 742, 749 (2d Cir. 1992). An appraisal proceeding, by contrast, is about "a determination of the fair value of Shanda as a going concern." (AC Ex. A at 14 ¶ (e).) If Monk's proposed inference were enough, then a former shareholder could bring a 10b-5 claim whenever an appraisal action yielded a higher value than the deal price. The PSLRA requires far more. Moreover, the opinion of an expert in subsequent litigation does not demonstrate what the opinion of Shanda's executives was the year before. As for Monk's speculation that Shanda could not have believed its opinion because the Company's projections were, according to Monk, so "grossly unreasonable," that too is insufficient under the PSLRA. *See Okla. Firefighters Pension & Ret. Sys. v. Student Loan Corp.*, 951 F. Supp. 2d 479, 497 (S.D.N.Y. 2013) (dismissing complaint where "plaintiffs allege[d] no *facts* [] to support their argument that defendants did not honestly believe their [statements] when made").

Fourth, while Monk spills much ink about the supposedly problematic projections (*see* Opp. at 4–7), that exercise does not suggest that Shanda's statements *about* the projections were false. (*See* Mem. at 13.) Shanda showed in its opening brief (Mem. at 13–14) that *OFI Asset Management v. Cooper Tire & Rubber*, 834 F.3d 500 (3d Cir. 2016), forecloses Monk's complaints about the substance of the projections, and the Opposition does not even mention the case. The Opposition also does not explain how Shanda would have been able to accurately predict the success of its first major foray into mobile games. (*See* Mem. at 15 n.6.)

Fifth, Monk's other complaints about the projections fail for the reasons Shanda has explained. (*See* Mem. at 15–16.) A "summary" of the projections is still a "summary" even if it omits the 2020 data because deriving a summary requires the exercise of reasonable judgment,

11

and as the Cayman Islands court found, "it is reasonable to treat the last year of the forecasts as being 2019." (AC Ex. A ¶ 136.) Further, as Monk himself admits, a "summary" need only cover the "main points succinctly." (Opp. at 9.) And Monk's theory is that he was duped into thinking that the Transaction price was fair because the projections were too pessimistic, but the missing final year showed a steep and rapid growth decline from 18.5% to 1%. Monk's contention that this was somehow "positive information" that would have "induce[d]" him not to sell his shares if it had been included (*id.* at 10) is absurd. Similarly, Monk's grievance (*id.* at 10–11) that Shanda should have updated the projections to account for Mir II Mobile's success is foreclosed by Shanda's statements that the projections were prepared in March 2015—months before the release of Mir II Mobile—and would not be updated. (*See* Mem. at 14) Monk's assertion that "Shanda told investors that these opinions had been refreshed since the Initial Proxy" (Opp. at 11) is plainly false and not supported by the Complaint citations.

      **C.**      **The Complaint fails to adequately plead scienter.**

As Shanda showed in its opening brief, the Complaint should be dismissed for the independent reason that it fails to sufficiently plead scienter. (*See* Mem. at 19–22.) Under Monk's own authority (Opp. at 11), "allegations that defendants should have anticipated future events and made certain disclosures earlier than they actually did do not suffice to make out a claim of securities fraud." *Novak v. Kasaks*, 216 F.3d 300, 309 (2d Cir. 2000). As discussed, Shanda made clear that the projections were prepared in March 2015, when it was impossible for Shanda to fully account for the success of a product that would not launch until August of that year. This is exactly the "fraud by hindsight" the Second Circuit proscribes. *See id.*

As for the adverse interest exception, the parties agree that it applies if the Shanda executives in the Buyer Group committed fraud at Shanda's expense. Under Monk's theory,

these executives committed fraud to purchase Shanda on the cheap. Thus, Shanda "is actually the victim of a scheme undertaken by the agent." *Kirschner v. KPMG LLP*, 938 N.E.2d 941, 952 (N.Y. 2010) (cited in Opp. at 12).[9]

## CONCLUSION

*Morrison* bars Monk's claims because they are based on a foreign transaction. But Monk's allegations do not satisfy the PSLRA in any event. He has not pleaded facts entitling him to invoke the necessary presumption of reliance. And his allegations of falsity and scienter are insufficient. The Complaint should be dismissed with prejudice.

Dated: April 26, 2019
      New York, New York

Respectfully submitted,

/s/ *Abby F. Rudzin*
Abby F. Rudzin
(arudzin@omm.com)
O'MELVENY & MYERS LLP
7 Times Square
New York, New York 10036
Telephone: (212) 326-2000
Facsimile: (212) 326-2061

William K. Pao (*pro hac vice*)
(wpao@omm.com)
O'MELVENY & MYERS LLP
400 South Hope Street
Los Angeles, California 90071
Telephone: (213) 430-6000
Facsimile: (213) 430-6407

*Attorneys for Defendant Shanda Games Limited*

---

[9] Two of the cases Monk cites do not even discuss the adverse interest exception. (*See* Opp. at 12 (citing *Acticon AG v. China E. Petroleum Holdings Ltd.*, 615 F. App'x 44, 45 (2d Cir. 2015); *Blank v. TriPoint Glob. Equities, LLC*, 338 F. Supp. 3d 194, 214–15 (S.D.N.Y. 2018)).)