**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

IN RE SHANDA GAMES LIMITED
SECURITIES LITIGATION

ORAL ARGUMENT REQUESTED

Case No. 18-CV-02463 (ALC)

**LEAD PLAINTIFF'S OMNIBUS OPPOSITION TO**
**DEFENDANTS' MOTIONS TO DISMISS**
**<u>THE SECOND AMENDED COMPLAINT</u>**

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ............................................................................................ ii

I.      INTRODUCTION ............................................................................................... 1

II.     FACTUAL BACKGROUND ............................................................................... 2

III.    LEGAL STANDARDS FOR MOTION TO DISMISS ......................................... 4

IV.     RELIANCE IS ADEQUATELY PLED UNDER *BASIC* ..................................... 5

       A.    Defendants' Argument that Plaintiff Cannot Invoke *Basic* Unless He
        Traded at the Market Price Is Illogical and at Odds with Controlling Law ........... 5

       B.    The Market for Shanda's ADS Was Efficient at All Relevant Times ................. 10

             1.    Plaintiff's Allegation Should Be Credited at This Stage ......................... 10

             2.    While Unnecessary at This Stage, Assessing the Strength of the
              Market Efficiency Allegations Confirms the Market Was Efficient ........ 12

V.      THE INSIDER TRADING CLAIMS ARE ADEQUATELY PLED ............................. 19

       A.    Defendants Purchased the Shares .......................................................... 20

       B.    The Trades Were Made Contemporaneously .............................................. 21

       C.    Plaintiff's Insider Trading Claims Are Actionable ................................... 22

       D.    Plaintiff's Insider Trading Claims Are Timely .......................................... 23

VI.     DEFENDANTS CANNOT RELITIGATE *MORRISON* AND FALSITY ..................... 24

       A.    The Law of the Case Doctrine .............................................................. 24

       B.    Defendants' *Morrison* Argument Still Fails .............................................. 26

       C.    Defendants' Falsity Arguments Still Fail ................................................. 28

             1.    Defendants' Materiality Argument Still Fails........................................ 28

             2.    Defendants' "Safe Harbor" Argument Still Fails ................................... 29

             3.    Defendants' Recitation of Their Previous Argument as to the
              Materiality of the 2020 Projections Fails................................................ 32

VII.    THE COMPLAINT ADEQUATELY ALLEGES LOSS CAUSATION........................ 33

VIII.   THE COMPLAINT STATES CONTROL PERSON CLAIMS .................................... 35

IX.     CONCLUSION.................................................................................................. 35

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*In re Adobe Sys., Inc. Sec. Litig.*,
139 F.R.D. 150 (N.D. Cal. 1991) ............................................................8

*Affiliated Ute Citizens of Utah v. United States*,
406 U.S. 128 (1972) ...................................................................20, 33

*Alki Partners, L.P. v. Vatas Holding GmbH*,
769 F. Supp. 2d 478 (S.D.N.Y. 2011) ......................................................8

*Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*,
133 S. Ct. 1184 (2013) .....................................................................7

*Ark. Tchr. Ret. Sys. v. Goldman Sachs Grp., Inc.*,
141 S. Ct. 1951 (2021) ...................................................................18

*Ark. Tchr. Ret. Sys. v. Goldman Sachs Grp., Inc.*,
955 F.3d 254 (2d Cir. 2020),
*vacated and remanded on other grounds,* 141 S. Ct. 1951 (2021) .....................17

*Ark. Tchrs. Ret. Sys. v. Goldman Sachs Grp., Inc.*,
879 F.3d 474 (2d Cir. 2018) ...............................................................6

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ........................................................................5

*Azar v. Blount Int'l, Inc.*,
No. 3:16-cv-438-SI, 2017 WL 1055966 (D. Or. Mar. 20, 2017) .....................34

*Basic Inc. v. Levinson*,
485 U.S. 224 (1988) ................................................................. *passim*

*Batson v. RIM San Antonio Acquisition, LLC*,
No. 15-cv-7576-ALC, 2018 WL 1581675 (S.D.N.Y. Mar. 27, 2018) ................25

*Bermudez v. City of New York*,
No. 1:10-cv-1162-ALC, 2015 WL 1500235 (S.D.N.Y. Mar. 31, 2015) ..............25

*Billhofer v. Flamel Techs., S.A.*,
281 F.R.D. 150 (S.D.N.Y. 2012) .................................................12, 13, 18

*Black v. Finantra Cap., Inc.*,
418 F.3d 203 (2d Cir. 2005) ................................................................7

*Brown v. Brewer*,
No. 06-cv-3731-GHK, 2010 WL 2472182 (D. Del .June 17, 2010) ......................................34

*Cammer v. Bloom*,
711 F. Supp. 1264 (D.N.J. 1989) ...........................................................................5, 12, 13, 14

*Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*,
310 F.R.D. 69 (S.D.N.Y. 2015) .....................................................................................12, 13, 14

*Chavin v. McKelvey*,
25 F. Supp. 2d 231 (S.D.N.Y. 1998)........................................................................................8

*Chiarella v. United States*,
445 U.S. 222 (1980)....................................................................................................... 22-23

*City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*,
752 F.3d 173 (2d Cir. 2014)...........................................................................................26

*City of Providence v. Aeropostale, Inc.*,
No. 11-cv-7132-CM-THK, 2013 WL 1197755 (S.D.N.Y. Mar. 25, 2013)...........................31

*Cmty. Healthcare Assoc. of N.Y. v. N.Y. State Dep't of Health*,
921 F. Supp. 2d 130 (S.D.N.Y. 2013), *vacated in part on other grounds,* 770
F.3d 129 (2d Cir. 2014)...........................................................................................25

*Cohen v. S.A.C. Trading Corp.*,
711 F.3d 353 (2d Cir. 2013)...........................................................................................24

*In re Computer Scis. Corp. Sec. Litig.*,
288 F.R.D. 112 (E.D. Va. 2012) ...........................................................................................11

*DoubleLine Cap. LP v. Odebrecht Fin., Ltd.*,
323 F. Supp. 3d 393 (S.D.N.Y. 2018)...........................................................................23, 24

*Dura Pharms., Inc. v. Broudo*,
544 U.S. 336 (2005)...........................................................................................33

*In re Envision Healthcare Corp.*,
No. 18-1068-RGA, 2019 WL 3494407 (D. Del. Aug. 1, 2019) ............................................34

*Fezzani v. Bear, Stearns & Co.*,
No. 99-cv-0793-RCC, 2005 WL 500377 (S.D.N.Y. Mar. 2, 2005) ......................................25

*Fin. Guar. Ins. Co. v. Putnam Advisory Co., LLC*,
783 F.3d 395 (2d Cir. 2015)...........................................................................................33

*Fireman's Fund Ins. Co. v. Great Am. Ins. Co.*,
10 F. Supp. 3d 460 (S.D.N.Y. 2014), *aff'd*, 822 F.3d 620 (2d Cir. 2016) .............................27

*Fisher v. Reich*,
   No. 92-cv-4158-MBM, 1995 WL 23966 (S.D.N.Y. Jan. 10, 1995) ......................................24

*In re Forcefield Energy Inc. Sec. Litig.*,
   No. 15-cv-3020-NRB, 2015 WL 4476345 (S.D.N.Y. July 22, 2015) ......................................8

*Galestan v. OneMain Holdings, Inc.*,
   348 F. Supp. 3d 282 (S.D.N.Y. 2018) ..................................................................................31

*Ganino v. Citizens Utils. Co.*,
   228 F.3d 154 (2d Cir. 2000) ................................................................................................29

*Giunta v. Dingman*,
   893 F.3d 73 (2d Cir. 2018) ..............................................................................................5, 10

*Green v. Hamilton Int'l. Corp.*,
   437 F. Supp. 723 (S.D.N.Y. 1977) .......................................................................................19

*Halliburton Co. v. Erica P. John Fund, Inc.*,
   134 S. Ct. 2398 (2014) ........................................................................................................17

*Halliburton Co. v. Erica P. John Fund, Inc.*,
   573 U.S. 258 (2014) ............................................................................................................11

*Heyman v. Heyman*,
   356 F. Supp. 958 (S.D.N.Y. 1973) .........................................................................................9

*In re Hot Topic, Inc. Sec. Litig.*,
   No. 13-cv-2939-SJO, 2014 WL 7499375 (C.D. Cal. May 2, 2014) ......................................34

*Howing Co. v. Nationwide Corp.*,
   972 F.2d 700 (6th Cir. 1992) .................................................................................................9

*In re Initial Pub. Offering Sec. Litig.*,
   544 F. Supp. 2d 277 (S.D.N.Y. 2008) ..................................................................................11

*In re Initial Pub. Offering Sec. Litig.*,
   241 F. Supp. 2d 281 (S.D.N.Y. 2003) ..................................................................................11

*In re ITT Educ. Servs., Inc. Sec. Litig.*,
   34 F. Supp. 3d 298 (S.D.N.Y. 2014) ....................................................................................31

*Kaplan v. S.A.C. Cap. Advisors, L.P.*,
   40 F. Supp. 3d 332 (S.D.N.Y. 2014) ....................................................................................23

*Krogman v. Sterritt*,
   202 F.R.D. 467 (N.D. Tex. 2001) ...................................................................................12, 18

*Larson v. Domestic & Foreign Com. Corp.*,
    337 U.S. 682 (1949).............................................................................................................21

*In re Laser Arms Corp. Sec. Litig.*,
    794 F. Supp. 475 (S.D.N.Y. 1989), *aff'd*, 969 F.2d 15 (2d Cir. 1992)....................................10

*Lewis v. Termeer*,
    445 F. Supp. 2d 366 (S.D.N.Y. 2006)...................................................................................34

*Lichtenberg v. Besicorp Grp. Inc.*,
    43 F. Supp. 2d 376 (S.D.N.Y. 1999)......................................................................................34

*Livid Holdings, Ltd. v. Salomon Smith Barney, Inc.*,
    416 F.3d 940 (9th Cir. 2005) ................................................................................................24

*Local 703, I.B. of T. Grocery & Food Emps.' Welfare Fund v. Regions Fin. Corp*,
    762 F.3d 1248 (11th Cir. 2014) ............................................................................................13

*Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*,
    797 F.3d 160 (2d Cir. 2015).................................................................................................33

*Madison Consultants. v. Fed. Deposit Ins. Corp.*,
    710 F.2d 57 (2d Cir. 1983)..............................................................................................9, 35

*McIntire v. China MediaExpress Holdings, Inc.*,
    38 F. Supp. 3d 415 (S.D.N.Y. 2014)..................................................................................8, 18

*Menaldi v. Och-Ziff Cap. Mgmt. Grp. LLC*,
    328 F.R.D. 86 (S.D.N.Y. 2018) .......................................................................................15, 16

*Merck & Co., Inc. v. Reynolds*,
    559 U.S. 633 (2010).............................................................................................................23

*In re Merrill Lynch Auction Rate Sec. Litig.*,
    704 F. Supp. 2d 378 (S.D.N.Y. 2010), *aff'd*, 671 F.3d 120 (2d Cir. 2011) ...........................10

*Merrill, Lynch, Pierce, Fenner & Smith, Inc. v. Young*,
    No. 91-cv-2923-CSH, 1996 WL 383135 (S.D.N.Y. July 9, 1996)........................................25

*Mills v. Elec. Auto-Lite Co.*,
    396 U.S. 375 (1970).............................................................................................................33

*In re Morgan Stanley Info. Fund Sec. Litig.*,
    592 F.3d 347 (2d Cir. 2010).....................................................................................29, 32, 33

*Mori v. Saito*,
    No. 10-cv-6465-KBF, 2013 WL 1736527 (S.D.N.Y. Apr. 19, 2013) ....................................28

*Morrison v. Nat. Austl. Bank Ltd.*,
  561 U.S. 247 (2010) .................................................................................................. *passim*

*In re Petrobras Sec.*,
  862 F.3d 250 (2d Cir. 2017) ...................................................................................26, 27

*In re Parmalat Sec. Litig.*,
  376 F. Supp. 2d 472 (S.D.N.Y. 2005) ...........................................................................10

*Pierre J. LeLandais & Co. v. MDS-Atron, Inc.*,
  543 F.2d 421 (2d Cir. 1976) ..........................................................................................34

*Pirnik v. Fiat Chrysler Autos., N.V.*,
  327 F.R.D. 38 (S.D.N.Y. 2018) ......................................................................................14

*In re PolyMedica Corp. Sec. Litig.*,
  453 F. Supp. 2d 260 (D. Mass. 2006) ............................................................................12

*In re Poseidon Concepts Sec. Litig.*,
  No. 13-cv-1213-DLC, 2016 WL 3017395 (S.D.N.Y. May 24, 2016) .............................28

*In re Salix Pharms., Ltd.*,
  No. 14-cv-8925-KMW, 2016 WL 1629341 (S.D.N.Y. Apr. 22, 2016) ...........................31

*Salvani v. ADVFN PLC*,
  50 F. Supp. 3d 459 (S.D.N.Y. 2014), *aff'd*, 628 F. App'x 784 (2d Cir. 2015) ...............10

*In re Satyam Comput. Servs. Ltd. Sec. Litig.*,
  915 F. Supp. 2d 450 (S.D.N.Y. 2013) ...........................................................................27

*In re Sci.-Atlanta, Inc. Sec. Litig.*,
  571 F. Supp. 2d 1315 (N.D. Ga. 2007) ...........................................................................8

*S.E.C. v. Geranio*,
  No. 12-cv-4257-DNG, 2013 WL 12146516 (C.D. Cal. Jan. 29, 2013) ..........................28

*S.E.C. v. Zandford*,
  535 U.S. 813 (2002) ........................................................................................................2

*In re Signet Jewelers Ltd. Sec. Litig.*,
  No. 16-cv-6728-CM-RWL, 2019 WL 3001084 (S.D.N.Y. July 10, 2019) ...........12, 14, 18

*Simon DeBartolo Grp., L.P. v. Richard E. Jacobs Grp., Inc.*,
  186 F.3d 157 (2d Cir. 1999) ..........................................................................................20

*In re Smart Tech. Inc. S'holders Litig..*,
  295 F.R.D. 50 (S.D.N.Y. 2013) ......................................................................................27

*Smilovits v. First Solar, Inc.*,
  295 F.R.D. 423 (D. Ariz. 2013) ................................................................11

*Strougo v. Barclays PLC*,
  312 F.R.D. 307 (S.D.N.Y. 2016),
  *aff'd, Waggoner v. Barclays PLC*, 875 F.3d 79 (2d Cir. 2017) ...............11

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
  551 U.S. 308 (2007) ...................................................................... 4, 5, 10

*In re Tezos Sec. Litig.*,
  No. 17-cv-6779-RS, 2018 WL 4293341 (N.D. Cal. Aug. 7, 2018) .........28

*TSC Indus., Inc. v. Northway, Inc.*,
  426 U.S. 438 (1976) ...................................................................................29

*In re UBS Auction Rate Sec. Litig.*,
  No. 08-cv-2967-LMM, 2010 WL 2541166 (S.D.N.Y. June 10, 2010) ...11

*In re United Brands Co. Sec. Litig.*,
  No. 58-cv-5445-JFK, 1988 WL 67413 (S.D.N.Y. June 20, 1988) ..........32

*United States v. O'Hagan*,
  521 U.S. 642 (1997) ............................................................................22, 23

*United States v. Quintieri*,
  306 F.3d 1217 (2d Cir. 2002) ..............................................................25, 26

*Vine v. Beneficial Fin. Co.*,
  374 F.2d 627 (2d Cir. 1967) .......................................................................19

*Viti v. Guardian Life Ins. Co. of Am.*,
  No. 10-cv-2908-ALC-MHD, 2013 WL 6500515 (S.D.N.Y. Dec. 11, 2013) .........25

*In re Vivendi, S.A. Sec. Litig.*,
  838 F.3d 223 (2d Cir. 2016) .......................................................................31

*Waggoner v. Barclays PLC*,
  875 F.3d 79 (2d Cir. 2017) .........................................................................14

*Wilson v. Great Am. Indus., Inc.*,
  979 F.2d 924 (2d Cir. 1992) ...................................................................9, 34

*Wilson v. LSB Indus., Inc.*,
  No. 15-cv-7614-RA-GWG, 2018 WL 3913115 (S.D.N.Y. Aug. 13, 2018) ............14

*In re Winstar Commc'ns Sec. Litig.*,
  290 F.R.D. 437 (S.D.N.Y. 2013) .....................................................12, 13, 14

*In re Xcelera.com Sec. Litig.*,
    430 F.3d 503 (1st Cir. 2005) .................................................................................13


**Statutes and Rules**

Private Securities Litigation Reform Act of 1995 ............................................29, 30, 31

Securities Exchange Act of 1934 § 20(a) ....................................................................35

Securities Exchange Act of 1934 § 10(b) ............................................................ *passim*


**Other Authorities**

Jacobs, Disclosure and Remedies Under the Securities Laws, § 20:53 (Mar. 2020) ...................33

Matthew Bender, Insider Trading § 4.07 (2013) ..........................................................20

Summary, MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY (11th ed. 2004) ............................32

Summary, POCKET OXFORD ENGLISH DICTIONARY (2d ed. 2008) ................................32

Title, BLACK'S LAW DICTIONARY (10th ed. 2014) .......................................................28

Lead Plaintiff David Monk ("<u>Plaintiff</u>") files this omnibus opposition to Defendants' motions to dismiss the Complaint.[1]

## I.   INTRODUCTION

Defendants committed a brazen fraud to buy all outstanding Shanda shares at a lowball price, by misleading investors about the Company's true value.  An appraisal already found that Defendants grossly underpaid for the shares, and Shanda's own expert admitted the shares were worth 34% more than the deal price.  And this Court has already ruled that Plaintiff sufficiently alleged that Defendants made material misstatements with scienter.

Specifically, the Court sustained claims that Defendants made false statements regarding their projections, which utilized depreciation and amortization models that violated basic accounting principles and contradicted Shanda's previous approach to modeling these figures and omitted an entire year of positive results from Defendants' disclosures.

The Court granted leave to amend upon a narrow finding that the prior complaint did not (a) sufficiently allege Shanda's ADS traded in an efficient market at the relevant time, as is required for Plaintiff to establish reliance under the *Basic* presumption; and (b) that the prior complaint did not allege the correct persons/entities purchased the ADS, for insider trading law purposes. The Complaint remedies both issues.  It adds detailed new allegations of market efficiency bolstered by expert analysis.  And it remedies any deficiencies in the insider trading claims with new allegations, which conform to the Court's prior insider trading holdings.

---

[1] Leave to file a 35-page omnibus brief was granted by stipulation (ECF No. 89).  The Second Amended Complaint ("<u>Complaint</u>") is cited as "¶_." ECF No. 72.  Defendant Shanda Games Limited ("<u>Shanda</u>")'s motion to dismiss (ECF No. 91) is cited as "<u>Shanda-MtD</u>."  Defendants Yingfeng Zhang, Capitalhold Limited, and Capitalcorp Limited's motion to dismiss (ECF No. 96) is cited as "<u>ZCC-MtD</u>."  The Court's 2019 Order granting Defendants' motion to dismiss is cited as "<u>2019 Order</u>" (ECF No. 57) and the Court's 2020 Order on reconsideration (ECF No. 70) is cited as "<u>2020 Order</u>."  Undefined terms are defined as in the Complaint.  Issues decided by the 2019 Order and 2020 Order are preserved for appeal.

Faced with these strong allegations, Defendants take a kitchen sink approach by (a) rehashing flawed arguments regarding the *Basic* presumption of reliance, without meaningfully responding to the new allegations; (b) repackaging those arguments as attacks on loss causation—which Defendants did not even deem significant enough to raise in their prior motion to dismiss—while ignoring the legal standards on that issue; (c) relitigating settled issues regarding whether the claims are barred as extraterritorial by *Morrison*, and whether the claims allege material false statements, notwithstanding the law of the case doctrine; and (d) attempting to dodge the insider trading laws with hyper-formalistic misdirection.

While this case involves complex issues — issues which are decisively settled in Plaintiff's favor — it is important to not lose sight of what the case is really about: wealthy insiders ripping off ordinary investors and running off with hundreds of millions in illicit profit. It is also important to put the arguments in context.  Stripped of its sophistry, Defendants' core premise is that they have a license to defraud.  This is highlighted in their leading rhetoric, claiming this case is a "square peg in a round hole."  Shanda-MtD at 1.  It is not.  What they mean, is that the securities laws do not protect investors from this sort of fraud.  They do.  The fraud is actionable under uncontroversial applications of settled law.  Moreover, it has been long established that to "effectuate [their] remedial purposes, the [securities laws] should be construed flexibly, not technically and restrictively.*"  S.E.C. v. Zandford*, 535 U.S. 813, 813 (2002).

## II.     FACTUAL BACKGROUND

Shanda defrauded its investors out of hundreds of millions of dollars when it delisted its ADS from NASDAQ and induced its minority investors to sell their holdings in a going-private transaction (the "Merger").  The fraud deceived investors into undervaluing the Company and selling their ADS rather than seeking appraisal.  ¶¶98-105.  The fraud enriched a small group that took Shanda private (the "Buyer Group"), including Defendant Zhang (its Board Chairman

2

and CEO), who reaped about $57 million in illicit profit from the fraud, as well as Ningxia, which reaped about $159 million and was represented on the Board by Defendant Liang.  ¶26.

In 2009, Shanda, accessed U.S. capital markets through the IPO of its ADS, which it listed on NASDAQ and registered with the SEC.  ¶62.  Shanda deposited two shares of its Class A stock per ADS, at a New York office of JPMorgan Chase Bank, N.A.  *Id.*

On April 3, 2015, Shanda announced the Merger at a price of $7.10 per ADS.  ¶104-05. The Buyer Group controlled enough votes to close the deal, but Shanda still needed to file Proxies so that investors could accurately value Shanda and decide whether to seek appraisal. ¶106.  An appraisal gives investors the right to reject the deal and instead seek a judicial determination of the fair value of their shares.  ¶151.  Thus, Shanda and the Buyer Group had an incentive to deceive investors into accepting the deal price, which undervalued Shanda, since they would then keep the difference between the deal price and Shanda's fair value.  *Id.*  Acting on this incentive, Shanda (1) told investors the deal was fair, (2) sought to convince investors that the price of $7.10 per ADS reflected the true value of the Company, and (3) omitted critical information from its Proxies.  *E.g.*, ¶¶194-208, 219-35.  But, when some investors did seek appraisal (the "Appraisal") (¶¶153-5552), ***Shanda's own expert*** admitted the fair value of the ADS was ***$9.56, 34% higher than the deal price***.  ¶¶154-55.  After an appeal, the courts found the fair value of the ADS to be ***$12.84, a whopping 80% higher than the deal price***.  ¶1.

A set of projections (the "Projections") published in summary form in Shanda's Initial Proxy and Final Proxy were central to Defendants' deception.  ¶¶189, 217.  The Appraisal revealed that this so-called "summary" omitted an entire year of data (¶¶189-90) and that the Projections undervalued Shanda by: (a) using an unreasonable game revenue model and manipulating that model to further understate revenue and overstate costs; (b) jettisoning

Shanda's past practice and violating accounting rules to overstate depreciation and amortization; and (c) using unjustifiable forecasts for the mobile version of its core game, Mir II.  ¶¶160-79.

By 2015, Shanda shifted its focus to mobile games. ¶¶70-72.  Unsurprisingly then, Shanda "spared no efforts" in developing Mir II Mobile, the mobile version of its flagship game, which took years to produce and employed a team of over 80 people.  ¶173 n.24.  Defendant Zhang forecasted "explosive growth" from mobile games like Mir II Mobile (¶79(d)), while Shanda referred to it as the "most anticipated RPG mobile game of the year," (¶79(m)), boasted that it had seen "overwhelming interest" in the game, (¶79(g)) and called it "by far [Shanda's] most excellent mobile game."  ¶79(i).  Yet, unbeknownst to the public, the Projections treated Mir II Mobile as an ordinary game with $15 million in lifetime revenues, ¶125(c), *far less than 1%* of the $1.96 billion Mir II PC earned in the seven years for which data is public.  ¶73.

On August 3, 2015, Shanda released Mir II Mobile and, as expected, it was an instant hit. ¶79.  Eleven days later, Defendant Zhang emailed employees announcing bonuses due to the game's "top spot" on the "best-selling chart."  ¶79(n).  As was disclosed after the Merger, Mir II Mobile earned $92-$107 million each month after its release and, in its first quarter, it was more profitable than Shanda's entire business in Q1-Q3 of 2015.  ¶80.  Despite knowing of this success (¶¶140-46), despite knowing of the Projections' flaws (¶¶254-58), and despite disclosure duties under Cayman law and under insider trading law (¶238-39), Defendants did not reveal this success and released the Final Proxy on October 13, 2015, touting the false Projections and lying about the deal's fairness (¶¶134-39).  Shanda deceived investors into selling at a deflated price of $7.10 per ADS, causing them to lose hundreds of millions of dollars.

## III.   LEGAL STANDARDS FOR MOTION TO DISMISS

The Court must "accept all factual allegations in the complaint as true," *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 309 (2007), and draw "all reasonable inferences in

the [Plaintiff's] favor," *Giunta v. Dingman*, 893 F.3d 73, 79 (2d Cir. 2018).  Generally, the

Complaint must merely be "plausible."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  Allegations

of falsity and scienter must be "at least as compelling" as opposing inferences (*Tellabs*, 551 U.S.

at 324), meaning if two inferences are equally compelling, Plaintiff's should be credited.

## IV.   RELIANCE IS ADEQUATELY PLED UNDER *BASIC*

Reliance is ordinarily an element of fraud claims, because it establishes the causal nexus

between the deception and plaintiffs' conduct.  However, the Supreme Court has established a

bedrock presumption in securities litigation holding that investors need not provide

individualized proof of reliance, where securities trade in an efficient market.  *Basic Inc. v.

Levinson*, 485 U.S. 224, 246 (1988).  The Court accepted Plaintiff's premise that he could invoke

*Basic* in alleging he was fraudulently induced to sell his securities into the Merger, but the Court

held that Plaintiff had not sufficiently pled that the market for Shanda's ADS was efficient.  2020

Order at 4. ("[T]he Court's conclusion that Plaintiff failed to demonstrate an efficient market and

thereby plead reliance was not predicated on a disagreement with the fundamentals of the *Basic*

presumption.").  Plaintiff has now cured any such issue with the pleadings, by providing

overwhelmingly strong allegations establishing that the market for Shanda's ADS was efficient

at all relevant times.  ¶¶282-314 (expert analysis of the *Cammer* and *Kroman* factors establishing

market efficiency and analysis of why the Merger context did not undermine that efficiency).

### A.   Defendants' Argument that Plaintiff Cannot Invoke *Basic* Unless He Traded at the Market Price Is Illogical and at Odds with Controlling Law

Defendants first offer a convoluted argument that Plaintiff cannot invoke *Basic* because

he did not trade at the market price, but instead tendered his shares into the Merger.  Shanda-

MTD at 12.  As a threshold matter, this argument was already rejected by the Court in its 2020

Order, and Defendants offer no compelling reason to reverse this decision.  *See* 2020 Order at 4

(finding no fundamental reason Plaintiff could not invoke *Basic*, but finding the allegations of market efficiency insufficient, and granting leave to amend).  For that reason alone, this argument fails as it violates the law of the case doctrine.  *See* Section VI(A).[2]

Defendants' argument is also at odds with controlling law and the logic of *Basic*.  The Second Circuit has held that *Basic* incorporates two constituent presumptions:

> **[1]** that the price of stock traded in an efficient market reflects all public, material information—including misrepresentations—and **[2]** that investors rely on the integrity of the market price when they choose to buy or sell stock.

*Ark. Tchrs. Ret. Sys. v. Goldman Sachs Grp., Inc.*, 879 F.3d 474, 478 (2d Cir. 2018).  The second constituent presumption directly undermines Defendants' argument.  This point is illustrated by Defendants' argument that Plaintiff does not plead, on an individualized basis, that he relied on the market price.  Shanda-MtD at 10.  Such an allegation is unnecessary because Plaintiff (and all Class members) are entitled to a presumption that they relied on the market price when trading.  The presumption that investors rely on the market price has been a core tenant of *Basic* since its inception, as the Supreme Court noted: "it is hard to imagine that there ever is a buyer or seller who does not rely on market integrity."  *Basic*, 485 U.S. at 246–47 (citation omitted).

The logic of this constituent presumption is simple and comports with "common sense and probability."  *Id.* at 246.  Imagine an acquaintance offers to sell you a share of Starbucks for $50.  There are many questions you might ask before committing to that transaction—and one especially likely question is "what is the market price for Starbucks stock on the NASDAQ?"  If that price is $75, you may choose to buy the stock for $50, as it would seem you are getting a

---

[2] The Court also implicitly rejected this argument when granting leave to amend to cure the issues raised in its prior ruling, but denying leave to add a plaintiff that sold its shares on the NASDAQ.  ECF No. 71. That ruling shows the Court viewed the prior complaint as deficient, based on the sufficiency of the market efficiency allegations, not based on a distinction between tendering and selling on the NASDAQ.

good deal (a $25 premium per share).  However, if the market price is $25, you would likely reject the offer, as it would seem to be a bad deal.  *Basic* simply adopts the ***presumption*** that investors rely on the market price in this fashion when making trading decisions.  Plaintiff is entitled to that presumption, and Defendants' theory that it is relevant that he did not trade "at" the market price fails because, there is no such requirement imposed by *Basic*.[3]

In *Black v. Finantra Capital, Inc.*, 418 F.3d 203 (2d Cir. 2005), the Second Circuit directly endorsed the applicability of this constituent presumption, even in the context of negotiated, off-exchange transactions, not made at the market price.  There, a friend solicited Black to "make a direct private purchase of restricted shares" of a publicly traded company.  *Id.* at 205–06.  Both the district court and the Second Circuit found that the *Basic* presumption applied.  *Id.* at 209.  Consistent with the regime established by *Basic*, and with the ordinary functioning of legal presumptions,[4] defendants then sought to rebut the presumption by pointing to deposition testimony in which Black indicated that the market price was only one of the factors he considered.  *Id.*  However, the Second Circuit determined that even this testimony was not sufficient to rebut the presumption.  *Id.* at 209-10.  The key here, is that, while the testimony was relevant to assessing whether the presumption had been rebutted, the Second Circuit did not require such testimony to invoke the presumption.  Thus, *Black* is directly on point in affirming the long-standing rule that even when investors trade at a negotiated price, they are entitled to invoke the presumption that they relied on the market price when making the decision to trade.

---

[3] While some cases have stated that those trading "at the market price" are entitled to invoke *Basic*, this has always reflected a casual articulation of the rule, noting that such trading is clearly sufficient to invoke *Basic* and there has never been a requirement to trade at that market price to invoke *Basic*.  *See e.g.,* Shanda-MtD at 9 (citing one sentence in *Basic* noting those who trade "at the market price" rely, but ignoring that *Basic* held "it is hard to imagine that there ever is a buyer or seller who does not rely on market integrity," *Basic*, 485 U.S. at 246–47).

[4] *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 133 S. Ct. 1184, 1192 (2013) (recognizing that defendants may submit *evidence* to rebut the plaintiffs' reliance at the class certification stage).

Unsurprisingly, given the controlling precedent on the issue, countless other cases have applied *Basic* even where the plaintiff did not trade at the market price.  *E.g.*, *In re Forcefield Energy Inc. Sec. Litig.*, 2015 WL 4476345, at *4 (S.D.N.Y. July 22, 2015) ("[T]he fact that [plaintiff] bought . . . through off-market transactions is irrelevant . . . The fraud-on-the-market theory depends on the existence of an efficient market whose price signals may be relied upon to inform an investor's choices.  Even though [plaintiff] bought equity shares outside the open market through a note exchange program, she plausibly relied on the market's efficient valuation of ForceField equity to determine whether to participate in the note exchange."); *In re Sci.-Atlanta, Inc. Sec. Litig.*, 571 F. Supp. 2d 1315, 1330 (N.D. Ga. 2007) (option traders rely "on the integrity of the price of the underlying stock"); *McIntire v. China MediaExpress Holdings, Inc.*, 38 F. Supp. 3d 415, 434 (S.D.N.Y. 2014) (similar); *In re Adobe Sys., Inc. Sec. Litig.*, 139 F.R.D. 150, 155 (N.D. Cal. 1991) (options traders may utilize the presumption "since the ***value*** of options is directly related to the value of common stock") (emphasis added).

Defendants' cases are consistent with this rule.  *See* Shanda-MTD at 12.  *Alki Partners, L.P. v. Vatas Holding GmbH,* rejected *Basic* because "by their own admissions, [plaintiffs] did not rely on th[e] market."  769 F. Supp. 2d 478, 493 (S.D.N.Y. 2011).  That factual finding simply has no application to the present case.  Defendants' other case is *Chavin v. McKelvey*, which Defendants misleadingly claim rejected *Basic* for "face-to-face negotiations."  25 F. Supp. 2d 231, 238 (S.D.N.Y. 1998).  In fact, *Chavin* rejected *Basic* because the pre-IPO purchases at issue were made at a time when there was no efficient market for the shares at all upon which the plaintiff could possibly have relied.  *Id.* ("At the time that McKelvey made the alleged misrepresentations, TMP's common stock was not traded publicly").  That Defendants are reaching for such inapposite cases highlights the lack of support available for their position.

8

Nor is there any merit to Defendants' argument that Plaintiff was a "forced seller." Shanda-MtD at 12.  Not only was this argument already rejected by the Court (*See* 2020 Order at 4), but it is simply factually incorrect.  Dissenting and seeking an appraisal was always an option, as was selling the shares to someone who would pay a premium to buy shares and seek appraisal (*see* ¶¶307-09)), as were many other options such as seeking court intervention to enjoin the closing of a Merger predicated on breached duties and fraud.  Here, the fact of these alternatives and their potential value is undeniable, given that other investors successfully sought appraisal, recovering based on a finding that the Merger undervalued their shares. ¶¶151-61.[5]

Many cases demonstrate that shareholders have viable claims where misrepresentations supported a merger, even if that shareholder lacked the means to stop the merger, and each of these cases necessarily establish that materiality is determined according to the normal rule looking to the importance of the information that was misrepresented.  *See, e.g., Wilson v. Great Am. Indus., Inc.*, 979 F.2d 924, 926 (2d Cir. 1992) (affirming damages ruling based on material misstatements in merger information statement, notwithstanding defendants held "well over the two thirds necessary" to close the merger); *Madison Consultants. v. Fed. Deposit Ins. Corp.,* 710 F.2d 57, 64 (2d Cir. 1983) (ordinary materiality analysis applied, even where plaintiff could not stop the transaction, noting availability of appraisal rights as forgone alternative to transaction to support plaintiffs' claims); *Howing Co. v. Nationwide Corp.*, 972 F.2d 700, 710 (6th Cir. 1992) (affirming plaintiff's standing and theory of loss where they alleged material misstatements in short-form merger, despite their inability to stop the deal, based on forgone appraisal rights).

---

[5] Defendants' argument is litigation by wordplay, based on a line of cases using the term "forced seller." Shanda-MtD at 23.  Those cases do not have anything to do with whether the investors had alternatives and merely embrace a "legal fiction" in plaintiffs' favor to expand their standing to sue.  In particular, they recognize that once a merger is voted upon, one has standing to sue even before they closed the sale by tendering their shares.  *Heyman v. Heyman*, 356 F. Supp. 958, 963 (S.D.N.Y. 1973) ("The term 'forced seller' is a legal fiction, for the plaintiff in *Vine* was not a seller at all when he brought suit").

**B.      The Market for Shanda's ADS Was Efficient at All Relevant Times**

The Complaint contains detailed pleadings, including analysis by a respected expert,

establishing that the market for Shanda's securities was efficient at all relevant points in time.

¶¶282-314; *see also* Complaint, Exhibit A (market efficiency slides).

**1.      Plaintiff's Allegation Should Be Credited at This Stage**

Before even analyzing the strength of the market efficiency analysis, the Court should

accept the allegation of market efficiency as true, on the basis of Chad Coffman's expert

analysis, and reserve the task of weighing the strength of the evidence for class certification.

*Tellabs*, 551 U.S. at 322 (courts must "accept all factual allegations in the complaint as true");

*Giunta*, 893 F.3d at 79 (courts must draw "all reasonable inferences in the [Plaintiff's] favor").

A mountain of authority demonstrates that plaintiffs need only ***allege*** market efficiency at

the pleading stage and detailed analysis of the strength of those allegations is reserved for later

stages of litigation.  *Basic*, 485 U.S. at 249 n.29 (holding, in reference to market efficiency, that

"***[p]roof of that sort is a matter for trial***"); *Salvani v. ADVFN PLC*, 50 F. Supp. 3d 459, 473 n.9

(S.D.N.Y. 2014), *aff'd*, 628 F. App'x 784 (2d Cir. 2015) ("the question of whether a market is

efficient [is a] question of fact and therefore not meant to be answered on a motion to dismiss");

*In re Laser Arms Corp. Sec. Litig.*, 794 F. Supp. 475, 490 (S.D.N.Y. 1989), *aff'd*, 969 F.2d 15

(2d Cir. 1992); ("Whether [the shares] traded in an efficient market is a question of fact.

Therefore, resolution of that issue must await presentation of further proof at trial."); *In re*

*Merrill Lynch Auction Rate Sec. Litig.*, 704 F. Supp. 2d 378, 395 (S.D.N.Y. 2010), *aff'd*, 671

F.3d 120 (2d Cir. 2011) (market efficiency "is not a pure question of law' and normally ***should***

***not be decided on a motion to dismiss.***"); *In re Parmalat Sec. Litig.*, 376 F. Supp. 2d 472, 509

(S.D.N.Y. 2005) ("[T]he question on a motion to dismiss is not whether plaintiff has proved an

efficient market, but whether he has pleaded one.") (quoting *Hayes v. Gross*, 982 F.2d 104, 107

(3d Cir. 1992)); *In re Initial Pub. Offering Sec. Litig.*, 241 F. Supp. 2d 281, 377 (S.D.N.Y. 2003) ("the question of whether securities were traded in an efficient market should not be decided on a motion to dismiss"); *In re UBS Auction Rate Sec. Litig.,* 2010 WL 2541166, at *25 (S.D.N.Y. June 10, 2010) ("The question on a motion to dismiss is not whether plaintiff has proved an efficient market, but whether he has pleaded one.") (citation omitted).

Furthermore, even at the later stages of litigation where factual issues can properly be weighed, the burden of establishing market efficiency is not onerous – as the requisite degree of efficiency does not require anything near perfect incorporation of information, but just that the market be sufficiently well developed to support the inference that it incorporated material information.  *See Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 272 (2014) (recognizing that the "modest premise underlying the presumption of reliance" means that "[d]ebates about the precise degree to which stock prices accurately reflect public information are . . . largely beside the point," because "all that *Basic* requires," is that the market be sufficiently developed for "false statements [to] affect it."); *e.g.*, *Strougo v. Barclays PLC*, 312 F.R.D. 307, 318 (S.D.N.Y. 2016) ("most courts in this Circuit agree that such listing is a good indicator of efficiency"), *aff'd, Waggoner v. Barclays PLC* , 875 F.3d 79 (2d Cir. 2017); *In re Initial Pub. Offering Sec. Litig.*, 544 F. Supp. 2d 277, 296 n.133 (S.D.N.Y. 2008) ("[T]he federal courts are unanimous in their agreement that a listing on the NASDAQ or a similar national market is a good indicator of efficiency."); *In re Computer Scis. Corp. Sec. Litig.,* 288 F.R.D. 112, 120 (E.D. Va. 2012) ("It is not surprising that no other federal courts have concluded that common shares traded on the NYSE are not traded in an efficient market."); *Smilovits v. First Solar, Inc.*, 295 F.R.D. 423, 431 (D. Ariz. 2013) ("trading of First Solar stock on NASDAQ—a major, well-developed stock exchange—weighs in favor of finding market efficiency.

Defendants have not 'identified any authority. . . that has held that common shares traded on the NASDAQ are not traded in an efficient market.'"); *In re PolyMedica Corp. Sec. Litig.*, 453 F. Supp. 2d 260, 266 (D. Mass. 2006) ("listing on such an exchange indisputably improves the market structure for trading in a particular stock" and "one would be hard-pressed to deny the relevance of this fact in an efficiency analysis").

### 2.   While Unnecessary at This Stage, Assessing the Strength of the Market Efficiency Allegations Confirms the Market Was Efficient

The "prevailing tests for market efficiency," are known as the *Cammer* and *Krogman* factors.  *In re Signet Jewelers Ltd. Sec. Litig.*, 2019 WL 3001084, at *11 (S.D.N.Y. July 10, 2019) (citing *Cammer v. Bloom*, 711 F. Supp. 1264, 1286-87 (D.N.J. 1989), and *Krogman v. Sterritt*, 202 F.R.D. 467, 474 (N.D. Tex. 2001)).  Courts are clear that these factors should be used "as an analytical tool rather than as a checklist."  *Billhofer v. Flamel Techs., S.A.*, 281 F.R.D. 150, 160 (S.D.N.Y. 2012).

**Cammer One: Weekly Trading Volume**.  "Average weekly trading volume of 2% or more of outstanding securities justifies a 'strong presumption' of an efficient market for that security."  *In re Winstar Commc'ns Sec. Litig.*, 290 F.R.D. 437, 447 (S.D.N.Y. 2013) (citation omitted).  High trading volume suggests efficiency "because it implies significant investor interest in the company" which, "implies a likelihood that many investors are executing trades on the basis of newly available or disseminated corporate information." *Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 310 F.R.D. 69, 79 (S.D.N.Y. 2015).  Mr. Coffman found that this factor supported the conclusion of Shanda's market efficiency, because Shanda had an average weekly trading volume of over 5% during the Analysis Period.  Weekly trading volume exceeded 2% for the vast majority of the Class Period.  ¶289.

***Cammer* Two: Analysts and Media Coverage**.  Public commentary, such as that of analysts, "supports a finding of market efficiency" because it shows that "investment professionals" are "inject[ing] their views on the . . . security into the market."  *In re Winstar Commc'ns Sec. Litig.*, 290 F.R.D. 437, 446 (S.D.N.Y. 2013).  During the Analysis Period, at least 13 securities analysts issued at least 91 reports, which Mr. Coffman concluded supports market efficiency.  ¶290.  Defendants respond that some of the reports came from investor media outlets such as *Seeking Alpha*.  Shanda-MtD at 9 n.11.  However, what matters is not the pedigree of the analyst, but the fact that there was meaningful public commentary about the Company, which supports the conclusion that the market price reflected material public information about the Company.  *See Carpenters*, 310 F.R.D. at 92 ("press coverage" weighed in favor of finding market efficiency); *Local 703, I.B. of T. Grocery & Food Emps.' Welfare Fund v. Regions Fin. Corp.*, 762 F.3d 1248, 1255 (11th Cir. 2014) (crediting attention from "investors and/or analysts who study the available information").

As the Court previously noted, there was a reduction of coverage during the Class Period, compared to the historical coverage of Shanda.  2020 Order at 4-5.  However, the Analysis Period coverage is more important to assessing efficiency than the relatively short Class Period, and even ***during the Class Period, some analyst coverage continued.***  ¶291; *In re Xcelera.com Sec. Litig.*, 430 F.3d 503, 514-15 (1st Cir. 2005) (finding market efficiency where only single analyst covered the company).  Even, if this factor did not weigh in favor of efficiency, that would not – especially at the pleading stage – undercut a finding of market efficiency.  The *Cammer* factors are not a checklist and it is not required that each factor be satisfied to establish the low hurdle of establishing a sufficiently efficient market.  *Billhofer*, 281 F.R.D. at 160.

*Cammer* **Three: Market Makers**. The number of market makers and arbitrageurs supports a finding of market efficiency because they "would react swiftly to company news and reported financial results by buying or selling stock and driving it to a changed price level." *Wilson v. LSB Indus., Inc.*, 2018 WL 3913115, at *10 (S.D.N.Y. Aug. 13, 2018).  Courts in this Circuit "have found that anywhere between six and twenty market makers is sufficient to support a finding of market efficiency." *Carpenters*, 310 F.R.D. at 92.  Shanda's ADS were traded on the NASDAQ during the Class Period and there were at least 46 market makers covering the Company, so this factor is easily satisfied.  ¶292.

*Cammer* **Four: SEC Registration Form S-3**. "The ability to file [a Form S-3 registration statement] indicates that the company is easily able to issue new securities," and is evidence of market efficiency.  *Winstar*, 290 F.R.D. at 447.  According to Mr. Coffman, Shanda appears to have been qualified to file on Form F-3 (the equivalent to S-3 for foreign issuers), which supports a finding of market efficiency.  ¶293.

*Cammer* **Five: Price Reaction**.  As a threshold matter, it is well established in this Circuit that – even at the Class certification stage – proof of price reaction is not required to satisfy a showing of market efficiency.  *Carpenters*, 310 F.R.D. at 86 (finding efficiency and holding "there is no reason to burden the court with review of an event study"); *Waggoner*, 875 F.3d at 96-98 (proof of price reaction not required where other factors support efficiency); *Pirnik v. Fiat Chrysler Autos., N.V.*, 327 F.R.D. 38, 45 n.3 (S.D.N.Y. 2018) (finding efficiency and holding "the Court need not and does not analyze the fifth *Cammer* factor"); *Signet*, 2019 WL 3001084, at *13 (similar).  However, Mr. Coffman conducted an event study over the Analysis Period and concluded that the study demonstrates a clear cause and effect relationship, *i.e.*, that a

statistical test shows a significant contemporaneous relationship between new firm-specific news and significant changes in the market price for Shanda ADS.  ¶294.

Defendants do not challenge Mr. Coffman's finding.  Instead, they argue that the event study was flawed because it looked at an Analysis Period that was broader than the Class Period. Shanda-MTD at 10-12.  However, the use of an Analysis Period is a common practice and Mr. Coffman's basis for use of an Analysis Period was adequately explained in the Complaint:

> Mr. Coffman analyzed the broader time period of the Analysis Period to enhance the power of his statistical tests and to evaluate whether there was evidence of market efficiency prior to the merger announcement on January 27, 2014. By analyzing and applying the methodologies described herein to the longer period, of which the Class Period is a subset, Mr. Coffman concludes that ***the evidence supports efficiency during the Class Period***.  Mr. Coffman also advised that based on his current review, ***even just looking at the Class Period in isolation, there is strong economic evidence of an efficient market.***

¶287 (emphasis added).  Defendants' approach is to engage in a highly factual analysis of the correct event study methodology for this case – challenging the factual credibility of Mr. Coffman's work, without the assistance of a counter-expert, which they cannot submit because factual analysis is not ripe for adjudication on a motion to dismiss.  *See* Shanda-MtD at 10-12; *cf. Menaldi v. Och-Ziff Cap. Mgmt. Grp. LLC*, 328 F.R.D. 86, 98 (S.D.N.Y. 2018) (finding it irrelevant that defendants were able to "poke[] some holes" in plaintiffs' expert's conclusions).

Defendants' factually intensive argument seems to be that the market for Shanda's stock was efficient but ceased to be efficient the moment the Class Period began.  They cite no case in history that has found that a one-time efficient market ceased to be efficient, while the stock still traded on the exchange.  Their unprecedented argument is based on an assumption that was already directly refuted by the Complaint, namely that the Merger announcement completely

destroyed market efficiency.  *See* Section VIII(B)(2).  If anything, the opposite is true, as the market becomes even more interested in a company once a merger is announced.

There is no doubt that the stock price strongly reacted to the announcement of the Merger and Merger-related news.  ¶303.  The stock continued to trade and fluctuated within a substantial 15% range.  *Id.*  The Merger announcement does not undermine efficiency, because even after a merger is announced the market continues to digest new information about the Company and that information affects the market price.  ¶¶304-14.  Market participants, including sophisticated arbitrageurs, will continue to value the shares, for purposes of determining the value of appraisal rights.  If the shares appear to be more valuable than the Merger consideration, the share price will be bid up as market participants seek to acquire shares upon which appraisal can be sought.[6]

Similarly, investors continue to engage in valuation—and trade accordingly—based on assessments of whether the deal is likely to close (and the "fallback" value if it does not, including the possibility of a topping offer).  ¶¶312-13 ("The fallback price reflects the value of the target firm . . . based on fundamentals, but also based on other potential merger offers.") (quoting Bester, *et. al.*, AFA 2010 Atlanta Meetings Paper, *Cash Mergers and the Volatility Smile* (July 23, 2020)).  In fact, the increased attention from highly sophisticated "merger arbitrage" firms enhances market efficiency, and here many firms specializing in investing in companies during the pendency of a merger enhanced Shanda's market efficiency.  ¶314.

In analyzing price-reactivity during the Class Period, the Court previously noted that the Complaint did not plead price increases to statements about the success of Mir II Mobile.  2020 Order at 5.  However, a core allegation of the Complaint is that Shanda did not actually release

---

[6] *See* ¶309 (citing Charles R. Korsmo, Minor Myers, *Appraisal Arbitrage and the Future of Public Company M&A*, 92 WASH. U.L. REV. 1551 (2015)).

the material news of the game's success, *i.e.*, that it earned at least $92 million in each month following its launch, until ***after*** the Class Period.  ¶16.  In contrast, the vague disclosures during the Class Period regarding the game would not be expected to cause strong price reactions.

In fact, material disclosures of information do not *necessarily* result in price reactions, even in efficient markets.  *Ark. Tchr. Ret. Sys. v. Goldman Sachs Grp., Inc.*, 955 F.3d 254, 264 (2d Cir. 2020), *vacated and remanded on other grounds,* 141 S. Ct. 1951 (2021) (recognizing that statements may "have price impact not because they introduce inflation into a share price, but because they 'maintain,'" the price).  The Supreme Court has held that plaintiffs need not plead price impact (or maintenance) to invoke *Basic*, because there is a ***presumption*** that if a market is efficient, material information is reflected in the stock price.  *Halliburton Co. v. Erica P. John Fund, Inc.*, 134 S. Ct. 2398, 2404 (2014) ("[T]he Court . . . declines to modify the prerequisites for invoking the presumption by requiring plaintiffs to prove 'price impact' directly at the class certification stage. . . .  Defendants may . . . introduce . . . evidence at the merits stage to rebut the *Basic* presumption.").

This point is emphasized in the context of the projections.  The market was given a summary of Shanda's bogus projections.  ¶¶11-12.  It is not surprising that these projections would maintain the ADS price at low levels, rather than depress the price further.  Notably, even if some disclosure of Mir II Mobile's success had been made, investors did not know that the projections had not already anticipated that success.  In other words, without clarifying that the projections assumed Mir II Mobile would only earn $15 million in lifetime revenue — a fact disclosed only after the close of the Merger (¶19) — the disclosure of Mir II's success could have been interpreted as consistent with the projections, and merely indicative of the fact that the

remainder of Shanda's game portfolio was in abysmal shape (which, of course, it was not).  The exact dynamics of price impact is deeply factual and not ripe for adjudication at this stage.[7]

**_Krogman_ One: Market Capitalization**.  More highly-capitalized corporations tend to be more well-known, closely followed, and therefore are more likely to be efficiently traded.  *See Krogman*, 202 F.R.D. at 478.  During the Analysis Period (and Class Period) Shanda's market capitalization reached $1.81 billion (¶295), which supports market efficiency.  *E.g.*, *McIntire*, 38 F. Supp. 3d at 433 (market capitalization of $292 to $585 million supported market efficiency); *Billhofer*, 281 F.R.D. at 154 (market capitalization of $288 million to $717 supported efficiency).

**_Krogman_ Two: Bid/Ask Spread**.  The small 0.145% to 0.368% spread between the prices at which investors bought and sold Shanda's ADS, indicates greater market certainty surrounding valuation, showing it traded in an efficient market.  ¶296; *See Krogman*, 202 F.R.D. at 478; *Signet*, 2019 WL 3001084, at *12 (noting market average spread of .68%).

**_Krogman_ Three: Public Float**.  A higher public float and greater institutional ownership supports a finding of efficiency because it shows market participants are valuing the shares. *See Krogman*, 202 F.R.D. at 478.  During the Analysis Period, on average, over 88% of Shanda's ADS were held by non-insiders and 210 institutions held the vast majority of the public float throughout the Analysis Period.  ¶297; *McIntire*, 38 F. Supp. 3d at 433 (finding that float between 57% and 69% of shares outstanding supported efficiency).

Coffman also considered additional factors that further support his conclusion that Shanda traded in an efficient market.  He found no evidence of "auto-correlation," meaning past

---

[7] Even at class certification, where price impact is ripe for analysis, Defendants face a steep burden if they seek to rebut *Basic* by challenging price impact.  *Goldman* recently rejected the idea that defendant may merely "offer evidence that . . . would support a finding of a lack of price impact," and held that "*Basic* and *Halliburton II* plainly require more: The defendant must 'in fact' 'seve[r] the link' . . . and a defendant's mere production of some evidence relevant to price impact would rarely accomplish that feat."  *Goldman,* 141 S. Ct. at 1962 (citations and internal quotation marks omitted).

price moves did not predict future moves, supporting a finding that the market was efficiently reacting to new information. ¶298; *see Billhofer*, 281 F.R.D at 160. He also found that there was an active options market for Shanda, which trading improves market efficiency. ¶299.

## V.   THE INSIDER TRADING CLAIMS ARE ADEQUATELY PLED

The Complaint alleges, and Defendants do not deny, that each Defendant possessed material non-public information ("MNPI"), including information about Mir II Mobile's extraordinary revenue and that the projections in the Proxies undervalued Shanda, both due to erroneous inputs, omitting the 2020 data, and undervaluing the success of Mir II Mobile, even though that success was known to Defendants prior to their insider trades. ¶317-20.

Defendants continue to offer a convoluted argument that because the Proxy states that the shares would ultimately be "cancelled" there was no securities purchase. ZCC-MtD at 3. However, the Proxy itself directly stated that the ADS were "securities" and would be "purchased" through the Merger. ¶¶222, 226, 318. Furthermore, the shares were only "cancelled" after they were bought, and Defendants cannot explain how the shares could be cancelled without first being purchased. Defendants' argument is inconsistent with the many § 10(b) cases alleging fraud in the context of mergers, because in each of those cases the court deemed the transaction as a "sale" under the securities laws. *See, e.g., supra,* at 9; *see Vine v. Beneficial Fin. Co.,* 374 F.2d 627, 634 (2d Cir. 1967) (acquisition of shares in merger constituted purchase). Finally, *Green v. Hamilton International Corp.*, proves the error in Defendants' argument, as there, the issuer was found to engage in actionable insider trading, where it redeemed matured notes, while in possession of MNPI, even though that transaction also functionally resulted in the cancellation of the notes. 437 F. Supp. 723, 727 (S.D.N.Y. 1977).

Thus, the outstanding issues are (a) which Defendants were purchasers, (b) were those purchases made contemporaneously with Plaintiff's sales, (c) were Defendants' purchases, which were made while in possession of MNPI, actionable, and (d) whether the claims are timely.[8]

### A.    Defendants Purchased the Shares

Plaintiff previously argued that Shanda purchased the shares.  Shanda claimed that "Buyer Group 5's Capitalhold bought it" and argued that the "the best way to ascertain the purchaser is to see who paid, that inquiry points to Capitalhold."  ECF No. 61 at 4-5.  The Court sided with Shanda, tracking Shanda's argument that Capitalhold was the purchaser because it paid for the shares.  *See* 2020 Order at 7 ("Plaintiff fails to plead . . . why ***the purchase of Shanda shares by Capitalhold or Capitalcorp*** is also a purchase by Shanda").

Plaintiff now alleges that the purchase was made by Capitalhold because it became the 100% owner of Shanda's equity due to the Merger, and because it distributed the money to the payment agent that was used to pay the merger consideration.  ¶321(b).  Aside from denying that any sale occurred — which is refuted above — Capitalhold does not offer any response to Plaintiff's allegations that it was the purchaser.  *See* ZCC-MtD at 3.  Plaintiff has sufficiently alleged Capitalhold was the purchaser, consistent with the Court's prior ruling.

Capitalcorp (now combined with Shanda) is also liable because it acted on behalf of Capitalhold in carrying out the purchase.  ¶321(c).  Capitalcorp's entire existence was as a special purpose entity to assist Capitalhold in completing the Merger.  An agent is liable for its

---

[8] Defendants also claim that reliance is an issue for the insider trading claims.  ZCC-MtD at 2.  However, reliance is not an element of §20A claims.  Matthew Bender, Insider Trading § 4.07 (2013); ECF No. 3-4. Reliance as to insider trading §10(b) claims, is satisfied by the *Affiliated Ute* presumption, which relieves the need to plead reliance where the claim sounds in an omission, as is necessarily the case with insider trading claims.  *See Simon DeBartolo Grp., L.P. v. Richard E. Jacobs Grp., Inc.*, 186 F.3d 157, 173 (2d Cir. 1999).  The 2019 Order and 2020 Order rejected *Affiliated Ute* based on **other** alleged duties, and besides preserving the issue for appeal, Plaintiff does not challenge those rulings.

actionable conduct regardless of whether it is acting for its principal. *Larson v. Domestic & Foreign Com. Corp.*, 337 U.S. 682, 686–87 (1949) ("the principle that an agent is liable for his own torts 'is an ancient one'") (citations omitted).  Defendant Zhang is also a purchaser, because he was the director, employee, and signatory of the Merger documents, for both Capitalcorp and Capitalhold, meaning he acted as their agent, in carrying out the Merger.  ¶321(d)-(e).

### B.    The Trades Were Made Contemporaneously

Defendants' only other argument focuses on the timing of the trades.  The Court previously held that the trade occurred — in the relevant sense — at "the time when the parties to the transaction are committed to one another."  2020 Order at 7 (citing *Radiation Dynamics, Inc. v. Goldmuntz*, 464 F.2d 876, 891 (2d Cir. 1972)).  Following from this rule, the Court held that Plaintiff traded on the last date he could seek appraisal (the "Dissent Date"), because that is when he was committed to the trade.  2020 Order at 7.  Defendants' purchase was therefore made contemporaneously with that trade, on the Dissent Date.

As a threshold matter, there could be no issue with contemporaneity because Plaintiff sold his shares to the purchasing Defendants (*i.e.*, Capitalhold, Capitalcorp, and Zhang), and a trade made *with* another party (in privity with them), will always be made contemporaneously with the other party, because the trade only occurs once, when they trade with each other.  ¶319.  Contemporaneity — and element of §20A, but not §10(b) — only ever becomes a meaningful issue, where (unlike here) one's counterparty is unknown, such as in typical NYSE trades.

Defendants try to construct a timing mismatch with an apples and oranges comparison.  Their argument seems to conflate the date one party assented to the trade with the date another party executed the trade.  However, as the Court already held, the execution date is not the focus of this analysis, which looks to when the parties were committed to each other.  Gaps between commitment to a contract and execution of that contract are common and cannot serve as a basis

to jettison the insider trading laws.  Defendants' wrongful act occurred when they obtained

Plaintiff's commitment to a trade, without disclosing the MNPI.  Whether that act occurred

before the trade was closed or when the trade was closed is irrelevant.

Alternatively, to the extent Defendants' argument is that the parties were committed at

different times, it also fails.  From a practical perspective, Defendants were committed to the

trade from at least the moment of the Dissent Date.  To hold otherwise, would merely credit a

hyper-technical view that they had *some* ability to cancel the deal before closing.  Such a hyper-

technical view would be at odds with the Court's prior ruling embracing a practical

determination that Plaintiff committed on the Dissent Date.  To hold *Defendants* were not

committed on that date (due to the technical possibility of not closing), but that *Plaintiff* was

committed would apply an inconsistent double standard, because (prior to closing), Plaintiff also

could technically have not carried out the trade, by selling his shares on the open market, or

seeking legal action (*e.g.*, he could have sought an injunction, especially if Defendants had

revealed the truth after the Dissent Date).  Thus, whether viewed through the Court's prior

holding that the Dissent Date was the practical date of assent or viewed through a technical lens,

as long as a consistent standard is applied, the trade necessarily occurred contemporaneously.

### C.      Plaintiff's Insider Trading Claims Are Actionable

Defendant Zhang's conduct trading on the basis of MNPI clearly violated the insider

trading laws because he was Shanda's CEO and clearly an insider.  *United States v. O'Hagan*,

521 U.S. 642, 651-52 (1997) (referring to "classical" theory of insider trading where insiders,

such as CEOs, are liable when trading on MNPI).  Capitalhold and Capitalcorp are both imputed

with Defendant Zhang's knowledge, as he was their sole employee and director.  ¶320(bc)-(d).

Due to their status as entities controlled by Shanda's CEO, they are "temporary insiders" subject

to the same liability for trading on the basis of MNPI.  *Id.*; *Chiarella v. United States*, 445 U.S.

222, 228 (1980) (recognizing "classical" insider trading liability where one obtains MNPI due to "position within company," which rule applies "not only to officers" or "other permanent insiders" but also to those who obtain information from fiduciaries of the company). Alternatively, Capitalhold and Capitalcorp are properly viewed as "tippees" under the misappropriation theory of insider trading because they obtained the MPNI due to Zhang, who was benefiting from the transaction as member of the Buyer Group, and who owed classical duties to refrain from trading on basis of MNPI.  *See O'Hagan*, 521 U.S. at 651-52.

### D.   Plaintiff's Insider Trading Claims Are Timely

Defendant Capitalhold and Capitalcorp move to dismiss the §10(b) insider trading claims in Count 2 as untimely.  ZCC-MtD at 7-9.  Notably, they intentionally distinguish these claims from the §20A claims, which are subject to a longer limitation period, and which can be sustained based on a primary §10(b) violation, regardless of whether a §10(b) claim would itself be timely.  *Kaplan v. S.A.C. Cap. Advisors, L.P.*, 40 F. Supp. 3d 332, 343 (S.D.N.Y. 2014).

The §10(b) claims are also timely.  "[T]he limitations period does not begin to run until the plaintiff . . .  discovers or a reasonably diligent plaintiff would have discovered 'the facts constituting the violation.'" *Merck & Co., Inc. v. Reynolds*, 559 U.S. 633, 634 (2010) (citation omitted).  Dismissal is only appropriate if "it is clear from the face of the complaint, and matters of which the court may take judicial notice, that the plaintiff's claims are barred as a matter of law." *DoubleLine Cap. LP v. Odebrecht Fin., Ltd.,* 323 F. Supp. 3d 393, 435 (S.D.N.Y. 2018).

Defendants contend that the trial court's decision in the Cayman appraisal action triggered the limitations clock because that opinion disclosed the fraud.  However, they cite no facts supporting the conclusion that Plaintiff knew about that opinion upon its issuance.  Without such facts, they would need to prove that, construing all facts in plaintiff's favor, that a reasonable investor would have known about the issuance of that opinion.  However, a

reasonably diligent plaintiff would not be following the docket of foreign cases involving a private company they are no longer invested in. *Fisher v. Reich*, 1995 WL 23966, at *6 (S.D.N.Y. Jan. 10, 1995) (inquiry notice not triggered until Plaintiff actually discovered Court records supporting case); *DoubleLine Cap.*, 323 F. Supp. 3d at 439–40 (reasonable plaintiffs not tasked with knowledge of public court documents); *Livid Holdings, Ltd. v. Salomon Smith Barney, Inc.,* 416 F.3d 940, 951 (9th Cir. 2005) (court filings "unlikely" to trigger limitations clock, since the "question of what a reasonably prudent investor should have known is particularly suited to a jury determination"). Defendants cite no news coverage (let alone coverage in publications that a reasonable plaintiff would be tasked with reading), about the Cayman trial court's opinion. Counsel is aware of no such news coverage. *See Cohen v.  S.A.C. Trading Corp.*, 711 F.3d  353, 363 (2d  Cir.  2013) (public court records revealing fraud did not trigger limitations clock because there was no indication the suit received any publicity).[9]

## VI.   DEFENDANTS CANNOT RELITIGATE *MORRISON* AND FALSITY

Defendants' attempt to relitigate the issues of falsity and *Morrison* are meritless and those issues were properly decided by the 2019 Opinion.

### A.   The Law of the Case Doctrine

Under the law of the case doctrine, "when a court has ruled on an issue, that decision should generally be adhered to by that court in subsequent stages in the same case . . . unless

---

[9] While Defendants also cite no news coverage regarding the appraisal appeal, Plaintiff notes that **even if** the appellate decision triggered the limitations clock, the claims would remain timely because Plaintiff filed a pre-motion letter seeking leave to amend on January 28, 2020, which is well within two years of the March 9, 2018 appraisal opinion. ECF No. 68. As Defendants admit, the filing of such a letter tolls the statute of limitations clock. ZCC-MtD at 7. Defendants also claim that the proposed amendment did not give Capitalcorp notice of the claims. ZCC-MtD at 8. Capitalcorp and Shanda were merged together in the Merger, and so Capitalcorp has been on notice of the claims since the Complaint was first filed. The proposed amendment identified Capitalcorp and alleged their role in the insider trading. ECF No. 68-1, *e.g.*, ¶¶36, 291. The Complaint breaks out Capitalcorp as a Defendant for clarity and out of an abundance of caution to avoid further attempts to dodge liability.

'cogent' and 'compelling' reasons militate otherwise." *United States v. Quintieri*, 306 F.3d 1217, 1225 (2d Cir. 2002) (citation omitted). The doctrine recognizes that "courts should be loathe" to "revisit a previously decided issue." *Viti v. Guardian Life Ins. Co. of Am.*, 2013 WL 6500515, at *13 (S.D.N.Y. Dec. 11, 2013) (Carter, J.) (quoting *Wash. Nat'l Life Ins. Co. of N.Y. v. Morgan Stanley & Co.*, 974 F. Supp. 214, 218 (S.D.N.Y. 1997)).

It is well established that this doctrine is controlling at the motion to dismiss stage. *E.g.*, *Bermudez v. City of New York*, 2015 WL 1500235, at *9 (S.D.N.Y. Mar. 31, 2015) (Carter, J.) (issue raised on motion to dismiss was "precluded by law of the case . . . not materially different from arguments [previously] rejected"); *Cmty. Healthcare Assoc. of N.Y. v. N.Y. State Dep't of Health*, 921 F. Supp. 2d 130, 138 (S.D.N.Y. 2013) (Carter, J.) (finding prior dismissal "binding" as to "legal conclusions"), *vacated in part on other grounds,* 770 F.3d 129 (2d Cir. 2014). However, the doctrine does not apply to determinations as to the adequacy of pleadings, where new allegations support a different outcome. *See Batson v. RIM San Antonio Acquisition, LLC*, 2018 WL 1581675, at *6 (S.D.N.Y. Mar. 27, 2018) (Carter, J.) ("this Court will examine the [fourth amended complaint] and apply the law of the case doctrine to those claims that do not contain new factual allegations"); *Merrill, Lynch, Pierce, Fenner & Smith, Inc. v. Young*, 1996 WL 383135, at *1 (S.D.N.Y. July 9, 1996) ("Courts "examine the Amended Complaint to determine whether plaintiffs have cured the former deficiencies."); *Fezzani v. Bear, Stearns & Co.,* 2005 WL 500377, at *2 (S.D.N.Y. Mar. 2, 2005) (considering "new factual allegations, the sufficiency of which have not been ruled upon."). The Complaint pleads new facts supporting Plaintiff's reliance and the insider trading claims, which means those issues may properly be considered. In contrast, Defendants offer no basis to disturb the *Morrison* and falsity rulings.

## B.      Defendants' *Morrison* Argument Still Fails

*Morrison v. National Australia Bank Ltd.*, 561 U.S. 247, 267 (2010), held that § 10(b) does not have extraterritorial effect and applies to (1) "transactions in securities listed on domestic exchanges," or (2) "domestic transactions in other securities." *Id.* at 247.  Defendants previously argued that Plaintiff could not invoke prong one of *Morrison* because mere listing on a domestic exchange is insufficient, citing a case dealing with securities listed on multiple exchanges where a foreign plaintiff had acquired foreign-issued shares on a foreign exchange. *City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG,* 752 F.3d 173, 180-81 (2d Cir. 2014).  The 2019 Order squarely rejected this argument and found it to be "***unpersuasive***," noting that this case is plainly distinguishable from *Pontiac* because the securities here were exclusively listed on the NASDAQ, a domestic exchange.   2019 Order at 6-7.

Defendants' attempt to relitigate this issue is barred by law of the case.   *Cf.* Shanda-MtD at 24 ("The Court previously rejected this argument").  They know this.  So, they disingenuously imply the Court left this issue open and "invited" Shanda to identify additional cases.  *Id.*  Not so.  The only language in the 2019 Order they could possibly be referring to is the Court's statement that Defendants had cited "no other cases" supporting their position.  2019 Order at 7.  Far from an invitation to relitigate the issue, this comment simply observed the Court had analyzed the authority submitted by Defendants.  What Defendants are *really* saying, is that they can ***always*** reopen decided issues merely by submitting additional cases — even cases decided well before their initial motion to dismiss — after the Court has already ruled.  This is precisely what the law of the case doctrine prevents.  *Quintieri*, 306 F.3d at 1225.

In any event, the cases cited by Defendants are unavailing.  Defendants blatantly misconstrue *In re Petrobras Securities*, by claiming that even though the "shares" were listed on the NYSE, the court required additional proof that the transactions were domestic.  Shanda-MtD

at 23 (citing 862 F.3d 250, 258-62 (2d Cir. 2017)).  In fact, the *Morrison* analysis in *Petrobras* was limited to issues regarding certain notes (which were **_not_** listed on an exchange), but the court found no *Morrison* issue as to the domestically listed ADS "shares."  *Petrobras*, 862 F.3d at 258-59.  Defendants also cite *In re Smart Technologies, Inc. Shareholders Litigation*, which involved shares listed in both the U.S. and Canada, and certified a class of those who had bought U.S.-listed shares, but not those who traded only on the Canadian exchange.  Shanda-MtD at 24 (citing 295 F.R.D. 50, 53 (S.D.N.Y. 2013)).  However, as the Court already recognized, this case involves shares *only* listed in the U.S. and Plaintiff did buy his shares in the U.S.[10]  Finally, Defendants cite *In re Satyam Computer Services Ltd. Securities Litigation,* where the plaintiffs' only dealing in the relevant securities was the private exercise of options in India, which the Court held was not domestic merely because separate shares were listed domestically.  Shanda-MtD at 24 (citing 915 F. Supp. 2d 450, 475 (S.D.N.Y. 2013)).

Even if the Court looks past the law of the case and sides with Defendants on *Morrison's* first prong, *Morrison's* second prong independently supports Plaintiff.  Operating through his U.S. based brokerage, while present in the U.S., Plaintiff bought his shares on the NASDAQ in the U.S. and sold domestically, receiving his cash domestically, when his shares were tendered at the depository in New York.  ¶¶32, 62.  Plaintiff engaged in no conduct internationally.

Defendants focus on their own conduct, but the "last act" for Plaintiffs' performance of the sale was his tendering of the shares domestically.  *Fireman's Fund Ins. Co. v. Great Am. Ins. Co.*, 10 F. Supp. 3d 460, 496 n.22 (S.D.N.Y. 2014), *aff'd*, 822 F.3d 620 (2d Cir. 2016) ("place of contracting" is the place "where the act last necessary to form the contract was performed").

---

[10] A policy that would strip the protections of the U.S. securities laws from those who bought shares on the U.S. Exchanges, merely because Defendants made certain decisions related to a merger abroad, is contrary to *Morrison* and would create the terrible policy result of enabling wrongdoers to design transactions to deprive U.S. investors of the protections expected.  *See* ECF No. 44 at 21-23.

Similarly, "title passed" domestically because Plaintiff's broker was located in the U.S. and title transferred where the broker made the book entry recording a change in ownership. *See* ECF No. 44 at 25 (citing UCC §§ 2-106(1), 2-401, 8-102(a)(17)).[11] *Morrison* is satisfied. *E.g.*, *In re Poseidon Concepts Sec. Litig.*, 2016 WL 3017395 (S.D.N.Y. May 24, 2016) (*Morrison* satisfied based on placing trade with broker in Florida); *Mori v. Saito*, 2013 WL 1736527, at *5 (S.D.N.Y. Apr. 19, 2013) (*Morrison* satisfied since "money changed hands" in the U.S.); *S.E.C. v. Geranio*, 2013 WL 12146516, at *5 (C.D. Cal. Jan. 29, 2013) (*Morrison* satisfied by U.S. escrow agent and sending agreement to person in U.S.); *In re Tezos Sec. Litig.*, 2018 WL 4293341, at *8 (N.D. Cal. Aug. 7, 2018) (*Morrison* satisfied by use of crypto-currency nodes in U.S.).

## C.     Defendants' Falsity Arguments Still Fail

The Court already ruled that Plaintiff adequately pled two sets of misstatements and omissions: (1) statements about Shanda's Projections rendered misleading due to Defendants' use of improper amortization and depreciation figures, which were calculated improperly and contrary to Shanda's historic practice; and (2) the omission of 2020 data from Shanda's supposed summary of its projections, which showed continued growth into that year. 2019 Order at 10-11.

### 1.     Defendants' Materiality Argument Still Fails

Defendants argue that their fraud was immaterial as a matter of law.  However, the Court already ruled otherwise.  2019 Order at 10 ("the Court cannot conclude that statements about projections were unimportant to a reasonable investor") (citation omitted); 2019 Order at 11 "the Court cannot conclude that a statement characterizing a summary of projections is "unimportant to a reasonable investor.").  These holdings were clearly correct, as investors would have viewed

---

[11] Defendants' argument that "title" did not pass because the shares were ultimately cancelled (Shanda-MtD at 25) ignores that "title," refers "the legal link between a person who owns property and the property," and transferred when Plaintiff's shares were tendered domestically by his U.S. brokerage, and recorded by his domestic broker. *See* Title, BLACK'S LAW DICTIONARY (10th ed. 2014).

the key financial projections and related statements put out by Shanda as not just material but essential to considering its value and, relatedly, in assessing the merits of the Merger, relative to alternatives, including the alternative of seeking appraisal.  Materiality is a "mixed question of law and fact" that will "rarely be dispositive" at this stage," and dismissal is only appropriate if the fraud was "so obviously unimportant . . . that reasonable minds could not differ" on its insignificance.  *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 360 (2d Cir. 2010).

Despite these holdings, which are subject to law of the case, Defendants argue that the information was immaterial because Plaintiff was forced to accept the Merger.  As Defendants recognize (Shanda-MtD at 23), the Court already rejected this argument, holding that "[i]t is not . . . necessary to assert that the investor would have acted differently."  2019 Order at 7-8 (citing *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 162 (2d Cir. 2000)).  While Defendants vaguely attempt to distinguish *Ganino*, they offer no sound reason to reevaluate the Court's prior holding.  Furthermore, the issue of how the information affected behavior goes to the issue of reliance, not materiality, which goes to the importance of the information and whether it would alter the "total mix" of information.  *TSC Indus., Inc. v. Northway, Inc.,* 426 U.S. 438, 449 (1976)).  Defendants do not seriously dispute the fraud affected the total mix of information.

However, the biggest flaw in Defendants' renewed argument is that it is premised on a totally incorrect factual assertion.  It is simply not true that Plaintiff had no option but to accept the Merger, as Plaintiff had alternatives to accepting the Merger, such as retaining his shares and seeking appraisal.  *See supra* at 9 (refuting Defendants' "forced seller" argument).

## 2.    Defendants' "Safe Harbor" Argument Still Fails

Defendants concede that the Court already ruled that the false statements regarding the preparation of the projections were not protected by the PSLRA safe harbor.  Shanda-MtD at 18 ("The Court concluded that this safe harbor did not apply") (citing 2019 Order at 10).

Defendants try to relitigate this issue by merely rehashing their old arguments.[12]  As a threshold matter, Defendants' argument fails because the safe harbor does not apply to going-private transactions. ¶315 (citing 15 U.S.C.A. § 78u-5(b) (E)).  Defendants **_do not address_** this fact.

The Court ruled that Plaintiff sufficiently alleged that Shanda released an (incomplete) summary of projections that utilized "depreciation and amortization models [that] violated basic accounting principles and contradicted the Defendant Shanda's previous approach to modeling these figures."  2019 Order at 10.  The Court held that the projections and "related statements about the preparation of the projections," were adequately alleged as false and misleading.  *Id.*

Defendants argue that these statements are "forward looking."  The statements at issue were not forward looking.  That projections have a forward-looking element does not render every statement about projections forward looking.  Here, the false statements were misleading when made, not merely bad predictions, because they utilized an approach that was grossly misleading at all points in time.  Defendants stated that the projections, "were reasonably prepared on bases reflecting the best available estimates."  ¶201.  This statement was misleading when made, because the projections were not reasonably prepared and did not reflect the best available estimates, but instead reflected blatantly improper accounting.  Defendants resort to misconstruing the pleadings as alleging only that the projections were misleading "in hindsight," (Shanda-MtD at 25-26)— but this is absolutely not true, as it was always misleading to use grossly improper amortization and depreciation methods, and no hindsight is required to reach this conclusion.  *See* ¶169 ("This approach was wrong as a matter of basic accounting principles and certainly did not make use of the best currently available estimates.").

---

[12] Defendants do not appear to raise any argument that the PSLRA safe harbor or any of their supposed cautionary language, has any bearing on their failure to disclose the 2020 Projections.

Where a plaintiff challenges a non-forward-looking aspect of a statement, that allegation is not subject to the safe harbor. *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 246 (2d Cir. 2016); *e.g., Galestan v. OneMain Holdings, Inc.*, 348 F. Supp. 3d 282, 304 (S.D.N.Y. 2018) ("Plaintiff correctly points out [the] statements are not protected by the safe harbor provision because they were statements of present fact. For example, [defendant] stated: 'We remain comfortable with our previously stated EPS guidance.'"); *City of Providence v. Aeropostale, Inc.*, 2013 WL 1197755 (S.D.N.Y. Mar. 25, 2013) (undisclosed information about key product line rendered projections false and misleading when made); *In re Salix Pharms., Ltd.*, 2016 WL 1629341, at *10 (S.D.N.Y. Apr. 22, 2016) (failure to disclose present information about the business that undermined the reliability of forward-looking statements was actionable).

Defendants' argument, that their cautionary language was meaningful, is irrelevant because the PSLRA is inapplicable to their present-tense misrepresentations. Shanda-MtD at 24-25. Further, the risk language was not meaningful, given that Defendants did not warn that the projections used unjustifiable methods at odds with their past approach and in violation of accounting principles. *In re ITT Educ. Servs., Inc. Sec. Litig.*, 34 F. Supp. 3d 298, 305 (S.D.N.Y. 2014) ("cautionary language is meaningful only when it discloses the known risks"). Rather, the risk language itself was boilerplate and failed to actually disclose the known risks. For example, Defendants made certain generic disclaimers about the supposed purpose of the projections. Shanda-MtD at 25. However, this did nothing to change the meaning and significance of the projections and is irrelevant as to Defendants' false assertions that the projections were reasonably prepared using the best available information. *E.g.*, ¶201.[13]

---

[13] Similarly, Defendants' out-of-circuit cases addressing projections provided merely to disclose what was provided to certain parties, are inapposite because those cases did not also allege false statements touting the preparation of the projections and explicitly warned the projections were "outdated." Shanda-MtD at 25 (citing *Laborers Loc. No. 231 Pension Fund v. Cowan*, 837 F. App'x 886, 891 (3d Cir. 2020)).

### 3.    Defendants' Recitation of Their Previous Argument as to the Materiality of the 2020 Projections Fails

Defendants repeat the exact same argument rejected in the 2019 Order in attacking the materiality of the undisclosed 2020 projections.  Shanda-MtD at 26-27.  Their argument is barred by law of the case (*see* Section VI(A)) and remains wholly unpersuasive.  Defendants claimed they were disclosing a summary of their projections, but in fact omitted an entire year from the data set—which year showed continued growth.

Defendants argue that as a "summary," it was appropriate to omit an entire year of data, but as Plaintiff explained last time Defendants made this argument (ECF No. 44 at 9), while a summary "dispenses with unnecessary details or formalities," Summary, POCKET OXFORD ENGLISH DICTIONARY (2d ed. 2008), it still must cover "the main points succinctly," Summary, MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY (11th ed. 2004).

Defendants also renew their theory that because Plaintiff alleges that the projections were unreasonably prepared, it cannot have been misleading to omit the positive 2020 data. But as previously explained (ECF No. 44 at 10), ***two wrongs do not make a right***. Defendants issued misleading information that understated Shanda's performance, and omitted the positive 2020 figures.  That the 2020 figures may have been less positive than they should have been, does not mean the absence of data for an entire year showing continued growth was immaterial.  *See In re United Brands Co. Sec. Litig.*, 1988 WL 67413, at *6 (S.D.N.Y. June 20, 1988) ("The weight a reasonable investor would give to . . . particular hard numbers . . . is the type of delicate assessment that is best left for a jury."); *Morgan Stanley*, 592 F.3d at 360 (materiality only basis to dismiss where fraud was "so obviously unimportant . . . that reasonable minds could not differ" on its insignificance).

## VII.   THE COMPLAINT ADEQUATELY ALLEGES LOSS CAUSATION

Defendants also repackage their transaction causation (*i.e.*, reliance) arguments into a misguided attack on loss causation.  Shanda-MtD at 14.  Their argument is, again, that Plaintiff was "forced" to sell his shares at the price set by the Merger, and that he therefore cannot establish loss causation.  *Id.*  This argument fails for the reasons stated below.

The burden of pleading loss causation "is not a heavy one."  *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 187 (2d Cir. 2015).  As the Second Circuit has noted, "[t]he vast majority of courts in this district have required that loss causation only meet the notice requirements of Rule 8."  *Id.* at 183.  All that is required at this stage is for plaintiff to "provide a defendant with some indication of the loss and the causal connection that the plaintiff has in mind."  *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 337 (2005).  The pleading stage is not the time to test the strength of the allegations of loss causation.  *See Fin. Guar. Ins. Co. v. Putnam Advisory Co., LLC*, 783 F.3d 395, 404 (2d Cir. 2015) (plaintiff "need only allege sufficient facts to raise a reasonable inference" in support of its loss causation theory).

It is hornbook law that a plaintiff defrauded into selling is entitled to "out of pocket" loss equal to "the fair value of the security he sold minus the fair value of the consideration he received." Jacobs, Disclosure and Remedies Under the Securities Laws, § 20:53 (Mar. 2020) (citations omitted).  Countless controlling cases reaffirm this measure of damages.  *Mills v. Elec. Auto-Lite Co.*, 396 U.S. 375, 389 (1970) (holding plaintiff suffers a loss where "the merger resulted in a reduction of the earnings or earnings potential of their holdings," and that "relief might be predicated on a determination of the fairness of the terms of the merger at the time it was approved."); *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 155 (1972) ("the correct measure of damages . . . is the difference between the fair value of all that the . . . seller received and the fair value of what he would have received had there been no fraudulent

conduct."); *Pierre J. LeLandais & Co. v. MDS-Atron, Inc.*, 543 F.2d 421, 424-26 (2d Cir. 1976)

(holding plaintiff may prove damages by alleging they were not paid "'fair cash value,' *i.e.*, the

appraisal value, of their holdings" as of the sale.); *Wilson*, 979 F.2d at 931-33 ("loss causation or

economic harm . . . may be established when a proxy statement prompts a shareholder to accept

an unfair exchange ratio for his shares" and holding that fair value is determined with "a

valuation of [the issuer's] future earning power").

      District Court opinions confirm this standard.  *Lewis v. Termeer*, 445 F. Supp. 2d 366,

371 (S.D.N.Y. 2006) (finding loss causation based on allegation that transaction consideration

"did not reflect the true value"); *Lichtenberg v. Besicorp Grp. Inc.*, 43 F. Supp. 2d 376, 389-90

(S.D.N.Y. 1999) ("[L]oss causation is established when a proxy solicitation would result or has

resulted in merger on terms that are unfair to the shareholders."); *In re Hot Topic, Inc. Sec. Litig.*,

2014 WL 7499375, at *10 (C.D. Cal. May 2, 2014) (loss causation well pled upon allegation that

higher projections showed "intrinsic value" was greater than merger consideration); *Azar v.*

*Blount Int'l, Inc*., 2017 WL 1055966, at *11 (D. Or. Mar. 20, 2017) (approving of allegation that

"Company's intrinsic value exceeded the" merger price); *In re Envision Healthcare Corp.*, 2019

WL 3494407, at *8 (D. Del. Aug. 1, 2019) (same); *Brown v. Brewer*, 2010 WL 2472182, at *25

(D. Del .June 17, 2010) (damages based on fair value and permitting valuation expert report).

      Plaintiff has easily alleged that at all relevant times the fair value of Shanda's ADS

exceeded the Merger price.  ¶277.  In fact, Shanda's own expert admitted during the Cayman

appraisal case that the Merger consideration – which Shanda had called "fair and in the best

interest" of shareholders, was 34% lower than the "fair value" of those shares.  ¶¶23; 158.

Defendants' argument is not that Plaintiff did not suffer a loss; their argument is that *there was*

*nothing they could do about it.*  This, of course, is an issue about *transaction causation (i.e.,*

*reliance)*, because it asks whether Plaintiff's sale was induced by the fraud or whether it was inevitable.  As explained in Section IV, Plaintiff has adequately established transaction causation.  Plaintiff had alternatives to the Merger, including seeking appraisal.  Countless cases, including those cited in the prior two paragraphs, confirm that plaintiffs have suffered economic loss and have viable claims where they were wrongfully induced to accept an unfair Merger, rather than (for example) seeking appraisal.  *See supra*, at 9; *e.g., Madison Consultants,* 710 F.2d at 63-64 (loss may be predicated on accepting Merger, forgoing appraisal).

To the extent Defendants' argument claims that Plaintiff suffered no loss because the *market price* was below the Merger price, this is equally spurious.  As a threshold matter, the cases cited above establish that loss in a defrauded-seller context is properly established based on the fair value of the shares, not the market price of those shares – the market price remains relevant only insofar as it plays a role in the *Basic* presumption of reliance.  Furthermore, the market price was maintained at deflated levels by Defendants' fraud (¶277), meaning it does not even function as evidence of fair value.  Finally, the availability of appraisal rights means that had the truth been revealed, the market price would have increased to reflect the fair value of shares, as investors buy up the stock to seek appraisal, wherein they could obtain a fair valuation. *See supra*, at 6-7 (citing Korsmo, *Appraisal Arbitrage*, 92 WASH. U.L. REV. 1551 (2015)).

## VIII.   THE COMPLAINT STATES CONTROL PERSON CLAIMS

Defendant Zhang also moves to dismiss the control person claim against him, under §20(a) of the Exchange Act, solely by arguing there was no primary violation of §10(b).  ZCC-MtD at 9.  As stated above, the primary claims should survive the motion to dismiss, and so do the control person claims against Defendant Zhang.

## IX.   CONCLUSION

For the foregoing reasons, the Court should deny the Motions in their entirety.

DATED:  July 30, 2021            LABATON SUCHAROW LLP

By:  */s/ Carol C. Villegas*

Carol C. Villegas
David J. Schwartz
Jake Bissell-Linsk
140 Broadway, 34th Floor
New York, NY  10005
Telephone: (212) 907-0700
Fax: (212) 818-0477
cvillegas@labaton.com
dschwartz@labaton.com
jbissell-linsk@labaton.com

***Attorneys for Lead Plaintiff
David Monk and Lead Counsel
for the Proposed Class***