USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC#: _____
DATE FILED: ___3/31/2022___

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------ x
:
:
:
:
IN RE SHANDA GAMES LIMITED        :         1:18-CV-2463-ALC
SECURITIES LITIGATION             :
:         <u>Opinion and Order</u>
:
:
:
:
------------------------------------------------------------------ x

**ANDREW L. CARTER, JR., United States District Judge:**

This lawsuit is a putative class action involving alleged federal securities fraud and insider trading in the context of a merger. Lead Plaintiff David Monk ("Plaintiff") brings this action, individually and on behalf of a class of former stockholders and former owners of American Depository Shares ("ADS"), against Defendants Shanda Games Limited ("Shanda"), Capitalcorp Limited and Capitalhold Limited (together, the "Capital Defendants"), as well as Defendants Yingfeng Zhang ("Zhang"), Li Yao, Lijun Lin, Heng Wing Chan, Yong Gui, Shaolin Liang, and Danian Chen (collectively, the "Individual Defendants"), alleging violations of the Securities and Exchange Act of 1934 ("the Exchange Act"). Defendant Shanda individually, as well as Zhang and the Capital Defendants jointly, move to dismiss the Second Amended Class Action Complaint (the "SAC") under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief can be granted. ECF Nos. 90, 95. For the reasons stated herein, the motions to dismiss are hereby **DENIED IN PART and GRANTED IN PART.**

**I. FACTUAL BACKGROUND**

Defendant Shanda Games Ltd. ("Shanda" or the "Company") is a global online video game company incorporated in the Cayman Islands with its principal executive offices in

1

Shanghai, China. SAC ¶¶ 33, ECF No. 72. In 2009, Shanda underwent an initial public offering and listed American Depository Shares ("ADS") on the NASDAQ and registered those ADS with the Securities and Exchange Commission. *Id.* ¶ 5. In mid-2013, Shanda started developing a mobile version of one of its most popular computer games, Mir II PC, which is entitled Mir II Mobile. SAC ¶¶ 7. Defendant Yingfeng Zhang ("Zhang") became CEO of Shanda beginning October 2014 and Chairman of the Board beginning November 2014. SAC ¶ 36.

On April 3, 2015, Shanda announced a proposed merger (the "Transaction") that would allow the Company to buy all Shanda securities held by unaffiliated holders, with Shanda as the surviving entity, which would allow the Company to go private. *Id.* ¶ 10. Although the Buyer Group controlled enough votes to execute the merger, the Company was required to file initial and final proxy statements (collectively, the "Proxies") to allow shareholders to determine whether they wanted to exercise appraisal rights. Shanda subsequently published an initial proxy statement on May 5, 2015, which included summaries of financial projections from March 2014 and March 2015. SAC ¶¶ 11. From December 2014 through August 2015, Shanda made public statements about its optimism for Mir II Mobile. SAC ¶¶ 13-14. On August 3, 2015, Shanda launched Mir II Mobile and Shanda employees, including Zhang, publicly recognized its success. SAC ¶¶ 15-16. On October 13, 2015, Shanda published a final proxy statement that included the same projections from the initial proxy statement. *Id.* ¶¶ 18-20.

Shareholders approved the merger on November 18, 2015 at the Extraordinary Shareholders Meeting. *Id.* ¶¶ 22. Defendant Capitalcorp, wholly owned and controlled by Defendant Capitalhold, merged with Shanda as part of the merger. SAC ¶¶ 34-35. Under the merger agreement, Shanda common stock owned by unaffiliated holders (all except the Buyer Group) was effectively sold at $3.55 per share and $7.10 per ADS. *Id.* ¶¶ 22, 148. A few

dissenting shareholders exercised their appraisal rights and sued Shanda, seeking the Grand Court of the Cayman Islands' determination of the fair value of its shares. *Id.* ¶¶ 23, 24. The Grand Court awarded the dissenters $16.68 per ADS. *Id.* ¶ 25. This award was partially reversed by the Court of Appeal of the Cayman Islands that determined the fair value of the shares was $12.84 per ADS. *Id.*

## II. PROCEDURAL HISTORY

On September 30, 2019, this Court granted Shanda's Rule 12(b)(6) motion to dismiss the First Amended Class Action Complaint (the "FAC") (henceforth, the "2019 Order"). ECF No. 57. On September 30, 2020, on a motion for reconsideration, this Court concluded that Plaintiff failed to state a securities fraud or insider trading claim against Shanda (the "2020 Order"). ECF No. 70. Defendants Shanda, Zhang, Capitalcorp, and Capitalhold ("the Moving Defendants") moved to dismiss for failure to state a claim on June 11, 2021. ECF Nos. 90-92, 95-96. By omnibus brief, Plaintiff opposed on July 30, 2021. ECF No. 100. On August 27, 2021, Moving Defendants filed reply briefs. ECF Nos. 101, 102. The Court considers both motions to dismiss fully briefed.

## III. STANDARD OF REVIEW

### A. Rule 12(b)(6)

When deciding a motion to dismiss, the Court must "accept as true all factual statements alleged in the complaint and draw all reasonable inferences in favor of the non-moving party." *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 191 (2d Cir. 2007). However, the Court need not credit "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). Claims should be dismissed when a plaintiff has not

3

pleaded enough facts that "plausibly give rise to an entitlement for relief." *Id.* at 679. A claim is plausible "when the plaintiff pleads factual content that allows the Court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678 (citing *Twombly*, 550 U.S. at 556). While not akin to a "probability requirement," the plaintiff must allege sufficient facts to show "more than a sheer possibility that a defendant has acted unlawfully." *Id.* (citing *Twombly*, 550 U.S. at 556). Accordingly, where a plaintiff alleges facts that are " 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.' " *Id.* (quoting *Twombly*, 550 U.S. at 557).

**B. Rule 9(b)**

Under Rule 8(a) of the Federal Rules of Civil Procedure, pleadings must contain only "a short and plain statement" of the basis for the court's jurisdiction and of the claim showing that the pleader is entitled to relief, and a demand for the relief sought. Fed. R. Civ P. 8(a). However, where, as here, a plaintiff has alleged fraud claims under § 10(b) of the Exchange Act, the complaint is subject to the heightened pleading requirements of Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act of 1995 (the "PSLRA"). Rule 9(b) requires that the complaint "state with particularity the circumstances constituting fraud or mistake." To satisfy the particularity requirement, a complaint must "(1) detail the statements (or omissions) that the plaintiff contends are fraudulent, (2) identify the speaker, (3) state where and when the statements (or omissions) were made, and (4) explain why the statements (or omissions) are fraudulent." *Fin. Guar. Ins. Co. v. Putnam Advisory Co., LLC*, 783 F.3d 395, 403 (2d Cir. 2015).

The PSLRA holds private securities plaintiffs to an even more stringent pleading standard. Under the PSLRA, a plaintiff must "(1) specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading; and (2) state with

4

particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 321, 127 S. Ct. 2499, 168 L. Ed. 2d 179 (2007) (internal citation and quotation marks omitted) (quoting 15 U.S.C. § 78u-4(b)). To determine that an inference of scienter is strong, the court must decide whether "a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs*, 551 U.S. at 324.

## IV. ANALYSIS

The Court granted Plaintiff limited leave to file the SAC to cure deficiencies identified in its 2019 and 2020 Orders ruling on Defendant Shanda's motion to dismiss the FAC. This time around, Plaintiff specifically seeks to remedy two deficiencies: (1) inadequate pleading of reliance under a fraud-on-the-market theory, and (2) failure to sufficiently allege insider trading. Pl.'s Opp. at 10. On reliance, the SAC incorporates expert analysis from Mr. Chad Coffman to raise allegations that Plaintiff traded his ADS in an efficient market. On insider trading, he proffers new factual matter to attempt to state claims under Section 10(b) and 20A. *Id.*

Shanda, Zhang, and the Capital Defendants argue that the SAC fails to state a claim for relief under the federal securities laws for several reasons. First, the new allegations fail to plead reliance. Second, the SAC does not adequately plead loss causation. Third, there are no properly pleaded actionable misstatements or omissions to plead fraud, and the new insider trading allegations remain insufficient because no defendant purchased ADS from Plaintiff. Fourth and finally, Defendants assert a defense under *Morrison v. National Australia Bank, Ltd.*, 561 U.S. 247 (2010).

**A. Law of the Case**

As a preliminary matter, the Parties disagree whether this Court's 2019 and 2020 rulings on Shanda's motion to dismiss the FAC constitute law of the case. The law of the case doctrine "forecloses re-litigation of issues expressly or impliedly decided by the [ ] court." *United States v. Quintieri*, 306 F.3d 1217, 1229 (2d Cir. 2002) (internal citations omitted). Absent "cogent or compelling reasons," the law of the case controls. *See Johnson v. Holder*, 564 F.3d 95, 99-100 (2d Cir. 2009) (internal quotations omitted). "[W]hen a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case" unless the decision "is clearly erroneous and would work a manifest injustice." *Arizona v. California*, 460 U.S. 605, 618 & n.8 (1983). The doctrine is discretionary. *Id.*; *accord Lewis v. Whelan*, 99 F.3d 542, 545 (2d Cir. 1996). The law of the case doctrine "counsels against reconsideration" where amended pleadings are "very similar" to the previous complaint." *Weslowski v. Zugibe*, 96 F.Supp.3d 308, 316 (S.D.N.Y. 2015) (citing *State Farm Mut. Auto. Ins. Co. v. Mallela*, No. 00-4293, 2002 WL 31946762, at *8 (E.D.N.Y. Nov. 21, 2002)). Accordingly, this Court will examine the SAC and apply the law of the case doctrine to recurring issues that do not involve new factual allegations.

**1. The *Morrison* Test**

The 2019 Order on Shanda's motion to dismiss the FAC determined that this case satisfies the first prong of *Morrison* because it involves "transactions in securities listed on domestic exchanges." Sept. 30, 2019 Op. and Order at 6-7. Defendants, including Shanda, reassert this argument in their moving papers. However, the 2019 Order was not an invitation to revive this issue on a second motion to dismiss. Defendants also had an opportunity to seek reconsideration within 14 days of entry of the 2019 Order. They did not do so. Because facts

6

regarding *Morrison* remain the same and no "cogent or compelling reasons" exist to revisit this issue, further litigation of the *Morrison* issue is foreclosed.

**B. Federal Securities Fraud Claims**

Defendants Shanda and Zhang argue that the SAC should be dismissed because it fails to adequately plead the essential elements of a claim under Section 10(b) and Rule 10b-5. To state a claim under both Section 10(b) of the Exchange Act and Rule 10b-5, Plaintiff must show: "(i) a material misrepresentation or omission; (ii) scienter; (iii) a connection with the purchase or sale of security; (iv) reliance by the plaintiff(s); (v) economic loss; and (vi) loss causation." *In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 509 (2d Cir. 2010). *See also* 15 U.S.C. § 78u–4(b).

Based on this Court's prior rulings, the law of the case controls the previously litigated issues here—namely whether Plaintiff has pleaded material misrepresentations or omissions and scienter (which they have). 2019 Order at 7-15.[1] On the element of reliance, Plaintiff does not allege direct reliance with respect to Plaintiff or any potential class members. Rather, he has proffered amendments that attempt to plead that he and other ADS holders traded in an efficient market, which would entitle them to a rebuttable presumption of reliance under the fraud-on-the-market doctrine. If Plaintiff can plead reliance, economic loss, and loss causation, he will adequately state a claim for securities fraud against Shanda and Zhang. Though Plaintiff now pleads reliance, he fails to adequately allege loss causation. Because he fails to plead loss causation, the Court need not reach economic loss element.

**1. Reliance**[2]

---

[1] 2019 Order at 7-15.
[2] The Court has already concluded that Plaintiff only sufficiently alleged materially false misstatements—not omissions—so the *Affiliated Ute* presumption of reliance does not apply. 2019 Order at 16 n.2. Re-litigation of this issue is barred by the law of the case doctrine.

7

Pursuant to the fraud-on-the-market doctrine, "the market price of shares traded on well-developed markets reflects all publicly available information, and, hence, any material misrepresentations." *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 131 S. Ct. 2179, 2181, 180 L. Ed. 2d 24 (2011) (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988)). Because the market "transmits information to the investor in the processed form of a market price," we can assume that an investor relies on public misstatements whenever he "buys or sells stock at the price set by the market." *Id.*

To plead reliance based on the presumption created by the fraud-on-the-market theory, a plaintiff "first must allege that the relevant market was open and developed or, in other words, efficient." *In re Parmalat Sec. Litig.*, 375 F.Supp.2d 278, 303 (S.D.N.Y. 2005). While the Second Circuit has "declined to adopt a particular test for market efficiency[,] . . . district courts in this and other Circuits regularly consider" the following:

> (1) the average weekly trading volume of the [stock], (2) the number of securities analysts following and reporting on [it], (3) the extent to which market makers traded in the [stock], (4) the issuer's eligibility to file an SEC registration Form S–3, and (5) the demonstration of a cause and effect relationship between unexpected, material disclosures and changes in the [stock's] price[ ].

*Waggoner v. Barclays PLC*, 875 F.3d 79, 94 (2d Cir. 2017), *cert. denied,* 138 S. Ct. 1702 (2018) (internal quotations and citations omitted).

Here, the SAC adds expert analysis from Mr. Chad Coffman who assessed whether Shanda ADS traded in an efficient market during the proposed class period "using generally recognized techniques." SAC ¶¶ 284-85. Mr. Coffman is the President of Global Economics Group, a Chicago-based firm that specializes in economics, statistics, and valuation in many different contexts, including securities litigation. SAC ¶¶ 284. He opined "that the market for Shanda's ADS was efficient throughout the Class Period." SAC ¶¶ 285. The SAC contains "a

8

limited summary of the facts and factors relevant to [his] conclusion that Shanda traded in an efficient market." SAC ¶¶ 285.

The Parties disagree whether this Court should credit the expert analysis at this stage in the litigation. Neither party presents case law that squarely addresses this question. This Court concludes that the approach taken on a substantially similar issue in another federal securities case entitled *Ong v. Chipotle Mexican Grill, Inc.*, 294 F.Supp.3d 199, 222 (S.D.N.Y. 2018), very persuasive. Other judges in this Circuit agree. *See, e.g.*, *Tung v. Bristol-Myers Squibb Co.*, No. 1:18-CV-01611 (MKV), 2020 WL 5849220, at *5 (S.D.N.Y. Sept. 30, 2020), *aff'd sub nom. Arkansas Pub. Emps. Ret. Sys. v. Bristol-Myers Squibb Co.*, No. 20-3716-CV, 2022 WL 727149 (2d Cir. Mar. 11, 2022).

In *Ong*, Defendants moved to strike an expert witness declaration and portions of the complaint that relied on expert testimony in the context of a motion to dismiss. Applying Fed. R. Civ. P. 10(c) and the incorporation-by-reference doctrine as interpreted by the Second Circuit, U.S. District Judge Katherine Polk Failla declined to consider the declaration in evaluating the legal sufficiency of the complaint. She reasoned that the expert declaration was not relied upon in drafting the complaint and that defendants' substantive challenges to the strength and accuracy of the declaration raised complex evidentiary issues that were inappropriate for the pleadings stage. Judge Failla struck the declaration from the complaint and declined to consider any conclusory allegations based on the declaration, including legal conclusions made by the expert, though she did still consider well-pleaded factual allegations.

Like in *Ong*, Defendants here challenge the accuracy and strength of the expert analysis from Coffman. Instead of a declaration, here, Plaintiff attached slides prepared by Coffman and

added his analysis of the *Cammer* and *Krogman* factors[3] into the body of the SAC. SAC ¶¶ 286-301. For the same reasons that Judge Failla declined to consider the expert declaration in *Ong*, this Court will neither consider the Coffman slides nor his expert analysis. The former is not a "written document" as defined by Rule 10(c), and the latter constitutes improper legal conclusions. This Court will only consider well-pleaded factual averments.

Solely examining well-pleaded, non-conclusory factual allegations, Plaintiff now meets his burden, albeit minimally, of showing that he traded in an efficient market. Taking his amended factual allegations as true, Plaintiff states that weekly trading volume exceeded 2% for most of the proposed class period (*Cammer* factor 1) and that 46 market makers traded in ADS during that same period (*Cammer* factor 3). At this stage, the Court is not to weigh the strength of these factors. Thus, these allegations are sufficient to plead an efficient market. Whether these two factors are probative indicators of market efficiency is to be decided as a question of fact later in this litigation. "While the Court notes that . . . Plaintiff[ ] . . . alleges facts that draw the efficiency of the [ADS] market into question, whether a market is efficient 'is not a pure question of law' and normally should not be decided on a motion to dismiss." *In re Merrill Lynch Auction Rate Sec. Litig.*, 704 F. Supp. 2d 378, 395 (S.D.N.Y. 2010), *aff'd sub nom. Wilson*

---

[3] Both *Cammer* and *Krogman* provide a set of factors that district courts typically use to determine market efficiency. In *Krogman*, the court wrote:

> In evaluating whether the market for an individual stock is efficient, courts have looked to a number of factors. *See, e.g., Cammer,* 711 F.Supp. at 1286–87; *O'Neil v. Appel,* 165 F.R.D. 479, 503 (W.D.Mich. 1996). The *Cammer* court identified five factors relevant to the determination of market efficiency: (1) the stock's average trading volume; (2) the number of analysts that followed and reported on the stock; (3) the number of market makers; (4) eligibility to file an S–3 Registration Statement; and (5) the reaction of the stock price to unexpected news events. *Cammer,* 711 F.Supp. at 1286–87. Other courts have applied additional factors, based on economic literature, including: (1) the capitalization of the company; (2) the bid-ask spread of the stock; and (3) the percentage of stock not held by insiders (the "float").

*Krogman v. Sterritt*, 202 F.R.D. 467, 474 (N.D. Tex. 2001) (citations and footnotes omitted) (cleaned up).

*v. Merrill Lynch & Co.*, 671 F.3d 120 (2d Cir. 2011) (footnote omitted) (quoting *In re Initial Public Offering Sec. Litig.,* 241 F.Supp.2d 281, 377 (S.D.N.Y.2003)). "The Court cannot say, on the record before it, that . . . Plaintiff[ ] cannot establish an efficient market." *Id.* As further noted in *In re Initial Public Offering Sec. Litig.*, "[t]he present finding—that plaintiff[ ] ha[s] made a sufficient showing that the . . . markets were efficient—is solely for the purposes of adjudicating the pending motion to dismiss and is not binding on the finder of fact." *In re IPO*, 241 F.Supp.2d at 288. "Based on the evidence presented at trial, the finder of fact may conclude that the relevant markets were efficient . . . [o]n the other hand, the finder of fact may conclude that one or more of the relevant markets was inefficient." *Id.* "This determination is also not binding for purposes of class certification." *Id.* At this early pleading stage, the Court will presume that ADS holders, such as Plaintiff, could have reasonably relied on the integrity of the market price when deciding whether to exercise dissenters' rights or sell shares at the negotiated price.

**2. Loss Causation**

This is where Plaintiff's securities fraud claims fail. He has not pleaded loss causation under Section 10(b). These elements are separate and distinct from reliance. The fraud-on-the-market theory creates "a rebuttable presumption of reliance, not a presumption of causation." *See Robbins v. Kroger Props. Inc.*, 116 F.3d at 1448 (citing Basic U.S. at 141-42, 108 S.Ct. 978). "Loss causation . . . requires a plaintiff to show that a misrepresentation that affected the integrity of the market price *also* caused a subsequent economic loss." *Halliburton Co.*, 563 U.S. at 812, 131 S. Ct. at 2186, 180 L.Ed.2d 24 (2011); 15 U.S.C. § 78u–4(b)(4). To establish loss causation, plaintiffs must show "that the subject of the fraudulent statement or omission was the cause of the actual loss suffered." *Suez Equity Inv'rs, L.P. v. Toronto-Dominion Bank*, 250 F.3d 87, 95 (2d Cir. 2001).

The SAC fails to plead loss causation. There are no allegations substantiating how or why the material misstatements—omission of 2020 summary data and the application of new methods to calculate depreciation and amortization figures in the Proxies—would have (i) affected the integrity of the market price and (ii) thus caused a subsequent economic loss to Plaintiff. For example, the SAC lacks allegations explaining in a plausible manner how or why Plaintiff was personally induced to sell his shares instead of exercising his appraisal rights. Upon the proposed merger announcement, the only outstanding issue for ADS holders to decide was whether to personally exercise appraisal rights or sell at the negotiated price of $7.10 per ADS. Plaintiff has not proffered sufficient and specific allegations to support any causal link between the alleged misrepresentations and his failure to provide timely written notice of objection to the Transaction (to exercise appraisal rights). *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 185 (2d Cir. 2015) ("[W]hereas foreseeability is to some extent relevant to proximate cause, it is 'aftseeability' that matters for loss causation . . . even though the link may not have been anticipated and may only have been shown to exist after the fact."). In fact, Plaintiff only came to know of his purported economic loss after the Cayman Islands proceedings. SAC para 277 ("Plaintiff and Class Members suffered economic loss when they sold their Shanda Securities for less than those securities were worth. Through the Appraisal Suit, and the subsequent appeal, it was determined that the fair value of the shares was $12.84."). The logic in *Loreley* applies with equal force here. In the context of a forced sale of shares with a pre-negotiated price, Plaintiff does not plead that any causal link exists between the alleged misrepresentations and his failure to exercise appraisal rights. For this reason, he cannot sustain securities fraud claims under Section 10(b) against Shanda or Zhang.

In sum, Plaintiff has failed to state a securities fraud claim under Section 10(b) against Defendants Shanda and Zhang (Count I). Because there is no primary fraud violation under Section 10(b), it follows that Zhang cannot be held liable as a control person under Section 20(a) (Count IV).[4]

**C. Insider Trading Claims**

This Court previously held that Plaintiff failed to state an insider trading claim against Shanda under Section 10(b) and Section 20A because he failed to adequately plead that Shanda was the purchaser in the going-private transaction. Plaintiff has proffered new insider trading allegations, including adding the Capital Defendants as parties to this case. At this early pleading stage, the Court concludes that Plaintiff has stated a claim for insider trading against Defendant Zhang only.

Section 10(b) and Rule 10b-5 are "violated when a corporate insider trades in the securities of his corporation on the basis of material, nonpublic information." *United States v. O'Hagan*, 521 U.S. 642, 651–52, 117 S.Ct. 2199, 138 L.Ed.2d 724 (1997). Thus, "a corporate insider must abstain from trading in the shares of his corporation unless he has first disclosed all material inside information known to him." *Chiarella v. United States*, 445 U.S. 222, 227, 100 S.Ct. 1108, 63 L.Ed.2d 348 (1980). The Second Circuit has explained that "[a]ny duty of

---

[4] Under Section 20(a) of the Exchange Act:

> Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlled person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

15 U.S.C. § 78t(a). In the Second Circuit, to plead a *prima facie* case of control person liability, a plaintiff must allege: "(1) a primary violation by the controlled person, (2) control of the primary violator by the defendant, and (3) that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d at 108.

13

disclosure is owed only to those investors trading contemporaneously with the insider; non-contemporaneous traders do not require the protection of the 'disclose or abstain' rule because they do not suffer the disadvantage of trading with someone who has superior access to information." *Wilson v. Comtech Telecommun. Corp.*, 648 F.2d 88, 94-95 (2d Cir. 1981) (citing *Fridrich v. Bradford*, 542 F.2d 307, 326 (6th Cir. 1976) (Celebrezze, J., concurring), *cert. denied*, 429 U.S. 1053, 97 S.Ct. 767, 50 L.Ed.2d 769 (1977)).

Similarly, in creating a private cause of action for insider trading, Section 20A expressly limited standing to contemporaneous investors in securities of the same class. 15 U.S.C. § 78t-1(a). "In order to state a claim under Section 20A(a), plaintiffs must: (1) plead a predicate insider trading violation of the Exchange Act and (2) allege sufficient facts showing 'that the defendant traded the security at issue contemporaneously with the plaintiff.'" *In re Take-Two Interactive Sec. Litig.*, 551 F. Supp. 2d 247, 309 (S.D.N.Y. 2008) (citations and internal quotation marks omitted).

### 1. Contemporaneous Trading

#### a. *Shanda*

Shanda is still not properly deemed a purchaser of ADS. The SAC merely alleges that Shanda held the Extraordinary Shareholders Meeting, approved the proposed merger, and when the merger became effective, converted "the right to surrender one ADS in exchange for US$7.10." SAC ¶¶ 321. However, as the SAC continues to assert and as explained in the 2020 Order, Shanda was the surviving entity after the merger went into effect. The allegations do not fix the pleading problem here, which is that the commitment to accept or appraise came *before* the merger took effect, and the surviving entity Shanda did not exist until that time. There is thus

no way that Plaintiff could have committed to the Transaction with surviving corporation Shanda. The allegations are inadequate to plead that Shanda was a purchaser.

   b. *Capitalhold*

However, there is no doubt, and there appears to be no serious dispute among the Parties, that Capitalhold purchased ADS based on the Final Proxy Statement and Merger Agreement. SAC ¶¶ 222, 226, 318.[5] Capitalhold gained full ownership interest in Shanda following the merger and distributed the money used to pay the merger consideration to shareholders. SAC ¶¶ 321(b). In the context of the specific type of merger at issue, Plaintiff and Capitalhold may be deemed a seller and purchaser of ADS, respectively. *See Liana Carrier Ltd. v. Pure Biofuels Corp.*, 672 F. App'x 85, 91 (2d Cir. 2016) (summary order) (citing *Vine v. Beneficial Finance Co.*, 374 F.2d 627, 635 (2d Cir. 1967) and *Goldberg v. Meridor*, 567 F.2d 209 (2d Cir. 1977); *see also KDH Consulting Grp. LLC v. Iterative Cap. Mgmt. L.P.*, 528 F. Supp. 3d 192, 205 (S.D.N.Y. 2021) (explaining that *Vine* created the "forced sale" doctrine, whereby the nature of a short form merger may permit shareholders to bring a Section 10(b) claim). Contrary to Defendants' belief, *Vine* dealt with interpreting "sale" or "purchase" language under Section 10(b), and that case did not distinguish between fraud and non-fraud claims. Plaintiff sufficiently pleads that the trade was contemporaneous because he sold his ADS and Capitalhold paid for them at closing on November 18, 2015.

   c. *Capitalcorp and Zhang*

Plaintiff asserts that both Capitalcorp and Zhang are purchasers because they each acted on behalf of Capitalhold in carrying out the purchase of shares. But the allegations only plausibly demonstrate that Zhang, in his capacity as sole director, employee, and indirect owner of

---

[5] Zhang and the Capital Defendants state that "it was Capital*hold* that paid the merger consideration and ended up owning Shanda. Defs.' Zhang Mem. at 4 (ECF No. 96 at 8) (citations omitted and emphasis original).

15

Capitalhold, was a purchaser of ADS. Plaintiff alleges that Capitalcorp was "created to effectuate the purchase of the outstanding Shanda Securities owned by Unaffiliated Holders." SAC ¶¶ 321(c). But Plaintiff fails to assert that he ever committed to Capitalcorp with respect to the Transaction, does not proffer adequate factual content to substantiate how Plaintiff committed to Capitalcorp, and provides no legal authority to support the proposition that merely effectuating a purchase would deem Capitalcorp a purchaser itself. Plaintiff further states that Zhang directed Capitalhold and Capitalcorp to purchase the Shanda securities. Taking the material allegations as true, Zhang indirectly owned 15% of Capitalhold equity, directed that entity to purchase securities in his capacity as its sole director and employee, and signed the merger documents for the Transaction on its behalf, thus it is plausible that he is a purchaser of ADS.[6]

In sum, the contemporaneous trading requirement is met with respect to Defendants Capitalhold and Zhang. "[T]he time of a 'purchase or sale' of securities within the meaning of Rule 10b-5 is to be determined as the time when the parties to the transaction are committed to one another." *Radiation Dynamics, Inc. v. Goldmuntz*, 464 F.2d 876, 891 (2d Cir. 1972). As discussed in the 2020 Order, Plaintiff twice pleaded that his ADS were sold on November 18, 2015—not the earlier date of dissent—a judicial admission to which he was and remains bound. 2020 Order at 4.[7] The SAC has pleaded that the trade occurred contemporaneously with the purchased made by Capitalhold and/or Zhang.

### 2. Corporate and Temporary Insiders

Though the Court has reasoned that Plaintiff has adequately pleaded that Defendants Capitalhold and Zhang satisfy the contemporaneous trading requirement for his insider trading

---

[6] Because Capitalcorp is not a purchaser, it is not plausible that Zhang would be a purchaser by acting on its behalf.
[7] The SAC still contains these same allegations. That Plaintiff sold his shares on November 18, 2015—the date of closing.

claims, only Zhang had a duty to disclose. Plaintiff cannot sustain an insider trading claim against Capitalhold because it was neither a temporary insider nor tippee.

Plaintiff alleges that Zhang, a top executive at Shanda, possessed material non-public information ("MNPI") regarding Mir II Mobile data, and did not disclose such information before purchasing Plaintiff's ADS. He would thus be liable as a corporate insider under the "traditional" or "classical theory" of insider trading, as articulated in *O'Hagan*, 521 U.S. at 652, 117 S.Ct. at 2207, 138 L.Ed.2d 724 (1997) (citing cases). "The classical theory applies . . . to officers, directors, and other permanent insiders of a corporation." *Id.* at 652 (quoting *Dirks v. SEC*, 463 U.S. 646, 655 n.14, 103 S.Ct. 3255, 3262, 77 L.Ed.2d 911 (1983)).

Whether his knowledge may be imputed to Capitalhold is a separate question that this Court answers in the negative. Under a misappropriation theory of insider trading liability, "a person violates Rule 10b-5 when he misappropriates [MNPI] in breach of a fiduciary duty or similar relationship of trust and confidence and uses that information in a securities transaction." *United States v. Falcone*, 257 F.3d 226, 230 (2d Cir. 2001). "[A] qualifying relationship does not require one to be a traditional corporate insider." *United States v. Kosinski*, 976 F.3d 135, 144 (2d Cir. 2020), *cert. denied,* 141 S. Ct. 2755, 210 L. Ed. 2d 904 (2021). A corporate outsider may become a "temporary insider" when confidential corporate information is revealed to him or her, such as an attorney or accountant, which may result in developing a fiduciary relationship between the outsider and shareholders. *Id.* (citing *Dirks*, 463 U.S. at 655 n.14, 103 S.Ct. 3255). "Temporary insiders are therefore forbidden from trading under both the classical and misappropriation theories without the requisite disclosure." *Id.* at 145.

Capitalhold is not a temporary insider. Plaintiff asserts that Capitalhold is a temporary insider simply because Zhang is its sole director and, as Shanda CEO, he controlled the entity.

But that is not enough to establish that Capitalhold itself owed any fiduciary duty or special relationship to shareholders. It was not a professional advisor or consultant to Zhang. Plaintiff also cites no controlling cases providing that an artificial entity may be held liable as a temporary insider. Courts generally find individuals to be temporary insiders.

3. Tippees

Because this is far from a conventional tipping case, Capitalhold is not subject to tippee liability. "Section 10(b) and Rule 10b-5 also reach situations where the insider or misappropriator tips another who trades on the information." *S.E.C. v. Obus*, 693 F.3d 276, 285 (2d Cir. 2012). As articulated in *Dirks*, "a tipper . . . is liable if the tipper breached a fiduciary duty by tipping MNPI, had the requisite scienter . . . when he gave the tip, and personally benefited from the tip." *Id.* "Personal benefit" is defined broadly and includes, but is not limited to, "pecuniary gain" and "reputational benefit." *Id.* (citing *Dirks* at 663-64, 103 S.Ct. 3255. "When an unlawful tip occurs, the tippee is also liable if he knows or should know that the information was received from one who breached a fiduciary duty (such as an insider or a misappropriator) and the tippee trades or tips for personal benefit with the requisite scienter." *Id.* (citing *Dirks*, at 660, 103 S.Ct. 3255).

Here, Plaintiff argues that Capitalhold is a tippee because it obtained MNPI from Zhang who personally benefited from the merger transaction as a member of the Buyer Group. This argument fails. First, Plaintiff pleads that Zhang is the sole director, employee, and indirect owner of 50% Capitalhold equity. But Plaintiff does not plead that Zhang passed MNPI to any other Capitalhold investor and that such investor knew or should have known that the information was received in breach of his fiduciary duties. Second, there are no allegations that Capitalhold personally benefited from any alleged tip. Plaintiff only alleges that Zhang himself

18

personally benefited in the form of windfall gains following the Transaction. SAC ¶¶ 26. Finally, Plaintiff cites no case law that an artificial entity may be held liable as a tippee under insider trading law.

In sum, the insider trading claims against Defendants Shanda, Capitalcorp, and Capitalhold must therefore be dismissed.[8]

## V. CONCLUSION

Defendants' motions to dismiss are hereby denied in part and granted in part. Count I (fraud) is dismissed under Rule 12(b)(6) for failure to plead loss causation. Accordingly, Count IV (fraud) is also dismissed because there is no primary violation to sustain a Section 20(a) claim for control personal liability. Counts II and III (insider trading) are dismissed against Defendants Shanda, Capitalcorp, and Capitalhold. The Clerk of Court is respectfully directed to terminate the motions at ECF Nos. 90 and 95 and to terminate Defendants Shanda, Capitalhold, and Capitalcorp from the case. Lead Plaintiff and the remaining defendants shall file a joint status report within 14 days informing the Court how they would like to proceed with this case. The Clerk of Court is instructed to terminate the motions at ECF Nos. 90, 95.

**Dated: March 31, 2022**
      New York, New York

                                            **ANDREW L. CARTER, JR.**
                                            **United States District Judge**

---

[8] Because insider trading claims against the Capital Defendants are dismissed, this Court need not reach their arguments that Plaintiff's second claim (Count II) is untimely.