22-3076
*In re Shanda Games Ltd. Sec. Litig.*

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: Feb 03, 2025

# UNITED STATES COURT OF APPEALS
# FOR THE SECOND CIRCUIT

August Term 2023

(Argued: January 24, 2024      Decided: February 3, 2025)

No. 22-3076

_____

IN RE: SHANDA GAMES LIMITED SECURITIES LITIGATION
_____

DAVID MONK,

Lead-Plaintiff-Appellant,

ASTOR BK REALTY TRUST, on behalf of itself and all others similarly situated,

Plaintiff,

-v.-

SHANDA GAMES LIMITED, YINGFENG ZHANG, LI YAO, LIJUN LIN, HENG WING
CHAN, YONG GUI, SHAOLIN LIANG, DANIAN CHEN,

Defendants-Appellees,

CAPITALCORP LIMITED, CAPITALHOLD LIMITED,

Defendants.

_____

CERTIFIED COPY ISSUED ON 02/03/2025

Before:     LIVINGSTON, Chief Judge, JACOBS, and LOHIER, Circuit Judges.

Plaintiff-Appellant David Monk challenges the district court's dismissal of his § 10(b) securities fraud case for failure to state a claim. Monk alleges that materially misleading proxy materials issued by Shanda Games Limited ("Shanda") as part of a freeze-out merger caused him to accept the merger price instead of exercising his appraisal rights. The United States District Court for the Southern District of New York (Carter, *J.*) dismissed Monk's claims on the ground that he failed properly to allege loss causation. We hold that the district court erred in dismissing Monk's claims. We agree with the district court that *City of Pontiac Policemen's and Firemen's Retirement System v. UBS AG*, 752 F.3d 173 (2d Cir. 2014), created a limited exception (for foreign securities purchased on foreign exchanges) to the general rule, set forth in *Morrison v. National Australia Bank Ltd.*, 561 U.S. 247 (2010), that "transactions in securities listed on a domestic exchange" fall within the scope of § 10(b), as this case does. *City of Pontiac*, 752 F.3d at 179-181 (quoting *Morrison*, 561 U.S. at 267). We further conclude that Monk has adequately alleged material misstatements; that federal law governs the adverse interest exception to imputation for scienter in § 10(b) cases; and that the scienter of the conflicted directors—who had the motive and opportunity to deflate the merger price for their own financial gain—can be imputed to the company. We also agree with the district court that Monk may invoke the rebuttable presumption of fraud-on-the-market to satisfy transaction causation because he relied on the market price to decide not to exercise his appraisal rights. We disagree with the district court's conclusion with respect to certain misrepresentations and on loss causation and hold that Monk adequately pleaded loss causation. We therefore **AFFIRM** in part and **VACATE** in part the judgment of the district court.

Judge Lohier joins the opinion of the court and files a concurring opinion. Judge Jacobs dissents in a separate opinion.

FOR PLAINTIFF-APPELLANT:          JAKE BISSELL-LINSK, Labaton Keller Sucharow LLP, New York, NY (Carol C. Villegas, Labaton Keller Sucharow LLP, New York, NY & Jeremy A. Lieberman,

Michael Grunfeld, Pomerantz LLP, New York, NY, *on the brief*)

FOR DEFENDANTS-APPELLEES:     ABBY F. RUDZIN, O'Melveny & Myers LLP, New York, NY (William K. Pao, O'Melveny & Myers LLP, Los Angeles, CA, *on the brief*).

DEBRA ANN LIVINGSTON, *Chief Judge*:

In this case we consider whether the securities fraud claims of minority shareholders who allege that they were fraudulently induced to tender their shares in a freeze-out merger (the "Freeze-Out Merger" or "Merger"), thereby forfeiting their appraisal rights, were properly dismissed.

Shanda Games Limited ("Shanda") was a video games business registered in the Cayman Islands with American Depository Shares ("ADS") listed on the NASDAQ.  Its premier asset was the right to market Mir II, a massively multiplayer online computer game, in China.  By 2013, Shanda had begun developing a mobile version of Mir II ("MIIM" or "Mir II Mobile") to access the expanding mobile game market.  Mere months before MIIM launched, Shanda authorized the Freeze-Out Merger, a conflicted transaction in which members of the Board of Directors of Shanda (the "Board"), including the CEO, were part of

the group of buyers (the "Buyer Group").  The Merger occurred three and a half months after the launch of MIIM.

As part of the Merger, Shanda issued two proxy statements (the "Proxies"). Although the minority shareholders lacked the power to stop the Merger, they could object to the Merger and exercise their appraisal rights.  The shareholders relied on the Proxies to evaluate whether to do so.  The Proxies represented that the Merger was fair to the shareholders and came to this conclusion based on a fairness opinion that relied on projections produced, in part, by Shanda's CEO. But the minority shareholders (now former ADS holders) in this putative class action ("Plaintiffs") allege that the Freeze-Out Merger was not fair.  The projections significantly underestimated Shanda's financial prospects, and an appraisal suit (the "Appraisal Action") later determined that the Freeze-Out Merger price was a mere 55 percent of the fair value of Shanda's shares.

Plaintiffs brought this putative securities fraud class action on behalf of themselves and other similarly situated investors pursuant to §§ 10(b), 20A, and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act").  David Monk was appointed lead plaintiff shortly thereafter.  Plaintiffs allege that Shanda; its former CEO, Yingfeng Zhang ("Zhang"); former CFO Li Yao; and five directors: Lijun Lin,

Heng Wing Chan, Yong Gui, Shaolin Liang ("Liang"), and Danian Chen (together with Zhang, the "Individual Defendants") made material misstatements and failed to disclose material information between May 5, 2015 and November 18, 2015 in an effort to conceal that the Freeze-Out Merger price did not reflect the fair value of Shanda's shares and thereby discourage the exercise of appraisal rights. As a result, Plaintiffs claim, they suffered financial loss through failure to exercise their appraisal rights and receive the appraisal value of their shares.

The United States District Court for the Southern District of New York (Carter, *J.*) dismissed the claims against Shanda and the securities claims against the Individual Defendants for failure to state a claim.  *In re Shanda Games Ltd. Sec. Litig.*, No. 18-CV-2463, 2022 WL 992794, at *9 (S.D.N.Y. Mar. 31, 2022) [hereinafter *In re Shanda III*]. [1]  For the reasons stated in this opinion, we conclude that the district court erred in dismissing Monk's claim.  We agree with the district court that, in light of *Morrison v. National Australia Bank Ltd.*, 561 U.S. 247 (2010), § 10(b) applies to Monk's claims because Shanda's ADS were securities listed exclusively

---

[1] Plaintiffs' Second Amended Complaint (the "Complaint"), the operative complaint in this appeal, also includes insider trading claims.  Lead Plaintiff Monk does not appeal the dismissal of the insider trading claims against Shanda and two entities created to carry out the Freeze-Out Merger, Capitalhold Limited and Capitalcorp Limited.  The insider trading claims against Zhang are not within the scope of this appeal.  *In re Shanda Games Ltd. Sec. Litig.*, No. 18-CV-2463 (S.D.N.Y.) ("District Court Docket"), District Court Docket. No. 111.

on a domestic exchange.  We further conclude that Monk has adequately pleaded actionable misstatements regarding the amortization and depreciation figures used in preparing the financial projections; the projections themselves as set forth in the Proxies; and the statements by Defendants characterizing the Merger as fair. But we hold that Monk has failed to plead actionable misstatements or omissions with regard to statements about the grouping of games for revenue estimates and the failure to disclose MIIM's revenue.  We also conclude that Monk has adequately pleaded scienter and that he is entitled to rely on the rebuttable presumption of fraud-on-the-market to plead reliance.  We disagree with the district court's conclusion that Monk failed adequately to plead loss causation and conclude, instead, that Monk sufficiently pleaded that he was induced to give up his appraisal rights by Shanda's material misstatements.  Accordingly, we AFFIRM in part, VACATE in part, and REMAND for further proceedings not inconsistent with this opinion.

## BACKGROUND

### I.    Factual Background[2]

---

[2] The following facts are drawn from the Complaint and the documents it incorporates by reference. We assume them to be true for the purposes of this appeal.  *New Eng. Carpenters Guaranteed Annuity and Pension Funds v. DeCarlo*, 80 F.4th 158, 165-66 (2d Cir. 2023).

Mir II was Shanda's golden goose.  In the five years preceding the Freeze-Out Merger, Mir II had generated over $1 billion in revenue.  By 2013, however, sales in Mir II were declining, so Shanda turned to the expanding and highly lucrative mobile game market to revitalize the franchise.  Shanda invested heavily in MIIM over the next two years, and initial testing was immensely successful.  In August 2015, Shanda launched MIIM with very high expectations.

During the years preceding the launch of MIIM, Shanda explored a going private transaction.  A committee of directors (the "Special Committee") was formed to negotiate and evaluate the proposed transaction.  The Special Committee hired Merrill Lynch (Asia Pacific) Limited ("Merrill Lynch") to provide it with financial advice.  To facilitate this advising role, Shanda's management provided Merrill Lynch with financial projections for Shanda (the "March 2014 Projections").

The negotiations involved a revolving cast of potential buyers. [3]  In Spring 2014, Buyer Group 1 indicated a willingness to pay $6.90 per ADS. But when the Special Committee "pushed for a higher price," Buyer Group 1 refused.  App'x 733, ¶ 88.  Buyer Group 2, formed in April 2014, continued to negotiate with the

---

[3] For clarity, we have excluded from this recitation of the facts certain changes to the composition of the Buyer Group that do not impact our analysis.

Special Committee. Buyer Group 3 was formed in the fall of 2014. It included Ningxia, a company that came to control 42 percent of the voting power of Shanda's shares. In September 2014, Buyer Group 3 indicated it would increase its offer to $7.10 per ADS.

At the end of October 2014, Shanda's then-CEO resigned and stepped down from his position on the Board. Zhang was then elevated from his internal position in Shanda to take over as CEO. Zhang subsequently purchased enough voting shares in Shanda to become, along with Ningxia, one of the dominant shareholders. Zhang and Ningxia joined the potential buyers to create Buyer Group 4, which collectively controlled 90 percent of all shareholder votes.

Shortly thereafter, the Chairman of Shanda's Board, Tiangqiao Chen ("Chen"), stepped down from his position and left the Board. Zhang was selected to fill Chen's seat on the Board and was appointed to serve as Shanda's Chairman. Simultaneously, the Chairman of Ningxia's Board of Directors was nominated to fill the open director position left by the departure of Shanda's former CEO. Ningxia's Chairman resigned from both Ningxia and Shanda in February 2015 and

was replaced on Shanda's Board by Liang, a vice general manager of Ningxia.  In March 2015, Buyer Group 4 proposed a purchase price of $6.90 per ADS.

To assist with the evaluation of this proposal, Shanda's management, including Zhang, provided the Special Committee and Merrill Lynch with new financial projections (the "March 2015 Projections," with the March 2014 Projections, the "Projections").  But the March 2015 Projections, which suggested a serious decline in Shanda's prospects, were materially flawed.

Without explanation, the income and revenue projected by the March 2015 Projections were lower.  Moreover, the process used to create the March 2015 Projections also differed from the way Shanda had previously calculated its financial projections.  Prior to the March 2015 Projections, Shanda had calculated amortization and depreciation by writing down fixed assets in accordance with their expected useful lives.  For the March 2015 Projections, Shanda calculated amortization and depreciation as a percentage of revenue.  This method violated accepted accounting principles and substantially overestimated amortization and depreciation to the extent that the net value of capital assets became negative during the projection period, which caused the March 2015 Projections to underestimate Shanda's value.  In addition, the March 2015 Projections

inexplicably estimated that MIIM would generate only $15 million in lifetime revenue. But MIIM was a key component of Shanda's business strategy—in which the company had heavily invested—and was designed to be the successor to Mir II, a game that had produced nearly two billion dollars in revenue over the seven years preceding the Merger.

After discussions with Merrill Lynch, the Special Committee requested a price of $7.10 per ADS from Buyer Group 4. Buyer Group 4 agreed to that price, and Merrill Lynch issued a fairness opinion. This opinion concluded that the merger price was fair based on "the projections provided to it by Shanda's management." App'x 737, ¶ 102. After Merrill Lynch issued its opinion, the Special Committee and then the Board determined that the Merger was "fair" and "in the best interests of the Company and Unaffiliated Holders," App'x 737, ¶ 103, despite the Board's knowledge that the March 2015 Projections were "seriously flawed," App'x 767, ¶ 181. The Board then authorized the execution of the merger agreement.

Although Buyer Group 4 controlled sufficient voting power to approve the Freeze-Out Merger, Shanda still needed to hold a meeting to allow all shareholders to vote in favor of the proposed merger as a precursor to tendering their shares or

to dissent as a precursor to exercising their appraisal rights. This meeting, the Extraordinary Shareholders Meeting (the "EGM"), was scheduled for November 18, 2015. Shanda filed the Initial Proxy on May 5, 2015 and a Final Proxy on October 13, 2015.

Both Proxies contained charts of the Projections. The March 2014 Projections included data for fiscal years 2013 through 2018 while the March 2015 Projections in the Proxies covered 2014 to 2019. Although the Proxies represented that this data was what Shanda furnished to Merrill Lynch for the fairness opinion, in actuality, Shanda had also provided Merrill Lynch detailed data for 2020 that showed continued growth.

The Proxies also described the process by which management had created the financial forecasts in the Projections. They explained that "[i]n compiling the projections, the Company's management . . . projected revenues for each new game . . ." and described the Projections as "based on numerous assumptions and estimates as to future events made by management that management believed were reasonable at the time the projections were prepared." App'x 769, ¶ 187; App'x 775, ¶ 215. The Proxies also stated that both the Special Committee and the Board "determined" that the Freeze-Out Merger was "fair to, and in the best

interests of, the Company and its shareholders and ADS holders."[4]  App'x 771, ¶ 195; App'x 776, ¶ 219.  The Final Proxy reiterated that "the Company believes that the Merger Agreement, the Plan of Merger and the Transactions, including the Merger, are fair to, and in the best interests of, the Company and its unaffiliated security holders."  App'x 778, ¶ 228.

On August 3, 2015, between the filing of the Initial Proxy and the Final Proxy, Shanda launched MIIM.  It was a massive success.  Within two weeks, MIIM was the top selling game on the iOS App Store.  Each month after its launch MIIM generated over $90 million in revenue.  Due to real-time data analytics, Shanda knew of MIIM's success before October 2015.  While the Final Proxy disclosed that Shanda had not updated the March 2015 Projections, the Proxy did not disclose the scale of the error in the estimates of MIIM's revenue.  By the time of the Final Proxy, MIIM had already generated many times the March 2015 Projection's estimates of MIIM's lifetime revenue.

At the EGM on November 18, 2015, the Buyer Group voted to approve the Freeze-Out Merger.  As a result, Monk and the other members of the putative class

---

[4] The statement attributed to the Board was that "the Board . . . determined that it was fair to, advisable and in the best interests of the Company and the Unaffiliated Holders to consummate the Transactions, including the Merger . . . ."  App'x 771-72, ¶ 197; App'x 777, ¶ 224.

who did not sell their stock during the class period (the "Tenderers") had their ADS cashed out for $7.10 per share.[5]  But that was not the end of the story for the former shareholders.  Three shareholders (the "Dissenters") objected to the Freeze-Out Merger and filed an appraisal action in the Grand Court of the Cayman Islands.  During the Appraisal Action, the errors discussed above, and others, came to light.  At the conclusion of the Appraisal Action, the Court of Appeals of the Cayman Islands affirmed that the Merger price did not represent the fair value of the shares and awarded the Dissenters $12.84 per ADS.

## II.    Procedural History

Astor BK Realty Trust filed a complaint on March 19, 2018 in the Southern District of New York.  Following a motion by Monk, the district court appointed him lead plaintiff on June 1, 2018.  Monk filed an amended complaint later that year.  Shanda then moved to dismiss all claims pursuant to Federal Rule of Civil Procedure 12(b)(6).  The district court granted the motion to dismiss on September 30, 2019.  *In re Shanda Games Sec. Litig.*, No. 18-CV-2463, 2019 WL 11027710 (S.D.N.Y. Sep. 30, 2019) [hereinafter *In re Shanda I*].

---

[5] The putative class, as defined by the Complaint, includes both those who tendered their stock through the Merger, such as Monk, and those who sold their stock during the class period, the "Sellers." Monk, a tenderer and the only named plaintiff, proceeds only on theories related to the Tenderers.

The district court ruled that Monk had failed to plead reliance because after the announcement of the Merger, the market in ADS was not efficient, so Monk could not rely on the fraud-on-the-market presumption. *Id.* at *9. The district court also ruled, however, that Monk *had* adequately pleaded that Shanda made two material misstatements: (1) the opinion in both Proxies that the March 2015 Projections were reasonably prepared (because the unreasonable amortization and depreciation figures meant that the statements were untrue and Shanda "did not have 'a reasonable basis for [said] belief[s]'") *id.* at *5 (quoting *Slayton v. American Express Co.*, 604 F.3d 758, 774 (2d Cir. 2010)); and (2) the Proxies' description of the March 2015 Projections as a summary when the 2020 data was omitted and this information could not be said to be immaterial on a motion to dismiss, *id.* at *6. But the district court also held that the statements that the Freeze-Out Merger was fair were inactionable opinion statements because Monk had failed to allege that "the facts supporting the belief that the deal was fair are untrue" or that "Defendant could not have believed $7.10 was fair." *Id.* at *7.

The next month, Monk filed a motion for reconsideration that the district court denied in part and granted in part, concluding, as relevant here, that Shanda's failure to release information about MIIM's revenue before the EGM was

not an actionable omission because there was no duty to disclose this information under Cayman law. *In re Shanda Ltd. Sec. Litig.*, No. 18-CV-2463, 2020 WL 5813769, at *4-5 (S.D.N.Y. Sep. 30, 2020) [hereinafter *In re Shanda II*]. Before the district court had issued its ruling in *In re Shanda II*, Monk filed a motion for leave to amend the complaint and to add another lead plaintiff, Altimeo Asset Management ("Altimeo"), a Seller. Shortly after issuing *In re Shanda II*, the district court granted leave to amend the complaint but denied leave to add Altimeo.

Monk filed a second amended complaint (the "Complaint") on October 23, 2020, and Shanda and Zhang moved to dismiss thereafter. Once again, the district court dismissed the claims against Shanda. *In re Shanda III*, at *9. This time, the district court concluded that, in light of the amendments, Monk had adequately pleaded an efficient market so he could invoke the fraud-on-the-market presumption for reliance. *Id.* at *5. But the district court decided that Monk had not adequately pleaded loss causation because the Complaint "lack[ed] allegations explaining in a plausible manner how or why Plaintiff was personally induced to sell his shares instead of exercising his appraisal rights." *Id.* at *6. Monk filed a timely notice of appeal, challenging the district court's dismissal of the Complaint and the earlier denial of leave to add Altimeo.

## DISCUSSION

"We review *de novo* a district court judgment granting a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), accepting all factual allegations in the complaint as true." *City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 179 (2d Cir. 2014). "To survive a motion to dismiss, a complaint must contain sufficient factual matter . . . to state a claim for relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks omitted). We may consider "any written instrument attached to the complaint, statements or documents incorporated into the complaint by reference, legally required public disclosure documents filed with the SEC, and documents possessed by or known to the plaintiff and upon which it relied in bringing this suit." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007).

Section 10(b) of the Exchange Act makes it unlawful to "[t]o use or employ, in connection with the purchase or sale of any security registered on a national securities exchange . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate . . . ." 15 U.S.C. § 78j(b). Rule 10b-5, one of the rules promulgated under § 10(b), provides: "[i]t shall be unlawful for any person . . . [t]o make any untrue statement of a material fact or to omit to state a material fact

16

necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading . . . ." 17 C.F.R. § 240.10b-5. To state a private securities-fraud claim under § 10(b) and Rule 10b-5, a plaintiff must plead "(i) a material misrepresentation or omission; (ii) scienter; (iii) a connection with the purchase or sale of a security[;] (iv) reliance by the plaintiff(s); (v) economic loss; and (vi) loss causation." *In re Omnicom Grp. Inc. Sec. Litig.*, 597 F.3d 501, 509 (2d Cir. 2010) (internal quotation marks omitted).

The district court dismissed the Complaint for failure to plead loss causation. *In re Shanda III*, 2022 WL 992794, at *6. Monk contests that conclusion and the district court's conclusions that four alleged misstatements and an omission were not actionable. Defendants urge us to affirm on the same basis as the district court or for failure to plead a material misstatement, reliance, or scienter. They also argue that § 10(b) does not apply to the actions at issue here. We conclude that § 10(b) applies and that Monk has adequately pleaded loss causation, reliance, scienter, and actionable misstatements. Accordingly, we vacate in part, and affirm in part the judgment of the district court and remand for further proceedings not inconsistent with this opinion.

## I. *Morrison*'s Extraterritoriality Bar

At the start, the district court held that this case falls within the scope of § 10(b) because the Plaintiffs' ADS were traded on a domestic exchange. *In re Shanda I*, 2019 WL 11027710, at *4. We agree. In *Morrison v. National Australia Bank Ltd.*, the Supreme Court determined that § 10(b) applies only domestically. *See generally* 561 U.S. 247 (2010). Explaining that there are two ways that a claim can be within § 10(b)'s scope, *Morrison* teaches that the provision affords a private cause of action first for "transactions in securities listed on domestic exchanges" and, second, for "domestic transactions in other securities." *City of Pontiac*, 752 F.3d at 179 (quoting *Morrison*, 561 U.S. at 267); *see also Absolute Activist Value Master Fund Ltd. v. Ficeto*, 677 F.3d 60, 66 (2d Cir. 2012). Here, the ADS were purchased on the NASDAQ and remained listed on the NASDAQ throughout the class period, after which they were cancelled and delisted from the exchange. This case is thus squarely about "transactions in securities listed on domestic exchanges," and so falls within the scope of § 10(b). *City of Pontiac*, 752 F.3d at 179.

Shanda argues that in *City of Pontiac*, we supposedly explained that "the question under *Morrison* is where the purchase or sale of securities at issue took place, not where the securities were listed." Appellee's Br. at 51. And because Shanda is a foreign corporation and, according to Shanda, the Freeze-Out Merger

18

occurred in China where the EGM took place, the tender of Monk's shares was not a domestic transaction within the scope of § 10(b). We disagree.

In *City of Pontiac*, we held that the purchase of foreign-issued stock on a foreign exchange did not constitute a transaction in a security "listed on a domestic exchange" for *Morrison* purposes merely because the security was dual-listed on a domestic exchange. *City of Pontiac*, 752 F.3d at 181. We rejected this so-called "listing theory" as to *Morrison*'s first prong because it was "irreconcilable with *Morrison* read as a whole." *Id.* at 179-80. But unlike in *City of Pontiac*—where the security was purchased on a foreign exchange and merely dual listed on a domestic exchange—Monk's ADS were traded *only* on a U.S. exchange, were purchased there, and ultimately delisted there. This case therefore falls squarely within *Morrison*'s first prong.

We have not, as Shanda alleges, collapsed into one the two circumstances in which a securities transaction qualifies as domestic for *Morrison* purposes. Indeed, our case law is clear that the two prongs of *Morrison* are distinct. *See id.* at 179-181 (considering separately claims about *Morrison* prongs one and two); *Absolute Activist*, 677 F.3d at 69 n.4 (explaining that its analysis of *Morrison*'s second prong did not impact the first prong). *City of Pontiac* thus merely carved out an exception

19

to prong one's general rule—that "transactions in securities listed on domestic exchanges" fall with the scope of § 10(b)—for claims arising from purchases of "foreign-issued shares on a foreign exchange." *City of Pontiac*, 752 F.3d at 181. It evinces a concern with attempts to regulate transactions in stock on foreign exchanges, and not an intent to otherwise limit prong one. *See id.* at 180 (discussing *Morrison*'s concern with "the location of the securities *transaction* and not the location of an exchange where the security *may be dually listed*" (second emphasis added, internal quotation marks omitted)). In contrast, Shanda's reading of *City of Pontiac* would run counter to *Morrison*'s recognition of "[t]he primacy of the domestic exchange" in the Exchange Act, 561 U.S. at 267, and thus be "irreconcilable with *Morrison* read as a whole," *City of Pontiac*, 752 F.3d at 179-80. Accordingly, having concluded that the transactions at issue here fall within the scope of § 10(b), we turn to the elements of the claim.

## II. Misrepresentations

On appeal, Monk argues that the Proxies contain four types of materially misleading misstatements and one omission.[6] Monk categorizes some of the

---

[6] As discussed further herein, "for an omission to be considered actionable under § 10(b), the defendant must be subject to an underlying duty to disclose." *Levitt v. J.P. Morgan Sec., Inc.*, 710 F.3d 454, 465 (2d Cir. 2013).

alleged misrepresentations as statements of fact and others as statements of opinion.  Defendants do not challenge any of these categorizations and so, for purposes of this appeal, we accept them.[7]   Material statements of fact are actionable if they are untrue.  17 CFR § 240.10b-5(b).  Statements of opinion are actionable if (1) "'the speaker did not hold the belief she professed[,]'" (2) "'the supporting fact[s] she supplied were untrue[,]'" or (3) "the speaker omit[ted] information whose omission makes the statement misleading to a reasonable investor." *Tongue v. Sanofi*, 816 F.3d 199, 210 (2d Cir. 2016) (quoting *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 186 (2015)).

"A statement structured, 'I believe that x is so because y has occurred,' contains the factual and falsifiable statement, 'y has occurred.'" *Abramson v. Newlink Genetics Corp.*, 965 F.3d 165, 175 (2d Cir. 2020).  This statement is potentially actionable if "y has in fact not occurred." *Id.*  The statement "I believe that x has occurred" is also actionable if a reasonable investor would understand the statement to imply that y has occurred and y has not, in fact, occurred. *Id.*  Because "a reasonable investor expects that opinion statements 'rest on some

---

[7] "In general, a fact is 'a thing done or existing or an actual happening,' while an opinion is 'a belief, a view, or a sentiment which the minds forms of persons or things.'" *New Eng. Carpenters*, 80 F.4th at 169 (quoting *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 183 (2015)).

meaningful inquiry,' 'fairly align with the information in the issuer's possession at the time,' and do not 'reflect baseless, off-the-cuff judgments,'" it is generally misleading when statements do not rest on meaningful inquiry, do not align with the information in the issuer's possession, or are baseless, off-the cuff judgments. *New Eng. Carpenters*, 80 F.4th at 170 (quoting *Omnicare*, 575 U.S. at 188) (ellipses and brackets omitted).

### A.     Statements Concerning the Preparation of Projections

#### 1.     Game Revenue Estimates

Monk first contends that Shanda's statements that the Projections provided in the Proxies were based on "projected revenues for each new game," App'x 769, ¶ 187; App'x 775, ¶ 215, and that the Projections "were reasonably prepared on bases reflecting the best available estimates and good faith judgments of the management of the Company," App'x 773, ¶ 201; App'x 776, ¶ 219, were materially misleading.  Monk argues that these statements, taken together, are actionable because "[a] reasonable investor interpreting these statements would understand them to mean that the projections reflected game-specific revenue forecasts based on the best available estimates for the revenue of each game" and that Shanda did not, in fact, perform a game-specific analysis.  Appellant's Br. at 50.  We disagree.

Assuming that the statement that the Projections were "reasonably prepared" based, *inter alia*, on "projected revenues for each new game" reflects an opinion, such a statement is actionable if "the statement omits information whose omission conveys false facts about the speaker's basis for holding that view and makes the opinion statement misleading to a reasonable investor." *New England Carpenters*, 80 F.4th at 171. But the statement is actionable only if a reasonable investor would believe that the statement implies those facts. *Abramson*, 965 F.3d at 175.

Monk has not adequately alleged that the opinion statements on which he relies would lead a reasonable investor to expect projections based on "game specific revenue forecasts" as opposed to some other methodology for projecting revenues for each new game. Indeed, the Complaint explains that "Shanda's management forecasted the expected revenue of each game slated for release." App'x 759, ¶ 163. But Shanda did so by categorizing games into three different types and then using that categorization to predict revenue. Shanda thus calculated each game's revenue—such that the statement in the Proxies is literally correct—but did so using a methodology that the Complaint alleges was a "simplistic method of generating projections." *Id*.

23

To be sure, "[s]tatements of literal truth 'can become, through their context and manner of presentation, devices which mislead investors.'"  *See Kleinman v. Elan Corp., PLC*, 706 F.3d 145, 153 (2d Cir. 2013) (quoting *McMahan & Co. v. Wherehouse Entm't, Inc.*, 900 F.2d 576, 579 (2d Cir. 1990)).  But on appeal, Monk does not explain why, in the context of reviewing a statement of opinion, a reasonable investor would have expected Shanda to have projected revenues for each new game individually, as opposed to categorizing them by type.  Accordingly, we conclude that the Complaint fails to allege a material misrepresentation as to these statements.

### 2.    Amortization & Depreciation

We conclude, with the district court, that Monk's next allegation of a material misrepresentation *is* well-pleaded.  Monk contends that it was materially misleading to describe the process used to create the March 2015 Projections as "reasonable" and reflecting the "best available estimates" when the method used to calculate amortization and depreciation in preparing the estimates violated basic and accepted accounting principles that a reasonable investor would assume were followed.  App'x 769, ¶ 187; App'x 772-73, ¶ 201; App'x 775, ¶ 215.  For the following reasons, we agree.

At the start, Monk *has* adequately alleged that basic accounting principles were violated in the preparation of the March 2015 Projections. Prior to the Freeze-Out Merger, Shanda had estimated depreciation and amortization based on the estimated useful life of the assets. But as the Complaint alleges, for the March 2015 Projections, Shanda used a new method, one which "assumed that depreciation and amortization would grow at a rate that was a function of revenue growth" in violation "of basic accounting principles." App'x 761, ¶ 169. This method resulted in the impossible outcome of the book value of Shanda's capital assets becoming negative in 2018. App'x 761-62, ¶ 170.

To be sure, Shanda was permitted to choose any accepted accounting method while characterizing its process for preparing the Projections as reasonable. But it was limited to *accepted* methods. *Cf. New Eng. Carp.*, 80 F.4th at 170 ("[A] plaintiff will be unable to establish that [a statement] is false merely by showing that other *reasonable* alternative views exist. Where those alternatives exist, the speaker making the statement (expressing an opinion) can choose among them . . . ." (emphasis added)). This is because a reasonable investor assured by Shanda that the Projections were reasonably prepared would infer that basic accounting principles were followed. As Judge Kaplan has aptly explained:

> [F]inancial professionals have developed specific metrics . . . to
> perform valuations of companies, their stock prices, and the like.
> Thus, a statement that a deal is "fair" reasonably may be understood
> as a statement, or at least as an implication, that the opinion reflects
> or is based upon one or more accepted valuation metrics. . . .
>
> If the directors' statements about the fairness of the deal . . . are not
> grounded in "the customs and practices of the relevant industry,"
> they "could be misleadingly incomplete" . . . . because the reasonable
> person, who "understands a statement of opinion in its full context,"
> would expect "not just that the issuer believes the opinion (however
> irrationally)," but that the opinion "rests on some meaningful . . .
> inquiry . . . ."

*In re Lehman Bros. Sec. Litig. & ERISA Litig.*, 131 F. Supp. 3d 241, 253-54 (S.D.N.Y.

2015) (quoting *Omnicare*, 575 U.S. at 189, 190); *see also City of Westland Police & Fire

v. Metlife*, 129 F. Supp. 3d 48, 71 (S.D.N.Y. 2015).

Shanda argues that the statements about the March 2015 Projections are

not actionable because "alleged flaws in the projections do not make statements

*about* projections misleading."  Appellee's Br. at 35.  But this is incorrect.  Shanda

relies on *OFI Asset Management v. Cooper Tire & Rubber*, 834 F.3d 481 (3d Cir. 2016).

In *OFI*, the plaintiff attempted to proceed on a theory that the projections provided

in the proxy materials were themselves "objectively false."  *Id.* at 500.  But the

Third Circuit held that because the proxy materials disclaimed the accuracy of the

projections, "the only relevant statement of fact" in these materials was "that the

projections were, in fact, the projections" provided to the relevant parties—a statement that was accurate and not misleading. *Id.* at 501. Here, however, Monk does not claim that the statements in question are objectively false statements of fact. He argues that they are statements of opinion that create the misleading impression that the projections were prepared using acceptable accounting techniques. Contrary to Shanda's contention, there is no special rule for opinion statements about projections, and Monk has adequately alleged that the opinions here were materially misleading. Accordingly, *OFI* is inapposite. We therefore affirm as to the district court's determination that these statements were actionable.

## B.      The Projections Themselves

Monk next alleges that the March 2015 Projections, as presented in the Proxies, are materially misleading because Shanda did not believe that these Projections reasonably estimated MIIM's future revenue. The Projections are opinion statements, *Shreiber v. Synacor, Inc.*, 832 F. App'x 54, 57 (2d Cir. 2020) (describing statements about expected future revenue as "quintessential opinion statements") (citing *Fait v. Regions Fin. Corp.*, 655 F.3d 105, 111 (2d Cir. 2011), *abrogated on other grounds by Omnicare*, 575 U.S. 175, *as recognized in Abramson*, 965 F.3d 165), which are actionable if "the speaker did not hold the belief she

professed," *Tongue*, 816 F.3d at 210 (quoting *Omnicare*, 575 U.S. at 186).  We agree with Monk that he has adequately alleged a material misrepresentation in connection with the March 2015 opinion statements about MIIM's prospects.

The March 2015 Projections estimated that MIIM would make only $15 million in lifetime revenue.  Monk has adequately alleged that Shanda did not believe that figure to be accurate.  The computer version of Mir II had grossed almost $400 million in the two years prior to the Freeze-Out Merger and nearly two billion dollars since 2008.  And Shanda had spent considerable resources on MIIM, its successor, employing approximately 80 people for more than two years to work specifically on it.[8]  In December 2014, Shanda described the results of its internal testing of MIIM as "fabulous."   App'x 727, ¶ 79(f).  Management also knew about "'official pre-orders, Official Weibo and Wechat data and . . . recent technical experience data'" which showed "early 'excellent performance,'" App'x 729, ¶ 79(i).  Shanda was aware of great public interest in MIIM.  App'x 727, ¶ 79(e) ("Shanda published an article . . . [that] explained that the premier of Mir II Mobile . . . 'piqued great public interest.'"); App'x 729, ¶ 79(k) ("'[H]undreds of thousands of passionate gamers' congregated on the [MIIM] website 'within an

---

[8] The head of development for MIIM explained that Shanda had "spared no efforts in terms of . . . reinvestments into this game."  App'x 725, ¶ 78.

extremely short time.'").  Shanda also publicly announced that it believed MIIM would be a massive success as part of the "best times" of the video game industry because of the "explosive growth" of mobile games.  App'x 726-27, ¶ 79(d).  Based on these allegations about the history of Mir II and Shanda's expectations about MIIM, Monk has adequately alleged that the Defendants did not believe the March 2015 Projections to be accurate.

Shanda argues that the March 2015 Projections fall within the Private Securities Reform Litigation Act ("PSLRA") safe-harbor provision because they are "forward-looking statements that were identified as such and accompanied by meaningful cautionary language."  Appellee's Br. at 35.  We disagree.  The safe harbor does not apply to forward-looking statements made in connection with a going private transaction.  15 U.S.C. § 78u-5(b)(1)(E); *Maso Cap. Inv. Ltd. v. E-House (China) Holdings Ltd.*, No. 22-355, 2024 WL 2890968, at *4 n.2 (2d Cir. 2024).  The Freeze-Out Merger is a going private transaction because it involved the "purchase of any equity security by the issuer of such security or by an affiliate of such issuer."  17 C.F.R. § 240.13e-3.  Because the PSLRA safe harbor does not apply, the March 2015 Projections, as provided in the Proxies, are evaluated simply as opinion statements, and Monk has adequately alleged that Shanda did not believe

the statements to be true when it made them.[9]  We therefore vacate and remand as to the district court's determination that they were not actionable.

### C.       Statements Concerning the Summary of the Data

The March 2015 Projections in the Proxies include a statement that they are a summary of the financial projections provided by management to Merrill Lynch and the Buyer Group.  Monk alleges that this statement was misleading because the March 2015 Projections, as presented in the Proxies, exclude one year of data, for 2020, that is a part of the actual projections.  The district court agreed, noting that a summary "must describe[] 'the main points succinctly.'"  *In re Shanda I*, 2019 WL 11027710, at *6 (quoting *Summary*, Pocket Oxford English Dictionary (2d ed. 2008)).  *See Summary*, Oxford Dictionaries, https://premium.oxforddictionaries.com/us/definition/american_english/summary, [https://perma.cc/XXE4-UCV5] (last visited January 31, 2025) (defining *summary* as "a brief statement or account of the main points of something").  We agree.  With one out of five years of data excluded, the March 2015 Projections do not constitute an accurate summary of the material provided to Merrill Lynch and to the Buyer Group.

---

[9] Neither party has briefed the applicability of the "bespeaks caution" doctrine, so we do not address its possible applicability.

Shanda contends, to the contrary, that "to 'summarize'" means "to *reduce the presented information to only a portion of the full material*" and that the Proxies' March 2015 Projections *do* constitute a summary because they are a "portion" of the financial projections afforded to Merrill Lynch and to the Buyer Group. Appellee's Br. at 40. Shanda points to our discussion of the definition of "summarize" in *In re Bank of America Corporation Securities, Derivatives & Employment Retirement Income Securities Act (ERISA) Litigation*, 772 F.3d 125 (2d Cir. 2014). But that very case defines summary as "constituting or containing a summing up of points: covering main points concisely: summarizing very briefly." *Id.* at 133 n.5 (quoting *Webster's Third New International Dictionary Unabridged* (2014)). The question is thus not whether it is misleading to describe the reduction of some amount of information in a condensed presentation as a summary, but whether it is misleading to describe the exclusion of one-fifth of the relevant data underlying a projection as a summary. As to this latter question, we conclude that it is.

Shanda next argues that it was entitled to "exercise its judgment in deciding whether the 2020 data was important enough to include." Appellee's Br. at 41. But the statement is not misleading simply because Shanda excluded a year's

31

worth of relevant data from the Proxies. Shanda *could* exercise its judgment in deciding what to include in the Proxies and what information to provide to Merrill Lynch and the Buyer Group. Once Shanda had provided information to Merrill Lynch and the Buyer Group, however, it could not thereafter mislead investors as to what information had been provided. And this is the crux of the misleading statement alleged by Monk.

Shanda finally argues that the excluded data was not material. A statement is material if there is "'a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available.'" *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 162 (2d Cir. 2000) (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988)). But on a Rule 12(b)(6) motion, "a complaint may not properly be dismissed . . . on the ground that the alleged misstatements or omissions are not material unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." *Litwin v. Blackstone Grp., L.P.*, 634 F.3d 706, 717 (2d Cir. 2011) (internal quotation marks and citation omitted). To be sure, the 2020 data show significantly lower revenue growth than the 2016 to 2019 data. But there is still revenue growth of 5.4 percent,

which Monk alleges constitutes "significant and positive information about the Company and its value."  App'x 743, ¶ 120.  This information may turn out to be immaterial.  But reasonable minds could disagree on this question and that is all that is required at the motion to dismiss stage.  Accordingly, we agree with the district court that Monk has adequately alleged material misrepresentations in connection with the representation in the Proxies that the March 2015 Projections contained therein constitute a summary of the projections provided to Merrill Lynch and to the Buyer Group.

### D.    Statements Concerning Fairness

Monk next argues that the statements in both the Initial Proxy and the Final Proxy that describe the Freeze-Out Merger as fair were misleading opinion statements because the Defendants disbelieved the statements and the statements did not align with the information in their possession.  For the following reasons, we agree.

At the start, we *disagree* with Monk that the testimony of Shanda's expert witness at the Appraisal Action provides a basis on which we may infer that Shanda did not believe the fairness statements when it issued the Proxies.  In the Proxies, Shanda opined that the merger price of $7.10 per ADS was fair.  During the Appraisal Action in the Cayman Islands, Shanda's valuation expert "found

that as of November 18, 2015, when the Transaction closed, the fair value of

Shanda's equity was $9.56 per ADS . . . ."  App'x 758, ¶ 158.  Monk argues that

"Shanda's admission by way of the expert report it proffered . . . indicates its belief

that $7.10 was unfair."  Appellant's Br. at 55.  But this is incorrect.

Monk directs us to *Kreppel v. Guttman Breast Diagnostic Institute*, No. 95-cv-

10830 (SWK) (MHD), 1999 WL 1243891 (S.D.N.Y. Dec. 21, 1999), which held that

an expert's testimony may be admitted as an adoptive admission under the

Federal Rules of Evidence.  Monk extrapolates from *Kreppel*'s holding about

admissions under the Federal Rules of Evidence to suggest that "when a party

proffers an expert report it may be treated as the parties' opinion."  Appellant's

Br. at 55.  But *Kreppel* itself explains that one of the reasons that an expert's opinion

can be an adoptive admission is because the party "was obviously fully aware of

[the expert's] opinion and analysis by no later than the date on which its counsel

received the report, and that [the party] chose nonetheless to proffer" the witness.

*Id.* at *1.  Here, even if we attributed the expert's views to Shanda, it would simply

show that at the time of the Appraisal Action, eighteen months after the Proxies

were published, Shanda believed that the fair value of Shanda's equity was $9.56

per ADS.  It does not tell us what Shanda believed when the Proxies were

published.  And for an opinion statement to be actionable on the theory that a defendant did not believe it, the defendant must not have believed the statement *when it was made*.

Setting the expert opinion aside, however, we conclude that Monk *has* adequately pleaded that the fairness opinions in the Initial Proxy did not align with the information in Shanda's possession when it issued that Proxy and that Shanda did not believe that the transaction was fair.  Monk has alleged that the Defendants understood that Merrill Lynch's assessment of the deal price was based, in part, on the revenue estimates for MIIM.  But we have already concluded that Monk has adequately alleged that Shanda did not believe the MIIM estimates to be correct.  The same allegations supporting that conclusion lead, here, to the determination that Monk has adequately alleged that the $15 million revenue estimate relied on by Merrill Lynch did not align with the information that Shanda had about MIIM's likely success.  And by adopting a fairness opinion that was based on such estimates, Shanda misled the shareholders.[10]

---

[10] Moreover, the Complaint also adequately alleges that the fairness opinion was misleading by virtue of its reliance on projections that were not prepared in accordance with accepted accounting techniques.  "[A] statement that a deal is 'fair' reasonably may be understood as a statement . . . that the opinion reflects or is based upon one or more accepted valuation metrics."  *In re Lehman Bros. Sec. Litig.*, 131 F. Supp. 3d at 253.  But, as discussed *supra*, the Complaint alleges that the amortization and depreciation figures employed in preparing Shanda's revenue estimates were not based on accepted accounting methods, rendering the fairness opinion misleading.

Relying on a district court opinion, Shanda argues, to the contrary, that "as a matter of law, Monk cannot show that a statement is misleading based on the unreasonableness of underlying projections." Appellee's Br. at 44 (citing *Gray v. Wesco Aircraft Holdings, Inc.*, 454 F. Supp. 3d 366, 387 (S.D.N.Y. 2020)). We disagree. As an initial matter, *Gray*'s reasoning is based on the PSLRA safe harbor, which is not applicable here. *Gray*, 454 F. Supp. 3d at 387, 390. But more importantly, a projection is not a magic wand that immunizes all statements that relate to that projection. *See In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 246 (2d Cir. 2016); *Shreiber*, 832 F. App'x at 57 (analyzing statements about future revenue using the *Omnicare* framework). We analyze the fairness statement like any other opinion.

We also conclude that Monk has adequately alleged that by the time of the Final Proxy the Defendants did not believe that the Merger was fair and that describing the Merger as fair did not align with the information in Shanda's possession. At that point, MIIM had launched and the game's initial success was such that the Defendants "could not possibly have believed the Buyout was fair." Appellant's Br. at 57. Shanda was able to track in-game purchases, the source of revenue for MIIM, in real time and management reviewed the data at least weekly. It is reasonable to infer that Defendants therefore would have known about

36

MIIM's success because MIIM generated over $90 million each month between its launch in August and the issuance of the Final Proxy in October.  Monk thus plausibly alleges that Shanda knew that the fairness opinion was based on assumptions that had proven incorrect, yet Shanda continued to state that the Merger was fair.  Accordingly, Monk has adequately pleaded that these statements are actionable.  *Cf. In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259, 266 (2d Cir. 1993) (finding opinion statements nonactionable when "the complaint contains no allegations to support the inference that the defendants either did not have these favorable opinions on future prospects when they made the statements or that the favorable opinions were without basis in fact").

Shanda argues that Monk has not adequately alleged that the Special Committee knew about MIIM's initial revenue figures or that such knowledge would establish that the Special Committee did not believe the Merger was fair.  But this argument misses the mark.  The Special Committee, comprised entirely of Board members, would have been privy to the same internal monitoring of MIIM's success as the rest of the Board.  According to the Complaint, the Special Committee and the Board each unanimously determined that the Freeze-Out Merger was fair after knowledge of MIIM's immediate success was shared across

the company. And the Final Proxy continued to reaffirm those determinations by stating that "'the Company believes' that the [Freeze-Out Merger] is 'fair to, and in the best interests of' the Unaffiliated Holders.'" App'x 751, ¶ 137. The Complaint adequately alleges that all Board members, including the Special Committee, knew of the problems with the March 2015 Projections and thus did not believe the fairness assessment.

Finally, Shanda argues that because information about MIIM's immediate success was available to shareholders before the deadline to dissent and the Proxies declared that the Projections had not been updated, shareholders could not have been misled. We again disagree. Monk does not claim that the Proxies misled the shareholders into believing that the MIIM estimates came true. He alleges that the Proxies misled the shareholders as to Shanda's belief in the March 2015 Projections and the fairness opinions based on them. The public's knowledge of MIIM's success did not inform the shareholders of the extent of the inaccuracies in the March 2015 Projections or that Shanda did not, in fact, believe in their accuracy, or in the Proxies' fairness opinions. *Cf. Koppel v. 4987 Corp.*, 167 F.3d 125, 132-33 (2d Cir. 1999) (holding that, even though adverse information was disclosed in a Solicitation of Consent, the Solicitation of Consent was misleading because it

implied that a recommendation considered the adverse information when it did not).  For these reasons, Monk's allegations with regard to statements made about the fairness of the Merger adequately support a claim for securities fraud.  We therefore vacate and remand as to the district court's determination that these statements were not actionable.

### E.    Omissions of MIIM Information

Finally, Monk argues that the Individual Defendants are liable for omissions because Cayman law required them to disclose the success of MIIM, and that Shanda is in turn liable for those omissions because the Individual Defendants were Shanda's agents.  We disagree.  Assuming *arguendo* that we would impose a duty to disclose based on a relationship established by Cayman law, we agree with the district court that Cayman law establishes no such duty here.

Monk's sole citation for the existence of a disclosure duty is a case from the New York Appellate Division purporting to apply Cayman law.  This New York case in turn relies on *Sharp v. Blank*, [2015] EWHC (Ch) 3220, a case from the High Court of Justice of England and Wales.  *Davis v. Scottish Re Grp. Ltd.*, 74 N.Y.S.3d

39

10 (N.Y. App. Div. 1st Dept. 2018).[11]  In *Sharp*, the High Court held that "although a director of a company can owe fiduciary duties to the company's shareholders, he does not do so by the mere fact of being a director, but only where there is on the facts of the particular case a 'special relationship' between the director and the shareholders."  *Sharp v. Blank* [2015] EWHC (Ch) 3220 [12].

To be sure, the High Court determined that a non-fiduciary relationship between directors and shareholders *does* give rise to a "sufficient information duty, which is expressly accepted to include a duty not to mislead or conceal information, and a duty to give advice and information in clear and readily comprehensible terms."  *Id.* at 15.  But this non-fiduciary relationship does not necessarily give rise to a duty for a director "to disclose material facts before entering into a transaction with his principal."  *Id.* at 23(1).  We think this statement makes clear that the duty of sufficient information, despite its name, is not a duty to disclose for the purposes of omission liability under § 10(b).[12]  We thus agree

---

[11] The Cayman Islands "administer justice in keeping with . . . the well established principles of common law which have been developed by the local, the British and other courts of the Commonwealth of Nations."  *Structure of the Courts*, CAYMAN ISLANDS JUDICIAL ADMINISTRATION, https://judicial.ky/who-we-are/structure-of-the-courts/ [https://perma.cc/Q2NV-98BT] (last visited January 31, 2025).

[12] The cases relied on by *Sharp* suggest that to the extent that the sufficient information duty involves a duty to inform, it requires, for instance, that a Board of Directors, having invited shareholders to a meeting, should provide sufficient information for shareholders to determine the topic of the meeting and decide whether to attend.  The shareholders need not be given full information.  *See, e.g., Re RAC Motoring Servs. Ltd.*, [2000] 1 BCLC 307 [326, 328]; *Residues Treatment & Trading Co. Ltd. v. Southern Resources Ltd.*, (1988) 14 ACLR 375.

with the district court that Cayman law does not impose a duty to disclose.
Accordingly, because Monk has not adequately pleaded a disclosure duty, *see In re Time Warner Inc. Sec. Litig.*, 9 F.3d at 267, the district court did not err in concluding that the failure to disclose the success of MIIM was not actionable.

## III. Scienter

The district court determined that Monk adequately alleged scienter on the theory that Zhang and Liang had motive and opportunity to commit fraud in order to secure a low merger price and that this scienter could be imputed to Shanda due to their respective positions. *In re Shanda I*, 2019 WL 11027710, at *7. We agree.

"A complaint alleging securities fraud under § 10(b) of the Exchange Act must satisfy the heightened pleading requirements of Rule 9(b) and the Private Securities Litigation Reform Act of 1995." *City of Pontiac*, 752 F.3d at 184. This requires plaintiffs to "specify each misleading statement . . . [and] state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Id.* (quoting *Anschutz Corp. v. Merrill Lynch & Co., Inc.*, 690 F.3d 98, 108 (2d Cir. 2012)). "[A]n inference of scienter must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs, Inc. v. Makor Issues &*

*Rights, Ltd.*, 551 U.S. 308, 324 (2007). "The requisite state of mind, or scienter . . . that the plaintiff must allege is 'an intent to deceive, manipulate or defraud.'" *Kalnit v. Eichler*, 264 F.3d 131, 138 (2d Cir. 2001) (quoting *Ganino v. Citizens Utils. Co.*, 228 F.3d, 154, 168 (2d Cir. 2001)). A plaintiff may establish scienter with facts "showing that the defendants had both motive and opportunity to commit the fraud." *City of Pontiac*, 752 F.3d at 184.

To adequately allege motive, a plaintiff must plead that individual defendants would realize "concrete benefits" from the misstatements but "[m]otives that are generally possessed by most corporate directors and officers do not suffice." *Kalnit*, 264 F.3d at 139 (internal citations omitted). We have previously held that "in some circumstances, the artificial inflation of stock price in the acquisition context may be sufficient for securities fraud scienter" because "not every company has the desire to use its stock to acquire another company." *Rothman v. Gregor*, 220 F.3d 81, 93 (2d Cir. 2000). Similarly, alleging the artificial deflation of stock can be sufficient. The desire of an acquiring entity to save money by acquiring a target company at a lower price is not a motive that every corporate insider has and gives rise to concrete financial gain. *See In re MCI Worldcom, Inc. Sec. Litig.*, 93 F. Supp. 2d 276, 283-84 (E.D.N.Y. 2000) (finding motive for an

acquiror to deflate share price of the target); *Buxbaum v. Deutsche Bank AG*, 196 F. Supp. 2d 367, 376 (S.D.N.Y. 2002) (finding motive for an executive of the acquiror to deflate share prices of the target).

Here, Monk has adequately alleged that Zhang and Liang would reap concrete, financial benefits from keeping the merger price low.[13]  "[A]ny money flowing out from Shanda through the [Freeze-Out Merger] was money that the ultimate Buyer Group would be 'spending,' since it was money that they would otherwise come to indirectly own through their acquisition of Shanda."  App'x 747, ¶ 127 n.19.  Thus, as members of the Buyer Group, deflating the value of Shanda's shares saved Zhang and Ningxia money because it reduced significantly "the amount of money [they] needed to spend to acquire Shanda."  App'x 783, ¶ 251.  Because this is not a motive "possessed by virtually all corporate insiders," the facts in the Complaint are sufficient plausibly to allege that Zhang and Liang, and thus Shanda, had motive to commit fraud.  *S. Cherry St., LLC v. Hennessee Grp.*, 573 F.3d 98, 109 (2d Cir. 2009) (quoting *Novak v. Kasaks*, 216 F.3d 300, 308 (2d Cir. 2000)).

---

[13] Liang was a high-level employee of Ningxia and Ningxia's representative on the Board.  Monk has thus plausibly alleged that Liang had the motives of Ningxia, a member of the Buyer Group.

Shanda argues that "a motive to secure a low transaction price cannot be sufficient to show a motive to defraud, because *every* buyer has that motive."[14] Appellee's Br. at 48-49.  That argument misunderstands our inquiry.  We ask about the motives of the speaker, *see* 17 C.F.R. § 240.10b-5 ("It shall be unlawful for any person . . . *to make* any untrue statement of material fact . . . ." (emphasis added)), specifically whether the motive is common to those in the position of the speaker.  The majority of corporate insiders do not have the goal of securing a low transaction price for stock in their own company.  In fact, they have the opposite goal.  Zhang and Liang were both corporate insiders of Shanda and its buyers.  Zhang and Liang's alleged motive—a low purchase price—stems from their role as buyers, not corporate officers, but their status as buyers does not change the focus of our inquiry because the speech in question came from Shanda.

Shanda next argues that even if Zhang and Liang acted with scienter, that scienter cannot be imputed to Shanda under the adverse interest exception to imputation.  We impute the scienter of certain corporate officers and employees to

---

[14] On appeal, Shanda further argues that Zhang and Liang did not have an opportunity to secure a low price for the shares in the Freeze-Out Merger.  Shanda has forfeited this argument by failing to raise it before the district court.  *In re Nortel Networks Corp. Sec. Litig.*, 539 F.3d 129, 132 (2d Cir. 2008).

a corporation.[15] *Teamsters Local 445 Freight Div. Pension Fund v. Dynex Cap., Inc.*, 531 F.3d 190, 195 (2d. Cir 2008) ("When the defendant is a corporate entity, this means that the pleaded facts must create a strong inference that someone whose intent could be imputed to the corporation acted with the requisite scienter."). We do so based on agency principles that impute the actions of an agent to the corporation because "[a] corporation can only act through its employees and agents . . . ." *Suez Equity Invs., L.P. v. Toronto-Dominion Bank*, 250 F.3d 87, 101 (2d Cir. 2001); *see also Adams v. Kinder-Morgan, Inc.*, 340 F.3d 1083, 1106 (10th Cir. 2003) ("The scienter of the senior controlling officers of a corporation may be attributed to the corporation itself to establish liability as a primary violator of § 10(b) and Rule 10b-5 when those senior officials were acting within the scope of their apparent authority.").

The adverse interest exception is an exception to the general rule that the acts and knowledge of an agent acting within the scope of his employment or with apparent authority are imputed to the principal for cases where "an agent acts

---

[15] We have not established "a bright-line rule to determine when an executive is sufficiently senior that his or her scienter can be attributed to the entity," *Barrett v. PJT Partners Inc.*, No. 16-CV-2841, 2017 WL 3995606, at *7 (S.D.N.Y. Sept. 8, 2017), but no one contests that Zhang and Liang are such executives.

adversely to the principal."[16]  Restatement (Third) of Agency § 5.04 (2006).  The adverse interest exception, the "most narrow of exceptions," requires that "the fraud is committed *against* a [principal] rather than on its behalf," and is inapplicable where "the agent act[s] both for himself and for the principal." *Republic of Iraq v. ABB AG*, 768 F.3d 145, 166 (2d Cir. 2014) (internal quotation marks and citations omitted).  If both the corporation and the rogue agent benefited, the adverse interest exception does not apply.  *See id.* at 167 (holding the adverse interest exception inapplicable even though the Hussein family "stole a material *portion* of" fraudulently obtained funds because some of the funds were "deposited in Iraq's treasury and used for political purposes" so "the interests of Iraq were not totally abandoned").

Here, we need not opine on the exact contours of the adverse interest exception—such as whether it requires actions akin to "outright theft or looting or

---

[16] The parties cite New York law in addressing the scope of this exception, but we agree with the Ninth Circuit that "this is a question of federal securities law, albeit one guided by (common law) agency principles."  *In re ChinaCast Educ. Corp. Sec. Litig.*, 809 F.3d 471, 475 n.4 (9th Cir. 2015).  *But see Belmont v. MB Inv. Partners, Inc.*, 708 F.3d 470, 494 (3d Cir. 2013) (holding that "the issue of imputation is determined by state law") (citing *O'Melveny & Myers v. F.D.I.C.*, 512 U.S. 79, 83 (1994)).  In determining when the scienter of individuals can be attributed to a corporation, we and our sister circuits have turned to principles of agency law, not the laws of the states in which each corporation is incorporated.  *See Suez Equity*, 250 F.3d at 101; *Makor Issues & Rts., Ltd. v. Tellabs Inc.*, 513 F.3d 702, 708 (7th Cir. 2008); *Adams*, 340 F.3d at 1107; *In re Omnicare, Inc. Sec. Litig.*, 769 F.3d 455, 473-75 (6th Cir. 2014).  Similarly here, in considering whether an exception to our general framework of scienter imputation applies, we turn to federal law.  Indeed, "looking to the idiosyncratic differences in state law would thwart the goal of promoting national uniformity in securities markets." *Steginsky v. Xcelera Inc.*, 741 F.3d 365, 371 (2d Cir. 2014).

embezzlement," *see Kirschner v. KPMG LLP*, 15 N.Y.3d 446, 466 (2010), or whether "the adverse interest rule collapses in the face of an innocent third party who relies on the agent's apparent authority," *In re ChinaCast*, 809 F.3d at 477.  At this stage in the litigation, Monk has more than adequately alleged facts from which it may be inferred that the fraud was for the benefit of not only Zhang and Liang, but Shanda as well.  The Complaint plausibly alleges that "the fraud *benefited* Shanda by preserving capital."  Reply Br. at 21.  Accordingly, the adverse interest exception does not apply, so Zhang and Liang's motives can be imputed to Shanda.  We thus agree with the district court that Monk has adequately pleaded scienter.

## IV.   Reliance

In civil cases where the government does not bring the action, "[r]eliance in a 10b-5 action ensures 'a proper connection between a defendant's misrepresentation and a plaintiff's injury.'"  *Arkansas Teachers Ret. Sys. v. Goldman Sachs Grp.*, 879 F.3d 474, 482 (2d Cir. 2018) (quoting *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 810 (2011) [hereinafter *Halliburton I*]).  Generally, a plaintiff may prove reliance, sometimes referred to as transaction causation, by showing "that he was [personally] aware of a company's statement and purchased [or sold] shares based on it" or by invoking the rebuttable fraud-on-the-market

presumption. *Id.* at 482-83 (internal quotation marks and citation omitted). This case presents the question whether the fraud-on-the-market presumption is available to minority-shareholder tenderers, such as Monk, who sold their shares in a freeze-out merger. We answer in the affirmative.

The fraud-on-the-market presumption relies on the "fundamental premise" that "'an investor presumptively relies on a misrepresentation' that 'was reflected in the market price at the time of his transaction.'" *Id*. at 483 (quoting *Halliburton I*, 563 U.S. at 813)). Because "the market 'transmits information to the investor in the processed form of a market price' we can assume . . . that an investor relies on public misstatements whenever he 'buys or sells stock at the price set by the market.'" *Halliburton I*, 563 U.S. at 811 (quoting *Basic*, 485 U.S. at 244, 247). Accordingly, the fraud-on-the-market theory "creates a rebuttable presumption that (1) misrepresentations by an issuer affect the price of securities traded in the open market, and (2) investors rely on the market price of securities as an accurate measure of their intrinsic value." *Hevesi v. Citigroup Inc.*, 366 F.3d 70, 77 (2d Cir. 2004).

But investors who trade at the market price are not the only ones who rely on the market price in making decisions to buy or sell. We think it reasonable to

presume that most investors who acquire or divest themselves of stock look at the market price to determine that stock's value. *See Basic*, 485 U.S. at 246-47 (explaining that the presumption that investors rely on market integrity is "supported by common sense" because "'it is hard to imagine that there ever is a buyer who does not rely on market integrity'") (quoting *Shclanger v. Four-Phase Systems Inc.*, 555 F. Supp. 535, 538 (S.D.N.Y. 1982)). Indeed, it is for this reason that we previously concluded that a plaintiff who purchases restricted shares at a discount in an off-market transaction can rely on the fraud-on-the-market presumption in establishing his reliance. *Black v. Finatra Cap., Inc.*, 418 F.3d 203, 210 (2d Cir. 2005).

We see no reason to reach a different conclusion here. A minority shareholder whose vote is not required for a merger to take place must still determine whether to tender his shares or to dissent and seek appraisal. And when material misrepresentations "pertain[ ] to shares that trade in a developed market," as here, such a person may be presumed to rely on the market price as an accurate measure of his stock's value when deciding to tender.[17] *Id.* at 209.

---

[17] Shanda does not contest the efficiency of the market for Monk's ADS on appeal. The dissent, however, contends that there was no developed market for Monk to rely on because the ADS price on the NASDAQ was constrained by the $7.10 merger price. The merger price surely influenced the market price.

The Complaint alleges that but for the claimed misrepresentations, the market price of Shanda's ADS would have been higher and Monk "would not have entered into the detrimental securities transaction"—namely, the forced sale that resulted in the forfeiture of his appraisal rights. *Lentell v. Merrill Lynch & Co., Inc.*, 396 F.3d 161, 172 (2d Cir. 2005) (quoting *Emergent Cap. Inv. Mgmt., LLC v. Stonepath Group, Inc.*, 343 F.3d 189, 197 (2d Cir. 2003)). To be sure, Monk's decision to dissent would not have prevented the Freeze-Out Merger. But Monk did have the choice whether to permit his shares to be sold in the Merger or to dissent and exercise his appraisal rights. And in such circumstances, and at this stage, he is entitled to the rebuttable presumption that in making this choice, he relied on the market price of his shares.

Shanda argues that Monk cannot rely on the presumption because he did not plead that he made the decision about whether to tender or seek appraisal "in reliance on either the contents of the proxy statements or the market price." Appellee's Br. at 32-33. But this is essentially the argument of the petitioners in *Basic* that "the fraud-on-the-market theory effectively eliminates the requirement

---

However, contrary to the dissent's assertion, it does not follow that the "only information that the market price conveyed . . . was the merger price" or that subsequent misstatements by Shanda could not have affected the price of the ADS. Indeed, in an efficient market, had the Proxies disclosed that the merger price severely undervalued the ADS, investors interested in seeking appraisal would presumably have purchased shares for that purpose, thereby driving up the market price.

that a plaintiff asserting a claim under Rule 10b-5 prove reliance." *Basic*, 485 U.S. at 243. In rejecting this argument and adopting the fraud-on-the-market presumption, the Supreme Court recognized that "[t]here is . . . more than one way to demonstrate the causal connection" between a defendant's misrepresentation and a plaintiff's injury. *Id.*

The Supreme Court's decisions pursuant to § 14(a) of the Exchange Act are instructive on this point.[18] (Indeed, the *Basic* Court cited *Mills v. Electric Auto Lite Co.*, 396 U.S. 375 (1970), which addresses § 14(a), in rejecting the petitioners' argument that the fraud-on-the-market theory essentially eliminates the requirement that a plaintiff prove reliance.) Pursuant to § 14(a), securities fraud plaintiffs pursuing claims regarding misleading statements in proxy materials can *prove* transaction causation by showing that the misstatements were material and that the proxy statements were an "essential link" in the transaction. *Mills*, 396 U.S. at 384-85. To be clear, Monk does not rely on *Mills*' essential link test in the context of this § 10(b) claim. But its availability to § 14(a) plaintiffs reinforces our

---

[18] Because § 14(a) and § 10(b) both require proof of transaction and loss causation, we frequently rely on cases involving the former cause of action to inform cases concerning the latter. *Grace v. Rosenstock*, 228 F.3d 40, 48 (2d Cir. 2000).

belief that Monk *may* rely on the *rebuttable* presumption of fraud-on-the-market at the pleading stage to allege transaction causation.

The dissent argues, to the contrary, that our reading of the § 14(a) precedent is incorrect and that the essential link test from *Mills* is not available in a freeze-out merger. But *Mills* expressly left open the question whether causation can be shown "where the management controls a sufficient number of shares to approve the transaction without any votes from the minority." 396 U.S. at 385 n.7. To be sure, the Supreme Court in *Virginia Bankshares, Inc. v. Sandberg*, 501 U.S. 1083 (1991), thereafter rejected the idea that the essential link test could be employed in the freeze-out merger context on the theory that corporate directors, acting from "a desire to avoid bad shareholder or public relations," would not have proceeded with the merger without the minority shareholders' proxies. *Id.* at 1101. But the Court's concern in that case was that the plaintiffs' argument "turn[ed] on inferences about what the corporate directors would have thought and done without the minority shareholder approval unneeded to authorize the action," and was thus overly "speculative." *Id.* at 1105. The Supreme Court both noted the inequity of declining to recognize a cause of action for "a class of would-be plaintiffs with claims comparable to those previously recognized," *id.* at 1104, and

52

made clear that the plaintiffs there did *not* claim, as Monk does here, that they lost an appraisal remedy by virtue of the defendants' materially misleading proxy statements, *id.* at 1108 n.14.

This court's precedent, moreover, is directly applicable. This court reaffirmed its existing § 14(a) precedent in the wake of *Virginia Bankshares*, holding that "transaction causation may be shown" in the freeze-out merger context "when a proxy statement, because of material misrepresentations, causes a shareholder to forfeit his appraisal rights by voting in favor of the proposed corporate merger." *Wilson v. Great American Indus., Inc.*, 979 F.2d 924, 931 (2d Cir. 1992). And we concluded in *Wilson* that "allowing [such an] action does *not* pose a threat of 'speculative claims and procedural intractability,' . . . because the forfeiture of state [remedies] is a question separate from the effectuation of the merger and does not require the court to guess how or whether the majority shareholders would have proceeded in the face of minority dissent." *Id.* at 932 (quoting *Virginia Bankshares*, 501 U.S. at 1105) (emphasis added); *see also Howing Co. v. Nationwide Corp.*, 972 F.2d 700, 708 (6th Cir. 1992) (adopting "loss-of-state-law-remedy theory" in context of freeze-out merger).

The dissent endeavors to distinguish *Wilson* by pointing to its affirmation that transaction causation may be shown when "a proxy statement, because of material misrepresentations, causes a shareholder to forfeit his appraisal rights *by voting in favor of the proposed corporate merger*."  979 F.2d at 931 (emphasis added).  Here, Monk does not allege whether he voted in favor of the Freeze Out Merger or took no action at all, thus permitting his shares to be sold.  But despite the language from *Wilson* on which the dissent relies, the class in that case was not limited to minority shareholders who voted in favor of the merger, but was defined as "all . . . shareholders at the time of the merger except the named defendants," *Wilson v. Great American Indus., Inc.*, 94 F.R.D. 570, 571-72 (N.D.N.Y. 1982).  The dissent's endeavor to distinguish *Wilson* is thus unavailing. [19]

Nor does the dissent's distinction make sense on its own merits.  Simply put, there is no reason for a minority shareholder to vote for or against a freeze-out merger whose success is guaranteed by the voting power of the majority.  A

---

[19] The dissent claims, as well, that in *Grace v. Rosenstock*, 228 F.3d 40 (2d Cir. 2000), we rejected a claim based on the forfeiture of appraisal rights because, *inter alia*, minority shareholders did not vote in favor of the merger.  But *Grace* did not address whether there is any distinction to be drawn between minority shareholders who vote in favor of a freeze-out merger and those who simply tender their shares. We held in *Grace* that the minority shareholders there could not rely on a theory of lost state appraisal rights because the plaintiffs' "appraisal suit was declared moot pursuant to their stipulation" earlier in the litigation and there was no other "available state-law remedy that [plaintiffs] forfeited in reliance on the . . . proxy statement."  228 F.3d at 50.

shareholder gains nothing by doing so. The failure to vote thus does not establish that a person in Monk's position made no decision—and thus did not rely on material misrepresentations. We therefore conclude that at this stage, Monk may rely on the fraud-on-the-market presumption. Like all § 10(b) defendants, Shanda and the Individual Defendants may rebut the presumption, *Waggoner v. Barclays PLC*, 875 F.3d 79, 99 (2d Cir. 2017), but Monk has adequately pleaded reliance.

## V. Loss Causation

Plaintiffs invoking § 10(b)'s private cause of action must prove not only transaction causation but also loss causation. *Lentell*, 396 F.3d at 172. Loss causation is "the causal link between the alleged misconduct and the economic harm ultimately suffered by the plaintiff." *Emergent Cap. Inv. Mgmt., LLC v. Stonepath Grp. Inc.*, 343 F.3d 189, 197 (2d Cir. 2003). It requires that "the subject of the fraudulent statement or omission was the cause of the actual loss suffered." *Castellano v. Young & Rubicam, Inc.*, 257 F.3d 171, 186 (2d Cir. 2001) (internal quotation marks and citation omitted).

As we have previously explained, "[t]he transaction effected by a proxy involves not only the merger of the corporate entities . . . but also the forfeiture of shareholder's appraisal rights," so "[t]he injury sustained by a minority shareholder powerless to affect the outcome of the merger vote is . . . the loss of

his appraisal right." *Wilson*, 979 F.2d at 931. In such a situation "loss causation may be established when a proxy statement prompts a shareholder to accept an unfair exchange ratio for his shares rather than recoup a greater value through a state appraisal." *Id.*

Monk has alleged that he suffered an economic loss when he accepted the tender price due to the misleading statements in the Proxies instead of receiving a higher value in an appraisal action. App'x 792, ¶ 277 ("Plaintiff and Class members suffered economic loss when they sold their Shanda Securities for less than those securities were worth. . . . Had the holders of Shanda Securities not been induced to sell at deflated prices they could have secured the fair value of their shares through appraisal."). Under our precedent, such allegations adequately plead loss causation.

Shanda argues, to the contrary, that Monk cannot allege loss causation because the tender price was not affected by the fraud and Monk does not allege that it was. But that misunderstands Monk's theory of loss causation. He does not claim that the price he received through the Freeze-Out Merger would have been higher if not for the misstatements. He alleges that he would have exercised his

appraisal rights and received greater value for his shares through an appraisal
action.

Shanda next argues that Monk has failed adequately to plead loss causation
because he has not adequately pleaded that he would have sought appraisal.  But
this argument conflates transaction and loss causation.  Whether the Proxies
induced the shareholders to forfeit their appraisal rights is a question of
transaction causation.  *Wilson*, 979 F.2d at 931 ("[L]oss causation or economic harm
to plaintiffs must be shown, as well as proof that the misrepresentations induced
plaintiffs to engage in the subject transaction, that is, transaction causation."); *see*
*Halliburton I*, 563 U.S. at 812 (contrasting loss causation and transaction causation).
Loss causation, in contrast, is adequately alleged by pleading that "the loss be
foreseeable and that the loss be caused by the materialization of [ ] concealed risk."
*Lentell*, 396 F.3d at 173 (emphasis omitted); *see also Castellano*, 257 F.3d at 186
("[L]oss causation has often been described as proximate cause, meaning that the
damages suffered by plaintiff must be a foreseeable consequence of any
misrepresentation.").  Here, Monk has plausibly alleged that the Proxies concealed
the higher value of Shanda, foreseeably resulting in the forfeiture of Monk's

appraisal rights, by means of the materially misleading statements that we have already discussed.

Shanda finally contends that Monk is improperly attempting to use the Exchange Act to obtain a "fair" price for his shares. Appellee's Br. at 27. But that is not how we read the Complaint. To be sure, the Complaint does use the term "fair value," *see, e.g.,* App'x 792, ¶ 277, and Shanda is correct that § 10(b) does not provide a private right of action for minority shareholders who claim they were harmed by an unfair merger as such. *Santa Fe Indus., Inc. v. Green*, 430 U.S. 462, 478 (1977). But Cayman law provides that "[a] shareholder in a Cayman-registered company who dissents from a merger . . . is entitled under section 238 of [Part XVI of the Companies Law] to be paid the 'fair value of his shares.'" App'x 266. Drawing all inferences in Monk's favor, we read the Complaint to use the term "fair value" to mean the amount per share that would have been awarded in an appraisal action, not an amount based on an independent evaluation of fairness.[20] App'x 756, ¶ 151 ("[Dissenting] rights provided investors with the ability to obtain an 'appraisal' of the 'fair value' of their shares.").

---

[20] To be clear, Monk was a Tenderer, and our discussion here concerns loss causation as it relates to Tenderers, and not Sellers who may have additional theories available to them.

We recognize that "[b]ecause the private right of action under § 10(b) and Rule 10b-5 is implied rather than express," *Grace*, 228 F.3d at 46, we must be careful not to expand § 10(b) actions beyond Congress's intent and must be especially alert to attempts to use § 10(b) to "interfere with state corporate law," *Santa Fe Indus.*, 430 U.S. at 479.  But "the fundamental purpose" of the Exchange Act is to "implement[] a philosophy of full disclosure."  *Id.* at 478 (internal quotation marks omitted).  So although "the fairness of the terms of the transaction is at most a tangential concern" of the Exchange Act, this is true only "once full and fair disclosure has occurred."  *Id.*; *see also Virginia Bankshares*, 501 U.S. at 1093 n.6 ("Although a corporate transaction's 'fairness' is not, as such, a federal concern, a proxy statement's claim of fairness presupposes a factual integrity that federal law is expressly concerned to preserve.").  And as we said in *Wilson*, "Congress' interest in the protection of investors and the free exercise of their voting rights . . . should not vary in degree according to the ability of the shareholder to affect the merger, if the vote nevertheless may result in a different sort of injury which full disclosure might have avoided."  *Wilson*, 979 F.2d at 931 (internal

quotation marks and citations omitted). We conclude that Monk has adequately

pleaded loss causation under a theory of lost appraisal rights. [21]

## VI.   Control Person

Section 20(a) "provides that individual executives, as 'controlling person[s]'

of a company, are secondarily liable for their company's violations of the Exchange

Act." *Altimeo Asset Mgmt. v. Qihoo 360 Tech. Co. Ltd.*, 19 F.4th 145, 152 (2d Cir. 2021)

(internal quotation marks omitted).   To state a claim of control person liability

under § 20(a), "a plaintiff must show (1) a primary violation by the controlled

person, (2) control of the primary violator by the defendant, and (3) that the

defendant was, in some meaningful sense, a culpable participant in the controlled

person's fraud." *ATSI*, 493 F.3d at 108.  The district court dismissed Monk's § 20(a)

claims because it concluded that Monk had failed adequately to plead a primary

violation.  *In Shanda III*, 2022 WL 992794, at *6.  Because the district court erred

---

[21] To the extent that Monk argues, in the alternative, that he lost the intrinsic fair value of his shares, this is not a viable theory of loss causation under the factual circumstances alleged in this case.  Even if the Proxies had not been misleading, Monk would not have received the intrinsic fair value of his shares because the Merger would have occurred over his dissent.  *Scattergood v. Perelman*, 945 F.2d 618, 624-25 (3d Cir. 1991).  There is thus no causal link between the Proxies and this loss.  Monk argues that without the misleading misstatements, he would have sold his stock or the Freeze-Out Merger would not have occurred.  But the Tenderers may not avail themselves of either argument.  *See Gurley v. Documation Inc¸* 674 F.2d 253, 257 (4th Cir. 1982) (prohibiting "deferred sales claims [because they] pose the same risk of abuse as the pure retention claims which are barred by *Blue Chip*"), *abrogated on other grounds by Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson*, 501 U.S. 350 (1991); *see also Virginia Bankshares*, 501 U.S. at 1105 (declining to extend § 14(a) claims to circumstances where "[c]ausation would turn on inferences about what corporate directors would have thought and done without the minority shareholder approval unneeded to authorize action").

when it held that there was no primary violation, we vacate the district court's dismissal of the § 20(a) claims.

## VII.  Leave to Amend

Monk also sought leave to amend his complaint by adding a Seller, Altimeo Asset Management ("Altimeo"), as an additional named plaintiff.  Federal Rule of Civil Procedure 15(a) provides that leave to amend "shall be freely given when justice so requires."  *In re Tribune Co. Fraudulent Conveyance Litig.*, 10 F.4th 147, 175 (2d Cir. 2021) (internal quotation marks and citations omitted).  And we review the "denial of leave to amend for abuse of discretion, unless the denial was based on an interpretation of law, such as futility, in which case we review the legal conclusion *de novo*."  *Panther Partners Inc. v. Ikanos Comm'n, Inc.*, 681 F.3d 114, 119 (2d Cir. 2012).

The district court did not explain why it denied leave to add Altimeo.  We disfavor denial of leave to amend without explanation, *see Cho v. Blackberry Ltd.*, 991 F.3d 155, 160 (2d Cir. 2021); *Lehmann v. Ohr Pharm., Inc.*, 830 F. App'x 349, 353 (2d Cir. 2020) (citing *Ronzani v. Sanofi S.A.*, 899 F.2d 195, 198 (2d Cir. 1990)), and such a denial can be an abuse of discretion because "refusal to grant leave must be based on a valid ground," *Hayden v. County of Nassau*, 180 F.3d 42, 53 (2d Cir. 1999).  Because the district court did not explain its basis for denying leave to amend, we

61

vacate the district court's order and remand for the district court to reconsider whether leave should be granted to add Altimeo.

## CONCLUSION

To summarize, we conclude that:

(1) These claims fall within the scope of § 10(b) because they concern "transactions in securities listed on domestic exchanges." *City of Pontiac*, 752 F.3d at 179 (quoting *Morrison*, 561 U.S. at 267).

(2) Monk has adequately pleaded the following actionable material misstatements:

   a. Descriptions of the March 2015 Projections as "reasonably prepared" and "best available estimates," App'x 773, ¶ 201, when basic accounting principles had not been followed in creating the March 2015 Projections;

   b. The March 2015 Projections themselves, as provided in the Proxies, because Shanda did not believe that the MIIM estimates within them were accurate;

   c. The description of the March 2015 Projections, as set forth in the Proxies, as a summary of the data provided to Merrill Lynch, when

the presentation in the Proxies excluded a year of data that had

been provided to Merrill Lynch; and

    d.  The statements in the Proxies describing the Merger as fair, when

this opinion did not fairly align with the information in Shanda's

possession at the time, and Shanda did not believe that the Merger

was fair when it issued the Proxies.

(3) Monk has adequately pleaded scienter based on the motive and

opportunity of Zhang and Liang who, although corporate insiders of

Shanda, had a motive to deflate the price of Shanda's stock to save money

as buyers.

(4) Monk has adequately pleaded reliance through his invocation of the

fraud-on-the-market presumption.

(5) Monk has adequately pleaded loss causation on the theory that he lost

the higher value he would have received if he had exercised his appraisal

rights.

(6) The control person claims should be reinstated.

(7) The district court abused its discretion by denying leave to add Altimeo

without explanation.

63

For the foregoing reasons, we **AFFIRM in part** and **VACATE in part** the judgment of the district court and **REMAND** for further proceedings not inconsistent with this opinion.

A True Copy

Catherine O'Hagan Wolfe, Clerk

United States Court of Appeals, Second Circuit

64